# GROUP EXHIBIT 1

| EXHIBIT | DATE | DESCRIPTION |
| --- | --- | --- |
| **1-A** | 06/15/2026 | State Court Action Complaint |
| **1-B** | 04/02/2024 | Complaint Exhibit A – The Daily Pilates, LLC's April 2, 2024 Franchise Disclosure Document |
| **1-C** | 11/19/2024 | Complaint Exhibit B – TDPCHARLOTTE1, LLC's November 19, 2024 Franchise Agreement with The Daily Pilates, LLC |
| **1-D** | 11/19/2025 | Complaint Exhibit C – Libretto Rescission Demand |
| **1-E** | 04/20/2026 | Complaint Exhibit D – Libretto Notice of Additional Breaches |
| **1-F** | 05/13/2026 | Complaint Exhibit E – TDP Response to Libretto Letters |

# EXHIBIT 1-A

26CV033240-590

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
26CV_____-640

TDPCHARLOTTE1, LLC a
North Carolina limited liability company, and
MIKE LIBRETTO,

Plaintiffs,

v.

THE DAILY PILATES, LLC, a Georgia
limited liability company, and LILY
COLLINS

Defendants.

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

## COMPLAINT FOR DAMAGES

Plaintiffs MIKE LIBRETTO and TDPCHARLOTTE1, LLC (collectively, "Plaintiffs") bring this Complaint against Defendants THE DAILY PILATES, LLC, and LILY COLLINS (collectively, "Defendants"), showing as follows:

### INTRODUCTION

1. This case is about the dark side of franchising: how an inexperienced franchisor induced Plaintiffs to invest hundreds of thousands in a new Pilates franchise with false promises of guaranteed income, then failed to provide any support, and even took affirmative actions to harm their business once they were under contract. This case concerns a) violations of the FTC Franchise Rule and violations of North Carolina and Georgia law, b) contractual claims governed by Georgia law, and c) common law tort claims.

2. The Daily Pilates, LLC ("TDP") is a franchisor. It is in the business of selling rights to operate businesses associated with TDP's trademarks. The enterprise of TDP consists of

1

(a) make knowingly false promises to induce persons with little to zero experience in the fitness industry to join the TDP franchise systems, (b) once they have signed, provide franchisees with little to no training or support while also treating them like employees who report directly to Defendant Collins, (c) charge franchisees over-market prices for required products and services that are unnecessary, ineffective, or even damaging to franchisees' businesses, (d) actively impair franchisees' businesses with ever changing pricing and system standards and a marketing approval process best-adapted for nineteenth century print media, (e) refuse to acknowledge franchisees' valid complaints and (f) put all resources into selling new franchises with no effort whatsoever on existing franchisees.

3. All franchisees outside of the greater Atlanta area, where the franchisor is based, learn in their first year of operation that the representations made to them were based on a business model significantly different than what they were sold. TDP studios are profitable only under certain conditions, including a pre-existing social media following in the tens or hundreds of thousands and a location in an area with abnormally high per capita income.

4. All of TDP's franchisees, including the profitable ones, suffer because TDP, ever focused on selling franchises in order to line its owner's pockets, never provides the support it promises to franchisees.

5. Plaintiff Mike Libretto is a South Carolina resident who owns 100% of TDPCharlotte1, LLC ("TDPCharlotte1"). He was fraudulently induced into executing a franchise agreement on November 19, 2024, on behalf of TDPCharlotte1 with The Daily Pilates, LLC for a studio in the Ballantyne neighborhood of Charlotte, NC. Mr. Libretto was also induced into signing a Personal Guaranty of TDPCharlotte1's obligations under the franchise agreement.

6. Plaintiffs bring this action to recover money damages representing the amount that Plaintiffs lost investing in and operating their TDP franchise, trebled pursuant to the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq*. (or the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, et seq.), plus their costs and attorneys' fees, and damages for breach of contract.

7. Plaintiffs bring this action against TDP and Lily Collins personally because she exerts complete control over TDP and used this control to commit the unlawful actions described herein in contravention of Plaintiffs' legal rights, and those wrongful actions caused Plaintiffs' injuries and losses.

**PARTIES**

8. Plaintiff Mike Libretto is an individual and a resident of York County, South Carolina.

9. Plaintiff TDPCharlotte1 is a limited liability company organized under the laws of the State of North Carolina. Its principal office address is 15205a John J Delaney Dr Charlotte, NC 28277. The only member of TDPCharlotte1 is Mike Libretto.

10. Defendant Lily Collins is a resident of Fulton County, Georgia. For all times relevant to this Complaint, Collins was an agent for and controlled the conduct of TDP. She personally induced Plaintiffs to execute an agreement with TDP and consistently lied to Plaintiffs about promised support that she knew TDP would never provide in order to keep them engaged as a franchisee.

11. Defendant TDP is a limited liability company organized under the laws of the Georgia. Its principal business address is 900 Dekalb Ave., #600, Atlanta, GA, 30307. TDP is owned by Lily Collins.

3

12. The Court has jurisdiction over the subject matter of the Complaint.

13. Defendants are subject to jurisdiction in this Mecklenburg County pursuant to N.C. Gen. Stat. § 1-75.4, *et seq.* because they engaged in the wrongful acts alleged in this Complaint and caused injury within Mecklenburg County; they provided goods or services in Mecklenburg County pursuant to contract; and they offered or sold, or participated in the offer or sale of franchises within Mecklenburg County.

14. Venue in this Court is proper in Mecklenburg County pursuant to N.C. Gen. Stat. § 1-80.

15. All conditions precedent to Plaintiffs' bringing this action have occurred or have been waived.

## FACTUAL ALLEGATIONS

### The TDP Franchise System

16. Pursuant to the Federal Trade Commission's Franchise Rule, 16 C.F.R. Part 436 (the "Franchise Rule"), franchisors are required to provide prospective franchisees with a Franchise Disclosure Document ("FDD") fourteen days before signing any agreement with them for a single franchised business (or "unit") or the development of multiple units.

17. Per the Franchise Rule, the FDD must disclose 23 different "items" of information to prospective franchisees so that they may make an informed decision, including information about: the nature of the franchise system; the principals who own and operate it; the costs of opening and operating a franchise; the existence of any recent litigation involving the franchisor; any consideration or "kickbacks" the franchisor or its affiliates receive based on required purchases of goods or services by franchisees; the material terms of the franchise agreement and all fees that

4

may be charged by the franchisor; the existence of other franchisees and their locations; and, if the franchisor elects to provide it, the representations about the financial performance of its outlets (whether company-owned or franchised), or projections of a prospective franchisee's performance with a full and fair presentation of those figures, the factual bases supporting them, and the percentage of franchisees that are realizing these financial performance representations.

18. Under Section 436.7 of the Franchise Rule, the FDD must be current as of the franchisor's most recent fiscal year and must be revised at least quarterly to reflect material changes.

19. The Daily Pilates began as a single Pilates studio opened by Lily Collins in the Inman Park neighborhood of Atlanta, Georgia in 2015. Pilates is a method of mind-body exercise that was developed in Germany in the early twentieth century by Joseph Pilates. Pilates is not patented and it relies on generic equipment, including dumbbells, mats, exercise balls, and "Reformer" machines, none of which are proprietary.

20. Ms. Collins founded TDP in 2020 after she was approached about franchising by two of her clients in Atlanta, GA, Nikki Hightower and Jessica Davis. TDP began selling franchises for The Daily Pilates studios in 2021.

21. Ms. Collins had no prior experience in franchising.

22. Lily Collins exerts total control over TDP. She completely dominates decisions relating to finances, policy, and business practices of TDP, such that TDP has no independent identity.

23. TDP executed its first franchise agreement in 2022 with former clients Nikki Hightower and Jessica Davis (despite not having provided them with a franchise disclosure document). The TDP studio for the first franchisee is located in the Buckhead Village District, a

5

premier real-estate development in the Buckhead neighborhood of Atlanta. The location was chosen by Ms. Hightower and Ms. Davis, who had retained their own real estate agent.

24. Ms. Hightower and Ms. Davis are, among other things, social media influencers who each had approximately 100,000 followers on Instagram at the time they executed a franchise agreement.

25. The Buckhead Unit opened in 2023 and quickly became successful thanks to the esthetic design choices of its owners and their pre-established social media presence. In fact, the revenues of the Buckhead Unit substantially exceeded those of the original The Daily Pilates studio in Inman Park, which is the only company/affiliate unit in the franchised system.

26. As the Buckhead location grew and gained notoriety, Ms. Collins sought to take credit for her first franchisee's success. In April 2025, Collins contributed to a marketing publication created by Buckhead Village that incorrectly depicted her as the owner of the Buckhead TDP studio. Collins knew the depiction was incorrect but did not correct it. The article was retracted on or about April 24, 2025, after the publisher was contacted by the true owners.

27. In 2024, TDP sold a franchise for a TDP location in Milton, Georgia. Milton is an affluent municipality in north Fulton County, Georgia. The owner of the Milton TDP franchise, Kelly Travis Hamm, is a reality television star and social media influencer, with an Instagram following of over 70,000 followers.

28. In a shameless effort to boost the TDP brand and sell more franchises, Lily Collins, through TDP, sought to use Ms. Hamm's likeness without her permission and without compensation to market TDP's brand and sell more franchisees. Ms. Collins was forced to remove all publications bearing Ms. Hamm's image upon threat of legal action.

6

29. Ms. Collins prominently uses her own image on the website for TDP and encourages and/or mandates TDP's franchisees to advertise on social media using her image.

30. The Buckhead and Milton locations are the only profitable TDP franchises in the TDP franchise system. Their success is entirely due to 1) the affluent markets in which the studios are located and 2) the personal social media efforts of their owners, who already had established large followings on social media before they signed their franchise agreements with TDP.

<div align="center"><strong>Sale of Franchise to Plaintiffs</strong></div>

31. Mike Libretto first learned of TDP in 2023 through a targeted Instagram ad that his wife saw. Mr. Libretto and his wife then contacted Mr. Collins to inquire about opening a TDP studio in Charlotte, NC.

32. In 2023, prior to providing a franchise disclosure document, Ms. Collins made several financial representations to Mr. Libretto about the TDP franchise system and what revenue he could expect to achieve operating a TDP franchised business.

33. Specifically, Ms. Collins told Mr. Libretto in several conversations that he could expect to achieve $54,000 per month in revenue with profits around $24,000 a month by operating a TDP franchise.

34. Ms. Collins also represented that the Inman Park TDP Studio under her direct control since 2015 realized sales of approximately $60,000 per month, which was untrue.

35. The information provided by Ms. Collins in 2023, lacked many of the disclosures, admonitions, and statements that are legally required to be made with financial performance representations in Item 19 of a franchisor's FDD pursuant to the Federal Trade Commission's Franchise Rule, 16 C.F.R. 436. The information was also given verbally in violation of the Franchise Rule, which prohibits all verbal financial performance representations.

<div align="center">7</div>

36. Defendants did not provide Mr. Libretto with a franchise disclosure document ("FDD") until April 23, 2024. A true and accurate copy of the FDD is attached as **Exhibit A**.

37. The FDD provided to Mr. Libretto did not contain the cover sheet disclosure statement required by NC Gen. Stat. § 66-95.

38. The FDD that was provided to Mr. Libretto made financial performance representations in Item 19 of the FDD that were based off the original studio Ms. Collins had operated since 2015, which has a unique relationship with the TDP, and the Buckhead franchisee, a business materially different from the business opportunity sold to Our Clients.

39. The FDD did not explain or mention that the Buckhead location's success had been driven by a uniquely affluent location and by the pre-existing social media presence of its founders. Mr. Libretto and his wife did not have a large social media presence before Plaintiffs executed a franchise agreement with TDP.

40. On November 19, 2024, in reliance upon the representations, omissions, and disclosures described above and at the Defendants' request, the Plaintiffs signed a franchise agreement with TDP (the "Franchise Agreement") and wired $40,000 to TDP as a franchise fee for a territory in Charlotte, NC. A true and accurate copy of the Franchise Agreement is attached as **Exhibit B**.

41. TDP did not obtain a surety bond or establish a trust account in North Carolina when it sold a franchise to Plaintiffs as required by NC Gen. Stat. § 66-96.

42. TDP did not make the required filings with the North Carolina Secretary of State pursuant to NC Gen. Stat. § 66-97 when it induced Plaintiffs to sign the Franchise Agreement.

8

43. TDP has never had a registered agent in North Carolina and therefore did not identify an agent to receive service of process in the state on the Franchise Agreement, in violation of NC Gen. Stat. § 66-99.

44. On December 11, 2024, TDPCharlotte1 signed a ten-year lease for its current location at 14835 Ballantyne Village Way, Charlotte, NC 14835. The lease was personally guaranteed by Mr. Libretto. Plaintiffs would not have executed the lease but for the representations and other actions of Defendants.

45. TDPCharlotte1 opened to the public for business as a The Daily Pilates studio on June 14, 2025.

46. Since opening, TDPCharlotte1 has never come close to realizing the revenue projections made in Item 19 of the FDD provided to Mr. Libretto in 2024.

47. TDPCharlotte1 has over $125,000 since it has been in operation.

**Breaches of the Franchise Agreement by Franchisor**

48. TDP has continued numerous singular and running breaches of the Franchise Agreement, actions that have contributed to the unprofitability of TPCharlotte1's business and thus caused Plaintiffs to suffer financial harm, to wit:

49. TDP never provided any training to TDPCharlotte1 prior to its opening for business, in violation of Section 5.A. of the Franchise Agreement. On the date scheduled by TDP for training, Ms. Collins appeared at TDPCharlotte1's locations, took pictures, arranged flowers, exchanged pleasantries with staff, and left a day early.

50. TDP had also promised to waive royalties for the first month of TDPCharlotte1's operation because it had required TDPCharlotte1 to pay, and TDP had collected, payment for Mrs.

9

Libretto's training certification. TDP reneged on the promise and charged full royalties for TDPCharlotte1's first month of operation.

51. The "training" that was provided to TDPCharlotte1 consisted of an employee reading the then current version of the operations manual to its franchisee on a video call.

52. TDP promised to hold an in-person training for new teachers at TDPCharlotte1's location in May 2025, but TDP, through Ms. Collins, cancelled the event without notice to Plaintiffs. When asked, TDP falsely claimed that it had cancelled the event because TDPCharlotte1 had not provided marketing materials for the event in time to be reviewed. In truth, TDPCharlotte1 had submitted its marketing materials for the event three months in advance. Furthermore, TDP approved materials for an identical event for another franchisee, in Lancaster, PA, during the same time period. The franchised location in Lancaster, PA has still not opened.

53. Ms. Collins told Plaintiffs they would have to, without compensation, fulfill a personal agreement Ms. Collins had made to train a client and potential employee of TDPCharlotte1. Ms. Collins even held TDPCharlotte1 responsible for drafting a written agreement with the client and potential employee (recommending they use ChatGPT) despite Ms. Collins having already accepted payment. The client cancelled her membership with TDPCharlotte1 due to her poor experience dealing with Ms. Collins.

54. TDP collects a "brand fee" from TDPCharlotte1, which is 2% of gross revenue. The "brand fee" is a relabeling of the "marketing fund" described in Section 10.C. of the Franchise Agreement.

55. TDP has refused Plaintiffs' request (also made by other TDP franchisees) to provide accurate information about how the Marketing Fund/Brand Fee has been spent since October 2025.

10

56. TDP's expenses from the Marketing Fund have been a) hosting an event in Florida, where TDP has no franchised or affiliate units, with an equipment provider, Bala, that gifted equipment to "influencers" who have no influence in Charlotte, NC; b) hosting a "Marketing Event" in Charleston, SC, another state with no TDP presence, that was in truth a thinly disguised baby shower for the then-pregnant Ms. Collins; and c) nation-wide advertising and content placement to boost the image of Ms. Collins and sell new franchises.

57. TDP has consistently refused to approve social media posts by TDPCharlotte1 in a timely matter, taking weeks or even months to respond to proposed advertisements, and capriciously denying them so late that TDPCharlotte1 has no time to supplement them.

58. TDP's unreasonably slow and capricious advertising and marketing approval process has directly harmed TDPCharlotte1's sales. For instance, TDP refused to approve any of TDPCharlotte1's proposed marketing materials for the entire month of October 2025 without ever providing an explanation, then failed to appear for a monthly scheduled marketing meeting without notice of cancellation or rescheduling. TDP meanwhile approved marketing materials for other franchisees during the same period.

59. TDP refused for over a month to publish TDPCharlotte1's business phone number on the The Daily Pilates website hosted by TDP, feigning refusal due because the proposed voicemail did not meet TDP's approval; yet the affiliate location owned by Ms. Collins did not even have working voicemail during the same time period.

60. TDP has encouraged TDPCharlotte1 to sell discounted studio membership packages to clients in order to generate additional revenue, but it simultaneously prohibited TDPCharlotte1 from selling discount memberships.

11

61. TDP has provided unsolicited equipment, such as a sock stand, to TDPCharlotte1's studio as a seeming gift, only to charge the franchisee later at a cost substantially higher than what the same generic product could have been obtained for elsewhere.

62. TDP has required that TDPCharlotte1 purchase from it weight sets manufactured by a third party, Bala, but not paid for shipping charges for the weights, so that TDPCharlotte1 was subsequently invoiced for such charges by the manufacturer.

63. TDP has increased the costs it charges TDPCharlotte1 for goods, such as socks, that TDP requires the franchisee to purchase from TDP after those goods have been ordered and after those goods have arrived several weeks late.

64. TDP constantly changes its operations manual without notice, then threatens default notices and fines for noncompliance. For instance, TDP insisted, approximately six months after TDPCharlotte1 opened for business, that it switch from cash to accrual basis accounting as a way to hide TDPCharlotte1's losses from other prospective franchisees, and when TDPCharlotte1 refused, TDP informed them it would not offer them performance initiatives available to other franchisees.

65. TDP sold a franchise for a location a short drive from TDPCharlotte1's studio in a neighborhood where several of TDPCharlotte1's clients and instructors live. TDP approved this new franchised location, which will open this summer, to offer memberships and classes at lower rates than those permitted for TDPCharlotte1. TDP is thus incentivizing potential customers of TDPCharlotte1 to join the newer franchised location to TDPCharlotte1's detriment.

66. TDP suffers from abnormally high staff turnover due to the tyrannical management-style of Ms. Collins. As a consequence, TDPCharlotte1 and other franchisees are constantly having to work with new personnel at TDP to address problems, and the problems are never resolved.

67. TDP has a single employee, Leah Zucker, nominally in charge of managing the entire franchise system. Ms. Zucker is a former Pilates instructor for Ms. Collins who, like Ms. Collins herself, had no prior experience in franchising before assuming her current position. Ms. Zucker's primary role is to provide a communication screen between Ms. Collins and TDP's franchises.

68. For several months, Ms. Collins has refused to interact with existing franchisees herself, including TDPCharlotte1, while on maternity leave from TDP, which she owns, but she was meanwhile providing interviews and appearing on social media assisting a new TDP franchisee's opening.

69. Due to all the aforementioned unreasonable requirements, failures of performance, and hostile actions of TDP, Plaintiffs had Defendants personally serviced on November 19, 2025, with their demand for rescission of the Franchise Agreement. The demand letter also gave notice of TDP's numerous breaches of the Franchise Agreement. A true and accurate copy of the November 19, 2025, demand letter is attached as **Exhibit C**.

70. Under Section 15.A. of the Franchise Agreement, the franchisee may terminate the Agreement by giving notice and an opportunity to cure within thirty (30) days.

71. Far more than 30 days have passed since Plaintiffs gave Defendants notice of TDP's breaches of the Franchise Agreement through its demand letter.

72. Having received no response from Defendants in five months, Plaintiffs sent another letter to Defendants, through counsel, on April 20, 2025, outlining *additional* breaches of the Franchise Agreement. A true and accurate copy of the April 20, 2025, letter is attached as **Exhibit D**.

13

73. Defendant finally responded to Plaintiffs through counsel in writing on May 13, 2026, saying that Plaintiffs' "allegations do not warrant much response, especially through counsel[; t]hey are mostly the types of day-to-day gripes that the parties should be able to resolve between themselves." Defendants then made false accusations that Plaintiffs had been unwilling to communicate directly and not through counsel. Thus, to date, Defendants have not substantively responded to Plaintiffs' demand letter, despite frequent communication between counsel for the parties in related litigation. A true and accurate copy of Defendants' May 13, 2026, letter is attached as **Exhibit E**.

74. Meanwhile, starting in May, Defendants began heavily marketing for a new TDP franchisee in Charlotte as though it were the first TDP business in the metropolitan area.

75. Following Defendants' dismissive response, Plaintiffs contacted Defendants directly to request a phone call. Ms. Collins accepted, and on or about May 28, 2026, Ms. Collins and Mr. Libretto agreed on material terms for Plaintiffs to terminate the Franchise Agreement and cease using TDP's trademarks. Under the agreed terms, each party would waive claims against the other, and the franchise agreement would be terminated, including any post-termination covenants not to compete.

76. In the weeks following the call, Plaintiffs continued to operate as a The Daily Pilates franchised business. Defendants, however, continued marketing the new TDP franchisee in Charlotte, NC at the expense of Plaintiffs' business. Defendant cut Plaintiffs off from marketing initiatives, and Defendant also encouraged the newer franchisee to poach Plaintiffs' employees.

77. With Defendants' knowledge and encouragement, the new TDP franchisee in Charlotte has been contacting Plaintiffs' employees directly to offer them jobs and even attended

a class before May 28, 2026, at Plaintiffs' studio for purposes of evaluating one of Plaintiffs' trainers in an audition surreptitiously arranged in coordination with Defendants. To date, at least one of Plaintiffs' employees has accepted the offer.

78. Despite having already effectively terminated the Franchise Agreement, and despite having already agreed on material terms for the termination of same, Defendants emailed Plaintiffs on June 9, 2026, to request $350,000 in a lump sum payment as consideration for terminating the agreement and waiving any post-termination noncompetition covenants.

79. To date, Plaintiffs have paid Defendants approximately $64,033.92 in fees and royalties, all in reliance of Defendants' material and knowing misrepresentations.

80. To date, Plaintiffs have suffered approximately $320,000.00 in damages due to the actions of Defendants. This figure does not include attorneys' fees and legal costs.

<u>**COUNT I**</u>
<u>**Violation of the North Carolina Business Opportunity Sales Act**</u>
<u>**N.C. Gen. Stat. § 66-94, et seq**</u>

81. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

82. A "business opportunity" under the North Carolina Business Opportunity Sales Act ("NCBOSA") means the sale of products, equipment, supplies, or services for the purpose of enabling the buyer to start a business, and in which the "seller guarantees that the purchaser will derive income from the business opportunity which exceeds the price paid for the business opportunity; or that the seller will refund all or part of the price paid for the business opportunity, or repurchase any of the products, equipment, supplies or chattels supplied by the seller, if the purchaser is unsatisfied with the business opportunity and pays to the seller an initial, required consideration which exceeds two hundred dollars ($200.00)." N.C. Gen. Stat. § 66-94(3).

15

83.     As detailed above, the Defendants represented to Plaintiffs that they would derive income from their TDP franchises business that would exceed the price Plaintiffs paid for the opportunity (i.e. the $40,000 franchise fee).

84.     Under the NCBOSA, a business opportunity seller who makes a representation set forth in N.C. Gen. Stat. § 66-94(3) must either have obtained a surety bond issued by a surety company in North Carolina or have established a trust account with a licensed and insured bank or savings institution in North Carolina in an amount not less than $50,000 in the favor of the State of North Carolina.

85.     Defendants have never obtained a surety bond nor established a trust account with any institution in North Carolina.

86.     Sellers subject to the NCBOSA who seek to qualify for a "responsible sellers exemption" must file with the N.C. Secretary of State two copies of a document signed under oath by the seller or one authorized to sign on behalf of the seller containing the following information:

> (1) The name of the seller and whether the seller is doing business as an individual, partnership, or corporation;
> (2) The principal business address of the seller;
> (3) A brief description of the products, equipment, supplies, or services being sold or leased by the seller; and
> (4) A statement which explains the manner in which each of the requirements of subsections (a) or (b) of this section are met.

 N.C. Gen. Stat. § 66-94.1

87.     Defendants have never filed any documents with the N.C. Secretary of State to qualify for the responsible sellers exemption under N.C. Gen. Stat. § 66-94.1.

88.     Under the NCBOSA, sellers of business opportunities are required to provide prospective purchasers a ***cover sheet*** before the purchasers sign a business opportunity contract or

16

before the seller accepts consideration from the seller, whichever is first, that includes the following statement:

**DISCLOSURES REQUIRED BY NORTH CAROLINA LAW**

> The State of North Carolina has not reviewed and does not approve, recommend, endorse or sponsor any business opportunity. The information contained in this disclosure has not been verified by the State. If you have any questions about this investment, see an attorney before you sign a contract or agreement.

N.C. Gen. Stat. § 66-95.

89.	Under § 66-95 of the NCBOSA, the disclosure document provided to purchasers must comply "in all material respects with 16 C.F.R. Part 436" or contain information similar to that provided in a typical franchise disclosure document, which is itemized in subsection (2) of the statute.

90.	The FDD provided to Mr. Libretto did not have the required disclosure as a cover sheet.  Nor did it contain the required disclosure in the end of the FDD as one of many state addenda.

91.	As detailed above, the FDD provided to Mr. Libretto did not comply in all material respects with 16 C.F.R. Part 436, the FTC Franchise Rule.

92.	Under § 66-97 of the NCBOSA, business opportunity sellers must file two copies of their disclosure document compliant with § 66-95 with the N.C. Secretary of State "prior to placing any advertisement or making any other representations to prospective purchasers in this State[, and they] shall update this filing as any material change in the required information occurs, but no less than annually." Such sellers must also file an irrevocable consent appointing the Secretary of State to receive service of process in any civil suit against the seller.

17

93. Defendants never filed any disclosure document or irrevocable consent to jurisdiction with the N.C. Secretary of State.

94. Under § 66-98 of the NCBOSA, sellers may not "represent that the business opportunity provides income or earning potential of any kind unless the seller has documented data to substantiate the claims of income or earning potential and discloses this data to the prospective purchaser at the time such representations are made."

95. As explained above, the Defendants had no documented data to substantiate the claims they made to Mr. Libretto. Defendants' "data" was based on a materially different business model than was sold to Mr. Libretto.

96. Plaintiffs have been injured by the Defendants' violations of the NCBOSA.

97. Defendants are liable to Plaintiffs for their violations of the NCBOSA in an amount exceeding $25,000.00, the exact amount to be determined at trial.

## COUNT II
### Violation of the North Carolina Deceptive Trade Practices Act
### N.C. Gen. Stat. § 75-1, et seq

98. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

99. A violation of the NCBOSA constitutes an unfair practice under N.C. Gen. Stat. 75-1.1 of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"). N.C. Gen. Stat. § 66-100(e).

100. A person injured by a violation of the NCUDTPA is entitled to damages that are treble the amount fixed by the verdict. N.C. Gen. Stat. § 75-16.

101. Defendants' violations of the NCBOSA constitute violations of the NCUDTPA.

18

102. Defendants violated the NCUDTPA by: (1) making verbal all verbal financial performance representations to Plaintiffs in violation of the FTC Rule, (2) providing (additional) unsubstantiated Financial Performance Representations in the FDD that were not supported by a reasonable basis as required by the FTC Rule; (3) failing to provide an updated FDD that contained all material information and without material omissions; and (4) otherwise breaching their duties of care to Plaintiffs, including, but not limited to, selling Plaintiffs a franchise on the promise of supports services that did not exist.

103. Defendants are liable to Plaintiffs for their violations of the NCUDTPA in an amount exceeding $25,000.00, the exact amount to be determined at trial.

### COUNT III
### Breach of Duty
### O.C.G.A. § 51-1-6

104. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

105. Defendants violated 16 C.F.R. Part 436, the FTC Franchise Rule, by making verbal all verbal financial performance representations to Plaintiffs outside of the FDD, providing unsubstantiated Financial Performance Representations in the FDD that were not supported by a reasonable basis, failing to provide an updated FDD that contained all material information and without material omissions; and selling Plaintiffs a franchise on the promise of supports services that did not exist.

106. A violation of the FTC Franchise Rule is a breach of a legal duty pursuant to O.C.G.A. § 51-1-6.

19

107. Plaintiffs have suffered damages as a direct and proximate result of Defendants' breach of duty in that they have been assessed phantom fees that were not properly disclosed before they executed the Franchise Agreement.

108. Plaintiffs have suffered damages as a direct and proximate result of Defendants' breach of duty in that they are threatened with termination for not complying with contrived standards that were not properly disclosed before they executed the Franchise Agreement.

109. Plaintiffs are entitled to recover their damages from Defendants in an amount exceeding $25,000.00, the exact amount to be determined at trial.

## COUNT IV
**Violations of Georgia's Fair Business Practices Act ("GFBPA"),**
**O.C.G.A. § 10-1-390, et seq.**

110. Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

111. Defendants' violation of the GUDTPA is a violation of the GFBPA.

112. Defendants' violation of the FTC Franchise Rule is a violation of the GFBPA.

113. Plaintiffs have suffered damages as a direct and proximate result of Defendants' willful violations of the GFBPA.

114. Plaintiffs are required under the GFBPA to provide a copy of any lawsuit claiming violations of said Act to the Attorney General of Georgia. It is unclear to Plaintiffs whether that requirement applies to arbitration proceedings, but Plaintiffs will provide a copy of this Demand, once it has been filed, to the Attorney General in an abundance of caution.

115. Plaintiffs are required under the GFBPA to provide an ante litem notice to Defendants before commencing an "action." It is unclear to Plaintiffs whether the ante litem

requirement applies to arbitration proceedings, but Plaintiffs have served Defendants with an ante litem notice contemporaneously with this demand in an abundance of caution.

116. Under the GFBPA, Plaintiffs are entitled to recover damages in an amount exceeding $25,000.00, the exact amount to be determined at trial.

<div align="center">

**COUNT V**
**Fraud/Intentional Misrepresentation**

</div>

117. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

118. All the misrepresentations and omissions of material fact described above, as well as Defendants' representations made in the FDD and outside of the FDD, also constitute common law fraud in the inducement and negligent misrepresentation.

119. As described supra, Defendants falsely represented material facts and omitted material facts that were necessary in order to make the representations not misleading with the intent to induce Plaintiffs to act upon the information in entering into a Franchise Agreement.

120. Defendants committed fraud by intentionally making known, material misrepresentations to induce Plaintiffs to sign the Franchise Agreement and thus make substantial investments of time and money that would benefit Ms. Collins at the Plaintiffs' expense.

121. The above-described statements and material omissions made by Defendants in order to induce Plaintiffs to invest in a TDP franchise were both false and willfully made with knowledge of their falsity (or ignorance as to the truth or falsity of the representations).

122. Plaintiffs reasonably relied on Defendants' representations and material omissions and have been damaged by the fraud perpetrated by Defendants.

21

123. Plaintiffs are entitled to recover damages against Defendants in an amount exceeding $25,000.00, the an exact amount to be determined at trial.

## COUNT VI
### Negligent Misrepresentation

124. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

125. Defendants owed Plaintiffs a duty to use reasonable care in making representations that they knew Plaintiffs were relying upon.

126. Defendants owed Plaintiffs a duty of care because they were supplying information for the guidance of Plaintiffs in a transaction in which Defendants had a pecuniary interest and which transaction was in the course of their business.

127. As described supra, Defendants breached their duty of reasonable care by negligently supplying false and misleading information (or omitting material facts), which Plaintiffs reasonably relied upon.

128. As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount exceeding $25,000.00, the exact amount to be determined at trial.

## COUNT VII
### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

129. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

130. Section 18.B. of the Franchise Agreement provides that interpretation of the Agreement is to be governed by Georgia law.

22

131.    The elements of a breach of contract claim under Georgia law are: (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages.

132.    Georgia law recognizes an implied covenant of good faith and fair dealing associated with all contracts.

133.    Furthermore, under Georgia law, every term and provision of any agreement shall be interpreted so that the requirements or obligations imposed therein are reasonable.

134.    TDP has breached the Franchise Agreement and the implied covenant of good faith and fair dealing by failing to meet its obligations to TDPCharlotte1 and failing to act in good faith.

135.    Plaintiffs are entitled to recoup their damages suffered as a result of TDP's breaches of the Franchise Agreement.  TDP is therefore liable to TDPCharlotte1 in an amount exceeding $25,000.00, the exact amount to be determined at trial.

## COUNT VIII
### Unjust Enrichment

136.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

137.    Plaintiffs have conveyed money to Defendants in the form of a franchise fee and various other fees, including royalties.

138.    Defendants have been unjustly enriched by its retention of the money paid to it by Plaintiffs, which Defendants have not earned and which should rightfully be returned to Plaintiffs.

## COUNT IX
### Attorney's Fees

139.    Plaintiffs repeat and reallege the allegations set forth in all preceding paragraphs as if fully set forth herein.

23

140.    Plaintiffs are also entitled to recover their attorney's reasonable fees and costs incurred as a result of this case pursuant to Section 18.F. of the Franchise Agreement and applicable law, including the North Carolina Business Opportunity Sales Act, the North Carolina Deceptive Trade Practices Act, and the Georgia Fair Business Practices Act.

## DEMAND FOR JURY

Plaintiffs demand a trial by jury.

## PRAYER

**WHEREFORE**, Plaintiffs respectfully request the following relief:

1.    That Plaintiffs be granted rescission of any contractual relationship with Defendants;

2.    That Plaintiffs be awarded rescission damages in the amount of their investment in a TDP franchise;

3.    That Plaintiffs be awarded their full amount of actual damages incurred due to the actions of Defendants;

4.    That Plaintiffs be awarded damages pursuant to North Carolina or Georgia statutory law;

5.    That Plaintiffs be released from any further obligation to any Defendants, including but not limited to, any Franchise Agreement or Guaranty thereof;

6.    That Plaintiffs be awarded their complete costs, disbursements, and reasonable attorneys' fees, to the extent authorized under applicable law; and

7.    That Plaintiffs be awarded such other and further relief as the adjudicator may deem just and appropriate.

*Signature on Following Page*

24

This 15th day of June, 2026.

<div align="right">

/s/ *Ryan M. Arnold*
Ryan M. Arnold (NC Bar No. 52010)
GALLIVAN, WHITE, & BOYD, P.A.
One Morrocroft Centre
6805 Carnegie Blvd., Suite 200
Charlotte, NC  28211
(704) 552-1712 – Phone
(704) 362-4850 – Fax
rarnold@gwblawfirm.com


CLARK HILL PLC

A. Binford Minter
Georgia Bar No. 117844
bminter@clarkhill.com
*Pro hac vice forthcoming*

3630 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326

</div>

# EXHIBIT 1-B

**FRANCHISE DISCLOSURE DOCUMENT**

# The Daily Pilates®

<div align="right">

The Daily Pilates LLC
a Georgia limited liability company
900 Dekalb Avenue, Suite 600
Atlanta, Georgia 30307
(404) 254-0167
thedailypilatesfranchise@gmail.com
www.thedailypilates.com

</div>

The franchise is for the right to own and operate a fitness business that offers Pilates reformer classes and related wellness services under the "The Daily Pilates®" name, business system and marks. The total estimated investment necessary to begin operation of a Studio ranges from $318,106 to $630,026. This includes $57,245 to $86,734 that must be paid to the franchisor or its affiliates prior to opening.

If you enter into a multi-unit development agreement under which you will commit to developing an agreed upon number of The Daily Pilates studios (typically either 2 or 3), the total investment necessary to acquire the multi-unit development rights under the typical multi-unit development agreement is $90,000 or $120,000, all of which must be paid to the franchisor. When you sign the muti-unit development agreement, you will also sign your first franchise agreement; please also refer to the initial investment described in the paragraph above.

This Disclosure Document summarizes certain provisions of your franchise agreement, multi-unit development agreement, and other information in plain English. Read this Disclosure Document and all accompanying agreements carefully. You must receive this Disclosure Document at least 14 calendar days before you sign a binding agreement with, or make any payments to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no government agency has verified the information contained in this document.**

You may wish to receive your Disclosure Document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact The Daily Pilates LLC at 900 Dekalb Avenue, Suite 600, Atlanta, Georgia 30307, (404) 254-0167.

The terms of your contract will govern your franchise relationship. Don't rely on this Disclosure Document alone to understand your contract. Read all of your contract carefully. Show your contract and this Disclosure Document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this Disclosure Document can help you make up your mind. More information on franchising, such as "*A Consumer's Guide to Buying a Franchise*," which can help you understand how to use this Disclosure Document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising. There may also be laws on franchising in your state. Ask your state agencies about them.

<div align="center">

**ISSUANCE DATE: April 2, 2024**

</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibit F. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit G includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only The Daily Pilates® business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a The Daily Pilates® franchisee?** | Item 20 or Exhibit F lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

# What You Need To Know About Franchising *Generally*

**<u>Continuing responsibility to pay fees</u>**. You may have to pay royalties and other fees even if you are losing money.

**<u>Business model can change</u>**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**<u>Supplier restrictions</u>**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**<u>Operating restrictions</u>**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**<u>Competition from franchisor</u>**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**<u>Renewal</u>**. Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**<u>When your franchise ends</u>**. The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

## Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit A.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

## Special Risks to Consider About *This* Franchise

Certain states require that the following risk(s) be highlighted:

1.  <u>**Out-of-State Dispute Resolution:**</u> The franchise agreement and multi-unit development agreement require you to resolve disputes with us by arbitration or litigation only within 50 miles of our then-current principal place of business (currently, Atlanta, Georgia). Out-of-state arbitration or litigation may force you to accept a less favorable settlement for disputes.  It may also cost you more to arbitrate or litigate with us in the state where our corporate headquarters are located than in your home state.

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.**

(a)     A prohibition on the right of a franchisee/developer to join an association of franchisees.

(b)     A requirement that a franchisee/developer assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in the Michigan Franchise Investment Act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)     A provision that permits a franchisor to terminate a franchise/the development rights prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee/developer to comply with any lawful provision of the franchise agreement or multi-unit development agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(d)     A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e)     A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f)     A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee/developer from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)     A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(i)     The failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(ii)     The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii)    The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)    The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)    A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)    A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor shall, at the request of a franchisee/developer, arrange for the escrow of initial investment and other funds paid by the franchisee/developer until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

Any questions regarding this notice should be directed to:

<div align="center">

**State of Michigan**
**Consumer Protection Division**
**Attn: Franchise**
**670 G. Mennen Williams Building**
**525 West Ottawa**
**Lansing, Michigan 48933**
**Telephone Number: (517) 373-7117**

</div>

*Note*: Despite subparagraph (f) above, we intend to fully enforce the arbitration provisions of the Franchise Agreement and Multi-Unit Development Agreement. We believe that paragraph (f) is preempted by federal law and cannot preclude us from enforcing these arbitration provisions. We will seek to enforce this section as written.

**THE MICHIGAN NOTICE APPLIES ONLY TO FRANCHISEES/DEVELOPERS WHO ARE RESIDENTS OF MICHIGAN OR LOCATE THEIR FRANCHISES IN MICHIGAN.**

# TABLE OF CONTENTS

**ITEM**                                                                                          **PAGE**

Item 1. THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES....2
Item 2. BUSINESS EXPERIENCE................................................................................................4
Item 3. LITIGATION ...................................................................................................................4
Item 4. BANKRUPTCY ..............................................................................................................4
Item 5. INITIAL FEES ................................................................................................................4
Item 6. OTHER FEES..................................................................................................................6
Item 7. ESTIMATED INITIAL INVESTMENT .........................................................................13
Item 8. RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES...........................17
Item 9. FRANCHISEE'S OBLIGATIONS .................................................................................20
Item 10. FINANCING ..................................................................................................................23
Item 11. FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND
        TRAINING.....................................................................................................................24
Item 12. TERRITORY...................................................................................................................36
Item 13. TRADEMARKS..............................................................................................................38
Item 14. PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION...........................40
Item 15. OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
        FRANCHISE BUSINESS ..............................................................................................41
Item 16. RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL..................................42
Item 17. RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION ...........43
Item 18. PUBLIC FIGURES ........................................................................................................50
Item 19. FINANCIAL PERFORMANCE REPRESENTATIONS ...............................................51
Item 20. OUTLETS AND FRANCHISEE INFORMATION ......................................................54
Item 21. FINANCIAL STATEMENTS.........................................................................................56
Item 22. CONTRACTS .................................................................................................................56
Item 23. RECEIPTS......................................................................................................................56

## EXHIBITS

Exhibit A     List of State Agencies / Agents for Service of Process
Exhibit B     Franchise Agreement
Exhibit C     Multi-Unit Development Agreement
Exhibit D     State Addenda and Agreement Riders
Exhibit E     Table of Contents – Operations Manual
Exhibit F     List of Current Franchisees; List of Former Franchisees
Exhibit G     Financial Statements
Exhibit H     Sample General Release
Exhibit I     Form of Lease Addendum
Exhibit J     Receipts

1

# Item 1.
## THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES

To simplify the language in this franchise disclosure document (this "Disclosure Document"), "Franchisor," "we," "us," or "our" means The Daily Pilates LLC, the franchisor. "You" means the person or entity who buys the franchise from us. If you are a corporation, partnership, limited liability company, or other business entity, your owners will have to guarantee your obligations and be bound by the provisions of the Franchise Agreement or the Development Agreement (each as defined below), as applicable, and other agreements as described in this Disclosure Document.

## The Franchisor

We were formed as a Georgia limited liability company on August 24, 2020. Our principal business address is 900 Dekalb Avenue, Suite 600, Atlanta, Georgia 30307. Our principal telephone number is (404) 254-0167. We operate under our corporate name and the name "The Daily Pilates®." We have never owned or operated any Studios (defined below), but our affiliate, LC Fitness, LLC, has owned and operated one The Daily Pilates studio since September 2015. We have not offered franchises in any other lines of business. We began offering franchises for The Daily Pilates studios in March 2021, and our sole business is to sell and service those franchises.

## Our Parents, Predecessors and Affiliates

We have no predecessors. There are no parents or affiliates of The Daily Pilates LLC that provide products or services to Studio franchisees or that have granted franchises for this or any other brand. Our registered agent for service of process is Lily Collins, 650 Killian Street, Atlanta, Georgia, 30312. We have identified other agents for service of process in Exhibit A.

## The Franchise

We grant franchises (each a "Franchise") for the development, ownership and operation of fitness studios that: (a) are currently identified by the trademark *The Daily Pilates*® (the "Brand") and such other trademarks and commercial symbols we periodically designate (together with the Brand, the "Marks"); (b) offer and sell Pilates and wellness classes, instruction and private sessions, various retail items, and other services and products we authorize from time to time; (c) reflect distinctive interior design and display procedures, color schemes, and décor ("Trade Dress"); and (d) operate using a designated "System" which includes the Marks, Trade Dress, and certain of our other intellectual property including trade secrets, copyrights, confidential and proprietary information, and designated training and exercise methods and know-how, fitness equipment, furniture and fixtures, marketing, advertising, sales promotions, cost controls, accounting and reporting procedures, and personnel management systems, each of which we may replace, further develop, or otherwise modify or discontinue from time to time (each a "Studio"). To acquire a Franchise, you will be required to execute a franchise agreement and related documents (a "Franchise Agreement"), the current form of which is attached as Exhibit B to this Disclosure Document. Each Studio is governed by a separate Franchise Agreement.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 36 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

We may, in our discretion, offer you the right to enter into a multi-unit development agreement (the "Development Agreement"), under which you would agree to acquire an agreed-upon number of franchises and open, according to an agreed-upon schedule (the "Development Schedule"), a corresponding number of Studios, each under a separate Franchise Agreement, within a specifically described and agreed upon geographic territory (the "Development Area"). Our current form of Development Agreement is attached as <u>Exhibit C</u> to this Disclosure Document. When you sign the Development Agreement, you will also sign your first Franchise Agreement on our current form. For each subsequent Franchise you acquire, you must sign our then-current form of Franchise Agreement, which may be materially different than the form we were using when you signed the Development Agreement.

If you are not a natural person (for example, a corporation, limited liability company or other legal entity), your owners will be required to sign an agreement (the form of which is attached to the Franchise Agreement as Attachment A) under which they each personally assume and guarantee your obligations under the Franchise Agreement and, if applicable, the Development Agreement. If an owner signing the guaranty is married and their spouse is not an owner of you, we will require the non-owner spouse to sign the guaranty for the limited purposes of (a) assuming the confidentiality and non-competition obligations under the Franchise Agreement and (b) acknowledging that their spouse's execution of the guaranty may impact the marital assets (including the non-owner spouse's interests in martial assets). The non-owner spouse is not otherwise obligated under the guaranty.

## Market Competition and Applicable Regulations

Studios offer services and products to the general public throughout the year. The target market is health and wellness-minded adults. The market for fitness instruction services is highly competitive. Your competition may include other fitness studios, local gyms, and similar businesses that offer Pilates classes and instruction or that provide fitness services and products generally, including national and regional boutiques and big-box chains. You may also encounter competition from other Studios operated by us, our affiliate or other Brand franchisees.

In addition to laws applicable to businesses generally, your Studio will be subject to various federal, state and local laws and regulations affecting the business, including those relating to membership agreements, zoning, access for the disabled, and safety and fire standards. Some states require that health and fitness facilities have a staff person available during all hours of operation that is certified in basic cardiopulmonary resuscitation or other specialized medical training. Some state or local laws may also require that health and fitness facilities have an automated external defibrillator and/or other first aid equipment on the premises. Certain states have passed laws relating specifically to automatic renewal of contracts, the operation of health and fitness facilities and membership contracts used by those facilities, including laws requiring bonds if a health and fitness facility sells memberships valid for more than a specified time period, requiring facility owners to deposit into escrow certain amounts collected from members before the facility opens (so-called "pre-sale" memberships), and imposing other restrictions on memberships sold by health and fitness facilities. You must learn about and comply with all such laws and regulations. You are also responsible for obtaining any licenses or permits required for operating your Studio.

<div align="center">3</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<div align="center">

**Item 2.**
**BUSINESS EXPERIENCE**

</div>

**Lily Collins - Chief Executive Officer**

Ms. Collins has been our Chief Executive Officer since August 2020, and the Chief Executive Officer of LC Fitness, LLC since September 2015. She is based in Atlanta, Georgia.

<div align="center">

**Item 3.**
**LITIGATION**

</div>

No litigation is required to be disclosed in this Item.

<div align="center">

**Item 4.**
**BANKRUPTCY**

</div>

No bankruptcy is required to be disclosed in this Item.

<div align="center">

**Item 5.**
**INITIAL FEES**

</div>

**Initial Franchise Fee**

You will pay us an initial franchise fee of $50,000 (the "Initial Franchise Fee"). If you sign additional Franchise Agreements, the Initial Franchise Fee will be reduced to $40,000 for the second Franchise Agreement and $30,000 for the third and each subsequent Franchise Agreement. Initial Franchise Fees are uniformly imposed, will be due and payable when you sign the Franchise Agreement, and will be non-refundable once we sign the Franchise Agreement.

**Authorized Instructor Training Program Fee**

You must engage at least one Pilates-certified instructor at all times, which may be you or your Operations Manager (as defined in Item 15) (an "Authorized Instructor"). If you are not able to meet this obligation when your Studio is ready to commence operation, you or the person you designate to be your Authorized Instructor must become Pilates-certified by successfully completing our instructor training program in Atlanta, Georgia, prior to opening (the "Authorized Instructor Training Program"). The Authorized Instructor Training Program fee is $2,499 per person attending the program, plus a flat fee of $1,000 if you request, and we agree, to conduct the training program at your Studio (plus reimbursement of our associated travel expenses). While you are required to have at least one Authorized Instructor for your Studio, we expect that most Studios will engage between 8 to 12 Authorized Instructors. Therefore, we anticipate that you will pay us between $2,499 and $30,988 for our provision of the Authorized Instructor Training Program, which does not include any reimbursement of our travel fees. This fee is due and payable in a lump sum before the training begins, is uniformly imposed, and is not refundable once paid. You may also choose to pass on the cost of the Authorized Instructor Training Program to your attendee(s), in which case your expenditures will be lower.

<div align="center">

4

</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

### Site Review Fee

There is no charge for us to review the first site you propose for your Studio. However, if you submit multiple proposed sites to us for our review, we may charge you a site review fee of $2,000 plus our out-of-pocket costs (estimated to be approximately $500) for each such site after the first one. If assessed, each site review fee will be due and payable, in a lump sum, when you submit the site for our consideration and is not refundable. Since we expect to use our discretion in determining whether you will be required to pay a site review fee (based, for example, on your efforts to lock in a site that we already approved and your reasons for submitting alternative sites), this fee is not uniformly imposed.

### Technology Fee

You are required to pay us a recurring technology fee (a "Technology Fee") that we will use, at our discretion, to fund the development, licensure and acquisition of various technologies and technology-related systems used in the operation of Studios. We reserve the right to increase the Technology Fee to reflect changes in the costs and availability of technology. The current Technology Fee is $352 per year and is currently paid annually. The first full year's Technology Fee will be due and payable, in a lump sum, before you commence the pre-sale of memberships to your Studio (typically two weeks prior to the Studio's initial opening). The Technology Fee is uniformly imposed and is not refundable.

### Music Licensing Fee

You must pay us a pro rata share of the fee we pay to music licensing companies for the right to play designated music in Studios (the "Music Licensing Fee"). We reserve the right to change the amount of the Music Licensing Fee to reflect changes in the costs of acquiring licenses from third-party licensors. The current Music Licensing Fee is $394 per year, currently paid annually. The first full year's Music Licensing Fee will be due and payable, in a lump sum, before you commence the pre-sale of memberships to your Studio (typically two weeks prior to the Studio's initial opening). The Music Licensing Fee is uniformly imposed and is not refundable.

### Initial Inventory

Prior to opening your Studio, you must purchase from us at least four types of branded opening inventory we specify, in minimum quantities we require from time to time (the "Initial Inventory"), which may include items such as apparel, t-shirts, grip socks, props, seasonal items and related accessories. The cost of the Initial Inventory can vary between $2,000 and $3,000, which we may require you to pay immediately upon execution of your Franchise Agreement. We will provide you with a list of available Initial Inventory options before you purchase any Initial Inventory. This payment is due in a lump sum, is uniformly imposed, and is not refundable.

### Development Fee

If we sign a Development Agreement with you, the required number of Studios required to be developed will be subject to your and our mutual agreement and will vary depending on your qualifications and the size and location of the agreed upon Development Area. When you sign the Development Agreement, you will be required to pay us a development fee (the "Development

5

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Fee"), the amount of which will be the full amount of the Initial Franchise Fee for each Studio you agree to develop as described in the paragraph entitled Initial Franchise Fee above. We typically expect developers to commit to developing either two or three Studios. If you agree to develop two Studios, you will pay us a Development Fee of $90,000; if you agree to develop three Studios, you will pay us a Development Fee of $120,000; and if you agree to develop more than three Studios, the Development Fee will increase by an additional $30,000 for each such additional Studio. As you sign Franchise Agreements in satisfaction of your obligations under the Development Agreement, we will credit a portion of your Development Fee toward satisfaction of the Initial Franchise Fee due under the applicable Franchise Agreement until the aggregate amount of these credits equals the amount of the Development Fee you paid. The Development Fee is due and payable, in a lump sum, when you sign the Development Agreement and is not refundable. The Development Fee is uniformly calculated (based on the number of Studios you commit to develop), but because the number of required Studios will vary depending on the developer's and our agreement, it is not uniformly imposed.

### Item 6.
### OTHER FEES

| Name of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty | 6% of Gross Revenue[1] | Currently monthly, by the 15th day of each calendar month | See note 1 below for the definition of Gross Revenue. |
| Temporary Royalty | $750 per week | Payable weekly commencing on the day of closure | Due only if you temporarily close your Studio without our consent. Payments continue on the same day of each week following closure until reopening or termination of the Franchise Agreement. The amount will not be prorated; if your Studio is closed for only a part of a week (measured from the day of closure), you will be required to pay the full week's amount. |
| Non-Compliance Fee | One percentage point increase to your Royalty rate | Payable at the same time as Royalty (currently monthly, by the 15th day of the month) | Payable if we determine that you are not in compliance with your obligations under the Franchise Agreement, until we determine that you have cured all deficiencies. |
| Marketing Fund Contribution | 2% of Gross Revenue | Payable at the same time as Royalty (currently monthly, by the 15th day of the month) | We may, on notice to you, adjust the amount of your required contributions to the Marketing Fund, subject to the Marketing Expenditure Cap.[2] |

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Name of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Local Advertising Cooperative | As determined by each Local Advertising Cooperative (not currently charged) | As determined by Co-Op, but estimated to be monthly | Depending on the make-up of the Local Advertising Cooperative, we may have or control the majority of the votes. Your required contributions will be part of and subject to the Marketing Expenditure Cap. |
| Local Advertising | The greater of (a) $1,500 or (b) 2% of the prior month's Gross Revenue | Monthly | This is the amount you are required to spend to promote your Studio in the local market, but we reserve the right to have you pay this amount to us (in which case we will spend it for you). We may, on notice to you, adjust your spending requirement subject to the Marketing Expenditure Cap. |
| Authorized Instructor Training Program (Pilates certification) | $2,499 per person, plus a flat fee of $1,000 if conducted at your Studio (plus reimbursement of our expenses) | As incurred | Payable if you elect to pay for additional personnel to become Authorized Instructors, or we are required to train a replacement Authorized Instructor. We are not responsible for any costs or expenses incurred by any person attending our training programs. The $1,000 flat fee will be incurred if you request, and we agree, to provide such training at your Studio, in which case you will also be required to reimburse us for the costs and expenses of our representatives in providing such training. The amount shown is the current amount, but it is subject to change in our sole discretion based on the costs of providing such instruction and other variables. Our affiliate offers additional voluntary training programs that allow instructors to receive additional instruction and certifications. Fees for attendance in those programs are typically paid by the trainees unless you agree with the trainee to pay or reimburse them. |

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Name of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Franchise Conference or Additional Trainings | Not currently charged | As invoiced | We may implement annual franchise conferences for our franchisees and provide additional mandatory training programs from time to time on new topics, for your replacement personnel, or as refreshers for previously trained people. We reserve the right to charge a fee for any such programs. |
| Additional Email Domain Fee | $84 per year for each domain in excess of 3 | As incurred | Your Technology Fee includes access to "thedailypilates.com" email addresses for up to 3 people in your organization. If you request, and we are willing to provide, email addresses for additional persons, you will pay a fee for each such person. The fee shown is the current amount, but it is subject to change based on our costs of controlling the email domain. |
| Vendor Payments | Actual costs | As invoiced | We may negotiate master agreements with approved suppliers or mandated vendors which require that we pay the vendor directly on your behalf. If we do, you will pay us the amounts due to the vendor, and we will, in turn, pay the vendor on your behalf. |
| Additional Assistance or Training Fee | $1,000 per day plus reimbursement of expenses | As incurred | Payable only if we agree to provide, at your request, additional assistance that we are not required under the Franchise Agreement to provide or if we do not feel that a Required Trainee has completed the Initial Training Program to our satisfaction. The amount shown is our current fee, but this fee is subject to change based on the assistance we provide and the associated costs. |
| Renewal Fee | 50% of the then-current or last Initial Franchise Fee | 30 days prior to expiration of Franchise Agreement | Payable if you choose to renew your Franchise Agreement and we allow you the opportunity to renew. |
| Transfer Fee | Franchise Agreement: 50% of the then-current Initial Franchise Fee<br><br>Development Agreement: $5,000 | Prior to transfer | The transfer fee covers our Transfer-related expenses, including for document review and preparation, evaluation of the proposed transferee, and training. |

8

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK   Document 1-1   Filed 07/08/26   Page 42 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Name of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Insurance | Amount of premiums we pay on your behalf plus an administrative fee of up to 10% of the premiums paid | As incurred | Payable if, after you open, you fail to maintain the required insurance coverage for your Studio, and we elect to purchase it for you. |
| Late Payment Fee | $100 per occurrence, plus interest on the unpaid amounts | As incurred | Payable if your checks are returned to us due to insufficient funds or if there are insufficient funds in the business account you designate to cover our withdrawals. |
| Interest on Late Payments | The lesser of the highest legal rate or 2% per month | As incurred | Payable on all overdue amounts. |
| No-Show Fee | The greater of (i) $500 per individual or occurrence, or (ii) the actual costs of rescheduling travel | As incurred | Payable only if your trainees register for a training program and fail, with less than 2 weeks' notice, to show up at the scheduled time or complete the majority of the program. |
| Tax Reimbursement | Actual costs, plus an administrative fee not to exceed 10% of taxes we pay | As incurred | You must reimburse us for any taxes that we are required to pay to any state taxing authority on account of the operation of your Studio or payments that you make to us (other than our own income taxes). |
| Interim Operations of your Studio | 10% of Gross Revenue, plus reimbursement of our costs and expenses | As incurred | Payable if we exercise our rights under the Franchise Agreement to assume operations of your Studio on an interim basis. |
| Indemnification | Will vary based on amounts awarded and our actual costs | As incurred | You must reimburse us if third party claims are made against us based on the operation of your Studio. |
| Costs of Curing Post-Term Deficiencies | Actual costs | As incurred | Payable if you fail to comply with your post-term obligations to de-identify your Studio, and we elect to do it for you. |
| Inspection and Testing for Unapproved Suppliers, Products or Equipment | $500, plus reimbursement of our actual costs | As incurred | Payable if, at your request, we agree to consider approving a vendor that is not then currently approved, including the cost of testing the vendor's products and inspecting its facilities. |
| Relocation Fee | $1,000, plus our actual expenses | Upon submission of a request to relocate | Payable if you request our permission to relocate your Studio. If we do not approve your relocation request, we will refund the fee less our actual expenses. |

9

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Name of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Operations Manual Access Violation Fee | $10,000 per occurrence | As incurred | Payable if you compromise the confidentiality of the Operations Manual, including by allowing unauthorized users access to it. |
| Lost Revenue Damages | Will vary under circumstances | Within 15 days of expiration or termination | Payable if the Franchise Agreement is terminated by you without cause or by us because of your breach. See note 3 below for how lost revenue damages are calculated. |
| Audit | Actual costs of auditing your books and records | As incurred | Payable if we audit of your books and records because you fail to timely furnish required reports, or if the audit reveals that you have understated or underpaid the amounts you owe by more than 2%. |
| Reinspection Expense Reimbursement | Reimbursement of the costs of inspection (currently estimated not to exceed $500 per failed inspection) | As incurred | Payable if our inspection of your Studio reveals that your Studio is not operating in accordance with the Franchise Agreement, and we subsequently re-inspect your Studio to determine whether you have cured the deficiency. |
| Costs and Attorneys' Fees | Actual costs | As incurred | You must pay our costs and attorney's fees if we are the prevailing party in any arbitration or litigation with you. |

**Explanatory Notes:**

1.　　*Gross Revenue*. "Gross Revenue" means the total revenue generated by or from the operation of your Studio, regardless of collection, in whatever form and whether or not in compliance with this Agreement. "Gross Revenue" does not include (a) any sales tax and equivalent taxes that are collected by you for or on behalf of any governmental taxing authority and paid thereto, or (b) the value of any allowance issued or granted to any client of your Studio that is credited in good faith by you in full or partial satisfaction of the price of the approved products or services offered in connection with your Studio, or (c) the provision of the Authorized Instructor Training Program at the Studio if we provide the training at the Studio and receive all fees associated therewith. Revenue from the purchase or redemption of gift certificates, gift cards or similar programs is calculated as part of Gross Revenue in accordance with our then-current guidelines for such programs. Gross Revenue also includes all insurance proceeds you receive to replace revenue that you lose from the interruption of your Studio due to a casualty or other event covered by business interruption or similar insurance coverage.

If, through no fault of our own, we are unable to determine your Gross Revenue, we may debit your account for 110% of the average of the last three Royalty and Marketing Fund contributions that we debited. If the amounts that we debit from your account under this paragraph

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

are less than the amounts you actually owe us (once we have determined the true and correct Gross Revenue), we will debit your account for the balance on the day we specify. If the amounts that we debit from your account are greater than the amounts you actually owe us, we will credit the excess against the amounts we otherwise would debit from your account during the following week. You must pay us any costs we incur (including reasonable attorneys' fees) in attempting to collect payments you owe or in otherwise enforcing the terms of the Franchise Agreement.

2.      *Marketing Expenditure Cap*. The amounts we require you to contribute to the Marketing Fund, spend on local marketing, and contribute to a Local Advertising Cooperative may not, in the aggregate during any particular calendar month, exceed five percent (5%) of your Studio's Gross Revenue (the "Marketing Expenditure Cap").

11

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

3.	*Lost Revenue Damages*. Lost Revenue Damages are to compensate us solely for lost future Royalty fees and Marketing Fund contributions that would have been paid if not for the termination and are calculated as follows: (1) the number of calendar months in the Measurement Period, multiplied by (2) the sum of the Royalty fee percentage and the Marketing Fund contribution percentage, multiplied by (3) the average monthly Gross Revenue of your Studio during the 24 full calendar months immediately preceding the termination date, minus (4) any cost savings we experienced as a result of the termination (or, if the termination is based on your unapproved closure of your Studio, the 36 full calendar months immediately preceding the closure); provided, however, that (i) if, as of the termination date, your Studio has not opened for business or had operated for fewer than 12 full calendar months, the average monthly Gross Revenue will equal the 24-month average Gross Revenue of all Studios that had operated for the full 24 calendar months immediately preceding termination of the Franchise Agreement; (ii) if, as of the termination date, your Studio operated for at least 12 but fewer than 24 full calendar months, monthly average Gross Revenue will equal the highest monthly Gross Revenue achieved by your Studio during the period in which it operated; and (iii) if the termination was based on the unapproved closure of your Studio, average monthly Gross Revenue, as described above, would be measured from closure date rather than the termination date.

Payments due to us or our affiliates will be paid by wire transfer of immediately available funds, electronic debit of your designated bank account, or such other method as we determine. All payments will be made subject to applicable withholding and other taxes. You are required to sign all documents we or your bank requires to authorize us to debit your designated bank account for all such amounts (the "EFT Authorization"), and your EFT Authorization must remain in full force and effect at all times the Franchise Agreement is in effect and for 30 days following its expiration or termination.

Except as described in this Item 6, all fees are imposed under the Franchise Agreement and collected by and payable to us or our affiliates. Fees paid to us or our affiliates are not refundable unless otherwise noted. Fees paid to third parties may be refundable based on your individual arrangements with those parties.  Fees may not be uniform for all franchisees.

[*Remainder of Page Intentionally Left Blank*]

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 46 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# Item 7.
## ESTIMATED INITIAL INVESTMENT

## YOUR ESTIMATED INITIAL INVESTMENT
## (FRANCHISE AGREEMENT)

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to Be Made |
|---|---|---|---|---|
| Initial Franchise Fee [1] | $50,000 | Lump sum | On execution of Franchise Agreement | Us |
| Schematic Drawings | $1,000 - $2,000 | Lump sum | Before opening | Approved Supplier |
| Initial Training Program – Travel & Living Expenses [2] | $2,000 - $12,000 | As incurred | Prior to training | Unaffiliated Suppliers |
| Authorized Instructor Training Program [3] | $0 - $5,000 | As incurred | Prior to training | Us, Unaffiliated Suppliers |
| Music Licensing Fee [4] | $394 | Lump sum | As invoiced | Us |
| Furniture, Fixtures, Fitness & Other Equipment [5] | $115,000 - $210,000 | As arranged | As arranged | Approved and Unaffiliated Suppliers |
| Rent & Security Deposit [6] | $20,000 - $48,000 | As arranged | As arranged | Landlord |
| Leasehold Improvements [7] | $80,000 - $200,000 | As arranged | As arranged | Unaffiliated Suppliers |
| Professional Fees & Permits [8] | $7,000 - $17,000 | As arranged | Before opening | Unaffiliated Suppliers |
| Computer System, Point-of-Sale System, and Technology Fee [9] | $3,712 - $5,632 | As incurred | As incurred | Us, Unaffiliated Suppliers |
| Opening Inventory & Supplies [10] | $4,000 - $6,000 | As incurred | As incurred | Unaffiliated Suppliers |
| Grand Opening Advertising [11] | $6,000 - $12,000 | As incurred | As incurred | Unaffiliated Suppliers |
| Insurance Premiums [12] | $2,000 - $4,000 | As arranged | As arranged | Unaffiliated Suppliers |
| Signage [13] | $6,000 - $15,000 | As incurred | As incurred | Unaffiliated Suppliers |
| Deposits [14] | $1,000 - $3,000 | As arranged | As incurred | Unaffiliated Suppliers |
| Additional Funds – 3 Months [15] | $20,000 - $40,000 | As arranged | As incurred | Unaffiliated Suppliers, Employees |
| **TOTAL ESTIMATED INITIAL INVESTMENT:** | **$318,106 - $630,026** | | | |

13

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**Explanatory Notes:**

Except as otherwise indicated, amounts shown as payable to us or our affiliates are not refundable under any circumstances. Amounts payable to third parties will be paid according to the terms of your agreement with the respective third parties.

1. *Initial Franchise Fee*. The amount shown is the Initial Franchise Fee for your first Franchise Agreement. We offer discounts for subsequent Franchise Agreements you sign, whether or not you do so pursuant to a Development Agreement. For your second Franchise Agreement, the Initial Franchise Fee is $40,000, and for your third and each subsequent Franchise Agreement, the Initial Franchise Fee is $30,000.

2. *Initial Training Program – Travel & Living Expenses; Instructor Training*. Before opening your Studio, your Managing Owner and your Operations Manager (if different than your Managing Owner) must attend and complete to our satisfaction our Initial Training Program. The Initial Training Program will consist of (i) operations and business management training for you (and your Operations Manager, if applicable) for no fewer than two days, which will take place at a location designated by us (most likely in Atlanta, Georgia), which may be your Studio ("Operations Manager Training"); and (ii) a secondary opening business assistance training, which will take place at your Studio for one to two days within the 30 days prior to your Studio's opening ("Opening Business Assistance Training," and together with Operations Manager Training, the "Initial Training Program").

3. *Authorized Instructor Training Program*. You are required to have at least one Pilates-certified instructor at your Studio. The low end of the range shown will apply if you or someone you engage is already certified in Pilates instruction. The high end of the range assumes you or your designee will need to become Pilates-certified and includes our fees for providing the Authorized Instructor Training Program necessary to become certified as described in Item 5 of this Disclosure Document and the travel and related expenses likely to be incurred by the person seeking to become an Authorized Instructor. We assume you will bear those expenses on behalf of your Authorized Instructor. The high end of the range also assumes that any additional Authorized Instructor Training Program fees incurred by additional trainees are paid by such trainees directly (and not by you on their behalf).

4. *Music Licensing Fee*. This represents your first years' music licensing fee as described in Item 5 of this Disclosure Document.

5. *Fitness Equipment; Furniture, Fixtures & Other Equipment*. The expense for all fitness equipment will vary depending on the class choices offered by your Studio and the amount of reformers needed. The low estimate is based on the purchase of 8 reformers and various props used for the provision of reformer Pilates classes. The high estimate is based on the purchase of approximately 6 additional reformers and other equipment and related items used your Studio.

6. *Rent & Security Deposit*. We assume that all Studios will be in premises that are leased, not purchased, by the Studio's owner. The cost of leasing a location for your Studio will vary significantly depending upon the market in which the proposed site is located and the existing building condition of the proposed site. A suitable building for a Studio will range in size from

14

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

approximately 1,400 square feet to 2,100 square feet. Local market conditions, changes in the economy, and inflation will all contribute to your real property costs. The location of the parcel of real property, its relationship to and the nature of any adjoining uses, and its accessibility will affect both its size and price. Lease agreements vary, but usually require the lessee to pay for maintenance, insurance, taxes and any other charges or expenses for the land and building and the operation of your Studio. This item includes an estimate of monies that would typically be required to be paid to the landlord from execution of the lease to 3 months after opening. If you are required to make a rent deposit, such deposit may be refundable under the terms of your lease.

7.　　*Leasehold Improvements*. To avoid excessive construction costs, we require that you pick contractors carefully by obtaining several competitive bids beforehand. These estimates do not include extensive exterior renovations since they are not typically necessary. Lease build-out requirements are based on our prototypical plans and may include, but not be limited to, building walls, installing doors, building wall dividers, installing flooring and building counters. Some landlords may be willing to waive rent payments for a period of time, or provide tenant improvement allowances; however, there is no guarantee that your landlord will do so.

8.　　*Professional Fees & Permits*. This item is an estimate of the fees likely to be paid to architects, lawyers and accountants during the development of your Studio.

9.　　*Computer System, POS System, and Technology Fee*. This estimate includes the required components of the Computer System (as defined in Item 11), including a laptop and iPad, as well as three months' of required payments to access to our approved suppliers' hosted software services (currently $620 to $760 per month). This estimate also includes your first annual payment of the Technology Fee (currently $352). These estimates do not include any service or maintenance costs. Additional information on the current requirements for the Computer System are noted in Item 11.

10.　　*Opening Inventory & Supplies*. The low end of the range shown includes your purchase of Initial Inventory (as described in Item 5 of this Disclosure Document) and basic supplies for the operation of your Studio (such as cleaning products), while the high end includes a restock of certain merchandise and basic supplies for the operation of a Studio during the first 3 months of your Studio's operations. The amount you spend on opening inventory and supplies will vary depending on the specific retail items you choose to purchase prior to opening your Studio, in quantities that we prescribe in the Operations Manual or otherwise in writing.

11.　　*Grand Opening Advertising*. You must conduct grand opening activities with our assistance and approval and using materials and programs we approve. We will determine the amount of your grand opening marketing spend based on factors we determine, such as the extent of familiarity with the Brand concept in the area where you will be operating your Studio.

12.　　*Insurance*. You must, at your own expense, keep in force insurance policies for your Studio. We may change types and amounts of coverage. This estimate is based on our current requirements and covers the first year of insurance payments. Insurance costs can vary widely, based on the area in which your Studio is located, your experience with the insurance carrier, the loss experience of the carrier, deductibles and coverage, and other factors beyond our control. Your lease agreement may require higher insurance limits than those stated above. You may have to prepay a portion of the first year's premiums for insurance.

<center>15</center>

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

13.     *Signage*. Signage pricing will depend on permitting requirements and the amount of signage needed or allowed for your specific Studio location. The low estimate includes the purchase of outdoor signage and two neon signs for indoor use where no permits are required. The high estimate includes higher-quality outdoor and indoor signage where permits are required.

14.     *Deposits*. This item includes estimated utility and similar deposits necessary to establish accounts with third-party vendors.

15.     *Additional Funds* (*For 3 Months Post-Opening*).    This is an estimate of your miscellaneous start-up expenses for the first 3 months of your Studio's operations, including payroll costs, as offset by the revenue generated by the Studio during that period.

We have based this estimate on our and our affiliate's experience in developing their respective Studios. You should review all figures in this Item 7 carefully with a business advisor before you decide to purchase the franchise. Neither we nor our affiliates offer financing directly or indirectly for any part of the initial investment. The estimate does not include any finance charge, interest, or debt service obligation.

### YOUR ESTIMATED INITIAL INVESTMENT
### (DEVELOPMENT AGREEMENT)

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is to Be Made |
|---|---|---|---|---|
| Development Fee [1] | $90,000 to $120,000 | Lump Sum | Upon Execution of Development Agreement | Us |
| **TOTAL ESTIMATED INITIAL INVESTMENT: [2]** | **$90,000 to $120,000** | | | |

**Explanatory Notes:**

Except as otherwise indicated, none of the amounts payable to us or our affiliates are refundable under any circumstances. All amounts payable to third parties will be paid according to the terms of your agreement with these respective third parties.

1.     *Development Fee*. The actual amount of the Development Fee will depend on the number of Studios you agree to develop under the Development Schedule because the Development Fee is equal to the Initial Franchise Fee, times the number of Studios you agree to open. For example, if you agree to open 2 Studios, the Development Fee would be $90,000 ($50,000 for your first Studio, $40,000 for your second Studio); and if you agree to open 3 Studios, the Development Fee would be $120,000 ($50,000 for your first Studio, $40,000 for your second Studio, and $30,000 for your third Studio). We apply this fee, in $50,000, $40,000 and $30,000 increments (respectively, as applicable), toward the initial franchise fee due under each Franchise Agreement signed in accordance with the Development Agreement. The minimum number of Studios required to be

16

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

opened under a Development Agreement is 2, but we may grant you the opportunity to open 3 Studios under a Development Agreement.

2. *Total Estimated Initial Investment.* The Development Agreement does not itself grant you the right or obligation to develop a Studio, but it does require you to purchase a Franchise to do so. For that reason, the estimated initial investment to develop a Studio is not shown in this chart. However, when you sign the Development Agreement, you will also sign the first Franchise Agreement under which you agree to incur the investment necessary to develop and open a Studio. We encourage you to review the initial chart in this Item 7 that describes the initial investment to develop a Studio pursuant to the Franchise Agreement.

## Item 8.
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

### Standards and Specifications

You are required to offer and sell all products and services that we specify from time to time and to offer and sell only those products and services that we approve from time to time. We have, and may further develop, standards and specifications for all aspects of the development and operation of a typical Studio, including the terms and conditions of your lease of the premises; the prototypical plans for the premises; color scheme, décor, and other Trade Dress elements; and the layout and placement of (and specifications for) all required furniture, fixtures, equipment (including components of the Computer System), signs, and other products, materials, and supplies used in the development and operation of a Studio (all of the foregoing being referred to, collectively, as the "Operating Assets"), as well as for the manner in which your Studio is operated, the terms and conditions under which memberships, gift cards, and loyalty programs are offered, and all products and services that are offered and sold by and through them. We have the right to develop, issue specifications for, and approve all items used in the development and operation of Studios as well as the manufacturers, suppliers and distributors (collectively, "Vendors") of items used and products and services sold by those businesses. Our standards and specifications may impose minimum requirements including, for example, as to quality, cost, delivery, performance, design and appearance, delivery capabilities, terms and conditions under which they are sold to you, and financing terms. We may change, delete, or modify any of our standards and specifications, and those changes might require that you make additional expenditures. You are required to purchase only the items that we approve or that meet our standards and specifications and, as described below, to purchase those items only from Vendors that we approve or otherwise allow.

We are not required to divulge our standards and specifications for products and services to you or any Vendor, but we may, primarily through the Operations Manual, make standards and specifications for certain items available to you, and we may communicate standards and specifications to our approved Vendors for the items they sell from time to time. If we determine that divulging standards and specifications will jeopardize the confidentiality of our intellectual property rights, we may elect to approve products or services that we determine meet our standards and specifications without communicating those standards and specifications to you or Vendors.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**Designated and Approved Vendors**

As discussed above, we may require you to purchase or lease brands, types, or models of products, services, supplies, Operating Assets, or other items only from Vendors we designate or approve, and we may mandate a limited number or a single source for some or all of those items. We and our affiliates may be an approved Vendor for some or all of the Operating Assets and may be the sole source for certain items. Your purchase of approved or mandated items may require that you enter into contracts with Vendors of those items, and we may mandate the terms and conditions of those contracts. We may concentrate purchases with one or more Vendors to obtain lower prices and/or the best advertising support and/or services for any group of Studios franchised or operated by us or our affiliates.

Approval of a product or supplier may be conditioned on requirements relating to product quality and durability, price, consistency, Brand enhancement, reliability, financial capability, labor relations, customer relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints), availability of products through other sources, and/or other criteria.

We will provide you with a list of approved Vendors, the content of which may change from time to time as we add to, change, or remove our approval of Vendors. If you would like us to consider approving a Vendor that is not then approved, you must submit your request in writing before purchasing any items or services from that Vendor. We will make all determinations about whether to approve an alternative Vendor based on our then-current criteria, which may change periodically upon notice to you, and we will use reasonable efforts to notify you of our decision within 7 days after we receive your written request and supporting documentation. If you do not receive our written approval within that time, the request will be deemed to have been denied. If we approve your request, we may later revoke it if we determine it is in the interests of the Brand and the System to do so. We are not obligated to issue to you our criteria for approving alternative Vendors. We may also refuse to consider and/or approve any proposed alternative supplier for any reason whatsoever. We may charge you a fee if you ask us to evaluate any proposed alternative supplier in the amount of costs we incur in inspecting and testing such products (currently $500 per request). We may, with or without cause, revoke our approval of any Vendor at any time, including if we determine (in our sole discretion) that such revocation is in the System's or the Brand's best interest.

Currently, (i) we and our affiliate are approved suppliers of certain Initial Inventory items and certain merchandise you will purchase during the operation of your Studio (including grip socks, branded merchandise and apparel, wellness products, accessories, and personal fitness equipment); and (ii) we mandate single-source Vendors for certain fitness equipment (such as reformers, hand weights, toning balls, foam rollers, and related props and accessories) and various rotating retail items offered for sale in Studios.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 52 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

We and our affiliates may derive revenue and other consideration from selling products and services to our franchisees and from approved Vendors based on their sales of products and services to our franchisees. We and our affiliates currently receive a credit from one Vendor equal to 7% of the amount of purchases made by our franchisees of certain fitness equipment. We are able to apply the credit toward the costs of purchases we or our affiliates make from that Vendor. In our prior fiscal year, we did not receive revenue from the sale to our franchisees of required products or services, but our affiliate received $858.75 from such sales.

We estimate that 90% to 95% of your initial investment and 90% to 95% of your ongoing expenditures will be directed to purchase products and services that will be restricted by us in some manner.

## Purchasing Programs, Material Benefits, and Ownership of Vendors

We may establish purchasing cooperatives and programs (including price terms) with certain Vendors with respect to Operating Assets and other items used in the development and operation of Studios. As of the issuance date of this Disclosure Document, there are no purchasing or distribution cooperatives for Studios. We have negotiated purchase arrangements with third-party distributors for certain fitness equipment required for the operation of Studios.

We do not provide material benefits to franchisees for purchasing particular products or services using required or approved suppliers.

As of the issuance date of this Disclosure Document, none of our officers currently owns an interest in any approved supplier other than LC Fitness LLC.

## Insurance

You must, at your expense, comply with the requirements regarding insurance coverages that we describe in our Operations Manual from time to time. If you fail or refuse to procure and maintain the required insurance, we may (but need not) obtain such insurance on your behalf, in which event you must cooperate with us and reimburse us for all premiums, costs and expenses we incur in obtaining and maintaining the insurance, plus a reasonable fee for our time incurred and resources used to obtain such insurance for you. Your obligation to satisfy our minimum insurance requirements is not diminished or limited in any way by any insurance we or our affiliates carry, and no insurance coverage that you or any other party maintains will be deemed a substitute for your indemnification obligations under the Franchise Agreement or the Development Agreement.

Our insurance requirements represent only the minimum coverage that we deem acceptable to protect our interests and are not representations or warranties of any kind that such coverage is sufficient to comply with your lease obligations and applicable laws or to protect your or your Studio's interests. It is your sole responsibility to make that determination and to acquire any additional coverages you believe are necessary to protect those interests, based on your own independent investigation. We are not responsible if you sustain losses that exceed your insurance coverage under any circumstances.

19

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Currently, we require that you purchase at least the following types and amounts of coverage (subject to change as described in our Operations Manual):

1. commercial general liability with product and completed operations, broad form contractual liability, personal injury and advertising injury, property damage, and fire and water damage legal liability (coverage of at least $1,000,000 per occurrence, $3,000,000 aggregate, and $5,000 per person medical expenses); and umbrella coverage;

2. (if you use an automobile in your business) automobile liability insurance with at least the following limits: $1,000,000 per occurrence/$3,000,000 aggregate;

3. commercial property insurance with limits not less than the current replacement cost of your Studio's business personal property and leasehold improvements;

4. business interruption/extra expense coverage with limits not less than 12 months' of rent;

5. employment practices liability insurance with limits of not less than $1,000,000 per claim; and

6. workers' compensation insurance as required by state law.

All insurance policies must be written by an insurance company with at least an "A" Rating Classification as indicated in A.M. Best's Key Rating Guide. We may designate, or require pre-approval of, the provider of any insurance required in connection with your Studio. Your obligation to obtain and maintain insurance shall neither be limited by reason of any insurance that may be maintained by us nor relieve you of liability under the indemnity provisions set forth in the Franchise Agreement. You must provide us with certificates of coverage at least annually.

## Item 9.
## FRANCHISEE'S OBLIGATIONS

**This table lists your principal obligations under the Franchise Agreement, Development Agreement, and other agreements. It will help you find more detailed information about your obligations in the Franchise Agreement and in other items of this Disclosure Document.**

| Obligation | Section in Agreement | Item in Disclosure Document |
|---|---|---|
| a. Site selection and acquisition/lease | Franchise Agreement: Sections 2.A, 2.B, 3.A and 3.B | Item 11 |
| | Development Agreement: Section 2.D | |

20

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Obligation | Section in Agreement | Item in Disclosure Document |
|---|---|---|
| b. Pre-opening purchases/leases | Franchise Agreement: Sections 3.A, 3.B and 9 | Items 7, 8 and 11 |
| | Development Agreement: N/A | |
| c. Site development and other pre-opening requirements | Franchise Agreement: Sections 3.A, 3.B, 5.A, 5.B and 10.A | Items 7, 8, and 11 |
| | Development Agreement: Section 2 | |
| d. Initial and ongoing training | Franchise Agreement: Section 5 | Items 6, 7, and 11 |
| | Development Agreement: N/A | |
| e. Opening | Franchise Agreement: Section 3.B | Item 11 |
| | Development Agreement: Section 2 | |
| f. Fees | Franchise Agreement: Section 4, Data Sheet | Items 5, 6, and 7 |
| | Development Agreement: Section 3, Data Sheet | |
| g. Compliance with standards and policies/Operations Manual | Franchise Agreement: Sections 3.B, 4.D, 5.E and 9.J | Items 8 and 11 |
| | Development Agreement: Section 2.D | |
| h. Trademarks and proprietary information | Franchise Agreement: Sections 6 and 7 | Items 13 and 14 |
| | Development Agreement: Section 5 | |
| i. Restrictions on products/services offered | Franchise Agreement: Section 9.C | Items 8, 11, 12, and 16 |
| | Development Agreement: N/A | |
| j. Warranty and customer service requirements | Franchise Agreement: Section 9.F | Item 11 |
| | Development Agreement: N/A | |

21

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Obligation | Section in Agreement | | Item in Disclosure Document |
|---|---|---|---|
| k. Territorial development and sales quotas | Franchise Agreement: N/A | | Item 12 |
| | Development Agreement: Sections 2.C and 2.D, Data Sheet | | |
| l. On-going product/service purchases | Franchise Agreement: Sections 9.C and 9.E | | Items 6 and 8 |
| | Development Agreement: N/A | | |
| m. Maintenance, appearance and remodeling requirements | Franchise Agreement: Sections 9.A and 9.J | | Items 6, 8, 11 and 17 |
| | Development Agreement: N/A | | |
| n. Insurance | Franchise Agreement: Section 9.G | | Items 7 and 8 |
| | Development Agreement: N/A | | |
| o. Advertising | Franchise Agreement: Section 10 | | Items 6, 7, 8, and 11 |
| | Development Agreement: N/A | | |
| p. Indemnification | Franchise Agreement: Section 17.C | | Item 6 |
| | Development Agreement: Section 8.B | | |
| q. Owner's participation/ management/staffing | Franchise Agreement: Sections 1.B and 1.C | | Items 11 and 15 |
| | Development Agreement: Section 1.B | | |
| r. Records and reports | Franchise Agreement: Section 11 | | Item 6 |
| | Development Agreement: Section 4 | | |
| s. Inspections and audits | Franchise Agreement: Section 12 | | Items 6 and 11 |
| | Development Agreement: N/A | | |

22

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Obligation | Section in Agreement | Item in Disclosure Document |
|---|---|---|
| t. Transfer | Franchise Agreement: Section 13 | Items 6 and 17 |
| | Development Agreement: Section 5 | |
| u. Renewal | Franchise Agreement: Section 14 | Items 6 and 17 |
| | Development Agreement: N/A | |
| v. Post-termination obligations | Franchise Agreement: Section 16 | Item 17 |
| | Development Agreement: Section 7 | |
| w. Non-competition covenants | Franchise Agreement: Section 8 | Item 17 |
| | Development Agreement: N/A | |
| x. Dispute resolution | Franchise Agreement: Section 18 | Item 17 |
| | Development Agreement: Section 9 | |
| y. Guaranty of Franchise Obligations | Franchise Agreement: Section 1.B, Attachment A | Item 15 |
| | Development Agreement: Section 1.B, Attachment A | |

## Item 10.
## FINANCING

We do not offer direct or indirect financing under the Franchise Agreement or the Development Agreement. We do not guarantee your promissory notes, mortgages, leases or other obligations.

23

## Item 11.
## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER

## SYSTEMS AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

**Our Pre-Opening Obligations**

Before you open your Studio, we will:

1. elect to provide, and provide you with construction management services to assist you in various stages of development of your Studio, including site selection, selection and appointment of an architect and general contractor, review of construction bids, supervision of construction, and general oversight of the construction process (Franchise Agreement – Sections 3.A and 3.B);

2. review and either approve or disapprove your proposed site for your Studio (Franchise Agreement – Section 3.A);

3. review and either approve or disapprove your proposed lease for your Studio premises (Franchise Agreement – Section 3.A);

4. provide you with our prototypical plans showing the standard layout and placement specifications for Operating Assets; review and, in our reasonable judgment, approve the steps you have taken to construct and prepare your Studio for opening in accordance our standards and specifications; and provide you with written confirmation that, in our reasonable judgment, your Studio meets our standards and specifications and is ready for opening (Franchise Agreement – Section 3.B);

5. provide certain assistance in connection with your purchase of necessary equipment, signs, fixtures, opening inventory, supplies, and other Operating Assets. We neither provide these items directly nor deliver or install them, but we do provide you with (a) the names of approved suppliers for those items for which we have approved suppliers (some of whom might be our affiliates) and (b) written specifications of certain other items that, from time to time, we allow you to purchase from suppliers of your choice (Franchise Agreement – Sections 3.B and 9);

6. provide both portions of the Initial Training Program to you (or your Managing Owner) and, as applicable, your Operations Manager, for your first (and second) Studio(s); and provide the Authorized Instructor Training Program to your prospective Authorized Instructor(s) (Franchise Agreement – Sections 5.A and 5.B);

7. assist with promotional and advertising activities related to the grand opening of your Studio (for your first and second Studios only) (Franchise Agreement – Sections 5.D and 10.A); and

8. provide access to our Operations Manual (Franchise Agreement – Section 5.E).

24

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## Our Pre-Opening Obligations – Area Development Agreement

After you sign a Development Agreement, but before you open your first Studio, we or our affiliates will provide you with the following assistance:

1. review sites you propose for the development of your Studio and, at our discretion, accept the proposed site using our then-current standards and issue you a Franchise Agreement (Development Agreement – Sections 2.D and 2.E).

## Site Selection and Possession

Before you sign a lease for or otherwise commit to taking possession of a site for your Studio, you must have our written approval of the site, and you must have our written approval of your proposed lease or other document under which you will take possession of the site. We may require you to use our designated Vendor in connection with site evaluation. While we may provide you with certain assistance, you are entirely responsible for searching for the site at which you want to develop your Studio, for deciding to pursue the site once we have approved it, and for deciding to sign a lease once we have approved it. Our approval of the site or lease is entirely for our own purposes and indicates only that the site meets our then-current requirements that we have established for protection of the Brand. We do not own any premises that are used for franchisee Studios.

If we have not identified your approved site in the Franchise Agreement when you sign it, we will designate in your Franchise Agreement an area (a "Search Area") within which you will have the non-exclusive right to search for potential sites for your Studio. If the Franchise Agreement is signed under a Development Agreement, the Search Area will be the Development Area described in the Development Agreement. Unless you have our prior written approval to do otherwise, all site reports that you submit to us must be for a site within your designated Search Area. You have 90 days after you sign the Franchise Agreement to locate and obtain our approval of the site in the Search Area. You must provide any information we request to aid in our evaluation of your proposed site. We may evaluate the proposed site based on any criteria we believe are relevant, including factors such as demographics, proposed rental rates, neighborhood and nearby business counts and characteristics, nearby residential populations, traffic counts, accessibility, parking, visibility, signage, and competition. We will generally accept or reject the site within 30 days after you have given us all the necessary information regarding the site you have selected.

Once we have approved your site, you must obtain our approval of the lease for your site before you sign it. We may condition our approval of the lease on the inclusion of certain lease terms we believe are necessary to ensure the protection and continuity of the Brand and your and the landlord's execution of the Lease Addendum in the form attached as Exhibit I to this Disclosure Document. Our approval indicates only that we believe the Premises and the lease's terms meet our then-acceptable criteria.

You must secure possession of the site within 30 days following our approval of the site and lease. If you do not comply with the timelines for obtaining site approval or securing possession, we may terminate the Franchise Agreement.

25

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

We or our designees may, but are not required to, provide you with certain assistance regarding conforming the premises to local ordinances and building codes and may provide certain construction, remodeling or decorating assistance. However, you are responsible for ensuring that your Studio complies with such local ordinances, building codes, other applicable laws, and the System Standards.

## Opening Requirements

You must complete the development of your Studio and prepare it for opening in accordance with the Franchise Agreement, the System Standards, and all applicable laws by the earlier of (i) 10 months after you sign your lease for the premises, or (ii) 12 months after you sign the Franchise Agreement; subject to our written confirmation that you have satisfied all of our pre-opening criteria, including that you have paid all fees due to us, you and your designated personnel have successfully completed all required training, and we have received all documents we require regarding the development and opening of your Studio. Subject to your compliance with applicable laws, you must open your Studio for regular business not later than 5 days following our written confirmation of those items. We may terminate the Franchise Agreement and retain your initial franchise fee payment if you fail to open your Studio to the public within such timeframes. The typical length of time between signing the Franchise Agreement and opening a Studio is between 9 and 12 months. Factors that affect this time include obtaining a satisfactory site, financing arrangements, lease negotiations, local ordinances, delivery and installation of equipment, and renovation of the premises.

## Assistance During the Operation of Your Studio

During your operation of your Studio, we or our designees will:

1. provide you with additional training, if you request it and we agree to provide it, including the Authorized Instructor Training Program to any additional or replacement Authorized Instructor(s), and the Initial Training Program for any replacement Required Trainee(s) (Franchise Agreement – Section 5);

2. continue to provide you with access to an electronic copy of the Operations Manual (Franchise Agreement – Section 5.E);

3. provide you with a list of authorized Vendors and suppliers for the products, merchandise, supplies, signs, furniture, fixtures, equipment and services (Franchise Agreement – Section 9.E);

4. provide you with our System Standards and other suggested standards, specifications and procedures for Studios (Franchise Agreement – Section 9.J);

5. provide you with assistance with advertising and marketing materials and programs and approve or disapprove the same (Franchise Agreement – Section 10.C); and

6. once established, maintain and administer a Marketing Fund (defined below), which may periodically provide you with samples of advertising, marketing, and promotional formats and materials that we may develop (Franchise Agreement – Section 10.B).

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Subject to applicable law, we may (but are not obligated to) determine prices that you may charge for products or services offered by your Studio to the extent we elect to do so (Franchise Agreement – Section 9.H).

## Operations Manual

During the term of your Franchise Agreement, we will provide you with access to our manual for the operation of Studios (the "Operations Manual"). Our Operations Manual may contain mandatory specifications, standards, operating procedures and rules that we periodically prescribe for operating Studios ("System Standards"), and you agree to comply with those standards and requirements. The Operations Manual may also contain other specifications, standards and policies that are merely suggestions for your consideration. It is within your discretion whether to adopt these suggested specifications, standards and policies. The Operations Manual may include one or more separate manuals and may be in any form and format we determine from time to time. The current table of contents of the Operations Manual is attached to this Disclosure Document as Exhibit D. There are currently 117 pages in our Operations Manual.

## Advertising and Promotion

*Grand Opening Marketing Program*. You must, at your expense and on the dates we designate before and after your Studio opens, conduct a grand opening marketing program for your Studio that complies with the requirements set forth in the Operations Manual. The amount you will be required to spend on your grand opening marketing program will depend on various factors such as existing awareness of the Brand, the density of the market in which the business is located, and the ability to get publicity about the opening; but we require that you spend no less than $6,000. The amount you spend on your grand opening marketing program will not count towards your other required marketing expenditures or the Marketing Expenditure Cap (defined below).

*Marketing Fund*. We may establish, administer, and require you to contribute to a marketing fund to promote the awareness of the Brand and Studios generally (the "Marketing Fund"). Your contribution will be in amounts we periodically specify, subject to the Marketing Expenditure Cap, and will be payable in the same manner as the Royalty. Currently, the required Marketing Fund contribution is two percent (2%) of your Studio's Gross Revenue. We have the right, at any time and on notice to you, to change the amount you must contribute to the Marketing Fund subject to the Marketing Expenditure Cap.

We or our affiliates or other designees will direct all programs that are funded by contributions to the Marketing Fund, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation. We may use contributions to the Marketing Fund to pay for preparing and producing materials and electronic or digital media in any form or format that we periodically designate, including but not limited to: administrating online advertising strategies, including maintaining a System Website or mobile apps; administering regional and multi-regional marketing and advertising programs; implementing a loyalty program; and supporting public relations, market research, product development, and other advertising, promotion, social media and marketing activities. In our discretion, we may sell you, at reasonable prices, copies of certain materials funded by contributions to the Marketing Fund.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 61 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

We will account for contributions to the Marketing Fund separately from our other funds and not use the Marketing Fund contributions for any of our general operating expenses. However, we may use contributions to the Marketing Fund to reimburse us or our affiliates or designees for the reasonable salaries and benefits of personnel who manage and administer or work on the Marketing Fund's activities, the Marketing Fund's other administrative costs, travel expenses of personnel while they are on Marketing Fund business, meeting costs, overhead relating to Marketing Fund business, and other expenses that we incur in activities reasonably related to administering or directing the Marketing Fund and its programs. While references to the availability of franchises may appear in marketing materials, the Marketing Fund will not be used primarily to sell franchises.

Contributions to the Marketing Fund will not be our asset, but we do not assume or owe any fiduciary obligation to you in respect of those contributions or for administering the Brand Fund or any other reason. We will hold all Marketing Fund contributions for the benefit of the contributors. We may spend in any fiscal year on Marketing Fund activities more or less than the total Marketing Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We may use all interest earned on the Marketing Fund contributions to pay costs before using the Marketing Fund's other assets. We will prepare an annual, unaudited statement of Marketing Fund collections and expenses and, once prepared, give you the statement for the most recently completed fiscal year upon your written request. We do not anticipate that the Marketing Fund will be audited. We may incorporate the Marketing Fund or operate it through a separate entity whenever we deem appropriate, in which case the successor entity will have all of the rights and duties we have.

We need not ensure that Marketing Fund expenditures in or affecting any geographic area are proportionate or equivalent to Marketing Fund contributions by Studios operating in that geographic area or that any Studio benefits from Marketing Fund activities either directly or in proportion to its Marketing Fund contributions. We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Marketing Fund contributions at the Marketing Fund's expense. We also may forgive, waive, settle, and compromise all claims by or against the Marketing Fund. Except as expressly provided in the Franchise Agreement, we assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing, or administering the Marketing Fund.

We may at any time defer or reduce your contributions to the Marketing Fund, and upon 30 days' prior notice to you, suspend Marketing Fund operations for one or more periods of any length and/or terminate (and if terminate, reinstate) the Brand Fund. If we terminate the Marketing Fund, we will, at our option, either spend all unspent monies at our discretion, until such amounts are exhausted, or distribute the funds in the Marketing Fund to the contributing Studio owners in a manner we deem fair and equitable.

We did not have an established Marketing Fund at the end of our last fiscal year; therefore, we did not collect or spend any Marketing Fund contributions during the prior fiscal year. We have no advertising councils.

*Local Advertising*. In addition to the grand opening advertising and the Marketing Fund, and beginning after you complete your grand opening advertising, you must spend, monthly, the greater of (a) $1,500 or (b) two percent (2%) of the prior month's Gross Revenue to locally advertise and promote your Studio (the "Local Advertising Requirement"). However, subject to the Marketing

28

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Expenditure Cap, we have the right, at any time and on notice to you, to change the amount of your Local Advertising Requirement.

You must list and advertise your Studio with the online directories we periodically prescribe and establish any other Online Presence (as defined in Item 13, below) we require or authorize, each in accordance with our System Standards. If other Studios are located within the directory's distribution area, we may require you to participate in a collective advertisement with them and to pay your share of that collective advertisement. Within 30 days after the end of each calendar quarter, we may require that you provide, in the manner that we prescribe, an accounting of your advertising expenditures during the preceding calendar quarter.

You must obtain our written approval of any advertising that you propose to use in connection with your Studio that has not been prepared by the Marketing Fund or that we have not approved. All such proposed materials must be completely clear, factual, ethical and not misleading and must conform to the marketing and advertising policies that we periodically prescribe. You must submit to us, for our approval, samples of marketing materials you intend to use at least 14 days prior to your proposed use. If you do not receive our written approval of the materials within 14 days of your submission, they are deemed to be disapproved. We may, in our discretion, withdraw our approval if a regulatory or other issue arises that, in our opinion, makes such withdrawal in our or the System's best interests.

We reserve the right, at any time, to issue you a notice that the amounts required to be spent by you for local advertising, instead, be paid to us or our designee. If we exercise this option, we will then spend such amounts, in accordance with local marketing guidelines and programs that we periodically develop, to advertise and promote your Studio on your behalf. We may instead, in our discretion, contribute any such amounts to the Marketing Fund or to a Local Advertising Cooperative as defined below. We may also elect, on one or more occasions and without prejudice to our rights to issue further notices, to temporarily or permanently cease conducting such marketing activities on your behalf and, instead, to require you to conduct such marketing activities yourself.

Except as described above, we are not required to spend any monies on advertising for the System generally, or specifically in the area or market in which your Studio is located.

*Local Advertising Cooperative*. When there are multiple Studios operating in the same geographical area (as we define), we may establish or direct the establishment of a local advertising cooperative ("Local Advertising Cooperative"), the purpose of which is, with our approval, to administer coordinated advertising programs and develop advertising, marketing and promotional materials for the area that the Local Advertising Cooperative covers. The Local Advertising Cooperative will be organized and governed in a form and manner, and begin operating on a date, that we determine. We may change, dissolve and merge Local Advertising Cooperatives, and may prepare annual financial statements available at franchisee request. We do not anticipate that such statements will be audited. You will sign any documents we require to become a member of a Local Advertising Cooperative and, subject to the Marketing Expenditure Cap, contribute to and participate in the activities of the designated Local Advertising Cooperative.

*Contributions by Company- or Affiliate-Owned Studios*. Studios that we or our affiliates own may, but will not be required to, contribute to the Marketing Fund or any Local Advertising Cooperatives.

<div align="center">29</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

*System Website*. We may establish, develop and update Online Presences to advertise, market, and promote Studios, the products and services that they offer and sell, or the Brand's franchise opportunity (each a "System Website"). We may, but are not obligated to, provide you with a webpage or other Online Presence that references your Studio on any System Website, upon which, you must: (i) provide us the information and materials we request to develop, update, and modify the information about your Studio; and (ii) notify us whenever any information about your Studio is not accurate.

If you default under the Franchise Agreement, we may, in addition to our other remedies, temporarily remove references to your Studio from any System Website until you fully cure the default (subject to state law). All advertising, marketing, and promotional materials that you develop for your Studio must contain notices of the System Website's domain name in the manner we designate.

You may not, without our prior written consent, develop, maintain or authorize any Online Presence that mentions your Studio, links to any System Website, or displays any of the Marks. You may not, directly or indirectly, through any Online Presence, promote, advertise or sell any products or services without our prior written approval. If we approve the use of any such Online Presence in your Studio's operations, you will develop and maintain such Online Presence only in accordance with our guidelines, including our guidelines for posting any messages or commentary on other third-party websites. Unless we specify otherwise, we will own the rights to each such Online Presence. At our request, you will us access to each such Online Presence, and to take whatever action (including signing assignment or other documents) we request to evidence our ownership of such Online Presence, or to help us obtain exclusive rights in such Online Presence. If we allow you to maintain an Online Presence for your Studio, you must prepare and link a privacy policy to such Online Presence. Your Online Presence's privacy policy must comply with all applicable laws, the System Standards, and other terms and conditions that we may prescribe in writing.

## Computer System

Before you open your Studio, you must obtain and install the integrated computer hardware and software that we periodically specify from time to time in the Operations Manual (the "Computer System"). Currently, the Computer System is comprised of a laptop computer, an iPad, management software, the point-of-sale system, and an inventory control system we designate.

You may be required to license, and sign a software license agreement regarding, certain proprietary software as part of our requirements for the Computer System. As part of the Technology Fee, we and our affiliates may charge you an initial or recurring fee for any proprietary software or technology that we or our affiliates license to you and for other maintenance, support, and technology development services that we or our affiliates provide. We may also require that you pay us for software and other technology that you receive through us from third-party providers. You will have sole and complete responsibility for the manner in which your Computer System interfaces at our specified levels of connection speed with our and any third party's computer system and any and all consequences if the Computer System is not properly operated, maintained, and upgraded. We will have independent access to your Computer System and the information generated and stored therein. There are no contractual limitations on our and our affiliates' right to access or use this information and data.

30

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Currently, we estimate the total cost of purchasing and installing the Computer System to be $1,500 to $3,000, which includes a laptop, iPad and basic operating software. You must pay for any additional or replacement proprietary software or technology that we, our affiliates or third-party designee licenses to you and for other maintenance and support services that we, our affiliates or a third-party designee provides. You will be responsible for paying for access to our approved suppliers of hosted software services for a monthly amount ranging from $620 to $760, which includes the cost for MindBody, Mailchimp, and MessengerAI; in addition to your annual Technology Fee (currently $352) for three (3) "thedailypilates.com" email domains, a Canva subscription, and other technologies and systems we may require from time to time. We may require you to purchase and use additional software services under the technology fee or otherwise, and you are fully responsible for updating and upgrading the Computer System as necessary. We have no obligation to provide you with ongoing maintenance, repairs, upgrades, and updates for your Computer System, but we estimate your annual cost of required maintenance, updating, upgrading, and third-party support contracts related to your Computer System will no more than $500.

**Training**

*Initial Training Program*. Before you may open your Studio for business, your Managing Owner and Operations Manager (which may be the same person, at your discretion) (the "Required Trainees") must complete our Initial Training Program to our satisfaction. The Initial Training Program is comprised of both (i) the Operations Manager Training (which is comprised of both the Owner Module and Operations Manager Module), and (ii) Opening Assistance Training.

You are expected to successfully complete the Owner Module of the Initial Training Program at least 90 days before you open your Studio, and your Operations Manager (if applicable) is expected to successfully complete the Operations Manager Module at least 45 days prior to opening your Studio. In addition to completion of Operations Manager Training, your Required Trainees must complete Opening Assistance Training within the 30 days prior to your Studio's scheduled opening. In any event, all components of the Initial Training Program must be completed before soliciting or pre-selling any memberships in or for your Studio, and before opening your Studio for business, or we may terminate the Franchise Agreement.

Currently, the Owner Module and Operations Manager Module are held simultaneously, taking place over no fewer than two  days at our affiliate's Studio in Atlanta, Georgia (or at an alternative location designated by us, which may be virtually); and Opening Business Assistance Training will take place at your Studio over one to two days within the 30 days prior to your Studio's opening. We have the option to offer any training programs virtually instead of in-person. We may also send our trainers to your Studio to conduct any part of training. We will determine the timing of each component of the Initial Training Program and the identity and composition of the trainer(s) conducting all portions of the Initial Training Program.

The Initial Training Program is conducted on an as-needed basis and is not presented on a regular schedule. Scheduling of the Initial Training Program is based on your and our availability, training facility availability, and your Studio's projected opening date. We may require that all of your Required Trainees attend and participate at the same time.

There is no fee for your (and your Operations Manager's, if applicable) attendance at the Initial Training Program; however, you will be responsible for all travel-related costs for your

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 65 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Required Trainees and other trainees as well as all travel-related costs for our representatives that travel to your Studio to conduct either or both portions of the Initial Training Program, which may include hotel, transportation, and airfare expenses.

We may vary the length and content of the Initial Training Program based on the experience and skill level of the individual(s) attending. We provide instructional materials and resources at the Initial Training Program, including the Operations Manual, agendas, and other materials, which cover information on us, software and technology, human resources guidelines, equipment operations guidelines, pre-sales and sales strategies, advertising and newsletter training, and the opening and initial operations of your Studio. We may also establish pre-training requirements, which the attendees will be expected to meet before attending the Initial Training Program, including study of provided materials and exams.

If we do not feel that a Required Trainee has completed Initial Training Program to our satisfaction, we may require these individuals to attend additional training at a time and location of our choice, and we may charge you our then-current fee for that additional training which is currently, $1,000 per day, plus expenses, but subject to change (the "Additional Assistance or Training Fee"). This additional training will be provided, in our discretion, at our affiliate's Studio in Atlanta, Georgia, your Studio, another Studio we designate, or virtually. If a Required Trainee is unable to successfully complete the Initial Training Program and/or any training we require to our satisfaction, and you are not able to replace such Required Trainee with an individual who successfully completes all of our requirements, we may terminate the Franchise Agreement.

You may request additional training for your personnel at the end of the Initial Training Program if your attendees do not feel sufficiently trained in the operation of a Studio. We and you will jointly determine the duration of this additional training, and we may charge you our then-current Additional Assistance or Training Fee for this additional training. However, if your attendees complete our Initial Training Program to our satisfaction, as applicable, and have not expressly informed us at the end of the program that they do not feel sufficiently trained in the operation of a Studio, then you and they will be considered to have been trained sufficiently to operate a Studio.

If (i) you appoint a new Operations Manager to supervise your Studio at any time (which appointment will be subject to our approval), (ii) your Managing Owner changes at any time, or (iii) you are acquiring an existing Studio from another System franchisee, you (or he or she) must attend the then-current Initial Training Program, and you must pay us our then-current Additional Assistance or Training Fee plus the cost of all travel and living expenses incurred by our representative(s). You are responsible for providing a training program that we approve for all your employees other than the attendees of the Initial Training Program.

We may implement annual franchise conferences for our franchisees and provide additional mandatory training programs from time to time on new topics, for your replacement personnel, or as refreshers for previously trained people. Though we do not charge for such programs as of the date of this Disclosure Document, we reserve the right to charge a fee for any such programs and for any training materials that we provide in connection with such trainings.

You must pay all travel and living expenses (including, wages, transportation, food, lodging, and workers' compensation insurance) that your Required Trainees and others attending our training programs on your behalf incur related to any and all meetings and/or other training courses and

32

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

programs, including the Initial Training Program. If applicable, you are also responsible for the travel and living expenses and out-of-pocket costs we incur in sending our trainer(s) to your Studio to conduct training, including food, lodging and transportation. Any specific ongoing training or advice we provide does not create an obligation for us to continue to provide this specific training or advice, all of which we may discontinue and modify periodically.

We currently provide the following Initial Training Program:

## INITIAL TRAINING PROGRAM

| Initial Training Program - Owner Module | | | |
|---|---|---|---|
| **Subject** | **Hours of Classroom Training** | **Hours of On-the-Job Training** | **Location** |
| Mission Statement and History | 0.5 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Expectations and Obligations | 0.5 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Studio and Equipment Set-Up and Support | 3 | 0 | Your Studio (or virtually) |
| Education and Training | 2 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Retail | 2 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Software Introduction | 1 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Sales and Operations | 2 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Finance | 1 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Hiring | 1 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Marketing | 2 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Grand Opening Prep | 4 | 0 | Your Studio (or virtually) |
| **TOTAL** | **19** | **0** | |

33

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Initial Training Program – Operations Manager Module | | | |
|---|---|---|---|
| **Subject** | **Hours of Classroom Training** | **Hours of On-the-Job Training** | **Location** |
| Mission Statement and History | 0.5 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Expectations and Obligations | 0.5 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Studio and Equipment Set-Up and Support | 3 | 0 | Your Studio (or virtually) |
| Classes | 2 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Retail | 2 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Client Communication | 4 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Maintenance | 1 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Marketing | 2 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Software Set-Up | 6 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Staff Management | 1 | 0 | Studio in Atlanta, Georgia (or virtually) |
| Grand Opening Prep | 4 | 0 | Your Studio (or virtually) |
| **TOTAL** | **26** | **0** | |

We may vary the length and content of the initial training program based upon the experience and skill level of the individual attending the initial training program.

Our training program is led by Lily Collins, our Chief Executive Officer, who has over 15 years of industry-related expertise and has been with us since our formation. Trainings will also be led by Rudi Rauschenbach, who has over 5 years of industry-related expertise and has over 2 years of experience with our affiliate. Other members of our team, each having at least one year of industry-related experience, may be involved in training periodically and our training staff may also change periodically.

We will not send any of our personnel and/or representatives to your Studio to provide any training, inspections, support or other services in-person if we determine that it is unsafe to do so. We may, at any time, and for any reason, elect to conduct any or all training, inspections, support or other services described in your Franchise Agreement virtually.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 68 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## Authorized Instructor Training Program

Your Studio must engage at least one Authorized Instructor at all times who has successfully completed the Authorized Instructor Training Program and is capable of providing Pilates instruction and other approved services at your Studio. Any individual that wishes to provide Pilates instruction or any of the other approved services at your Studio must first (a) demonstrate that he/she has met all instructor eligibility requirements in the Operations Manual, and (b) test out with a sample class with either you, your Operations Manager, or us. We may charge you our then-current non-compliance fee for each day that you permit or have permitted a non-certified/trained Pilates instructor to provide any Pilates instruction or any of the other approved services at your Studio.

Your Required Trainee(s) may complete the Authorized Instructor Training Program and teach classes at your Studio if they choose to do so. The Authorized Instructor Training Program will be conducted at our company-owned Studio in Atlanta, Georgia (or at another location we specify, which may be virtually) on an as-needed basis, or you may request that we send our representative(s) to your Studio to conduct the training. All travel and living expenses you (and your employees) incur must be paid by you.

The fee for the Authorized Instructor Training Program is $2,499 per person, plus a flat fee of $1,000 if such training is conducted at your Studio. We are not responsible for any costs or expenses incurred by any person attending our training programs. The $1,000 flat fee will be incurred if you request, and we agree, to provide such training at your Studio, in which case you will also be required to reimburse us for the costs and expenses of our representatives in providing such training (including airfare, lodging, transportation, and related expenses). The costs for us to conduct the Authorized Instructor Training Program at your Studio will be charged per occurrence of training at your Studio and are subject to change in our sole discretion. The per-person fee for the Authorized Instructor Training Program is subject to change during the term of your Franchise Agreement. We will provide all education, manuals, online materials and tests for the Authorized Instructor Training Program.

## No-Show Fee

You must pay us a "no-show" fee equal to the greater of $500 per occurrence or the actual costs of rescheduling travel, if: (i) you (or your Operations Manager, if applicable) register for the Initial Training Program, or if you (or your Operations Manager, if applicable) or your employee(s) register for Instructor Training; and (ii) you (or they) fail to attend or fail to have the appropriate parties attend without having provided us with two weeks' prior written notice. This fee also applies if you (or your Operations Manager) register for Instructor Training or the Initial Training Program and fail to attend the entirety of the program.

## Additional Assistance

If, at any time prior to opening your Studio or after your Studio is operational, we agree to provide, at your request, additional assistance that we are not required under the Franchise Agreement to provide, you will be required to pay us the Additional Assistance or Training Fee, plus the cost of all travel and living expenses incurred by our representative(s) (if applicable). This Additional Assistance or Training Fee applies if you request our assistance in providing Instructor

35

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Training or any additional or ongoing business training at your Studio and is subject to change based on the assistance we provide and the associated costs.

If you appoint a new Operations Manager to supervise your Studio at any time, which appointment will be subject to our approval, or your Principal Owner changes at any time, he or she must attend the then-current Initial Training Program you must pay us our then-current Additional Assistance or Training Fee, plus expenses. You are responsible for providing a training program that we approve for all your employees other than the attendees of the Initial Training Program. All employees must pass a training program to our satisfaction that meets our minimum criteria, and all Authorized Instructors must be certified as such, prior to providing services at your Studio.

## Item 12.
## TERRITORY

**Franchise Agreement**

You will not receive an exclusive territory. You may face competition from other Studio franchisees, from Studios that we or our affiliates own, from other channels of distribution, or from competitive brands that we control. However, so long as you are in compliance with the terms of your Franchise Agreement, we will not authorize any other person or entity to operate a Studio within the protected territory designated in your Franchise Agreement. If you have not selected a site for your Studio as of the date of your Franchise Agreement, we will define your protected territory when we approve your proposed premises. If you do not accept our definition of your protected territory, you may submit an alternative site for our approval. There is not a minimum protected territory. We will typically define the boundaries of your protected territory, in our discretion, as either boundaries on a map or a circle with your Studio at its center and a specified radius we determine based on the factors we deem relevant, which might include demographics and population density, traffic patterns, and the character of nearby businesses and residences.

You may only operate your Studio at the premises. You may not relocate your Studio to a location other than the premises or open additional locations without our prior written approval. If we allow you to relocate your Studio, you will be assessed a relocation fee for the services we provide in connection with your relocation, including reviewing and approving a new site and lease, assisting with the design and construction of the new site, assisting with suppliers for the new site, training and other onsite opening services (currently $1,000, plus reimbursement of our expenses). Our determination to approve or disapprove a relocated site may be based on various criteria, which we may change in our discretion. As we do not anticipate consenting to the relocation of Studios, we have not yet developed conditions or criteria for approval or disapproval of relocation.

All Studios are free to advertise, solicit and accept orders from any customers regardless of the location of your Studio. However, you must not engage in any advertising or promotions within any known protected territory of any other Studio without our written consent. Additionally, except in connection with the approved System Website, you may not engage in any promotional or similar activities, whether directly or indirectly, through or on any Online Presence. You may not sell any Studio product or service through any alternative channel of distribution, including through any Online Presence (such as the Internet, catalog sales, telemarketing, or other direct marketing). If we permit you to offer or sell products from anywhere other than the premises of your Studio, we may

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

limit, and modify from time to time, the geographic area in which you may offer products and services.

Except as described above, continuation of your Franchise does not depend on your achieving a certain sales volume, market penetration, or other contingency. You have no options, rights of first refusal or similar rights to acquire additional Franchises.

## Development Agreement

If you enter into a Development Agreement, you will receive a Development Area within which you will have certain rights to develop Studios. There is no minimum size for a Development Area. The size and configuration of the Development Area will depend on the number of Studios you commit to developing and may be described in terms of contiguous ZIP codes, street or county boundaries, or similar methods, and may be depicted on a map. Your Development Area will be described in the Development Agreement before you sign the Development Agreement. Using our then-current standards, we must approve the location of each site.

As long as you are in compliance with the Development Agreement, and except with respect to Special Venue Businesses (defined below), we will not, during the term of the Development Agreement, operate or grant the right to anyone else to operate a Studio within the Development Area, or grant Development Rights to anyone else to be exercised with your Development Area. A "Special Venue Business" is any Studio (1) that is located within or as part of a larger venue or facility (a "Host Facility"), (2) that is operated by the owner or operator of the Host Facility or its licensee as an amenity of the Host Facility, and (3) whose customers are primarily members or residents of the Host Facility and their permitted guests.

To maintain your rights under the Development Agreement, you must open and have in operation the cumulative number of Studios stated on the Development Schedule by the dates agreed upon in the Development Schedule. Failure to do so will be grounds for either a loss of territorial exclusivity or a termination of the Development Agreement.

When the last Studio to be developed within the Development Area opens for business, your exclusive rights under the Development Agreement with respect to the Development Area will expire, and we and our affiliates will have the right to operate and to grant to others development rights and franchises to develop and operate Studios within the Development Area. This right will be subject only to the territorial rights under your franchise agreements for Studios in the Development Area and the right of first refusal to develop additional Studios described above. The Development Area may not be altered unless we and you mutually agree to do so, and will not be dependent on your maintaining of any sales volume. You are not granted any other option, right of first refusal or similar right to acquire additional Studios in your Development Area under the Development Agreement, except as described above.

## Reservations of Rights

We reserve for ourselves and our affiliates all rights that are not expressly granted to you in the Franchise Agreement or the Development Agreement and the right to do all things that we do not expressly agree in those agreements not to do, in each case, without compensation to you, without regard to proximity to your Studio, and on such terms and conditions as we deem appropriate. For

37

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

example, and without limitation, we and our affiliates may, ourselves or through authorized third parties:

(1) own and operate, and license others to own and operate, Studios offering similar or identical products and services and using the System or elements of the System (i) under the Marks anywhere outside of the protected territory, as applicable, and (ii) under names, symbols, or marks other than the Marks anywhere, including inside and outside of the protected territory, as applicable (though no such plans currently exist);

(2) develop or become associated with other businesses, including those within the fitness, health, and wellness industries, and/or award franchises under such other concepts for locations anywhere, including inside and outside of the protected territory, whether or not using the System and/or the Marks, provided that such businesses located in the protected territory, as applicable, are not, during the term of the Franchise Agreement or Development Agreement, as applicable, identified by the "The Daily Pilates®" trademark;

(3) acquire, be acquired by, merge, affiliate with, or engage in any transaction with other businesses (whether competitive or not) located anywhere and, even if such businesses are located in the protected territory, (i) convert the other businesses to the Brand, (ii) allow such other businesses to operate as part of the System, whether or not converted to the Brand, and/or (iii) permit the other businesses to continue to operate under another name;

(4) solicit customers, advertise, and authorize others to advertise, and promote sales of and from Studios anywhere, including within the protected territory; and

(5) using the Marks or other trademarks and commercial symbols, market and sell, and grant to others the right to market and sell, anywhere (including within the protected territory), through other channels of distribution (for example, through the Internet, telemarketing, mail order, e-commerce and catalog sales, and product lines in other businesses), any products and services that are or have been authorized for sale at Studios.

## Item 13.
## TRADEMARKS

You must use the Marks to identify your Studio and to identify yourself as the independent owner of your Studio in the manner we require. You have no right to sublicense or assign your right to use the Marks. You may not use any Mark (1) as part of any business entity name; (2) with any modifying words, terms, designs, or symbols (other than logos we have licensed to you); (3) in selling any unauthorized services or products; (4) as part of any website, domain name, email address, social media account, user name, other online presence or presence on any electronic medium of any kind ("Online Presence"), except as set forth in the Operations Manual or otherwise in writing from time to time; (5) in connection with any advertisement to sell or otherwise dispose of your Studio or any Operating Assets; or (6) in any other manner that we have not expressly

38

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

authorized in writing.  Except for the System Website or with our prior written consent, you may not use the Marks as part of any domain name, homepage, electronic address, or otherwise in connection with a website, and then only under the terms we specify.

The Marks are owned by us. All rights in and goodwill from the use of the Marks accrue to us in accordance with our interests. No agreement significantly limits our rights to use or sublicense the Marks in a manner material to the franchise.

We have obtained and/or applied for registrations of the following Marks on the Principal Register of the U.S. Patent and Trademark Office ("USPTO"):

| Mark | Application / Registration Number | Application / Registration Date |
|---|---|---|
| THE DAILY PILATES (Word Mark) | Reg. No. 7039381 | May 2, 2023 |
| | App. No. 98312345 | December 13, 2023 |

We do not have a federal registration for each of our principal trademarks. Therefore, such trademarks do not have many legal benefits and rights as a federally registered trademark. If our right to use an unregistered trademark is challenged, you may have to change to an alternative trademark, which may increase your expenses.

We have timely filed, and will continue to timely file, all required affidavits and renewals for these registrations.

There is presently no effective determination of the USPTO, the Trademark Trial and Appeal Board, the trademark administrator of any state or any court, nor any pending infringement, opposition or cancellation proceeding or any pending material litigation involving our principal Marks. Except as described above, we know of no superior prior rights or infringing uses that could materially affect your use of the Marks.

You must notify us immediately of any apparent infringement or challenge to your use of any Mark, or of any person's claim of any rights in any Mark, and you may not communicate with any person other than us and our and our affiliates' attorneys, regarding any infringement, challenge or claim. We may take the action we deem appropriate (including no action) and control exclusively any litigation, USPTO proceeding or other administrative proceeding from the infringement, challenge or claim or otherwise concerning any Mark. You must sign the documents and take the actions that, in the opinion of our attorneys, are necessary or advisable to protect and maintain our interests in the Marks. We will reimburse you for your reasonable costs of taking any action that we have asked you to take. However, we are neither contractually obligated to protect you against infringement or unfair competition claims arising out of your use of the Marks, nor are we required to participate in your defense or indemnify you.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

We may establish new Marks in the future, and you must use and display these marks in accordance with System Standards and bear all costs associated with changes to Marks. If it becomes advisable at any time for us and/or you to modify or discontinue using any Mark and/or use one or more additional or substitute trade or service marks, you must comply with our directions within a reasonable time after receiving notice. We do not have to reimburse you for your costs, loss of revenue or other expenses of promoting a modified and/or substitute trademark or service mark.

## Item 14.
## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

We do not own any patents, pending patent applications, or registered copyrights that are material to the franchise. However, we claim copyrights in the Operations Manual (which contains our trade secrets), handbooks, the System Website, advertising and marketing materials, all or part of the Marks, and other portions of the System and other similar materials used in operating Studios. We have not registered these copyrights with the United States Registrar of Copyrights but need not do so at this time to protect them. You may use these items only as we specify while operating your Studio (and must stop using them if we so direct you).

There currently are no effective adverse determinations of the United States Copyright Office (Library of Congress) or any court regarding the copyrighted materials. No agreement limits our right to use or allow others to use the Confidential Information (defined below) or copyrighted materials. We know of no infringing uses of our copyrights which could materially affect your using the copyrighted materials in any state. We need not protect or defend our copyrights, although we intend to do so if we determine that it is in the System's best interests. We may control any action involving the copyrights, even if you voluntarily bring the matter to our attention. We need not participate in your defense nor indemnify you for damages or expenses in a proceeding involving a copyright.

Our Operations Manual and other materials contain our and our affiliates' confidential information (some of which constitutes trade secrets under applicable law) (the "Confidential Information"). This information includes specifications, standards, systems, procedures, sales and marketing techniques; knowledge and experience used in developing and operating Studios; training and operations materials, methods, formats, knowledge and specifications regarding suppliers of Operating Assets and other products and supplies; marketing and advertising programs and strategies for Studios; any computer software or similar technology that is proprietary to us or the System; strategic plans, growth, development and expansion goals, targeted demographics, knowledge of the operating results and financial performance of Studios; site selection criteria; and all information relating to members, such as member names, addresses, telephone numbers, email addresses, buying habits, preferences, demographic information and related information.

All ideas, concepts, techniques, or materials concerning a Studio, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the System, and works made-for-hire for us. To the extent any item does not qualify as a "work made-for-hire" for us, you assign ownership of that item, and all related rights to that item, to us and must take whatever action (including signing assignment or other documents) we request to show our ownership or to help us obtain intellectual property rights in the item.

<div align="center">40</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

You may not use our Confidential Information in an unauthorized manner. You must adopt and implement procedures to prevent unauthorized use or disclosure of Confidential Information, including restricting its disclosure to personnel of your Studio and certain other people and using non-disclosure and non-competition agreements with those having access to Confidential Information in a form determined by us. We may regulate the form of agreement that you use, and we will be a third-party beneficiary of that agreement with independent enforcement rights.

All Confidential Information is owned by us and our affiliates, and you will only use Confidential Information for the development, promotion, and operation of your Studio. You will not use or sell Confidential Information to any third parties and you will comply with all applicable laws governing the use and protection of Confidential Information.

## Item 15.
## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

If you are an entity, you must identify one of your owners who is a natural person with at least a 10% ownership interest and voting power in you (the "Managing Owner"). You must also designate a person, who may, but need not, be your Managing Owner or one of your other owners, to serve as the "Operations Manager" of your Studio. You (or your Managing Owner) are solely responsible for the management, direction and control of your Studio, subject to the terms and conditions of the Franchise Agreement and the Development Agreement. Your Operations Manager must supervise the management and day-to-day operations of your Studio on a full-time basis and continuously exert best efforts to promote and enhance your Studio and the goodwill associated with the Marks.

We have the right to approve your Operations Manager before he or she begins to provide services at your Studio. Your Operations Manager must satisfy our educational and business experience criteria for Operations Managers of Studios, as set forth in the Operations Manual or otherwise, and satisfactorily complete our Initial Training Program and any other training programs we may periodically require.

If we determine that your Studio is being managed improperly, or if you are in default in the performance of any of your obligations under the Franchise Agreement, we may, but need not, enter upon and take possession of your Studio for a period not to exceed 180 days, and thereafter take, in your name, all other actions necessary to effect the provisions of the Franchise Agreement (or appoint a third party to assume such operations). All funds from your Studio's operation while it is under our (or the third party's) management will be kept in a separate account by us, and all expenses will be charged to this account. We may charge you (in addition to the Royalty, Marketing Fund contributions, and other amounts due to us or our affiliates) our then-current fee for the interim operation of your Studio, plus our (or the third party's) direct out-of-pocket costs and expenses, if we (or a third party) assume your Studio's operations. During the term of the Franchise Agreement, we may adjust the amount of this daily fee periodically by an amount that is commensurate with inflation. We (or a third party) have a duty to utilize only reasonable efforts and will not be liable to you or your owners for any debts, losses, or obligations your Studio incurs, or to any of your creditors for any products, other assets, or services your Studio purchases, while we (or a third party) operate it.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 75 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

If you are not a natural person, your direct and indirect owners with at least a 10% ownership interest and voting power in you must personally guarantee your obligations under the Franchise Agreement and the Development Agreement and agree to be bound personally by every contractual provision, whether containing monetary or non-monetary obligations, including the covenant not to compete. Our current form of Guaranty and Assumption of Obligations is attached as Attachment A to the Franchise Agreement and the Development Agreement. In addition, if these owners are married, their spouse may have to consent in writing to their signing of the guaranty and bind themselves to the confidentiality and non-competition provisions of the Franchise Agreement. Such spousal consent also serves to bind the assets of the marital estate to the owner's performance of the guaranty.

## Item 16.
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must use the premises at which the Studio is located solely for the operation of your Studio. You must offer and sell all services and products that we periodically specify for Studios, and you may offer and sell only those services and products that we have approved for sale in Studios. You must offer and sell approved products and services only at the premises and in the manner we have authorized. We may periodically change the required and/or authorized products and services and Vendors from whom they are purchased, and there are no limits on our right to do so. You must promptly implement these changes and must discontinue selling any products or services that we at any time decide to disapprove in writing. You may not sell any products or services through alternative channels of distribution (including any Online Presence). You must discontinue selling and offering for sale any services or products that we at any time decide to disapprove in writing.

Our System Standards may regulate participation in and requirements for member/customer loyalty programs, reciprocity programs, membership transfer policies and programs, and similar programs for members of similarly situated Studios, including the terms and conditions we periodically specify for (a) providing access to your Studio for members of other Studios; (b) honoring memberships covering some or all Studios and providing Studio access to those members; (c) accepting memberships that we or our affiliates process or assist in processing for your Studio, including paying us and our affiliates reasonable fees for online membership applications that we process and other assistance we and they provide relating to your Studio's memberships; and (d) each Studio bearing, or sharing in, the costs and expenses associated with participating in any of these programs. Our System Standards also may regulate the terms of membership offerings and maximum, minimum and other pricing requirements, including requirements for promotions, special offers and discounts in which some or all Studios participate, in each case to the maximum extent the law allows (although you must ensure that your membership offerings and membership agreements comply with applicable laws and regulations). For any product or service which we do not regulate the maximum or minimum prices, we may require you to comply with any advertising policy we adopt. You also must participate in the manner we specify in any group membership reciprocity or other programs that we periodically establish.

Except as disclosed in this Item, we do not impose any restrictions regarding the customers to whom you may sell authorized products and services.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 76 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## Item 17.
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

## THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the Franchise Agreement, Development Agreement and related agreements. You should read these provisions in the agreements attached to this Disclosure Document.**

| Provision | Section in Agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Franchise Agreement: Section 2.A | 10 years from the Effective Date. |
| | Development Agreement: Section 2.A | Term ends on the earlier of (i) the scheduled opening date of the last Studio as specified on the Development Schedule, or (ii) the last day of the last development period. |
| b. Renewal or extension of the term | Franchise Agreement: Section 14.A | If you are in substantial compliance with the Franchise Agreement, you may extend the term for two successive terms of 5 years. |
| | Development Agreement: N/A | Not applicable. |
| c. Requirements for franchisee to renew or extend | Franchise Agreement: Section 14.A | You must give at least 90 days' but not more than 180 days' notice; be in full compliance with the System Standards; not be in breach of any agreement with us or our affiliates, satisfy all monetary obligations; have the right to remain in possession of the Studio premises; pay our then-current successor franchise fee; meet all requirements then-applicable for approval of new franchisees; execute then-current Franchise Agreement and general release (unless prohibited by law); and comply with current qualifications and training requirements. The then-current Franchise Agreement may contain terms and conditions materially different from those in the Franchise Agreement attached to this Disclosure Document (e.g., different Royalty fees). We must be offering franchises within the state of your Studio when you give your renewal notice. |
| | Development Agreement: N/A | Not applicable. |
| d. Termination by franchisee | Franchise Agreement: Section 15.A | You may terminate the Franchise Agreement if we materially breach the agreement and do not cure default after receiving notice from you. |
| | Development Agreement: Section 6.A | You may terminate the Development Agreement if we materially breach the agreement and do not cure default after notice from you. |

43

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Provision | Section in Agreement | Summary |
|---|---|---|
| e. Termination by franchisor without cause | Franchise Agreement: N/A | We may not terminate the Franchise Agreement without cause. |
| | Development Agreement: N/A | We may not terminate the Development Agreement without cause. |
| f. Termination by franchisor with cause | Franchise Agreement: Section 15.B | We may terminate only if you or your owners commit one of several violations. Under cross-default provisions, we may also terminate the Franchise Agreement if you or your approved affiliate fails to comply with any provision of any other agreements with us or our affiliates (including a Development Agreement) and does not cure such failure within the applicable cure period. |
| | Development Agreement: Section 6.B | We may terminate only if you or your owners commit one of several violations. Under cross-default provision, we can also terminate the Development Agreement if you or your approved affiliate fails to comply with any provision of any other agreements with us or our affiliates (including a Franchise Agreement) and does not cure such failure within the applicable cure period. |
| g. "Cause" defined – curable defaults | Franchise Agreement: Section 15.B | We will have cause to terminate your Franchise Agreement for the following defaults if we give you notice and the requisite opportunity to cure the default: (a) 21 days for failure to complete required training; (b) 10 days for failure to maintain required insurance; (c) 5 days for failure to pay amounts owed; (d) 15 days for failure to cure quality assurance deficiencies; (e) 72 hours for failure to comply with law; and (f) 30 days for failure to comply with any provision of the Franchise Agreement that is not specifically called out (subject to state law). |
| | Development Agreement: Section 6.B | We will have cause to terminate your Development Agreement for the following defaults if we give you notice and an opportunity to cure the default: 30 days for failure to comply with any provision of the Development Agreement that is not specifically called out (subject to state law). |
| h. "Cause" defined – non-curable defaults | Franchise Agreement: Section 15.B | Non-curable defaults under the Franchise Agreement include material misrepresentations or omissions in acquiring a franchise or operating your Studio; failure to secure the premises for your Studio within 90 days after our approval of such premises, or fail to open your Studio within the designated time periods; failure to construct your Studio according to the plans we approve; closure, failure to operate for more than 3 days, or other abandonment; conviction of a felony; dishonest or unethical conduct; engaging in conduct which adversely affects the reputation of Studios, the System, |

44

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Provision | Section in Agreement | Summary |
|---|---|---|
| | | or the Marks; unauthorized Transfer; loss of the right to occupy the premises; unauthorized use or disclosure of Confidential Information; failure to pay taxes; understating Gross Revenue 3 times or more during the Term; repeated defaults (even if cured); occurrence of certain bankruptcy or insolvency events; failure to comply with anti-terrorism laws; health and safety risks; and failure to comply with other agreements with us or our affiliate and do not correct such failure within the applicable cure period, if any (subject to state law). |
| | Development Agreement: Section 6.B | Non-curable defaults under the Development Agreement include material misrepresentations or omissions; failure to comply with the Development Schedule; unapproved transfers; repeated defaults (even if cured); insolvency events; failure to comply with anti-terrorism laws; engaging in conduct which adversely affects the reputation of Studios, the System, or the Marks; and failure to comply with other agreements with us or our affiliate and do not correct such failure within the applicable cure period, if any (subject to state law). |
| i.   Franchisee's obligations on termination/non-renewal | Franchise Agreement: Section 16 | You must: (i) pay outstanding amounts; (ii) close your Studio for business; (iii) cease using the Marks; (iv) cease to identify yourself or your Studio as a franchised location; (v) return to us or destroy (as we require) all items, forms and materials containing any Mark or otherwise identifying or relating to the Studio as a Brand Studio; (vi) remove all signage, unless we are buying your Studio; (vii) cease using all telephone numbers, directory listings, contact information associated with your Studio, and Online Presences; (viii) comply with de-identification standards; (ix) cease using the Confidential Information; and (x) comply with the non-competition and non-solicitation provisions. You must also sell us your Studio if we exercise our purchase option. You must also pay Lost Revenue Damages, if we terminate the Franchise Agreement because of your breach (or if you terminate without cause). |

45

| Provision | Section in Agreement | Summary |
|---|---|---|
| | Development Agreement: Section 7 | Under the Development Agreement, you must cease to directly or indirectly exercise or attempt to exercise any of the rights granted to you under the agreement, comply with all obligations that either expressly survive or by their nature are intended to survive the expiration or termination of the agreement, and refrain from interfering or attempting to interfere with our or our affiliates' relationships with any Vendors, franchisees or consultants or engage in any other activity which might injure the goodwill of the Marks or the System. |
| j. Assignment of contract by franchisor | Franchise Agreement: Section 13.A | No restriction on our right to assign. |
| | Development Agreement: Section 5.A | No restriction on our right to assign. |
| k. "Transfer" by franchisee -definition | Franchise Agreement: Section 13.B | A "Transfer" includes the sale, assignment, transfer, conveyance, give-away, pledge, mortgage, or other disposition of or encumbrance of any direct or indirect interest in the Franchise Agreement (including any or all rights or obligations thereunder); your Studio or its assets (other than in the ordinary course of business); your right to possession of the premises; or any direct or indirect ownership interest in you (regardless of its size) |
| | Development Agreement: Section 5.B | Includes the assignment, sale, transfer, conveyance, pledge, mortgage, or other disposal or encumbrance of the Development Agreement, your development rights, or any direct or indirect ownership interest in you. |
| l. Franchisor's approval of transfer by franchisee | Franchise Agreement: Sections 13.B | Franchise Agreement may not be assigned without our consent. |
| | Development Agreement: Section 5.B | Development Agreement may not be assigned without our consent. |

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Provision | Section in Agreement | Summary |
|---|---|---|
| m. Conditions for franchisor approval of transfer | Franchise Agreement: Section 13.C | Your Studio has opened for business; transferee must provide all application materials and satisfy all selection criteria; you must provide transfer documents and transfer must meet our criteria; transferee must refurbish your Studio in compliance with our then-current System Standards; subject to state law, you (and your owners) must sign a general release in a form satisfactory to us, you (and your owners, and your and their immediate family members) must sign a non-competition covenant in favor of us; your Studio must be in full compliance with our System Standards, the Franchise Agreement, and any other agreement between us and you; transferee must complete all mandatory training; you (and your owners) and transferee (and its owners) must sign a consent to transfer; all required actions under the lease are satisfied; transferee signs then-current forms of agreements, including the Franchise Agreement; you pay (or cause to be paid) a transfer fee; and you provide evidence of transfer of all necessary and appropriate business licenses, insurance policies, and material agreements. |
| | Development Agreement: Section 5.C | Transferor (and transferor's owners and guarantors) must be in compliance with their obligations under the Development Agreement; transferee must provide all application materials and satisfy all selection criteria; you must provide transfer documents and transfer must meet our criteria; any financing of the purchase price by transferor or transferee must be subordinate to transferee's obligations to pay us all amounts due us, our affiliates, and third-party Vendors; you (and your owners) must sign a general release, in a form satisfactory to us; you (and your transferring owners) (and your or their immediate family members) must sign a non-competition covenant in favor of us; you must pay all amounts owed to us, our affiliates, and third-party Vendors and must have submitted all required reports and statements under the Development Agreement and any Franchise Agreement; you and your owners must not have violated any provision of the Development Agreement or any other agreement with us or our affiliates during both the 60-day period before you requested our consent to the transfer through the effective date of the transfer; transferee must sign our then-current form of Development Agreement and related documents, payment of transfer fee; and the transfer must not be made separate and apart from the transfer to the same transferee of all Franchise Agreements signed pursuant to the Development Agreement. |

47

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 81 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Provision | Section in Agreement | Summary |
|---|---|---|
| n.  Franchisor's right of first refusal to acquire franchisee's Franchised Business | Franchise Agreement: Section 13.G | If you receive an offer to sell or transfer an interest, direct or indirect, in the Franchise Agreement, your Studio or an ownership interest in you, we have a right of first refusal to purchase such interest offered for the price and on the terms and conditions contained in the offer with certain provisions; if this right is not exercised within 30 days of our receipt of notice of such intention to sell or transfer, then you may sell or transfer in accordance with Item 17(k) through 17(m). |
|  | Development Agreement: Section 5.F | If you receive an offer to sell or transfer an interest, direct or indirect, in the Development Agreement (which must not be made separate and apart from any transfer to the transferee of any Franchise Agreements you signed pursuant to the Development Agreement), your development rights or an ownership interest in you, we have a right of first refusal to purchase such interest offered for the price and on the terms and conditions contained in the offer with certain provisions; if this right is not exercised within 30 days of our receipt of notice of such intention to sell or transfer, then you may sell or transfer in accordance with items Item 17(k) through 17(m). |
| o.  Franchisor's option to purchase franchisee's business | Franchise Agreement: Section 16.B | We may purchase the assets of your Studio for liquidation value upon the expiration of the Franchise Agreement and any successor franchise granted to you, or the termination of the Franchise Agreement by you without cause or by us with cause (each a "Termination Event"). In the case of a Termination Event, we have 30 days from the Termination Event to provide you with written notice of our election to purchase your Studio. |
|  | Development Agreement: N/A | Not applicable. |
| p.  Death or disability | Franchise Agreement: Section 13.D | Your death (or the death of any of your owners) constitutes a transfer of the franchise requiring our consent (see Item 17(k) above) and starting our right of first refusal (see Item 17(n) above). |
|  | Development Agreement: Section 5.B | Neither the Development Agreement nor any ownership interests in you may be transferred without our prior written consent. |

48

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 82 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Provision | Section in Agreement | Summary |
|---|---|---|
| q. Non-competition covenants during the term of the franchise | Franchise Agreement: Section 8 | Neither you, nor your affiliates, your Operations Manager, any of your or your affiliates' owners or their immediate family members may have any involvement, directly or indirectly, in a "Competitive Business," wherever located or operating (except for any equity ownership of less than five percent (5%) of a Competitive Business whose stock or other forms of ownership interest are publicly traded on a recognized United States stock exchange). "Competitive Business" means any business (other than an authorized Studio): (i) that offers products and services that are the same as or substantially similar to those offered at Studios; (ii) whose core offerings include Pilates and wellness instruction, classes, and private sessions and related services; (iii) whose offerings, concept, business model or method of operation is similar to that of a Studio or any other wellness businesses operated, franchised or licensed by us or our affiliates; or (iv) that grants franchises or licenses for the operation of any of the foregoing or provides services to the franchisor or licensor of any of the foregoing. You may neither interfere with vendor, supplier, or consultant relationships nor engage in activities that would harm the Marks or System. |
| | Development Agreement: N/A | Not applicable. |
| r. Non-competition covenants after the franchise is terminated or expires | Franchise Agreement: Section 16.A | You may not have any involvement, directly or indirectly, in a Competitive Business for 2 years within 30-mile radius of the premises of your Studio or any Studio in existence or under construction at time of termination or expiration of Franchise Agreement. You may neither interfere with vendor, supplier, or consultant relationships nor engage in activities that would harm the Marks or System. |
| | Development Agreement: N/A | Not applicable. |
| s. Modification of the agreement | Franchise Agreement: Section 19.B | No modifications except in writing and signed by both you and us. |
| | Development Agreement: Section 10.A | No modifications except in writing and signed by both you and us. |

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK   Document 1-1   Filed 07/08/26   Page 83 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| Provision | Section in Agreement | Summary |
|---|---|---|
| t. Integration/merger clause | Franchise Agreement: Section 19.G | Only the written terms of the Franchise Agreement and other related written agreements are binding (subject to state law). Any representation or promises outside of the Disclosure Document and Franchise Agreement may not be enforceable. However, nothing in the Franchise Agreement is intended to disclaim the representations we made in the Disclosure Document that we furnished to you. |
|  | Development Agreement: Section 10.F | Only the written terms of the Development Agreement and other related written agreements are binding (subject to state law). Any representation or promises outside of the Disclosure Document and Development Agreement may not be enforceable. However, nothing in the Development Agreement is intended to disclaim the representations we made in the Disclosure Document that we furnished to you. |
| u. Dispute resolution by arbitration or mediation | Franchise Agreement: Section 18.A | We and you must arbitrate all disputes at a location in or within 50 miles of our or, as applicable, our successor's or assign's then-current principal place of business (currently, Atlanta, Georgia). |
|  | Development Agreement: Section 13.A | We and you must arbitrate all disputes at a location in or within 50 miles of our current principal place of business (currently, Atlanta, Georgia) (subject to state law). |
| v. Choice of forum | Franchise Agreement: Section 18.C | You must sue us in the state of our or, as applicable, our successor's or assign's then-current principal place of business (currently Atlanta, Georgia) (subject to state law). |
|  | Development Agreement: Section 9.C | You must sue us in the state where our corporate headquarters are located (currently Atlanta, Georgia) (subject to state law). |
| w. Choice of law | Franchise Agreement: Section 18.B | Georgia law (subject to state law). |
|  | Development Agreement: Section 9.B | Georgia law (subject to state law). |

Applicable state law might require additional disclosures related to the information contained in this Item 17. These additional disclosures, if any, appear in Exhibit D.

## Item 18.
## PUBLIC FIGURES

We do not use any public figure to promote our franchises.

50

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about performance at a particular location or under particular circumstances.

## Data Set and Methodology

As of February 29, 2024, there were two (2) *The Daily Pilates* Studios (the "Data Set") open and operating, one of which is owned and operated by our affiliate (the "Affiliate Studio") and the other of which is owned and operated by a third-party franchisee (the "Franchised Studio"). The Affiliate Studio operated during the entire 12-month period beginning March 1, 2023, and ending February 29, 2024 (the "Measurement Period"). The Franchised Studio opened for business on March 18, 2023, and operated for the remainder of the Measurement Period. Both Studios are located in Atlanta, Georgia. They are located in different trade areas but are approximately nine (9) driving miles apart. There are no material differences with respect to how these Studios are operated, and we have no reason to believe that persons interested in Pilates training in Atlanta, Georgia visit Pilates studios more or less frequently than customers in other parts of the United States.

The chart below reflects actual historical data for each Studio in the Data Set for the Measurement Period. For each metric, we show the data as a dollar amount and as a percentage of Total Revenue. After the row labeled "EBITDA," we have included adjustments to reflect the impact on EBITDA of fees that would have been paid to us by each Studio had it been operated during the Measurement Period under the form Franchise Agreement you will be expected to sign if you purchase a *The Daily Pilates* Studio franchise.

We have not independently audited or verified the financial data provided to us by the franchisee whose Studio appears in the Data Set.

## Definitions

As used in the following Table:

• "Gross Revenues" means the same thing as "Gross Revenues" under the Franchise Agreement, which is defined as all the total revenue generated by or from the operation of the Studio, in any form, including all revenue generated from the sale and provision of any and all gift cards and other approved products and services at or through the Studio and, if applicable, all proceeds from any business interruption insurance. "Gross Revenues" does not include (a) any sales tax and equivalent taxes that are collected by you for or on behalf of any governmental taxing authority and paid thereto, (b) the value of any allowance issued or granted to any client of the Studio that is credited in good faith in full or partial satisfaction of the price of the approved products or services offered in connection with the Studio, or (c) the provision of the Authorized Instructor Training

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 85 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Program at the Studio if we provide the training at the Studio and receive all fees associated therewith.

• "COGS" means the aggregate cost of purchasing products for re-sale at the Studio.

• "Labor" means the total cost of salaries, wages, payroll taxes, and payroll service fees. It does not include any guaranteed payments or distributions of profits to owners of the legal entity that owns the Studio or other non-employee-related distributions.

• "Occupancy" means the aggregate expenses for rent for the Studio premises, utilities, and security services.

• "Franchise Fees" is the amount of Royalties paid to us by the Studio.

• "Other Expenses" means the aggregate of all other expenses incurred in the operation of the Studio during the Measurement Period (excluding guaranteed payments and other distributions to owners of the Studio, COGS, Labor, Occupancy, and Franchise Fees).

• "EBITDA" means Gross Revenues minus COGS, Labor, Occupancy, Franchise Fees, and Other Expenses before consideration of interest payments, taxes, depreciation and amortization.

• The "Royalty Adjustment" is the difference between the amount paid by the Studios in the Data Set for Royalty Expense and the amount franchisees are required to pay under the current form Franchise Agreement (6%). The reason for the difference is that the franchisee of the Franchised Studio in the Data Set is subject to an older form of Franchise Agreement that provided for a different royalty rate than is provided for under the current form Franchise Agreement.

• The "Marketing Fund Adjustment" reflects the contribution you would be required to make under your Franchise Agreement to our Marketing Fund. There was no Marketing Fund during the Measurement Period, so neither Studio in the Data Set paid a Marketing Fund contribution during that period. This adjustment does not include local marketing dollars spent by the Studios, which amounts are included in the row labelled Other Expenses.

• "Adjusted EBIDTA" means EBITDA minus the Royalty Adjustment and the Marketing Fund Adjustment.

[*Remainder of Page Left Blank Intentionally*]

52

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**Results**

| Item | Affiliate-Owned Studio | | Franchised Studio | |
|---|---|---|---|---|
| (rounded to the nearest whole) | $ | % of Revenue | $ | % of Revenue |
| Total Revenue | $830,941 | 100% | $710,967 | 100% |
| COGS | $11,775 | 1% | $15,960 | 2% |
| Labor | $203,423* | 24% | $225,407* | 32% |
| Occupancy | $57,203 | 7% | $124,383 | 17% |
| Franchise Fees | $0 | 0% | $54,088** | 8% |
| Other Expense | $107,701 | 13% | $88,243 | 12% |
| EBITDA | $450,839 | 54% | $202,885 | 29% |
| Adjustments to EBITDA | | | | |
| Royalty | $49,856 | 6% | ($14,219) | -2% |
| Marketing Fund | $16,619 | 2% | $14,219 | 2% |
| Total Adjusted EBITDA | $383,364 | 46% | $202,885 | 29% |

\* This amount does not include owner draws.

\*\* Under its Franchise Agreement, the owner of the Franchised Studio pays a higher Royalty than you would be required to pay under your Franchise Agreement. The adjustment to EBITDA for this item is a reduction of this expense item.

<center>***</center>

**Some outlets have earned this amount. Your individual results may differ. There is no assurance that you'll earn as much.**

Written substantiation for the financial performance representation will be made available to you upon reasonable request.

Other than the preceding financial performance representation, we do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections or your future income, you should report it to the franchisor's management by contacting Lily Collins, 900 Dekalb Avenue, Suite 600, Atlanta, Georgia 30307, phone: (404) 254-0167, the Federal Trade Commission, and the appropriate state regulatory agencies.

<center>53</center>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## Item 20.
## OUTLETS AND FRANCHISEE INFORMATION
## TABLE NO. 1
## Systemwide Outlet Summary for Years 2021 to 2023 [1]

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2021 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 |
| | 2023 | 0 | 1 | +1 |
| Company-Owned [2] | 2021 | 1 | 1 | 0 |
| | 2022 | 1 | 1 | 0 |
| | 2023 | 1 | 1 | 0 |
| **Total** | **2021** | **1** | **1** | **0** |
| | **2022** | **1** | **1** | **0** |
| | **2023** | **1** | **2** | **+1** |

1.      The numbers in this Item 20 are as of December 31 of each year.

2.      The company-owned outlet is owned by our affiliate, LC Fitness, LLC.

## TABLE NO. 2
## Transfers of Outlets from Franchisees to
## New Owners (Other Than Franchisor or an Affiliate) For Years 2021 to 2023

| State | Year | Number of Transfers |
|---|---|---|
| All States | 2021 | 0 |
| | 2022 | 0 |
| | 2023 | 0 |
| **Total** | **2021** | **0** |
| | **2022** | **0** |
| | **2023** | **0** |

54

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

### TABLE NO. 3
### Status of Franchised Outlets for Years 2021 to 2023

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations for Other Reasons | Outlets at End of Year |
|---|---|---|---|---|---|---|---|---|
| Georgia | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2023 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| **Total** | **2021** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
|  | **2022** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
|  | **2023** | **0** | **1** | **0** | **0** | **0** | **0** | **1** |

### TABLE NO. 4
### Status of Company-Owned Outlets for Years 2021 to 2023

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired from Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of Year |
|---|---|---|---|---|---|---|---|
| Georgia | 2021 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2022 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2023 | 1 | 0 | 0 | 0 | 0 | 1 |
| **Total** | **2021** | **1** | **0** | **0** | **0** | **0** | **1** |
|  | **2022** | **1** | **0** | **0** | **0** | **0** | **1** |
|  | **2023** | **1** | **0** | **0** | **0** | **0** | **1** |

### TABLE NO. 5
### Projected Openings as of December 31, 2023, for the 2024 Fiscal Year

| State | Franchise Agreements Signed But Not Opened | Projected New Franchised in the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| New Jersey | 1 | 1 | 0 |
| North Carolina | 0 | 1 | 0 |
| Georgia | 1 | 1 | 0 |
| **Total** | **2** | **3** | **0** |

Exhibit F contains a list of the names, addresses and telephone numbers of our current franchisees as of December 31, 2023. Exhibit F also contains a list of the names and last known address and telephone number of each franchisee who had a Franchise Agreement terminated, cancelled, not renewed or who otherwise voluntarily or involuntarily ceased to do business under the

55

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Franchise Agreement during the most recently completed fiscal year, or who had not communicated with us within 10 weeks of the issuance date of this Disclosure Document. If you buy this franchise, your contact information may be disclosed to buyers when you leave the franchise system.

Within the last three years, no franchisees have signed confidentiality clauses. In some instances, however, current and former franchisees may sign provisions restricting their ability to speak openly about their experience with our franchise system. You may wish to speak with current and former franchisees, but be aware that not all such franchisees will be able to communicate with you.

As of the date this Disclosure Document was issued, there were no trademark-specific franchisee organizations that were created, sponsored, or endorsed by us and there were no trademark-specific franchisee organizations that requested to be included in this Disclosure Document.

## Item 21.
## FINANCIAL STATEMENTS

Attached as Exhibit G is: (i) our audited balance sheet as of December 31, 2023, and December 31, 2022, and the related statements of income, member's equity, and cash flow for the fiscal years then-ended; (ii) the related statements of income, member's equity, and cash flow for the fiscal year ended December 31, 2021; and (iii) an unaudited interim balance sheet as of January 31, 2024 and accompanying statements for the period from January 1, 2024 to January 31, 2024.

## Item 22.
## CONTRACTS

The following contracts are attached as exhibits to this Disclosure Document:

Exhibit B – Franchise Agreement
    Attachment A – Guaranty and Assumption of Obligations
    Attachment B – Representations and Acknowledgment Statement
Exhibit C – Multi-Unit Development Agreement
    Attachment A – Guaranty and Assumption of Obligations
Exhibit D – State Addenda and Agreement Riders
Exhibit H – Sample General Release

## Item 23.
## RECEIPTS

Exhibit J contains detachable documents acknowledging your receipt of this Disclosure Document. Please sign and date each receipt and return one copy to us. Keep the other copy along with this Disclosure Document for your records.

The Daily Pilates LLC
2024_04 FDD
1533.002.002/398436.10

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 90 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**EXHIBIT A**

**STATE AGENCIES/AGENTS FOR SERVICE OF PROCESS**

The Daily Pilates LLC
2024_04 FDD | Ex. A – State Agents
1533.002.002/401545.2

# STATE AGENCIES/AGENTS FOR SERVICE OF PROCESS

Listed here are the names, addresses and telephone numbers of the state agencies having responsibility for the franchising disclosure/registration laws. We may not yet be registered to sell franchises in any or all of these states or appointed the identified agent for service of process in states in which we have not applied for registration to offer or sell franchise. There may be states in addition to those listed below in which we have appointed an agent for service of process. There may also be additional agents appointed in some of the states listed.

**CALIFORNIA**

Department of Financial Protection & Innovation:
1 (866) 275-2677

*Los Angeles*

Suite 750
320 West 4th Street, Suite 750
Los Angeles, California 90013-2344
(213) 576-7500

*Sacramento*

2101 Arena Boulevard
Sacramento, California 95834
(916) 445-7205

*San Diego*

1455 Frazee Road, Suite 315
San Diego, California 92108
(619) 610-2093

*San Francisco*

One Sansome Street, Ste. 600
San Francisco, California 94104-4428
(415) 972-8565

**HAWAII**

(state administrator)

Business Registration Division
Securities Compliance Branch
Department of Commerce
 and Consumer Affairs
P.O. Box 40
Honolulu, Hawaii 96810
(808) 586-2722

**ILLINOIS**

Franchise Bureau
Office of the Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 782-4465

**INDIANA**

(state administrator)

Indiana Secretary of State
302 West Washington Street
Securities Division, E-111
Indianapolis, Indiana 46204
(317) 232-6681

(agent for service of process)

Indiana Secretary of State
200 West Washington Street, Room 201
Indianapolis, Indiana 46204
(317) 232-6531

**MARYLAND**

(state administrator)

Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2021
(410) 576-6300

(agent for service of process)

Maryland Securities Commissioner
at the Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2021
(410) 576-6360

The Daily Pilates LLC
2024_04 FDD | Ex. A – State Agents
1533.002.002/401545.2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**MICHIGAN**

(state administrator)

Michigan Attorney General's Office
Consumer Protection Division
Attn: Franchise Section
G. Mennen Williams Building
525 West Ottawa Street
Lansing, Michigan  48909
(517) 373-7622

(agent for service of process)

Michigan Department of Commerce,
Corporations, Securities & Commercial Licensing
Bureau
P.O. Box 30018
Lansing, Michigan  48909

**MINNESOTA**

(state administrator)

Minnesota Department of Commerce
85 7th Place East, Suite 280
St. Paul, Minnesota 55101
(651) 539-1600

(agent for service of process)

Commissioner of Commerce
Minnesota Department of Commerce
85 7th Place East, Suite 280
St. Paul, Minnesota 55101
(651) 539-1600

**NEW YORK**

(state administrator)

NYS Department of Law
Investor Protection Bureau
28 Liberty Street, 21st Floor
New York, NY 10005
(212) 416-8236   Phone
(212) 416-6042   Fax

**NORTH DAKOTA**

(state administrator)

North Dakota Securities Department
600 East Boulevard Avenue
State Capitol - Fourteenth Floor - Dept 414
Bismarck, North Dakota  58505-0510
(701) 328-4712

**OREGON**

Department of Business Services Division of
Financial Regulation
350 Winter Street, NE, Room 410
Salem, Oregon 97310-3881
(503) 378-4387

**RHODE ISLAND**

Department of Business Regulation
Division of Securities
John O. Pastore Complex Building 69-2
1511 Pontiac Avenue
Cranston, Rhode Island 02920
(401) 462-9645

**SOUTH DAKOTA**

Division of Insurance
Securities Regulation
124 S. Euclid, Suite 104
Pierre, South Dakota  57501
(605) 773-3563

**VIRGINIA**

(state administrator)

State Corporation Commission
Division of Securities
 and Retail Franchising
1300 East Main Street, Ninth Floor
Richmond, Virginia  23219
(804) 371-9051

(agent for service of process)

Clerk, State Corporation Commission
1300 East Main Street, First Floor
Richmond, Virginia  23219
(804) 371-9733

2

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 93 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**WASHINGTON**

(state administrator)

Department of Financial Institutions
Securities Division
P.O. Box 41200
Olympia, Washington 98504-1200
(360) 902-8760

**WISCONSIN**

(state administrator)

Securities and Franchise Registration
Wisconsin Department of Financial Institutions
4822 Madison Yards Way, North Tower
Madison, Wisconsin 53705
(608) 266-0448

(agent for service of process)

Office of the Secretary
Wisconsin Department of Financial Institutions
P.O. Box 8861
Madison, Wisconsin 53708-8861
(608) 261-9555

The Daily Pilates LLC
2024_04 FDD | Ex. A – State Agents
1533.002.002/401545.2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Case 3:26-cv-00550-KDB-DCK   Document 1-1   Filed 07/08/26   Page 95 of 299

**EXHIBIT B**

**FRANCHISE AGREEMENT**

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 96 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**THE DAILY PILATES LLC**

**FRANCHISE AGREEMENT**

**Franchisee:** _____

**Studio Number:** _____

**Studio Address:** _____

The Daily Pilates LLC
2024_04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.8

# THE DAILY PILATES®

## FRANCHISE AGREEMENT
## DATA SHEET

1. **Effective Date of Agreement**: _____

2. **Franchisee**:

| | |
|---|---|
| Name: | |
| Address: | |
| Attention: | |
| Email Address: | |
| Phone: | |
| Type of Entity: | |
| Date of Formation: | |
| State of Formation: | |
| Managing Owner: | |

3. **Franchisee Owners**.

| Name | Address | Type of Interest | Percentage Held |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

4.     **Operations Manager** [Section 9.D]: _____

5.     **Territory** [Section 2.B]: (check one):

        ☐ the area within a circle having the main entrance to your Studio as its center and a radius of _____ miles; or

        ☐ the area described as follows: _____
_____; or

        ☐ the area shown on the following map:

        [*insert map*]

6.     **Studio Premises** [Section 2.A]: _____

The Daily Pilates LLC
2024_04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

7. **Search Area** [Section 3.A] (check one):

    (a)    ☐ N/A

    (b)    ☐ The area shown on the following map:


[*insert map*]


8. **Certain Fees** [Article 4]:

    (a)    **Initial Franchise Fee** (check one): ☐ $50,000 ☐ Other $_____

    (b)    **Royalty** (check one): ☐ 6% of Gross Revenue ☐ Other $_____


9. **Additional Terms or Modifications to the Agreement**. The following terms, if any, supplement or amend the provisions of the Franchise Agreement Terms attached hereto and will control in the event of any conflicts:


[*insert as applicable*]


10. **Acknowledgement and Acceptance of Agreement**. By signing below, you represent and warrant to us that the information contained in this Data Sheet is true and correct. The parties, intending to be legally bound, accept and agree that this Data Sheet and the accompanying Franchise Agreement Terms (together, the "**Agreement**") describe their respective rights and obligations, and each agrees to be bound thereto and to perform as set forth therein.


**THE DAILY PILATES LLC**, a Georgia limited liability company

**FRANCHISE OWNER:**

_____
**[Name]**

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

The Daily Pilates LLC
2024 04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# THE DAILY PILATES®
# FRANCHISE AGREEMENT TERMS

## TABLE OF CONTENTS

| Section | Page |
|---|---|
| 1. Preambles. | 1 |
| A. Background. | 1 |
| B. Business Entity. | 1 |
| C. Managing Owner. | 1 |
| 2. The Franchise. | 2 |
| A. Grant. | 2 |
| B. Your Territory. | 2 |
| C. Territorial Rights We Reserve. | 2 |
| 3. Development and Opening of Your Studio. | 3 |
| A. Locating and Securing Possession of the Premises. | 3 |
| B. Development and Opening of Your Studio. | 3 |
| C. Liquidity, Ownership and Financing. | 4 |
| 4. Certain Fees. | 4 |
| A. Initial Franchise Fee. | 4 |
| B. Royalty Fee. | 4 |
| C. Definition of "Gross Revenue". | 4 |
| D. Non-Compliance Fee. | 5 |
| E. Late Payments and Reporting. | 5 |
| F. Application of Payments; Set-Offs. | 5 |
| G. Method of Payment. | 5 |
| 5. Training and Assistance. | 6 |
| A. Initial Training Program. | 6 |
| B. Authorized Instructor Training Program. | 6 |
| C. Training of Employees. | 7 |
| D. Additional Training and Guidance. | 7 |
| E. Operations Manual. | 8 |
| 6. Marks. | 8 |
| A. Ownership and Goodwill of Marks. | 8 |
| B. Limitations on Your Use of Marks. | 9 |
| C. Notification of Infringements and Claims. | 9 |
| D. Discontinuance of Use of Marks. | 9 |
| E. Non-Disparagement. | 9 |
| 7. Confidential Information. | 10 |
| A. Types of Confidential Information. | 10 |
| B. Disclosure and Limitations of Use. | 10 |
| C. Exceptions to Limitations. | 10 |
| D. Innovations. | 11 |
| 8. Competition and Interference During Term. | 11 |
| A. Covenants. | 11 |
| B. Competitive Business Defined. | 12 |
| 9. Business Operations and System Standards. | 12 |
| A. Condition and Appearance of Your Studio. | 12 |
| B. Use of Designated Computer System. | 12 |
| C. Products and Services Your Studio Offers. | 13 |
| D. Management of Your Studio. | 13 |
| E. Approved Vendors. | 14 |

i

F. Compliance with Laws and Good Business Practices. ...................................................14
G. Insurance. .....................................................................................................................15
H. Pricing. ..........................................................................................................................15
I. Contact Information and Listings. ................................................................................16
J. Compliance with System Standards. ............................................................................16
K. Information Security. .....................................................................................................17
L. Employees, Agents and Independent Contractors. .......................................................18
10. Marketing. ............................................................................................................................18
A. Grand Opening Marketing. ...........................................................................................18
B. Marketing Fund. ............................................................................................................18
C. Local Advertising Expenditures. ..................................................................................19
D. Local Advertising Cooperative. ....................................................................................20
E. Branded Emails. ............................................................................................................20
F. System Websites & Online Presences. .........................................................................21
11. Records, Reports, and Financial Statements. ......................................................................22
12. Inspections and Audits. .......................................................................................................23
A. Our Right to Inspect Your Studio. ................................................................................23
B. Our Right to Audit. ........................................................................................................23
13. Transfer. ...............................................................................................................................23
A. By Us. ............................................................................................................................23
B. By You or Your Owners. ...............................................................................................23
C. Conditions for Approval of Transfer. ...........................................................................24
D. Your Death or Disability. ..............................................................................................25
E. Effect of Consent to Transfer. .......................................................................................26
F. Public or Private Offering. ............................................................................................26
G. Our Right of First Refusal. ............................................................................................26
14. Expiration of the Agreement. ..............................................................................................27
A. Your Right to Acquire a Successor Franchise. .............................................................27
B. Grant of a Successor Franchise. ....................................................................................27
15. Termination of Agreement. ..................................................................................................28
A. By You. ..........................................................................................................................28
B. By Us. ............................................................................................................................28
C. Franchisor's Rights AND Remedies in Addition to Termination. ................................30
16. Our and Your Rights and Obligations Upon Termination or Expiration of the Agreement. .........31
A. Your Obligations. ..........................................................................................................31
B. Our Right to Purchase Your Studio. ..............................................................................32
C. Lost Revenue Damages. .................................................................................................33
D. Continuing Obligations. ................................................................................................34
17. Relationship of the Parties/Indemnification. .......................................................................34
A. Independent Contractors. ...............................................................................................34
B. No Liability To Or for Acts of Other Party. .................................................................34
C. Indemnification. .............................................................................................................34
18. Enforcement. ........................................................................................................................35
A. Arbitration. ....................................................................................................................35
B. Governing Law. .............................................................................................................36
C. Consent to Jurisdiction. .................................................................................................36
D. Waiver of Punitive Damages, Jury Trial and Class Action. .........................................37
E. Injunctive Relief. ...........................................................................................................37
F. Costs and Attorneys' Fees. ............................................................................................37
G. Limitations of Claims. ...................................................................................................37
19. Miscellaneous. .....................................................................................................................38
A. Security Interest. ............................................................................................................38

The Daily Pilates LLC
2024 The Daily Pilates Franchise Agreement
1533.002.002/398469.8
Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

B.  Binding Effect....................................................................................................................38

C.  Rights of Parties are Cumulative. .........................................................................................38

D.  Severability and Substitution of Valid Provisions. ...............................................................38

E.  Waiver of Obligations............................................................................................................39

F.  The Exercise of our Judgment. .............................................................................................39

G.  Construction...........................................................................................................................39

H.  Notices and Payments............................................................................................................40

I.  Counterparts; Copies..............................................................................................................40

J.  Safety. ....................................................................................................................................40

K.  Prohibited Parties...................................................................................................................41

## ATTACHMENTS

ATTACHMENT A      Guaranty and Assumption of Obligations
ATTACHMENT B      Representations and Acknowledgement Statement

iii

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<div align="center">

**THE DAILY PILATES®**
**FRANCHISE AGREEMENT TERMS**

</div>

The following Franchise Agreement Terms (these "**Terms**") form an integral part of the Agreement between **The Daily Pilates LLC**, a Georgia limited liability company having its address at 900 Dekalb Avenue, Suite 600, Atlanta, Georgia 30307 ("**we**," "**us**" or "**our**"), and the party signing the attached Data Sheet as the "Franchisee" ("**you**").

1.    **PREAMBLES**.

    A.    **BACKGROUND**.

We grant franchises for the development, ownership and operation of fitness studios that (a) are currently identified by the trademark *The Daily Pilates*® (the "**Brand**") and together with such other trademarks and commercial symbols we periodically designate, the "**Marks**"); (b) offer and sell Pilates and wellness classes, instruction and private sessions, and related services; (c) reflect distinctive interior design and display procedures, color schemes, and décor; ("**Trade Dress**"); and (d) operate using a designated "**System**" which includes the Marks, Trade Dress, and our intellectual property including trade secrets, copyrights, confidential and proprietary information, and designated training and exercise methods and know-how, fitness equipment, furniture and fixtures, marketing, advertising, sales promotions, cost controls, accounting and reporting procedures, and personnel management systems, each of which we may replace, further develop, or otherwise modify or discontinue from time to time (each a "**Studio**" and collectively, the "**Studios**").

Based on your own investigation and diligence, you have requested that we grant you the right to develop, own and operate a Studio, using the Marks and System (the "**Franchise**") and, to support your request, you and, as applicable, your owners have provided us with certain information about your and their background, experience, skills, financial condition and resources (collectively, the "**Application Materials**"). In reliance on, among other things, the Application Materials, we are willing to grant you the Franchise on these Terms.

    B.    **BUSINESS ENTITY**.

If you are not a natural person, you agree, represent and warrant to us that: (1) you were validly formed and are and will maintain, throughout the Term (defined below), your existence and good standing under the laws of the state of your formation and remain qualified to do business in the state in which you operate your Studio; (2) the information on the attached Data Sheet is complete and accurate as of the Effective Date; (3) the only business that you will own or operate during the Term will be your Franchise and, if applicable, other Studios that you operate pursuant to other franchise agreements with us; (4) at our request, you will furnish us with copies of all documents regarding your formation, existence, standing, and governance; and (5) each of your owners that has direct or indirect ownership of at least 10% of the ownership interests in you (each a "**Principal Owner**") and, if the Agreement is signed pursuant to a Multi-Unit Development Agreement, the developer under that agreement, will sign and deliver to us our then-standard form of Guaranty and Assumption of Obligations (the "**Guaranty**"). Our current form of Guaranty appears as Attachment A hereto.  The non-owner spouse of each guarantor must also sign the Guaranty in the capacity and for the purposes reflected in the Guaranty.

    C.    **MANAGING OWNER**.

You or, if you are not a natural person, one of your Principal Owners you designate, subject to our approval, will be your "**Managing Owner**." You agree that your Managing Owner will be authorized, on your behalf, to deal with us in all matters that arise in respect of the Agreement. We will be entitled to rely on the decision of your Managing Owner without being obligated to seek the approval of your other owners.

<div align="center">1</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

2. **THE FRANCHISE.**

A. **GRANT**.

We hereby grant you the Franchise to develop, own and operate a Studio ("**your Studio**") solely at the "**Premises**" identified on the attached Data Sheet or that we subsequently approve as described in Section 3 below, for a term beginning on the Effective Date and, unless sooner terminated as provided herein, expiring at the close of regular business on the day preceding the 10th anniversary of that date (the "**Term**"). You agree to faithfully, honestly, and diligently perform your obligations under these Terms and use your best efforts to promote your Studio and the Brand. You agree not to conduct the business of your Studio at any location other than the Premises and to use the Premises only for your Studio. Once your Studio opens for business, you agree to continuously operate it in accordance with these Terms for the duration of the Term.

B. **YOUR TERRITORY**.

Subject to your compliance with the terms of the Agreement, we will not, and we will not authorize any other person to, operate a Studio within the area described on the attached Data Sheet as your Territory (the "**Territory**"). If you have not selected a site for your Studio as of the Effective Date, we reserve the right to define your Territory at the time the Premises are identified and approved by us in accordance with Section 3.A below. If you disagree with our definition of the Territory, you may elect to locate and submit an alternative location to us for approval pursuant to Section 3.A below.

C. **TERRITORIAL RIGHTS WE RESERVE**.

We retain all rights to conduct and authorize anyone else to conduct any business activities of any kind whatsoever and do anything other than what we have specifically and expressly agreed in Section 2.B to refrain from doing, at all times before, during and after the Term, without limitation and without compensation to you, regardless of the nature or location of such activities or their customers, and including any business offering or selling products or services that are similar to, the same as, or competitive with, those that your Studio customarily offers or sells, including, the right to:

(1) own and operate, and license others to own and operate, Studios using the System and the Marks on such terms and conditions we deem appropriate;

(2) develop or become associated with other businesses, including other fitness, health and wellness concepts and systems, and/or award franchises under such other concepts for locations whether or not using the System and/or the Marks;

(3) acquire, be acquired by, merge or affiliate with, or engage in any transaction with other businesses (whether or not competitive) located anywhere and (i) convert the other businesses to the Brand and to allow them to operate as part of the System, and/or (ii) permit the other businesses to continue to operate under another name;

(4) solicit customers, advertise, and authorize others to advertise, and promote sales of Studios, and fill customer orders; and

(5) market and sell, and grant to others the right to market and sell, products and services that are authorized for sale at Studios through other or alternative channels of distribution (for example, through the Internet, telemarketing, mail order, e-commerce and catalog sales, and product lines in other businesses) using the Marks or other trademarks and commercial symbols.

2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

3. **DEVELOPMENT AND OPENING OF YOUR STUDIO.**

    A. **LOCATING AND SECURING POSSESSION OF THE PREMISES**.

Despite any assistance we provide, you are entirely responsible, at your expense, for doing everything necessary to develop and open your Studio in accordance with these Terms, including, subject to our prior written approval, locating, selecting, and securing possession of the Premises from which your Studio will operate. If the Premises are not identified in the attached Data Sheet when you sign the Agreement, you must, within 90 days after the Effective Date, locate and obtain our approval of the Premises that must be located within the Search Area identified on the attached Data Sheet. You must provide any information we request to aid in our evaluation of your proposed Premises. Our approval of your proposed site is entirely for our own purposes and, by approving your site, we are not representing or guaranteeing that it will perform as you or we expect. We are not responsible if the site we approve fails to meet your expectations.

If you submit multiple proposed sites to us for our review, for each such site after the first one, we may require you to pay us a site review fee of $2,000 plus reimbursement of any out-of-pocket expenses we incur in connection with the review.

You must secure possession of the Premises within 30 days following our approval, by signing a lease, sublease or other agreement that allows you to develop and operate your Studio at the Premises for the entire Term (the "**Lease**"). You may not, however, sign the Lease until you have received our written approval of its terms. As a condition of our acceptance of the Lease, we may require the Lease to include certain provisions that we periodically require to protect and maintain the Brand and System. If we accept the Lease, we do so for our own purposes, and we make no representation or warranty as to the quality or suitability of the Lease or its terms. You should obtain the advice of your own professional advisors before signing it.

    B. **DEVELOPMENT AND OPENING OF YOUR STUDIO**.

We will provide you our current prototypical plans showing the standard layout and placement specifications for all required equipment, the Computer System (defined below), furniture, fixtures and signs (all of the foregoing being referred to, collectively, as the "**Operating Assets**"). You must, by 10 months after you sign the Lease, do all things necessary to complete the development of your Studio and prepare it for opening in accordance with these Terms, the System, and applicable laws, including adapting the prototypical plans; acquiring and installing the Operating Assets; constructing your Studio to our approval, using vendors we approve as described below, in accordance with the approved detailed construction plans and specifications and space plans for your Studio; retaining and paying all architects and contractors; securing all required operating permits, licenses, and insurance; and retaining and training all employees. You will provide us with any progress reports we request during the course of any design, construction, and remodeling work. We are permitted to visit and inspect the Premises at any time during the design, construction, and remodeling process. At our option, you will employ any design, construction, and remodeling professionals that we designate or approve.

You may not open your Studio for business until we have confirmed in writing that you have completed all pre-opening tasks we require to our satisfaction. Subject to your compliance with applicable laws, you must open your Studio for regular business not later than five days following our written confirmation that you are approved to open. In any event, if you do not open your Studio for business within 12 months following the effective date of this Agreement, we may terminate this Agreement.

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 104 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

C. **LIQUIDITY, OWNERSHIP AND FINANCING**.

We have granted the Franchise to you based, in part, on your representations to us regarding, and our assessment of, your liquidity as of the Effective Date. You will ensure that, throughout the Term, you will maintain sufficient liquidity to meet your obligations under the Agreement.

If at any time you or your affiliates propose to obtain any financing with respect to the Premises, your Studio, or any Operating Assets in which any of such items are pledged as collateral to secure your performance in connection with such financing, the financing is a Transfer subject to our prior written consent in accordance with Sections 13.B and 13.C of these Terms. You may not pledge, assign or encumber this Agreement or the Franchise granted herein.

Subject to this Section 3.C, you must apply for and diligently pursue any government-issued, government-sponsored, or governmental-guaranteed grants, non-recourse loans and/or bailouts for which you qualify and that are made available to small businesses for economic stimulus.

4. **CERTAIN FEES**.

A. **INITIAL FRANCHISE FEE**.

You agree to pay us, on your execution of the Agreement, a non-recurring and non-refundable initial franchise fee in the amount shown on the attached Data Sheet.

B. **ROYALTY FEE**.

Throughout the Term, you agree to pay us a royalty fee (the "**Royalty**") calculated at the rate identified on the attached Data Sheet. Unless we specify otherwise, Royalty will be payable weekly, on or before the day of the week we specify from time to time, based on the Gross Revenue generated during the preceding week. Notwithstanding the foregoing, if you temporarily close your Studio without our consent, you must pay us $750 ("**Temporary Royalty**") each full or partial week your Studio is temporarily closed, due and payable as, when and in the same manner as the Royalty. Temporary Royalty payments will continue on the same day of each subsequent week following the closure of your Studio, until reopening or termination of the Agreement. The amount of Temporary Royalty will not be prorated if your Studio is closed for only part of a week. Payment of Temporary Royalty will not act as a cure of the default caused by the unauthorized closure and will not alter or impair any other rights we have under the Agreement or any other agreements between us and you or your affiliates, all of which are reserved. If we do not exercise our right to terminate based on your unauthorized closure, you may only re-open your Studio with our prior written consent, and upon the re-opening, your last Temporary Royalty payment will be prorated (if applicable), and your Royalty will resume as described above in this Section 4.C.

C. **DEFINITION OF "GROSS REVENUE"**.

As used in the Agreement, "**Gross Revenue**" means the total revenue generated by or from the operation of your Studio, regardless of collection, in whatever form and whether or not in compliance with this Agreement. "Gross Revenue" does not include (a) any sales tax and equivalent taxes that are collected by you for or on behalf of any governmental taxing authority and paid thereto, (b) the value of any allowance issued or granted to any client of your Studio that is credited in good faith by you in full or partial satisfaction of the price of the approved products or services offered in connection with your Studio, or (c) the provision of the Authorized Instructor Training Program at your Studio if we provide the training at your Studio and receive all fees associated therewith. Revenue from the purchase or redemption of gift certificates, gift cards or similar programs is calculated as part of Gross Revenue in accordance with our then-current guidelines for such programs. Gross Revenue also include all insurance proceeds you receive to replace revenue that you lose from the interruption of your Studio due to a casualty or other event covered by business interruption or similar insurance coverage.

4

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 105 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

D.    **NON-COMPLIANCE FEE**.

The Royalty rate we charge under the Agreement was determined based on the assumption that you will comply with your obligations hereunder. If you do not comply with your obligations (including your obligation to at all times engage an Authorized Instructor (as defined in Section 5.B) for the provision of services at your Studio), we will incur additional costs and expenses and, depending on the nature of the noncompliance, may lose the revenue we bargained for in entering the Agreement. Therefore, if we determine that you are not in compliance with your obligations under the Agreement, your Royalty rate will be increased to one percentage point (1%) above the Royalty rate shown on the attached Data Sheet (the "**Non-Compliance Fee**") until we determine that you have cured all deficiencies and are compliant with all terms of the Agreement, at which time it will revert to the rate shown in the attached Data Sheet. Payment of the Non-Compliance Fee is not a cure of the non-compliance that triggered its payment. The Non-Compliance Fee is intended to compensate us for certain expenses or losses we will incur as a result of the non-compliance and is not a penalty or an expression of the total amount of such damages. Nothing in this Section limits any of our other rights and remedies available under the terms of these Terms.

E.    **LATE PAYMENTS AND REPORTING**.

All unpaid amounts you owe us for any reason will bear interest after their due date at the lesser of one and two percent (2%) per month or the highest commercial contract interest rate allowed by law. Payment of interest is in addition to a $100 late fee for each late or returned payment. We may debit your bank account automatically for the service charge and interest. You acknowledge that this Section 4.I is not our agreement to accept any payments after they are due or our commitment to extend credit to, or otherwise finance your operation of, your Studio.

If, through no fault of our own, we are unable to determine your Gross Revenue, we may debit your account for 110% of the average of the last three Royalty and Marketing Fund (as defined in Section 10.C) contributions that we debited. If the amounts that we debit from your account under this paragraph are less than the amounts you actually owe us (once we have determined the true and correct Gross Revenue), we will debit your account for the balance on the day we specify. If the amounts that we debit from your account are greater than the amounts you actually owe us, we will credit the excess against the amounts we otherwise would debit from your account during the following week. You must pay us any costs we incur (including reasonable attorneys' fees) in attempting to collect payments you owe or in otherwise enforcing the terms of the Agreement.

F.    **APPLICATION OF PAYMENTS; SET-OFFS**.

Despite any designation you make, we may apply any of your payments to any of your past due indebtedness to us. We and our affiliates may set off any amounts you or your affiliates owe to us or our affiliates against any amounts we or our affiliates owe you or your affiliates. You may not withhold payment of any amounts owed to us on the grounds of our alleged non-performance of any of our obligations under the Agreement or for any other reason, and you specifically waive any right you may have at law or in equity to offset any funds you may owe us or to fail or refuse to perform any of your obligations under the Agreement.

G.    **METHOD OF PAYMENT**.

We may require you, and you agree, to pay any amounts you owe us or our affiliates by any means we periodically specify whenever we deem appropriate. Currently, you authorize us to debit your designated bank account for all such amounts (the "**EFT Authorization**"). You agree to sign and deliver to us any documents we or your bank require for such EFT Authorization. Such EFT Authorization shall remain in full force and effect at all times the Agreement is in effect and for 30 days following its expiration or termination.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

5. **TRAINING AND ASSISTANCE**.

    A. **INITIAL TRAINING PROGRAM**.

The Initial Training Program is comprised of both (i) the Owner Module and Operations Manager Module (the "**Operations Manager Training**"); and (ii) opening business assistance training, which provides assistance and recommendations regarding the opening and initial operations of your Studio ("**Opening Assistance Training**," and together with Operations Manager Training, the "**Initial Training Program**").

Scheduling, location, content, length and format of our Initial Training Program is at our discretion, and we reserve the right to require that all of your attendees attend and participate at the same time. Successful completion, to our satisfaction, of the Initial Training Program by your Managing Owner and your Operations Manager (which may be the same person at your discretion) (the "**Required Trainees**") is required before you open your Studio to the public. You are expected to successfully complete the Owner Module of the Initial Training Program at least 90 days before you open your Studio, and your Operations Manager (if applicable) is expected to successfully complete the Operations Manager Module at least 45 days prior to opening your Studio. In addition to completion of Operations Manager Training, your Required Trainees must complete Opening Assistance Training within the 30 days prior to your Studio's scheduled opening. In any event, all components of the Initial Training Program must be completed before soliciting or pre-selling any memberships in or for your Studio, and before opening your Studio for business. You will be responsible for all travel and living expenses, wages, and benefits owed to, and other costs of, persons attending the training programs on your behalf or at your request.

If you or your affiliates are opening your (or their) first or second Studio, we will conduct the Initial Training Program and will not charge a fee for participation by the Required Trainees. After your and your affiliates' second Studio, you will be required to conduct the Initial Training Program for the Required Trainees who have not previously completed the training program as provided by us. Before acting as trainers, your trainers must themselves have successfully completed the Initial Training Program, and you must conduct the Initial Training Program in a manner we designate, at a Studio owned by you or your affiliates. Notwithstanding the foregoing, we reserve the right to conduct the Initial Training Program ourselves for your or your affiliates' third or subsequent Studio if we determine that you are unable to properly conduct the required training and, in the event we conduct such required training, we may charge you a reasonable fee for doing so. We may also charge a reasonable fee if any replacement Required Trainee or any persons other than the Required Trainees attend the Initial Training Programs that we conduct.

There is no fee for your Required Trainees' attendance at the Initial Training Program; however, you are responsible for all travel and living expenses we incur if we are traveling to your Studio, and you are responsible for all of your own travel and living expenses if your Required Trainees are attending the training in Atlanta, Georgia. If you are acquiring an existing franchise from another System franchisee, then you must pay our then-current Additional Assistance or Training Fee for all Required Trainees. We may also charge you the Additional Assistance or Training Fee, plus our expenses, if any replacement Required Trainee or any persons other than the Required Trainees must attend the Initial Training Program that we conduct. If your Required Trainees fail to complete all portions of the Initial Training Program within the prescribed timeline, we may terminate the Agreement.

    B. **AUTHORIZED INSTRUCTOR TRAINING PROGRAM**.

Your Studio must at all times engage at least one individual that is Pilates-certified and capable of and authorized to provide Pilates instruction and other approved services at all times (an "**Authorized Instructor**"), which may be you (or your Managing Owner) or your Operations Manager. Any individual that wishes to become an Authorized Instructor must first (i) demonstrate that he/she has met all instructor

<div align="center">6</div>

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 107 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

eligibility requirements we require from time to time, (ii) complete the training program we require for all Authorized Instructors, and (ii) test out with a sample class with us, you or your Operations Manager (the "**Authorized Instructor Training Program**"). We are not responsible for any costs or expenses incurred by any person attending our training programs. You are responsible for all travel and living expenses incurred by you (and your employees) or, if applicable, us and our representative(s). The Authorized Instructor Training Program for your prospective Authorized Instructor(s) will be held at a time that you and we agree.

If at any time your Studio does not engage at least one Authorized Instructor for the provision of services, we may charge you our then-current Non-Compliance Fee for each day that you permit or have permitted a non-certified/trained Pilates instructor to provide any Pilates instruction or any other approved services at your Studio.

The fee for our Authorized Instructor Training Program is currently $2,499 per person, plus a flat fee of $1,000 if you request, and we agree, to provide such training at your Studio. If our representative(s) travel to your Studio for training, you will be responsible for reimbursement of all related travel costs of such representatives. We are not responsible for any costs or expenses incurred by any person attending our training programs. These costs are assessed on all participants in the Authorized Instructor Training Program, including if your Required Trainees attend. The costs and fees for us to conduct the Authorized Instructor Training Program at your Studio will be charged per occurrence of training at your Studio and are subject to change in our sole discretion.

You must pay us a "no-show" fee equal to the greater of $500 per occurrence or the actual costs of rescheduling travel, if your trainee registers for any portion of the Initial Training Program or the Authorized Instructor Training Program and fails, with less than 2 weeks' notice, to show up at the scheduled time or complete the majority of the program.

C.  **TRAINING OF EMPLOYEES**.

You are responsible for providing a training program that we approve for all your employees other than the attendees of the Initial Training Program. All employees must pass a training program to our satisfaction that meets our minimum criteria prior to providing services at your Studio. You will be responsible for the proper training of your employees. You must ensure that everyone you employ is properly trained and is qualified to perform his or her duties at your Studio in accordance with the System and System Standards.

D.  **ADDITIONAL TRAINING AND GUIDANCE**.

If this is your or your affiliates' first or second Studio, we will, at our expense, send one or more of our representative(s) to your Studio to assist with its grand opening (the identity, composition, and length of which will be in our discretion). If this is your or your affiliates' third or subsequent Studio, and we determine that it is in your and the Brand's best interests to send a training and grand opening representative to assist with your Studio's opening, you will be responsible for reimbursing us for the costs and expenses incurred by the training and grand opening representative(s) we send to provide that support, including the costs of travel, lodging, meals, and our then-current Additional Assistance or Training Fee to cover the teams' salary. Our trainer(s) will determine the amount of required time and support necessary to prepare your staff for the grand opening of your Studio.

We may implement annual franchise conferences for our franchisees and provide additional mandatory training programs from time to time on new topics, for your replacement personnel, or as refreshers for previously trained people. We reserve the right to charge a fee for any such programs and for any training materials that we provide in connection with such trainings. You agree to give us reasonable

The Daily Pilates LLC
2024\_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

assistance in training other Studio franchisees, and we will reimburse you for your reasonable out-of-pocket expenses in doing so.

We may periodically advise and guide you regarding various aspects of the operation of your Studio and System Standards (defined below). We will determine the location, frequency, content, and method of delivering all such advice and guidance. If you request, and we agree to provide, additional or special guidance, assistance, or training, we may charge you our then-applicable fees, including per diem charges and travel and living expenses for our personnel.

If, at any time prior to opening your Studio or after your Studio is operational, we agree to provide, at your request, additional assistance that we are not required under the Franchise Agreement to provide, you will be required to pay us a fee, currently in the amount of $1,000 per day but subject to change (the "**Additional Assistance or Training Fee**"), plus the cost of all travel and living expenses incurred by our representative(s) (if applicable). This Additional Assistance or Training Fee applies if you request our assistance in providing the Authorized Instructor Training Program or any additional or ongoing business training at your Studio, and is subject to change in our sole discretion.

E.     **OPERATIONS MANUAL**.

During the Term, we will provide you with electronic access to our manual for the operation of Studios (the "**Operations Manual**"). We will determine the content of the Operations Manual, the frequency in which it may be updated, and the manner and format in which it is delivered or made available to you. The Operations Manual may contain mandatory specifications, standards, operating procedures and rules that we periodically prescribe for operating Studios ("**System Standards**"), and you agree to comply with those standards and requirements. The Operations Manual may also contain other specifications, standards and policies that we may periodically suggest for the operation of your Studio, and adoption of those items in the operation of your Studio will be at your discretion. We may periodically modify the Operations Manual, including in the form of memoranda and newsletters, to reflect changes in System Standards.

Our master copy of the Operations Manual is the controlling copy, and it remains our sole property. The Operations Manual and any passwords and access credentials are part of our Confidential Information (defined below) and must be protected against improper use and disclosure. As such, you may use it only in the operation of your Studio in accordance with these Terms and protect it from improper use and disclosure as described in Article 7 below. If you or your owners or affiliates, intentionally or otherwise, compromise the secure access to the Operations Manual, including, but not limited to, allowing unauthorized users access to it and its contents, you will be required to pay us liquidated damages in the amount of $10,000 to compensate us for the breach and related damage to the System. You are responsible for any loss, destruction, damage, or unauthorized access or use of your copy of the Operations Manual.

6.     **MARKS**.

A.     **OWNERSHIP AND GOODWILL OF MARKS**.

Your right to use the Marks and the System is derived solely from this Agreement and limited to your operating your Studio at the Premises according to these Terms and all System Standards. Your unauthorized use of the Marks or the System is a breach of the Agreement and infringes our and our affiliates' intellectual property rights. Your use of the Marks and any goodwill created by that use are exclusively for our and our affiliates' benefit, and the Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to use them strictly as described in these Terms). You agree not to, at any time during or after the Term, contest or assist any other person in contesting the validity of our and our affiliates' rights to the Marks.

8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

B.    **LIMITATIONS ON YOUR USE OF MARKS**.

You agree to use the Marks we periodically designate as the sole identification of your Studio and to identify yourself as the licensee of the Marks and the independent owner of your Studio in the manner we prescribe. You may not use any Mark (1) as part of any legal entity name or trade name (unless required by law and you promptly notify us in writing of all trade names you intend to register or use); (2) with any modifying words, terms, designs, or symbols (other than logos we have licensed to you); (3) in selling any unauthorized services or products, (4) as part of any website, domain name, email address, social media account, user name, other online presence or presence on any electronic, virtual, or digital medium of any kind ("**Online Presence**"), except as set forth in the Operations Manual or otherwise in writing from time to time; (5) in connection with any advertisement of any prospective transfer that would require our approval under Article 13; (6) to secure any obligation or indebtedness; or (7) in any other manner that we have not expressly authorized in writing. You agree to give the notices of trademark and service mark ownership and registrations that we specify and to maintain, solely during the Term, any fictitious or assumed name registrations required under applicable law.

C.    **NOTIFICATION OF INFRINGEMENTS AND CLAIMS**.

You must notify us immediately of any apparent infringement or challenge to your use of any Mark, or of any person's claim of any rights to or in any Mark (each an "**Infringement Matter**"), and not to communicate with any person other than us or our affiliates, our attorneys, and your attorneys, regarding any such Infringement Matter. We and our affiliates may take the action we or they deem appropriate (including no action) and control exclusively any litigation, administrative actions, or other legal proceedings arising from any Infringement Matter, and you agree to sign any documents and take any other reasonable action that we believe to be necessary or advisable to protect and maintain our and our affiliates' interests in any such proceeding or otherwise to protect and maintain our and their interests in the Marks. We will reimburse you for your reasonable costs of taking any action that we or our affiliates ask you to take in this regard. We also agree to reimburse you for all damages and expenses that you incur in any trademark infringement proceeding disputing your authorized use of any Mark under the Agreement if you have timely notified us of, and comply with our directions in responding to, the proceeding.

D.    **DISCONTINUANCE OF USE OF MARKS.**

If it becomes advisable, in our opinion, to modify or discontinue any Mark used by Studios or to use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your expenses of complying with our directions in that regard or for any loss of revenue due to any modified or discontinued Mark. We may exercise these rights at any time and for any reason, business or otherwise, that we think best, and you waive any claims, demands or damages arising therefrom.

E.    **NON-DISPARAGEMENT**.

You agree not to (and to use your best efforts to cause your current and former owners, officers, directors, agents, employees, representatives, attorneys, spouses, affiliates, successors and assigns not to) disparage or otherwise speak or write negatively, directly or indirectly, of us, our affiliates, any of our or our affiliates' directors, officers, employees, representatives, current and former franchisees or developers, the Brand, the System, any Studio (including your Studio), any business using the Marks, any other brand or concept of us or our affiliates, or which is reasonably likely to subject the Brand or such other brands to ridicule, scandal, reproach, scorn, or indignity, or negatively impact the goodwill of the Marks or the System. This provision survives termination or expiration of the Agreement.

<center>9</center>

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 110 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

7. **CONFIDENTIAL INFORMATION**.

    A.    **TYPES OF CONFIDENTIAL INFORMATION**.

In connection with your Franchise under the Agreement, you and your owners and personnel may from time to time be provided and/or have access to non-public information about the System and the operation of Studios (including your Studio) some of which constitutes our trade secrets under applicable law, whether or not marked confidential (the "**Confidential Information**"), including:

    (1)    Marketing strategies, methods, materials and information;

    (2)    Pricing strategies;

    (3)    the Operations Manual and its contents;

    (4)    growth and development plans, strategies, and forecasts related to the System;

    (5)    site selection criteria;

    (6)    training and operations materials;

    (7)    the System Standards and other methods, formats, specifications, standards, systems, procedures, techniques, market research, customer data, knowledge, and experience used in developing, promoting and operating Studios and the products and services they offer and sell;

    (8)    knowledge of specifications for, and vendors of, Operating Assets and other products and supplies;

    (9)    any software or other technology which is proprietary to us, our affiliates, or the System, including, without limitation, digital passwords and identifications and any source code of, and data, reports, and other materials generated by, the software or other technology, and any materials created by or for our benefit; and

    (10)    knowledge of the operating results and financial performance of Studios (including your Studio).

    B.    **DISCLOSURE AND LIMITATIONS OF USE**.

You agree that your relationship with us does not vest in you any interest in the Confidential Information other than the right to use it in the development and operation of your Studio in accordance with these Terms, and that the use, duplication or improper distribution or publication of the Confidential Information in any case would constitute an unfair method of competition. You acknowledge and agree that the Confidential Information is proprietary, includes trade secrets belonging to us and is disclosed to you or authorized for your use solely on the condition that you agree, and you therefore do agree, that you will: (1) not use the Confidential Information in any other capacity; (2) maintain the absolute confidentiality of the Confidential Information during and after the Term; (3) not make unauthorized copies of, or improperly disclose or publish any portion of, the Confidential Information however and in whatever form or format disclosed to you; and (4) adopt and implement all reasonable procedures and safeguards we periodically prescribe to prevent unauthorized use or disclosure of the Confidential Information, including, establishing reasonable security and access measures, restricting disclosure to your employees, and the use of nondisclosure and noncompetition agreements we may prescribe for employees or others who have access to the Confidential Information.

    C.    **EXCEPTIONS TO LIMITATIONS**.

The restrictions on your disclosure of the Confidential Information will not apply to the: (i) disclosure of information, processes, or techniques which are lawfully known and used in wellness industry or by the public generally (as long as the availability is not because of a violation of applicable law or an obligation

The Daily Pilates LLC
2024-04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.8

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 111 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

to us or our affiliates by you), provided that you have first given us written notice of your intended disclosure; (ii) disclosure of the Confidential Information in judicial or administrative proceedings when and only to the extent you are legally compelled to disclose it, provided that you have first given us the opportunity to obtain an appropriate protective order or other assurance satisfactory to us that the information required to be disclosed will be treated confidentially; and (iii) disclosure of your Studio's operating results and financial performance to your existing and prospective lenders, and, provided they are bound by confidentiality obligations, to potential investors in you or purchasers of your Studio.

D.    **INNOVATIONS**.

You must promptly disclose to us all ideas, concepts, methods, techniques and products conceived or developed by you and/or any of your affiliates, owners, agents, representatives, contractors or employees during the Term relating to the development or operation of your Studio or other Studios ("**Innovations**"), whether or not protectable intellectual property and whether created by or for you or your owners or employees. All Innovations are our sole and exclusive property and works made-for-hire for us and shall constitute our Confidential Information. To the extent any Innovation does not qualify as a work made-for-hire for us, by this Section you assign ownership of that Innovation, and all related rights to that Innovation, to us and agree to sign (and to cause your owners, employees, and contractors to sign) whatever assignment or other documents we request to evidence our ownership or to help us obtain intellectual property rights in the Innovation. We and our affiliates have no obligation to make any payments to you or any other person with respect to any Innovations. You may not use any Innovation in operating your Studio or otherwise without our prior approval.

8.    **COMPETITION AND INTERFERENCE DURING TERM**.

A.    **COVENANTS**.

We have granted you the Franchise in consideration of and reliance upon your agreement to deal exclusively with us and the agreement of certain of your related parties not to engage in activities that are competitive with us and Studios. You therefore agree that, during the Term, neither you, your affiliates, your Operations Manager, nor any of your or your affiliates' owners or their immediate family members (collectively, the "**Restricted Parties**") will:

(1)    have any direct or indirect interest as an owner (whether of record, beneficially, or otherwise) in a Competitive Business (as defined below), wherever located or operating (except that equity ownership of less than five percent (5%) of a Competitive Business whose stock or other forms of ownership interest are publicly traded on a recognized United States stock exchange will not be deemed to violate this subparagraph);

(2)    perform services for or provide benefits to, in any capacity, a Competitive Business, wherever located or operating;

(3)    divert or attempt to divert any actual or potential business or customer of your Studio to a Competitive Business;

(4)    interfere or attempt to interfere with our or our affiliates' relationships with any vendors, franchisees or consultants; or

(5)    directly or indirectly, appropriate, use or duplicate the System or System Standards, or any portion thereof, for use in any other business or endeavor.

You agree to obtain similar covenants from your owners and Operations Managers. We have the right to regulate the form of agreement that you use and to be a third-party beneficiary of that agreement

11

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

with independent enforcement rights. Nothing contained herein shall be deemed a waiver of our right to terminate pursuant to Section 15.B of these Terms.

B.     **COMPETITIVE BUSINESS DEFINED**.

The term "**Competitive Business**" means any business (other than an authorized Studio): (i) that offers products and services that are the same as or substantially similar to those offered at Studios; (ii) whose core offerings include Pilates and wellness instruction, classes, and private sessions and related services; (iii) whose offerings, concept, business model or method of operation is similar to that of a Studio or any other wellness businesses operated, franchised or licensed by us or our affiliates; or (iv) that grants franchises or licenses for the operation of any of the foregoing or provides services to the franchisor or licensor of any of the foregoing.

9.     **BUSINESS OPERATIONS AND SYSTEM STANDARDS**.

A.     **CONDITION AND APPEARANCE OF YOUR STUDIO**.

You agree to place or display at the Premises (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos, display and advertising materials, and other Trade Dress elements that we periodically approve. You further agree to maintain the condition and appearance of your Studio, its Operating Assets and the Premises in accordance with the System Standards and, consistent with the image of Studios, as an efficiently operated business offering high-quality products and services and observing the highest cleanliness and efficient, courteous service. Toward that end, you agree, without limitation and at your expense, to: (a) clean, repaint, redecorate, repair, and maintain the interior and exterior of the Premises at intervals that we prescribe; (b) maintain, repair or, at our discretion, replace damaged, worn-out or obsolete Operating Assets or elements of the Trade Dress at intervals that we may prescribe (or, if we do not prescribe an interval for replacing any Operating Asset or Trade Dress element, as that Operating Asset or Trade Dress element needs to be repaired or replaced); and (c) renovate, refurbish, remodel, or replace the real and personal property and equipment used in operating your Studio when reasonably required to comply with our System Standards. If we change our System Standards, we will give you a reasonable period of time within which to comply with such changes.

You are responsible for maintaining required branded retail items in sufficient quantities, and for maintaining and/or replacing Pilates and other equipment as needed and follow maintenance guidelines as described in any manufacturer's or seller's instructions and in the Operations Manual from time to time.

B.     **USE OF DESIGNATED COMPUTER SYSTEM**.

You must, at your expense, obtain, maintain, and use in your Studio the integrated computer hardware and software that we periodically specify from time to time in the Operations Manual, including the management software, point-of-sale system, and inventory control system we designate (the "**Computer System**"). You also agree to maintain a functioning e-mail address and all specified points of high-speed internet connection. We may modify specifications for, and components of, the Computer System, which might require you to acquire new or modified computer hardware or software and obtain service and support for the Computer System. You must at all times during the Term ensure that your Computer System, as modified, meets our System Standards and functions properly. You must record all documents and information in the Computer System as we specify, including all receipts, expenses, invoices, member lists, class and employee schedules and other business information.

You may be required to license, and sign a software license agreement regarding, certain proprietary software as part of our requirements for the Computer System. We and our affiliates may charge you an initial and recurring fee to fund the development, licensure, and acquisition of various technologies and technology-related systems used in Studios (a "**Technology Fee**"). We reserve the right to increase the

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Technology Fee to reflect changes in the costs and availability of technology. We may also require that you pay us for software and other technology that you receive through us from third-party providers. You will have sole and complete responsibility for the manner in which your Computer System interfaces at our specified levels of connection speed with our and any third party's computer system and any and all consequences if the Computer System is not properly operated, maintained, and upgraded. We may change the Technology Fee from time to time.

You must incur the costs of obtaining the Computer System (or additions and modifications) and required service or support, payable to us and/or our affiliates through the Technology Fee. It is your responsibility to implement and pay for all changes, modifications, maintenance, and upgrades associated with the Computer System, and we have no obligation to reimburse you for any costs detailed in this Section 9.B unless otherwise noted. We have no obligation to provide maintenance, repairs, upgrades, or updates to the Computer System. If proprietary software is developed and provided to you, we may revise your obligations in that regard. We may elect to require updates or upgrades to any component of these systems, and there will be no limitations on such requests.

You will provide us with any passwords necessary to access the business information for your Studio that is stored on the Computer System. We may use such information to communicate directly to the members of your Studio, and to provide updates, information, newsletters, and special offers to the members. Upon expiration or termination of the Agreement, you shall have no further access or rights to the member information.

C.     **PRODUCTS AND SERVICES YOUR STUDIO OFFERS**.

You agree that you (1) will offer and sell from your Studio all of the products and services, and in the manner, that we periodically specify; (2) will not offer or sell at or from your Studio, the Premises or any other location any products or services we have not authorized; and (3) will discontinue selling and offering for sale any products or services that we at any time disapprove. You will obtain and use all equipment we require for the operation of your Studio and will refrain from using any equipment prohibited or not approved by us. You must immediately bring your Studio into compliance with our System Standards for such products or services, including by purchasing or leasing any necessary Operating Assets, making any required changes to signage and advertising materials, and updating your Computer System to include any software, hardware or other equipment necessary to offer such products services through an online and/or automated system. If, at any time, we require or permit you to offer off-site products or services, we reserve the right to limit the geographic area in which you may offer such products or services, and we may periodically modify that geographic area, in our sole discretion. We may implement membership reciprocity programs or campaigns by and among Studios within the franchise system, and you must comply with such programming.

D.     **MANAGEMENT OF YOUR STUDIO**.

You must designate a person, who may, but need not, be your Managing Owner or one of your other owners, to serve as the "**Operations Manager**" of your Studio. Your Studio must at all times be managed by your Operations Manager that: (i) is designated by you to assume primary responsibility, and has authority, for the day-to-day management and operation of your Studio; (ii) will devote full-time and best efforts to the supervision and management of your Studio; (iii) satisfies our educational and business experience criteria for Operations Managers of Studios, as set forth in the Operations Manual or otherwise; and (iv) has satisfactorily completed our Initial Training Program and any other training programs we may periodically require. Such individual must be on-site at your Studio during normal business hours to manage the day-to-day operations of your Studio, but you are solely responsible for hiring and determining the terms of employment for your Operations Manager.

<div align="center">13</div>

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 114 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

You must inform us in writing of the identity of your Operations Manager and any replacements. You must also keep us advised in writing of all instructors involved in the operation of your Studio and their contact information. If your Operations Manager ceases active employment at your Studio or no longer satisfies the qualifications of an Operations Manager in accordance with this Section, you must promptly notify us and take corrective measures (which may include additional training or replacement) within 30 days. You are responsible for ensuring proper interim management and continued operations of your Studio until those corrective measures are completed or a replacement Operations Manager is designated, approved by us, and trained as required by these Terms.

E. **APPROVED VENDORS**.

You agree to use the manufacturers, vendors, distributors, suppliers, and producers (collectively referred to herein as "**vendors**") that we specify or approve for all aspects of the development (including site selection, selection and appointment of an architect and general contractor, review of construction bids, supervision of construction, and general oversight of the construction process) and operation of your Studio for which such vendors provide goods or services. We also reserve the right to periodically approve or designate the terms and distribution methods for any goods or services. We may, at our option, arrange with designated vendors to collect or have our affiliates collect fees and expenses associated with products and services they provide to you and, in turn, pay the vendor on your behalf for such products or services. If we elect to do so, you agree that we or our affiliates may auto-debit your bank account for such amounts in the same manner and using the same authorization that you grant us with respect to payment of Royalty and other fees. We or any of our affiliates may be a vendor, or otherwise party to these transactions, and may derive revenue or profit from such transactions. We and any of our affiliates may use such revenue or profit without restriction. We also reserve the right to collect a music licensing fee on behalf of any designated third-party supplier or otherwise.

If you would like us to consider approving a vendor that is not then approved by us, you must submit a written request before purchasing any items or services from that vendor. We will make all determinations about whether to approve an alternative vendor or product based on our then-current criteria, which may change periodically. We are not required to respond to your request, and any actions we take in response to your request will be at our sole and unfettered discretion, including the assessment of a fee to compensate us for the time and resources we spend in evaluating the proposed vendor. We may, with or without cause, revoke our approval of any vendor at any time.

F. **COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES**.

You must secure and maintain in force throughout the Term all required licenses, permits and certificates relating to the operation of your Studio and operate your Studio in full compliance with all applicable laws, ordinances and regulations, including PCI compliance standards. You agree to comply and assist us in our compliance efforts, as applicable, with any and all laws, regulations, executive orders (whether at the federal, state or local level) or otherwise relating to anti-terrorist activities, including without limitation the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury or other regulations. In connection with such compliance efforts, you agree not to enter into any prohibited transactions and to properly perform any currency reporting and other activities relating to your Studio as may be required by us or by law. You confirm that you are not listed in the Annex to Executive Order 13224 and agree not to hire any person so listed or have any dealing with a person so listed (the Annex is currently available at http://www.treasury.gov). You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders or regulations, and specifically acknowledge and agree that your indemnification responsibilities as provided in Section 17.C pertain to your obligations hereunder. Notwithstanding the foregoing, in the event an executive order is issued that directly affects the operation of your Studio, you will not close your Studio unless: (1) you obtain our prior written consent; and (2) it is

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

specifically in response to an applicable executive order and not based on recommendations or guidelines issued by a governmental authority or agency or the Centers for Disease Control and Prevention.

You agree to comply with our website privacy policy, as it may be amended periodically, pertaining to any Online Presence or use or access to any System Website (as defined in Section 10.G below); you further agree to comply with any requests to return or delete consumer personal information, whether requested by us or directly by the consumer, as required by applicable data sharing and privacy laws.

You and your Studio must in all dealings with its customers, vendors, us and the public adhere to the highest honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice that might injure our business, any Studios, or the goodwill associated with the Marks. You must notify us in writing within three (3) business days of: (1) the commencement of any action, suit or proceeding relating to your Studio; (2) the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality relating to your Studio; (3) any notice of violation of any law, ordinance or regulation relating to your Studio, and/or that any audit, investigation, or similar proceeding is pending or threatened against you or your Studio; (4) receipt of any notice of complaint from the Better Business Bureau, any local, state or federal consumer affairs department or division, or any other government or independent third party involving a complaint from a client or potential client relating to your Studio; (5) written complaints from any customer or potential customer, and (6) any and all other notices you receive claiming that you (or your affiliates or representatives) have violated or breached any intellectual property rights, or the terms and conditions of any agreements related to the operation of your Studio. You must immediately provide to us copies of any documentation you receive of any of the foregoing events and resolve the matter in a prompt and reasonable manner in accordance with good business practices.

G. **INSURANCE**.

You must, at your expense, comply with the requirements regarding insurance coverages that we describe in our Operations Manual from time to time. If you fail or refuse to procure and maintain the required insurance, we may (but need not) obtain such insurance on your behalf, in which event you must cooperate with us and reimburse us for all premiums, costs and expenses we incur in obtaining and maintaining the insurance, plus a reasonable fee for our time incurred in obtaining such insurance. No insurance coverage that you or any other party maintains will be deemed a substitute for your indemnification obligations to us or affiliates under Section 17.C or otherwise.

Our insurance requirements represent only the minimum coverage that we deem acceptable to protect our interests and are not representations or warranties of any kind that such coverage is sufficient to comply with applicable law or protect your interests or those of your Studio. It is your sole responsibility to make that determination and to acquire any additional coverages you believe are necessary to protect those interests, based on your own independent investigation.

H. **PRICING**.

Unless prohibited by applicable law, we may periodically set a maximum or minimum price that you may charge for products and services offered by your Studio. If we impose such a maximum or minimum price, you may charge any price for the product or service up to and including our designated maximum price or down to and including our designated minimum price. The designated maximum and minimum prices for the same product or service may, at our option, be the same. For any product or service for which we do not impose a maximum or minimum price, we may require you to comply with an advertising policy adopted by us which will prohibit you from advertising any price for a product or service that is different than our suggested retail price. Although you must comply with any advertising policy we

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

adopt, you will not be prohibited from selling any product or service at a price above or below the suggested retail price unless we impose a maximum price or minimum price for such product or service.

I.  **CONTACT INFORMATION AND LISTINGS**.

You agree that each telephone or facsimile number, directory listing, and any other type of contact information used by or that identifies or is associated with your Studio (any "**Contact Identifiers**") will be used solely to identify your Studio in accordance with these Terms. You acknowledge and agree that, as between us and you, we have the sole rights to, and interest in, all Contact Identifiers and all Online Presences. You hereby authorize us and irrevocably appoint us or our designee as your attorney-in-fact to direct the telephone company, postal service, registrar, Internet Service Provider and all listing agencies to transfer such Contact Identifiers to us.

J.  **COMPLIANCE WITH SYSTEM STANDARDS**.

You agree at all times to operate and maintain your Studio according to each and every System Standard, as we periodically modify and supplement them. Though we retain the right to establish and periodically modify System Standards, you retain the right and sole responsibility for the day-to-day management and operation of your Studio and the implementation and maintenance of System Standards at your Studio. System Standards may regulate any aspect of the operation and maintenance of your Studio, including, but not limited to, any one or more of the following:

(1)  sales, marketing, advertising and promotional programs and materials and media used in these programs;

(2)  staffing levels for your Studio and employee qualifications, training, dress and appearance (although employee selection and promotion, hours worked, rates of pay and other benefits, work assigned and working conditions are your sole responsibility);

(3)  use and display of the Marks;

(4)  days and hours of operation;

(5)  methods of payment that your Studio may accept from customers;

(6)  participation in market research and product and service testing programs;

(7)  participation in gift card programs and other loyalty programs;

(8)  cleanliness, consistency, safety and training specifications;

(9)  class and private session instruction, including service offerings, equipment use, class cadence, and inclusion (or exclusion) of certain instruction;

(10)  bookkeeping, accounting, data processing and record keeping systems and forms; formats, content and frequency of reports to us of sales, revenue, and financial performance and condition;

(11)  participation in quality assurance and customer satisfaction programs;

(12)  types, amounts, terms and conditions of insurance coverage required for your Studio, including criteria for your insurance carriers; and

(13)  any other aspects of operating and maintaining your Studio that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Studios.

16

Case 3:26-cv-00550-KDB-DCK  Document 1-1  Filed 07/08/26  Page 117 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Our modification of System Standards, which may accommodate regional or local variations, may obligate you to invest additional capital in your Studio and incur higher operating costs. At our discretion, we may require you to make certain modifications to the manner of operation of your Studio, including without limitation, modifying the hours of operation, changing the manner in which products or services shall be delivered to customers, limiting or changing the products or services that you shall provide to customers, and creating and displaying temporary signage, all of which may be required on a regional or local basis as necessary to address certain public health concerns. These modifications do not need to be implemented throughout the System, and in certain situations, could only affect your Studio, and could include requiring temporary closure. We will determine the scope and duration of such modifications.

### K.  **INFORMATION SECURITY**.

You may from time to time have access to information that can be used to identify an individual, including names, addresses, telephone numbers, e-mail addresses, employee identification numbers, signatures, passwords, financial information, credit card information, biometric or health data, government-issued identification numbers and credit report information ("**Personal Information**"). You may gain access to such Personal Information from us, our affiliates, our vendors, or from your own operations. You acknowledge and agree that, as between us and you, all Personal Information (other than Restricted Data, as defined below) is our Confidential Information and is subject to the protections in Section 7.

During and after the Term, you (and if you are a legal entity, each of your owners) agree to, and to cause your respective current and former employees, representatives, affiliates, successors, and assigns to: (a) collect, disclose, process, retain, and use all Personal Information only in strict accordance with all applicable laws, regulations, orders, the guidance and codes issued by industry or regulatory agencies, and the privacy policies and terms and conditions of any applicable Internet presence; (b) assist us with meeting our compliance obligations under applicable laws and regulations relating to Personal Information; and (c) promptly notify us of any communication or request from any customer or other data subject to access, correct, delete, opt-out of, or limit activities relating to any Personal Information.

If you become aware of a suspected or actual breach of security or unauthorized access involving Personal Information, you will notify us immediately and specify the extent to which Personal Information was compromised or disclosed. You also agree to follow our instructions regarding curative actions and public statements relating to the breach. We reserve the right to conduct a data security and privacy audit of any part of the Studio and Computer System at any time, from time to time, to ensure that you are complying with our requirements. You must promptly notify us if you receive any complaint, notice, or communication, whether from a governmental agency, customer or other person, relating to any Personal Information, or your compliance with our obligations relating to Personal Information under this Agreement, and/or if you have any reason to believe that you will not be able to satisfy any of your obligations relating to Personal Information under this Agreement.

Notwithstanding anything to the contrary in the Agreement, you agree that we do not control or own any of the following Personal Information (collectively, the "**Restricted Data**"): (a) any Personal Information of employees, officers, contractors, owners or other personnel of you, your affiliates, or the Studio; (b) such other Personal Information as we may from time to time expressly designate as Restricted Data; and/or (c) any other Personal Information to which we do not have access. Regardless of any guidance we may provide generally and/or any specifications that we may establish for Personal Information, You have sole and exclusive responsibility for all Restricted Data, including establishing protections and safeguards for such Restricted Data.

<div align="center">17</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

L.    **EMPLOYEES, AGENTS AND INDEPENDENT CONTRACTORS**.

You must maintain at all times a sufficient number of properly trained and competent employees and independent contractors in order to operate your Studio in accordance with the System Standards. You acknowledge and agree that you are solely responsible for all decisions relating to employees, agents, and independent contractors that you hire to assist in the operation of your Studio. You agree that any employee, agent or independent contractor that you hire will be your – not our – employee, agent or independent contractor. You also agree that you are exclusively responsible for the terms and conditions of employment of your employees, including recruiting, hiring, firing, training, compensation, work hours and schedules, work assignments, safety and security, discipline, and supervision. You must ensure that all personnel who work at your Studio are properly licensed, certified, registered with appropriate authorities, trained, educated and experienced to perform the tasks assigned to them or to which they are likely to engage in connection with their relationship with your Studio. You agree to manage the employment functions of your Studio in compliance with federal, state, and local employment laws.

10.    **MARKETING**.

A.    **GRAND OPENING MARKETING**.

You must, at your expense and on the dates we designate, conduct a grand opening marketing program for your Studio that complies with the requirements set forth in the Operations Manual ("**Grand Opening Marketing**"). The amount you will be required to spend on Grand Opening Marketing will depend on various factors, but we require that you spend no less than $6,000. We or our approved vendors may choose to perform certain advertising and promotional activities reasonably targeted at the area surrounding the Premises, in which case you may be required to pay to us directly the Grand Opening Marketing expenses or other expenses we designate. The amount you spend on Grand Opening Marketing will not count towards your other required marketing expenditures under this Article 10 or the Marketing Expenditure Cap (defined below).

B.    **MARKETING FUND**.

We reserve the right to form and require you to contribute to a Marketing Fund, which will be used to promote the awareness of the Brand and Studios generally (the "**Marketing Fund**"). Your contribution will be in amounts we periodically specify and will be payable in the same manner as the Royalty. We have the right, at any time and on notice to you, to change the amount you must contribute to the Marketing Fund, but we cannot require that the percentage of Gross Revenue you are required to contribute to the Marketing Fund, spend on local marketing pursuant to Section 10.D below, and contribute to a Local Advertising Cooperative exceed, in the aggregate, five percent (5%) ("**Marketing Expenditure Cap**").

We or our affiliates or other designees will direct all programs that are funded by contributions to the Marketing Fund, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation. We may use contributions to the Marketing Fund to pay for preparing and producing materials and electronic or digital media in any form or format that we periodically designate, including but not limited to: administrating online advertising strategies, including maintaining a System Website or mobile apps; administering regional and multi-regional marketing and advertising programs; implementing a loyalty program; and supporting public relations, market research, product development, and other advertising, promotion, social media and marketing activities. In our discretion, we may sell you, at a reasonable price, copies of certain materials funded by contributions to the Marketing Fund.

We will account for contributions to the Marketing Fund separately from our other funds and not use the Marketing Fund contributions for any of our general operating expenses. However, we may use contributions to the Marketing Fund to reimburse us or our affiliates or designees for the reasonable salaries

18

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

and benefits of personnel who manage and administer activities funded by the Marketing Fund, the Marketing Fund's other administrative costs, travel expenses of personnel while they are on Marketing Fund business, meeting costs, overhead relating to Marketing Fund business, and other expenses that we incur in activities reasonably related to administering or directing the Marketing Fund and its programs.

Contributions to the Marketing Fund will not be our asset, but we do not assume or owe any fiduciary obligation to you in respect of those contributions or for administering the Marketing Fund or any other reason. We will hold all Marketing Fund contributions for the benefit of the contributors and use contributions for the purposes described in this Section 10.C. We may spend in any fiscal year on Marketing Fund activities more or less than the total Marketing Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We may use all interest earned on the Marketing Fund contributions to pay costs before using the Marketing Fund's other assets. We will prepare an annual, unaudited statement of Marketing Fund collections and expenses and, once prepared, give you the statement for the most recently completed fiscal year upon your written request. The Marketing Fund is not audited. We may incorporate the Marketing Fund or operate it through a separate entity whenever we deem appropriate. The successor entity will have all of the rights and duties specified in this Section 10.C.

We need not ensure that Marketing Fund expenditures in or affecting any geographic area are proportionate or equivalent to Marketing Fund contributions by Studios operating in that geographic area or that any Studio benefits from Marketing Fund activities either directly or in proportion to its Marketing Fund contributions. We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Marketing Fund contributions at the Marketing Fund's expense. We also may forgive, waive, settle, and compromise all claims by or against the Marketing Fund. Except as expressly provided in this Section 10.C, we assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing, or administering the Marketing Fund. Studios owned by us or our affiliates are not required to contribute to any Marketing Fund.

We may at any time defer or reduce your contributions to the Marketing Fund, and upon 30 days' prior notice to you, suspend Marketing Fund operations for one or more periods of any length and/or terminate (and if terminate, reinstate) the Marketing Fund. If we terminate the Marketing Fund, we will, at our option, either spend all unspent monies at our discretion, until such amounts are exhausted, or distribute the funds in the Marketing Fund to the contributing Studio owners in a manner we deem fair and equitable.

C.      **LOCAL ADVERTISING EXPENDITURES**.

In addition to your obligations under Section 10.A through Section 10.C above, and beginning after you complete your Grand Opening Marketing pursuant to Section 10.B, you must spend a certain amount of your monthly Gross Revenue to locally advertise and promote your Studio (the "**Local Advertising Requirement**"). However, subject to the Marketing Expenditure Cap we have the right, at any time and on notice to you, to change the amount of your Local Advertising Requirement. You must list and advertise your Studio with the online directories we periodically prescribe and establish any other Online Presence we require or authorize, each in accordance with our System Standards. If other Studios are located within the directory's distribution area, we may require you to participate in a collective advertisement with them and to pay your share of that collective advertisement. Within 30 days after the end of each calendar quarter, and upon our request at any other time, you agree to send us, on our request and in the manner that we prescribe, an accounting of your expenditures required under this Section during the preceding calendar quarter or another period we designate.

You must not engage in any advertising or promotions within any known Territory of any other franchisee's Studio without our written consent. All materials you use to promote your Studio must be materials that we have provided or made available to you or that we otherwise approve, in writing, prior to

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

your use.  All such materials that you create must be completely clear, factual, ethical and not misleading and must conform to our marketing and advertising policies that we periodically prescribe. You must submit to us, for our approval, samples of marketing materials you intend to use at least 14 days prior to your proposed use.  If you do not receive our written approval of the materials within 14 days of your submission, they are deemed to be disapproved. We may, in our discretion, withdraw our approval if a regulatory or other issue arises that, in our opinion, makes such withdrawal in our or the System's best interests.

You must also obtain our prior approval before participating in any marketing events or advertising opportunities. If you submit to us for approval any materials or proposals, then we are permitted to adopt those materials or proposals for general use in advertising or promotions, in which case you will take any action we reasonably request to document and confirm an irrevocable and perpetual assignment to us or our designee of any copyright and a waiver of any moral rights relating to that advertising or promotion in consideration of the continued use of the Marks and System. You must fully participate, at your expense, in all advertising, marketing, and promotional activities we require, including the introduction or test marketing of new products or services, grand opening events, industry events, reciprocity programs and other initiatives and programs we direct or approve.

We reserve the right, at any time, to issue you a notice that the amounts required to be spent by you under this Section 10.D shall, instead, be paid to us or our designee. If we exercise this option, we will then spend such amounts, in accordance with local marketing guidelines and programs that we periodically develop, to advertise and promote your Studio on your behalf.  We may instead, in our discretion, contribute any such amounts to the Marketing Fund or to a Local Advertising Cooperative in accordance with and as required under Section 10.E below. We may also elect, on one or more occasions and without prejudice to our rights to issue further notices, to temporarily or permanently cease conducting such marketing activities on your behalf and, instead, to require you to conduct such marketing activities yourself in accordance with this Section 10.D.

D. **LOCAL ADVERTISING COOPERATIVE**.

When there are multiple Studios operating in the same geographical area (as we define), we may establish or direct the establishment of a local advertising cooperative ("**Local Advertising Cooperative**"), the purpose of which is, with our approval, to administer coordinated advertising programs and develop advertising, marketing and promotional materials for the area that the Local Advertising Cooperative covers. The Local Advertising Cooperative will be organized and governed in a form and manner, and begin operating on a date, that we determine. We may change, dissolve and merge Local Advertising Cooperatives. You agree to sign any documents we require to become a member of a Local Advertising Cooperative and, subject to the Marketing Expenditure Cap, to contribute to and participate in the designated Local Advertising Cooperative.

E. **BRANDED EMAILS**.

We may require you to use an email address associated with our registered domain name in connection with the operation of your Studio. If we require you to obtain and use such an email address, you must do so in accordance with our System Standards. You acknowledge and agree that we will have access to all such email accounts and all documents, data, materials, and messages shared from or by such accounts. We may deactivate any such account or limit your or your users' access to it at any time. You acknowledge and agree that you will use such email address only in connection with the operation of your Studio and in compliance with all applicable laws. You agree to indemnify us and our affiliates for claims arising from your unlawful use of such email address.

<div align="center">20</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

F.  **SYSTEM WEBSITES & ONLINE PRESENCES**.

We may establish, develop and update Online Presences to advertise, market, and promote Studios, the products and services that they offer and sell, or your Studio franchise opportunity (each a "**System Website**"). We may, but are not obligated to, provide you with a webpage or other Online Presence that references your Studio on any System Website, upon which, you must: (i) provide us the information and materials we request to develop, update, and modify the information about your Studio; (ii) notify us whenever any information about your Studio is not accurate; and (iii) pay our then-current initial technology Fee for the Online Presences that are dedicated to your Studio. You acknowledge that we have final approval rights over all information on any System Website.

If you default under the Agreement, we may, in addition to our other remedies, temporarily remove references to your Studio from any System Website until you fully cure the default. All advertising, marketing, and promotional materials that you develop for your Studio must contain notices of the System Website's domain name in the manner we designate. We may deactivate the System Website or limit your users' access to it at any time.

You may not, without our prior written consent, develop, maintain or authorize any Online Presence that mentions your Studio, links to any System Website, or displays any of the Marks. You may not, directly or indirectly, through any Online Presence, promote, advertise or sell any products or services without our prior written approval.  If we approve the use of any such Online Presence in your Studio's operations, you will develop and maintain such Online Presence only in accordance with our guidelines, including our guidelines for posting any messages or commentary on other third-party websites. Unless we specify otherwise, we will own the rights to each such Online Presence. At our request, you agree to grant us access to each such Online Presence, and to take whatever action (including signing assignment or other documents) we request to evidence our ownership of such Online Presence, or to help us obtain exclusive rights in such Online Presence. If we allow you to maintain an Online Presence for your Studio, you must prepare and link a privacy policy to such Online Presence. Your Online Presence's privacy policy must comply with all applicable laws, the System Standards, and other terms and conditions that we may prescribe in writing.

We and our affiliates have the right to sell merchandise through any System Website directly to retail and/or wholesale customers, and in doing so, we have the right to create a separate System Website or other web page containing the *The Daily Pilates*® name and Marks.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, WE HEREBY EXPRESSLY DISCLAIM ALL WARRANTIES (WHETHER EXPRESS, IMPLIED OR STATUTORY) RELATED TO THE AVAILABILITY AND PERFORMANCE OF A SYSTEM WEBSITE AND YOUR STUDIO'S PAGE, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. TO THE MAXIMUM EXTENT PERMITTED BY LAW, WE WILL NOT BE LIABLE FOR ANY DIRECT OR INDIRECT DAMAGES (INCLUDING ANY CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS) RELATED TO THE USE, OPERATION, AVAILABILITY OR FAILURE OF THE SYSTEM WEBSITE OR YOUR STUDIO'S PAGE.

The Daily Pilates LLC
2024-04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.8

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 122 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

11. **RECORDS, REPORTS, AND FINANCIAL STATEMENTS**.

You must establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats we periodically prescribe. You agree to give us in the manner and format that we periodically prescribe:

(1) on or before the 5th day following each accounting period specified by us from time to time (each an "**Accounting Period**"), a report on the Gross Revenue of your Studio during the preceding Accounting Period;

(2) within 30 days after the end of each accounting month specified by us from time to time (each an "**Accounting Month**"), the operating statements, financial statements, statistical reports, purchase records, and other information we request regarding you and your Studio covering the previous Accounting Month and the fiscal year to date;

(3) within 90 days after the end of each fiscal year, annual profit and loss and source and use of funds statements and a balance sheet for your Studio as of the end of that calendar year, prepared in accordance with generally accepted accounting principles or, at our option, international accounting standards and principles;

(4) within 10 days after our request, exact copies of federal and state income tax returns, sales tax returns, and any other forms, records, books, and other information we periodically require relating to your Studio and the Franchise; and

(5) by January 15, April 15, July 15 and October 15 of each calendar year, reports on the status (including the outstanding balance, then-current payment amounts, and whether such loan is in good standing) of any loans outstanding as of the previous calendar quarter for which your Studio or any of the Operating Assets are used as collateral. You must also deliver to us, within five (5) days after your receipt, copies of any default notices you receive from any of such lenders. You agree that we or our affiliates may contact your banks, other lenders, and vendors to obtain information regarding the status of loans of the type described herein and your accounts (including payment histories and any defaults), and you hereby authorize your bank, other lenders, and vendors to provide such information to us and our affiliates.

We may disclose data derived from these reports. Moreover, we may, as often as we deem appropriate (including on a daily basis), access the Computer System and retrieve all information relating to the operation of your Studio. You agree to preserve and maintain, in a secure location at your Studio for at least seven (7) years after the end of each fiscal year, all records related to that year (including, but not limited to, sales checks, purchase orders, invoices, payroll records, customer lists, check stubs, sales tax records and returns, cash receipts and disbursement journals, and general ledgers). Your submission of any records or reports to us will constitute your representation that the contents of such records or reports are accurate to the best of your knowledge.

At our request, you will provide current financial information for your owners and guarantors sufficient to demonstrate their ability to satisfy their obligations under their individual Guarantees. If you are an entity, then you will provide to us on our request copies of any corporate records, including formation and governance documents.

22

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 123 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

12. **INSPECTIONS AND AUDITS**.

    A.    **OUR RIGHT TO INSPECT YOUR STUDIO**.

We (or our designee) may at all times and without prior notice to you inspect, photograph, record activity in, and observe your Studio and its operations for consecutive or intermittent periods we deem necessary; remove samples of any products and supplies; interview your personnel and customers; inspect your Computer System and its components; and inspect and copy any books, records, and documents relating to the operation of your Studio. You agree to fully cooperate with us. If we exercise any of these rights, we will not interfere unreasonably with the operation of your Studio. You agree to present to your customers the evaluation forms that we may prescribe and to participate (and request your customers to participate) in any surveys performed by or for us. You must reimburse all of our costs (including supplier fees, travel expenses, room and board, and compensation of our employees) associated with re-inspections or follow-up visits that we conduct after any audit or inspection of your Studio identifies one or more failures of the System Standards, and/or if any follow-up visit is necessary because we or our designated representatives were for any reason prevented from properly inspecting any or all of your Studio (including because you or your personnel refuse entry to your Studio).

    B.    **OUR RIGHT TO AUDIT**.

We and our designated agents or representatives may at any time during your business hours, and without prior notice to you, examine, take, or copy the bookkeeping and accounting records for your Studio, the sales and income tax records and returns, and such other records we deem necessary to determine your compliance with the Agreement. You agree to cooperate fully with us and our representatives and independent accountants in any examination, and you hereby appoint us as your attorney-in-fact to receive and inspect your confidential sales and other tax records and hereby authorize all tax authorities to provide such information to us for all tax periods during the Term. If any examination discloses an understatement of the Gross Revenue, you agree to pay us, within 15 days after receiving the examination report, the Royalty and Marketing Fund contributions due on the amount of the understatement, plus our service charges and interest on the understated amounts from the date originally due until the date of payment. Furthermore, if an examination is necessary due to your failure to timely furnish reports, supporting records, or other information as required, or if our examination reveals a Royalty or Marketing Fund contribution understatement exceeding two percent (2%) of the amount that you actually reported to us for the period examined, you agree to reimburse us for the costs of the examination, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board, and compensation of our employees. These remedies are in addition to our other remedies and rights under the Agreement and applicable law.

13. **TRANSFER**.

    A.    **BY US**.

We have the right to delegate the performance of any portion or all of our rights and obligations under the Agreement to third-party designees, whether these designees are our agents or independent contractors with whom we have contracted to perform these obligations. We maintain a staff to manage and operate the System and that staff members can change as employees come and go. You represent that you have not signed the Agreement in reliance on any particular manager, owner, director, officer, or employee remaining with us in any capacity. We may change our ownership or form or assign the Agreement and any other agreement to a third party without restriction.

    B.    **BY YOU OR YOUR OWNERS**.

Your rights and duties under the Agreement are personal to you (or your owners if you are a Business Entity), and we have granted you the Franchise in reliance upon our perceptions of your (or your

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 124 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

owners') individual or collective character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, neither you nor any owners, nor any of your or their permitted successors or assigns, shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise dispose of or encumber any direct or indirect interest in the Agreement (including, without limitation, any or all of your rights or obligations under it), your Studio or its assets (other than in the ordinary course of business), your right to possession of the Premises, or any direct or indirect ownership interest in you (regardless of its size) (each, a "**Transfer**"), without our prior written approval. Any Transfer without our prior written approval is a material breach of the Agreement and has no effect.

If you intend to list your Studio for sale with any broker or agent, you shall do so only after obtaining our written approval of the broker or agent and of the listing agreement and any advertising materials. You may not use any Mark in advertising the sale of your Studio or of any ownership in you without our prior written consent.

C.     **CONDITIONS FOR APPROVAL OF TRANSFER**.

You may not transfer or assign the Agreement before your Studio has opened for business. You also agree that you may not engage in a Transfer that results in the grant of a security interest in the Agreement or the Franchise. Thereafter, if you (and your owners) are in full compliance with these Terms and the proposed transferee and its owners (if the transferee is a Business Entity) meet our then-current qualifications for new franchisees then, subject to the other provisions of this Article 13, we may approve a Transfer subject to the conditions that we determine are necessary to protect the Brand and System, which conditions may include the following:

(1)     you and the proposed transferee and its owners (if the transferee is a Business Entity) must provide all information and documents we request, and request our consent, regarding the Transfer and the proposed transferee and its owners or affiliates, such that we may determine, in our sole discretion, whether the terms of the proposed Transfer are reasonable and will not unduly hinder the transferee's ability to operate your Studio in accordance with the then-applicable franchise agreement;

(2)     you must provide us executed versions of any relevant documents to affect the Transfer, and all other information we request about the proposed Transfer, and such Transfer meets all of our requirements. If you or your owners offer the transferee financing for any part of the purchase price, you and your owners hereby agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in your Studio are subordinate to the transferee's obligation to pay Royalty, Marketing Fund contributions, and other amounts due to us, our affiliates, and third party vendors and otherwise to comply with the Agreement (or any applicable franchise agreement replacing the Agreement);

(3)     the transferee agrees to upgrade, remodel and/or refurbish your Studio in accordance with our then-current System Standards;

(4)     you (and your owner(s)) sign a general release, in a form satisfactory to us, of any and all claims against us and our owners, officers, directors, employees and agents;

(5)     you (and your transferring owner(s)) (and your or their immediate family members) have signed a non-competition covenant in favor of us, commencing on the effective date of the Transfer, by the post-termination obligations under the Agreement;

(6)     you are in full compliance with the Agreement and any other agreement between us and our affiliates and you and your affiliates, and your Studio is being operated in all respects in compliance with our System Standards, including that all Operating Assets are in place and in good working order; all fees and other amounts owed to us, our affiliates, and vendors are paid in full;

<div align="center">24</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

all required reports and statements have been submitted; and all operating deficiencies identified in pre-sale inspections have been corrected;

(7) all persons required to complete training under the transferee's franchise agreement satisfactorily complete our training program, and transferee has paid all costs and expenses we incur to provide the training program to such persons;

(8) all notices or approvals relating to the proposed Transfer (including any landlord notices or consents) have been given or obtained, as required, with copies provided to us;

(9) the transferee, at our request, signs our then-current form of franchise agreement and related documents for the balance of the Term, any and all of the provisions of which may differ materially from any and all of those contained in these Terms;

(10) you pay or cause to be paid to us a Transfer fee in the amount of 50% of our then-current standard initial franchise fee; and

(11) you provide us the evidence we reasonably request to show that appropriate measures have been taken to affect the Transfer as it relates to your Studio's operations, including, by transferring all necessary and appropriate business licenses, insurance policies, and material agreements, or obtaining new business licenses, insurance policies and material agreements.

We may review all information regarding your Studio that you give the transferee, correct any information that we believe is inaccurate, and give the transferee copies of any reports that you have given us or we have made regarding your Studio.

D. **YOUR DEATH OR DISABILITY**.

Upon your death or disability (if you are a natural person), the executor, administrator or other personal representative of such person must promptly notify us in writing and must transfer your interest in the Agreement and in your Studio to a third party approved by us, within a reasonable period of time, not to exceed 12 months from the date of death or six months from the date of disability. Such transfers, including by will or by inheritance, will be subject to the same terms and conditions as *inter vivos* Transfers and will be subject to our right of first refusal under Section 13.G. For purposes of these Terms, the term "**disability**" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent such person from performing the obligations set forth in these Terms.

If any of the foregoing in this Section 13.D occurs, and your Studio is not being managed by a trained Operations Manager, the executor, administer or other personal representative must, within a reasonable period of time, not to exceed 15 days from the date of death or disability, appoint a qualified manager to operate your Studio. If it has not already done so, the Operations Manager will be required to complete our Initial Training Program at your expense. Pending the appointment of a new Operations Manager as provided herein, or if, in our judgment, your Studio is not being managed properly any time after your death or disability, we have the right, but not the obligation, to appoint an interim manager for your Studio. All funds from the operation of your Studio during the management by our appointed manager will be kept in a separate account, and all expenses of your Studio, including compensation, other costs and travel and living expenses of our manager, will be charged to this account. We also have the right to charge a reasonable management fee (in addition to amounts payable under the Agreement) during the period that our appointed manager manages your Studio. Operation of your Studio during any such period will be on your behalf, provided that we only have a duty to utilize our best efforts and will not be liable to you or your owners for any debts, losses or obligations incurred by your Studio or to any of your creditors for any products, materials, supplies or services your Studio purchases during any period it is managed by our appointed manager.

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

E. **EFFECT OF CONSENT TO TRANSFER**.

Our consent to a Transfer is not, and may not be relied upon by any party as, a representation of the fairness of the terms of any contract between you and the transferee, a guarantee of your transferee's prospects of success, or a waiver of any claims we have against you (or your owners) or of our right to demand full compliance by you and the transferee with the Agreement.

F. **PUBLIC OR PRIVATE OFFERING**.

Written information used to raise or secure funds can reflect upon us and the System. You agree to submit any written information intended to be used for that purpose to us before inclusion in any registration statement, prospectus or similar offering memorandum. Should we object to any reference to us or our affiliates or any of our business in the offering literature or prospectus, the literature or prospectus shall not be used until our objections are withdrawn. You may not engage in a public offering of securities without our prior written consent.

G. **OUR RIGHT OF FIRST REFUSAL**.

If you (or any of your owners) desire to engage in a Transfer, you (or your owners) agree to obtain from a responsible and fully disclosed buyer, and send us, a true and complete copy of a bona fide, executed written offer (which may include a letter of intent) relating exclusively to an interest in you or in the Agreement and your Studio no later than five days after your receipt of the executed offer. The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be couched entirely as a dollar amount, and we may require the proposed buyer submit with its offer a reasonable earnest money deposit acceptable to us. We may require you (or your owners) to send us copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction.

Within 30 days after we receive an exact copy of the bona fide offer and all relevant information we request, we may, by written notice delivered to you or your selling owner(s), elect to purchase the interest offered for the price and on the terms and conditions contained in the offer. We may substitute cash and cash equivalents for any non-cash form of payment proposed in the offer. If we exercise our right of first refusal, we will have 30 days from the date we notified you of our intended purchase to prepare for closing. You and your owners must make all customary representations and warranties given by the seller of the assets of a business or the ownership interests in a legal entity, as applicable (including that the items sold are free and clear of all liens), and you and your selling owner(s) (and your and their immediate family members) must comply with the obligations regarding Competitive Businesses, as described in Section 16.A below, as though the Agreement had expired on the date of the purchase. We have the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this Section 13.G.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we otherwise approve the Transfer in accordance with, and you (and your owners) and the transferee comply with the conditions in, Sections 13.B and 13.C above. If you do not complete the sale to the proposed buyer within 60 days after either we notify you that we do not intend to exercise our right of first refusal or the time our exercise expires, or if there is a material change in the terms of the sale (which you agree to tell us promptly), we or our designee will have an additional right of first refusal during the 30-day period following either the expiration of the 60-day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our or our designee's option.

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 127 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

14. **EXPIRATION OF THE AGREEMENT.**

    A.     <u>**YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE**</u>.

Subject to this Article 14, you may acquire, separately, up to two (2) consecutive successor Franchises of five (5) years each (or, if shorter, until the expiration or termination of your right to possess the Premises). The acquisition of the first successor Franchise will be subject to this Section 14.A, and the acquisition of the second (and each subsequent) successor Franchise will be subject to the franchise agreement whose term is expiring. If you desire to acquire a successor Franchise under the Agreement, then each of the following conditions must be met before and/or at the time of acquisition (as appropriate):

    (1)     you must have given us written notice of your election to acquire a successor Franchise not less than 90 days and not more than 180 days before the end of the Term;

    (2)     you must have taken, at your expense, all steps identified by us to bring your Studio into full compliance with the then-current System Standards;

    (3)     you must be, and must have been throughout the Term in compliance with your obligations under these Terms (including any monetary obligations to us or third parties), and during that same period, you and your affiliates must have been in compliance with your or their obligations under any other agreements with us;

    (4)     you must pay us our then-current successor franchise fee, which will be in lieu of any initial franchise fee otherwise required by that agreement;

    (5)     you must meet our requirements then-applicable for approval of new franchisees;

    (6)     you must present satisfactory evidence that you have the right to remain in possession of the Premises for the operation of your Studio for the full duration of the successor term, and you must have obtained, maintained, and be in good standing with all necessary and applicable licenses and permits required for the operation of your Studio;

    (7)     you and you owners must execute our then-current form of franchise agreement and related documents, which will supersede the Agreement in all respects, and the terms of which may differ from the terms of the Agreement and may include a higher Royalty and Marketing Fund contribution or expenditure requirement, and the then-current franchise agreement will be modified to reflect, among other things, that your Studio is developed and operating and that the right to further successor terms is as provided in this Section 14.A;

    (8)     you and your owners must have executed and delivered to us a general release (in a form prescribed by us, as permitted by applicable law) of all claims against us and our affiliates, and each of our respective officers, directors, owners, partners, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, including claims arising under the Agreement or under federal, state or local laws, rules, regulations or orders;

    (9)     you must remain in compliance with all provisions of the Agreement until the execution of the successor franchise agreement; and

    (10)     we are then granting Franchises for Studios in the state in which your Studio is located.

    B.     <u>**GRANT OF A SUCCESSOR FRANCHISE**</u>.

We will respond, in writing, within 90 days after we receive your notice under Section 14.A(1) with our decision to grant you a successor franchise and listing any deficiencies that must be corrected or to not grant a successor franchise with reasons for our decision. If our decision is to grant you a successor franchise, our willingness to do so will also be subject to your continued compliance with all of the terms

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 128 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

and conditions of the Agreement through the date of its expiration. Failure by you or your owners to sign such agreements and releases necessary for the successor franchise and to deliver them to us, along with payment of the applicable fee, for acceptance and signature within the earlier of 60 days after their delivery to you or the expiration of the Term will be deemed an election not to acquire a successor franchise.

15. **<u>TERMINATION OF AGREEMENT</u>**.

A. **<u>BY YOU</u>**.

If you and your owners are fully complying with the Agreement and we materially fail to comply with the Agreement and do not correct the failure within 30 days after you deliver written notice of the material failure to us or if we cannot correct the failure within 30 days and we fail to give you within 30 days after your notice reasonable evidence of our effort to correct the failure within a reasonable time, you may terminate the Agreement effective an additional 30 days after you deliver to us written notice of termination. Your termination of the Agreement other than according to this Section 15.A. will be deemed a termination without cause and a breach of the Agreement.

B. **<u>BY US</u>**.

We may terminate the Agreement, effective upon delivery of written notice to you, if:

(1) you (or any of your owners) have made or make any material misrepresentation or omission in the Application Materials or otherwise in acquiring the Franchise or operating your Studio;

(2) you do not sign a Lease for an acceptable site for the Premises or open your Studio within the time periods specified under Article 3;

(3) you do not construct your Studio in strict accordance with the plans we approve;

(4) we determine any Required Trainees are not capable or qualified to satisfactorily complete the Initial Training Program, and you do not replace them with persons who are able to, and do, successfully complete the Initial Training Program within 21 days following our written notice to you;

(5) you (i) close your Studio for business or inform us of your intention to cease operation of your Studio, (ii) fail to actively operate your Studio for three or more consecutive days, or (iii) otherwise abandon or appear to have abandoned your rights under the Agreement;

(6) you (or any of your owners) are or have been convicted by a trial court of, or plead or have pled no contest or guilty to, a felony, or engage in any other conduct that, in any of the foregoing events, is reasonably likely in our opinion to adversely affect the reputation of your Studio, other Studios, the System, or the goodwill associated with the Marks;

(7) you fail to maintain the insurance we require and do not correct the failure within 10 days after we deliver written notice of that failure to you;

(8) you (or any of your owners) make or attempt to make a Transfer without complying with the requirements of Article 14;

(9) you lose the right to occupy the Premises;

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

(10) you (or any of your owners) knowingly make any unauthorized use or disclosure of any Confidential Information;

(11) you violate any law, ordinance, rule or regulation of a governmental agency in connection with the operation of your Studio and fail to correct such violation within 72 hours after you receive notice from us or any other party;

(12) you fail to pay us or our affiliates any amounts due and do not correct the failure within five days after written notice of that failure has been delivered or fail to pay any third-party obligations owed in connection with your ownership or operation of your Studio and do not correct such failure within any cure periods permitted by the person or Business Entity to whom such obligations are owed;

(13) you fail to pay when due any federal or state taxes due on or in connection with the operation of your Studio, unless you are in good faith contesting your liability for those taxes;

(14) you understate the Gross Revenue three times or more during the Term;

(15) you (or any of your owners) (a) fail on three or more separate occasions within any 12 consecutive month period to comply with any provision of these Terms, or (b) fail on two or more separate occasions within any six consecutive month period to comply with the same obligation under these Terms, in either case, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you;

(16) you (or any of your owners) file a petition in bankruptcy or a petition in bankruptcy is filed against you; you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or the substantial part of your property; your Studio is attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant, or levy is vacated within 30 days; or any order appointing a receiver, trustee, or liquidator of you or your Studio is not vacated within 30 days following the order's entry;

(17) you (or any of your owners) fail to comply with anti-terrorism laws, ordinances, regulations and Executive Orders;

(18) you create or allow to exist any condition in connection with your operation of your Studio, at any location, which we reasonably determine to present a health or safety concern for your Studio's customers or employees;

(19) you fail to pass a quality assurance audit, and do not cure such failure within 15 days after we deliver written notice of the failure to you;

(20) you (or any of your owners) fail to comply with any other provision of these Terms or any System Standard (including your offer or sale of non-approved products or services or offer or sale of products or services through a medium we have not approved), and do not correct the failure within 30 days after we deliver written notice of the failure to you; or

(21) you or an affiliate fails to comply with any other agreement with us or our affiliate and do not correct such failure within the applicable cure period, if any.

<div align="center">29</div>

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 130 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

In addition to our right to terminate the Agreement in accordance with this Section, we may also exercise any lesser remedies prior to such termination and during any period in which you must cure a default of the Terms. These lesser remedies are in addition to our right to terminate the Agreement or to bring a claim for damages. You acknowledge that our taking of any or all such actions under this Section will not deprive you of the most essential benefits of the Agreement and will not constitute a constructive termination of the Agreement.

C.     **<u>FRANCHISOR'S RIGHTS AND REMEDIES IN ADDITION TO TERMINATION</u>**.

If you are in default in the performance of any of your obligations, or if you breach any term or condition of the Agreement, in addition to our right to terminate the Agreement, and without limiting any other rights or remedies to which we may be entitled at law or in equity, or if we have issued a notice to you in exercise of our rights to purchase your Studio under Section 16.B below, then we may, at our election, immediately or at any time thereafter, and without notice to you, cure such default on your behalf and, in our discretion, either directly or through our designee, enter upon and take possession of your Studio for a period not to exceed 180 days, and thereafter take, in your name, all other actions necessary to effect the provisions of the Agreement. We have the right to extend the period in which we take possession of your Studio if you are in continuing default under the Agreement or if returning operations to you will, in our sole determination, be detrimental to the Brand. You agree that any such entry or other action shall not be deemed a trespass or other illegal act, and we will not be liable in any manner to you for so doing. You must pay the entire cost of such entry or other action(s) to us on demand, including reasonable compensation to us for the management of your Studio. If we exercise our rights under this Section, then we are not required to use your employees and reserve the right to designate our own personnel to manage and operate your Studio.

During the period in which we or our designee operates your Studio under this Section, you will cooperate with us and our designees to support the operation of your Studio in compliance with the System Standards, including making available any and all books, records, systems and accounts. You agree that all funds derived from the operation of your Studio during this period will be held and used solely by us or our designee, will be used to pay expenses associated with the operation of your Studio (including payment of any fees and other amounts owed by you to us under the Agreement and our then-current fee for such interim operation of your Studio), and will be accounted for separately from our other revenue and expenses.

You agree that we or our designee must exercise only a reasonable degree of care in operating your Studio and we are under no duty to take extraordinary measures or, in any way, fund the operations to ensure your Studio's success or continued operations during or after such period. You agree that you continue to bear the sole liability for any and all accounts payable, obligations, and/or contracts, including all obligations under your Studio lease and all obligations to your vendors and employees and contractors, unless and until we expressly assume them in connection with the purchase of your Studio under Section 16.B below. We may elect to cease such interim operations of your Studio at any time with notice to you. We (or our designee) will not be liable to you or your owners for any debts, losses, or obligations your Studio incurs, or to any of your creditors.

Our decision to operate your Studio on an interim basis will not affect our right to terminate the Agreement under Section 15.B above. Your indemnification obligations set forth under Section 17.C will continue to apply during any period that we or our designee operate your Studio.

<div align="center">30</div>

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 131 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

16. **OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THE AGREEMENT**.

A. **YOUR OBLIGATIONS**.

You and, as applicable, your owners and all such other persons or entities who are bound under the terms of the Agreement must immediately do the following:

(1)     pay us all Royalty, Marketing Fund contributions, interest, and all other amounts owed to us (and our affiliates) which then are unpaid;

(2)     close your Studio for business to customers and cease to directly or indirectly sell any products and services of any kind and in any manner from the Premises unless we direct you otherwise in connection with our exercise of our option to purchase pursuant to Section 16.B below;

(3)     cease all direct or indirect use any Mark, any colorable imitation of a Mark, other indicia of a Studio, any trade name, trademark, service mark, trade dress, or other commercial symbol that indicates or suggests a connection or association with us or the System, in any manner or for any purpose (except in connection with other Studios you operate in compliance with other franchise agreements with us);

(4)     cease to directly or indirectly identify yourself or your business as a current or former Studio or as one of our current or former franchise owners (except in connection with other Studios you operate in compliance with other franchise agreements with us) and take the action required to cancel or assign all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

(5)     return to us or destroy (as we require) all items, forms and materials containing any Mark or otherwise identifying or relating to your Studio as a *The Daily Pilates*-branded Studio;

(6)     if we do not exercise our option to purchase your Studio under Section 16.B below, promptly and at your own expense, make the alterations we specify in the Operations Manual (or otherwise) to distinguish the Premises and building clearly from its former appearance and from other Studios, including by removing all materials bearing the Marks and removing from both the interior and exterior of the Premises all materials and components of our trade dress as we determine to be necessary in order to prevent public confusion and in order to comply with the non-competition provisions set forth in paragraph (10) below;

(7)     cease using or operating with any Contact Identifiers or Online Presence related to your Studio or the Marks, and take any action as may be required to disable such Contact Identifier or Online Presence, or transfer exclusive control and access of such Contact Identifier or Online Presence to us or our designee, as we determine in our sole discretion;

(8)     comply with all other System Standards we periodically establish (and all applicable laws) in connection with the closure and de-identification of your Studio, including as it relates to disposing of Personal Information, in any form, in your possession or the possession of any of your employees; and

(9)     cease using any Confidential Information (including computer software or similar technology and digital passwords and identifications that we have licensed to you or that otherwise are proprietary to us or the System) in any business or otherwise and return to us or destroy (as we require) all copies of the Operations Manual and any other confidential materials that we have loaned you;

(10)     for two (2) years beginning on the effective date of termination or expiration, neither you nor any other Restricted Party will have any direct or indirect interest as an owner (whether of record, beneficially, or otherwise), investor, partner, director, officer, employee,

31

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

consultant, lessor, representative, or agent in any Competitive Business located or operating (i) at the Premises, (ii) within a 30-mile radius of the Premises; or (iii) within a 30-mile radius of any other Studio in operation or under construction on the later of the effective date of the termination or expiration of the Agreement or the date on which all Restricted Parties begin to comply with such obligations; and

(11) you and your owners, your or your owners' affiliates, or the officers, directors, managers or immediate family members of any of the foregoing, will refrain from interfering or attempting to interfere with our or our affiliates' relationships with any vendors, franchisees or consultants or engage in any other activity which might injure the goodwill of the Marks or the System.

Within 30 days after the expiration or termination of the Agreement, you must give us evidence satisfactory to us of your compliance with these obligations. If you fail to take any of the actions or refrain from taking any of the actions described above, we may take whatever action and sign whatever documents we deem appropriate on your behalf to cure the deficiencies, including, without liability to you or third parties for trespass or any other claim, to enter the Premises and remove any signs or other materials containing any Marks from your Studio. You must reimburse us for all costs and expenses we incur in correcting any such deficiencies. If any Restricted Party refuses voluntarily to comply with the obligations set forth in Section 16.A(10), the two-year period for that person will commence with the entry of a court order enforcing that provision. You and your owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcement of the covenants made in Section 16.A(10) will not deprive you of your personal goodwill or ability to earn a living.

B. **<u>OUR RIGHT TO PURCHASE YOUR STUDIO</u>**.

In addition to any other rights to purchase we have, we have the right to purchase your Studio and/or any and all equipment, furniture, fixtures, signs, supplies you own and used in your Studio, as described in this Section 16.B (the "**Purchase Option**"), upon the expiration of the Agreement without the grant of a successor Franchise (except where a successor Franchise was not granted because we are not then offering Franchises), our termination of the Agreement under Section 15.B, or your termination of the Agreement without cause (each of the foregoing, a "**Termination Event**"). We will have 30 days after a Termination Event to exercise the Purchase Option upon written notice to you. We have the unrestricted right to assign the Purchase Option in our discretion. The purchase price for your Studio will be the net realizable value of the tangible assets in accordance with the liquidation basis of accounting (not the value of your Studio as a going concern) ("**Liquidation Value**"). In any case, the Liquidation Value will be less any outstanding liabilities of your Studio. In addition, we shall have the option to assume your Lease for the Premises, or if an assignment is prohibited, a sublease for the full remaining term on the same terms and conditions as your Lease. No value will be attributed to the value of the Marks or the System or to the assignment of the Lease (or sublease) for the Premises or the assignment of any other assets used in conjunction with your Studio, and we will not be required to pay any separate consideration for any such assignment or sublease.

If you dispute our calculation of the Liquidation Value, we will appoint one independent accredited appraiser, within 30 days after we receive all relevant financial and other information necessary to calculate the Liquidation Value, who will calculate the Liquidation Value based on the criteria above. You and we will share equally the appraiser's fees and expenses. The appraiser must complete its calculation within 30 days after its appointment. The appraiser's calculation of the Liquidation Value will be the purchase price. Closing of the purchase will take place, as described below, on a date we select which is within 90 days after determination of the Liquidation Value.

<div align="center">32</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Unless we assume the management of your Studio under Section 15.D above, you will continue to operate your Studio in accordance with the Agreement through the closing. Prior to closing, you agree to cooperate with us in conducting due diligence, including providing us with access to your business and financial records, contracts and all other information relevant to your Studio. At the closing, we (or our assignee) will pay the purchase price in cash. You agree to execute and deliver to us (or our assignee):

(a)      all customary agreements, in form and substance acceptable to us and in which you (i) provide all customary warranties and representations, including, without limitation, as to ownership and condition of and title to assets, no liens and encumbrances on assets, validity of contracts and agreements, and liabilities affecting the assets, contingent or otherwise; (ii) transfer good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and other transfer taxes paid by you; (iii) and assign the Lease and all of the licenses and permits for your Studio which are permitted to be assigned or transferred; and

(b)      an agreement, in form and substance satisfactory to us, voluntarily terminating the Agreement under which you and your owners release, in form and substance satisfactory to us, any and all claims you and your owners have against us and our owners, officers, directors, employees, agents, successors, and assigns and agree to comply with all post-term obligations set forth in Sections 16.A above and with all other obligations which, either expressly or by their nature, are intended to survive termination or expiration of the Agreement.

C.      **LOST REVENUE DAMAGES**.

You agree that we will suffer compensable damages including, among others, the amount of the Royalty and Marketing Fund contributions we would have received, and for which we bargained in entering into this Agreement, if you terminate this Agreement without cause or we terminate this Agreement because of your breach (the "**Lost Revenue Damages**"). You and we acknowledge that, because Royalty and Marketing Fund contributions are calculated primarily as a percentage of your Studio's Gross Revenue, it will be impossible to calculate Lost Revenue Damages once your Studio ceases operation. To bring certainty to the actual amount of Lost Revenue Damages, you and we agree that Lost Revenue Damages will equal the net present value of: (1) the lesser of 36 or the number of calendar months remaining on the Term absent the termination, multiplied by (2) the sum of the Royalty and Marketing Fund contribution percentages in effect as of the termination date, multiplied by (3) the average monthly Gross Revenue of your Studio during the 24 full calendar months immediately preceding the termination date, minus (4) any cost savings we experienced as a result of the termination (or, if the termination is based on your unapproved closure of your Studio, the 36 full calendar months immediately preceding the closure); provided, however, that (i) if, as of the termination date, your Studio had not opened for business or had operated for fewer than 12 full calendar months, the average monthly Gross Revenue will equal the 24-month average Gross Revenue of all Studios that had operated for the full 24 calendar months immediately preceding termination of this Agreement; (ii) if, as of the termination date, your Studio operated for at least 12 but fewer than 24 full calendar months, monthly average Gross Revenue will equal the highest monthly Gross Revenue achieved by your Studio during the period in which it operated; and (iii) if the termination was based on your unapproved closure of your Studio, average monthly Gross Revenue, as described above, would be measured from closure date rather than the termination date.

You and we acknowledge and agree that (a) our agreement on the calculation of Lost Revenue Damages is a reasonable determination of actual damages we will suffer in the event of a termination as described above and is not a penalty, and (b) Lost Revenue Damages represent only lost Royalty and Marketing Fund contributions, and the right to recover such damages is not exclusive of and does not replace any other rights we have under this Agreement or applicable law if this Agreement is terminated as

The Daily Pilates LLC
2024–04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Case 3:26-cv-00550-KDB-DCK      Document 1-1      Filed 07/08/26      Page 134 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

described above, including the right to seek other damages we suffer as a result of a termination as described above or the events on which such termination was based.

You agree to pay us Lost Revenue Damages, as calculated in accordance with this Section, within 15 days after the Agreement expires or is terminated, or on any later date that we determine.

### D.     **CONTINUING OBLIGATIONS**.

All of our and your (and your owners') obligations which expressly or by their nature survive the Agreement's expiration or termination will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire, including all obligations relating to non-disparagement, non-competition, non-interference, confidentiality, and indemnification.

## 17.     **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION**.

### A.     **INDEPENDENT CONTRACTORS**.

The Agreement does not create a fiduciary relationship between you and us. You and we are and will be independent contractors, and nothing in the Agreement is intended to make either you or us a general or special agent, joint venturer, partner, or employee of the other for any purpose. Nothing in the Agreement authorizes you to make any contract, agreement, warranty, or representation on our behalf or to incur any debt or other obligation in our name. You agree to identify yourself conspicuously in all dealings with customers, vendors, public officials, your personnel, and others as the owner of your Studio under a franchise we have granted and to place notices of independent ownership on the business cards, advertising, invoices, and other materials we periodically require. You also acknowledge that you will have a contractual relationship only with us and may look only to us to perform under the Agreement.  None of our affiliates is a party to the Agreement and has no obligations under it.

### B.     **NO LIABILITY TO OR FOR ACTS OF OTHER PARTY**.

We and you may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other or represent that our respective relationship is other than franchisor and franchise owner.  We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of your Studio or the business you conduct under the Agreement. We will have no liability for your obligations to pay any third parties, including any product vendors. We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes, whether levied upon you or your Studio, due to the business you conduct (except for our income taxes). You are responsible for paying these taxes and must reimburse us for any such taxes that we must pay to any state taxing authority on account of your operation or payments that you make to us, and, at our election, a reasonable administrative fee (not to exceed 10%) in making such payment.

### C.     **INDEMNIFICATION**.

You agree to indemnify, defend, and hold us, our affiliates, and our and their respective owners, directors, managers, officers, employees, agents, successors, and assignees (the "**Indemnified Parties**") harmless against, and to reimburse any one or more of the Indemnified Parties for, all claims, obligations, and damages directly or indirectly arising out of the development or operation of your Studio, the business you conduct under the Agreement, or your breach of the Agreement, including, without limitation, those alleged to be caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused solely by the Indemnified Party's gross negligence or willful misconduct in a final, unappealable ruling issued by a court with competent jurisdiction. For purposes of this indemnification, "**claims**" include all obligations, damages (actual,

<div align="center">34</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

consequential, or otherwise), and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation or alternative dispute resolution, regardless of whether litigation or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at your expense (including choosing and retaining its own legal counsel) and agree to settlements or take any other remedial, corrective, or other actions. This indemnity will continue in full force and effect subsequent to and notwithstanding the Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you under this subparagraph. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you under this subparagraph.

18.   **ENFORCEMENT**.

    A.   **ARBITRATION**.

We and you agree that all controversies, disputes, or claims between us or any of our affiliates, and our and their respective owners, officers, directors, agents, and employees, on the one hand, and you (and your owners, guarantors, affiliates, and employees), on the other hand, arising out of or related to: (1) the Agreement or any other agreement between you (or any of your owners) and us (or any of our affiliates); (2) our relationship with you;  (3) the scope or validity of the Agreement or any other agreement between you (or any of your owners) and us (or any of our affiliates) or any provision of any of such agreements (including the validity and scope of the arbitration provision under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court); or (4) any System Standard, must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association (the "**AAA**"). The arbitration proceedings will be conducted by one arbitrator and, except as this Section otherwise provides, according to the AAA's then-current Commercial Arbitration Rules.  All proceedings will be conducted at a suitable location chosen by the arbitrator that is within 50 miles of our or, as applicable, our successor's or assign's then-current principal place of business (currently, Atlanta, Georgia). All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 *et seq.*). The interim and final awards of the arbitrator shall be final and binding upon each party, and judgment upon the arbitrator's awards may be entered in any court of competent jurisdiction.

The arbitrator has the right to award or include in his or her awards any relief which he or she deems proper, including, without limitation, money damages, pre- and post-award interest, interim costs and attorneys' fees, specific performance, and injunctive relief, provided that the arbitrator may not declare any of the trademarks owned by us or our affiliates generic or otherwise invalid, or award any punitive or exemplary damages against any party to the arbitration proceeding (we and you hereby waiving to the fullest extent permitted by law any such right to or claim for any punitive or exemplary damages against any party to the arbitration proceeding). In any arbitration brought pursuant to this Section, and in any action in which a party seeks to enforce compliance with this provision, the prevailing party shall be awarded its costs and expenses, including attorneys' fees, incurred in connection therewith.

We and you agree to be bound by the provisions of any applicable contractual or statutory limitations provision, whichever expires earlier.  We and you further agree that, in any arbitration proceeding, each party must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding.  Any claim which is not submitted or filed as required will be forever barred.  The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us.

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

WE AND YOU AGREE THAT ARBITRATION WILL BE CONDUCTED ON AN INDIVIDUAL BASIS AND THAT A PROCEEDING REQUIRED UNDER THIS SECTION TO BE SUBMITTED TO ARBITRATION MAY NOT BE: (I) CONDUCTED ON A CLASS-WIDE BASIS, (II) COMMENCED, CONDUCTED OR CONSOLIDATED WITH ANY OTHER ARBITRATION PROCEEDING, (III) JOINED WITH ANY SEPARATE CONTROVERSY, DISPUTE OR CLAIM OF AN UNAFFILIATED THIRD-PARTY, OR (IV) BROUGHT ON YOUR BEHALF BY ANY ASSOCIATION OR AGENT. Notwithstanding the foregoing, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute, controversy or claim that otherwise would be subject to arbitration under this Section, then all parties agree that this arbitration clause shall not apply to that dispute, controversy or claim and that such dispute, controversy or claim shall be resolved in a judicial proceeding in accordance with the dispute resolution provisions of these Terms.

We and you agree that, in any arbitration arising as described herein, the arbitrator shall have full authority to manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute. The parties may only serve reasonable requests for documents, which must be limited to documents upon which a party intends to rely or documents that are directly relevant and material to a significant disputed issue in the case or to the case's outcome. The document requests shall be restricted in terms of time frame, subject matter and persons or entities to which the requests pertain, and shall not include broad phraseology such as "all documents directly or indirectly related to." You and we further agree that no interrogatories or requests to admit shall be propounded, unless the parties later mutually agree to their use.

The provisions of this Section are intended to benefit and bind certain third-party non-signatories. The provisions of this Section will continue in full force and effect subsequent to and notwithstanding the expiration or termination of the Agreement.

Any provisions of these Terms below that pertain to judicial proceedings shall be subject to the agreement to arbitrate contained in this Section.

B. **<u>GOVERNING LAW</u>**.

Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 *et seq*.), or other United States federal law, the Agreement and any related agreements, the Franchise and all claims arising from the relationship between us (or any of our affiliates, and our and their respective owners, officers, directors, agents, representatives, and employees) and you (and your owners, guarantors, affiliates, and employees) will be governed by the laws of the State of Georgia, without regard to its conflict of laws rules, except that (1) any state law regulating the offer or sale of franchises or governing the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section, and (2) the enforceability of those provisions of the Agreement which relate to restrictions on you and your owners' competitive activities will be governed by the laws of the state in which your Studio is located.

C. **<u>CONSENT TO JURISDICTION</u>**.

Subject to the obligation to arbitrate under Section 18.A above and the provisions below, you and your owners agree that all actions arising under the Agreement or any related agreements, or otherwise as a result of the relationship between you (and your owners, guarantors, affiliates, and employees) and us (or any of our affiliates, and our and their respective owners, officers, directors, agents, representatives, and employees) must be commenced in the court nearest to our or, as applicable, our successor's or assign's then-current principal place of business (currently, Atlanta, Georgia), and you (and each owner) irrevocably submit to the jurisdiction of that court and waive any objection you (or the owner) might have to either the jurisdiction of or venue in that court.

<div align="center">36</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

D.      **<u>WAIVER OF PUNITIVE DAMAGES, JURY TRIAL AND CLASS ACTION</u>**.

Except for your obligation to indemnify us for third party claims under Section 17.C, we and you (and your owners) waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between us and you, the party making a claim will be limited to equitable relief and to recovery of any actual damages it sustains. We and you irrevocably waive trial by jury in any action or proceeding brought by either of us.

We and you agree that any proceeding between us or relating to the Agreement will be conducted on an individual basis and that any proceeding between us and any of our affiliates, or our and their respective owners, officers, directors, agents, and employees, on the one hand, and you or your owners, guarantors, affiliates, and employees, on the other hand, may not be: (i) conducted on a class wide basis, (ii) commenced, conducted or consolidated with any other proceeding, (iii) joined with any claim of an unaffiliated third-party, or (iv) brough on your behalf by any association or agent.

E.      **<u>INJUNCTIVE RELIEF</u>**.

Nothing in the Agreement, including the provisions of Section 18.A, bars our right to obtain specific performance of the provisions of the Agreement and injunctive relief against any threatened or actual conduct that will cause us, the Marks, or the System loss or damage, under customary equity rules, including applicable rules for obtaining restraining orders and temporary or preliminary injunctions.  You agree that we may seek such relief from any court of competent jurisdiction in addition to such further or other relief as may be available to us at law or in equity.  You agree that we will not be required to post a bond to obtain injunctive relief and that your only remedy if an injunction is entered against you will be the dissolution of that injunction, if warranted, upon due hearing (all claims for damages by injunction being expressly waived hereby).

F.      **<u>COSTS AND ATTORNEYS' FEES</u>**.

The prevailing party in any judicial or arbitration proceeding shall be entitled to recover from the other party all damages, costs and expenses, including arbitration and court costs and reasonable attorneys' fees, incurred by the prevailing party in connection with such proceeding.

G.      **<u>LIMITATIONS OF CLAIMS</u>**.

You and your owners agree not to bring any claim asserting that any of the Marks are generic or otherwise invalid. UNLESS PROHIBITED BY APPLICABLE LAW, EXCEPT FOR CLAIMS ARISING FROM YOUR NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS YOU OWE US, ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THE AGREEMENT OR OUR RELATIONSHIP WITH YOU WILL BE BARRED UNLESS A JUDICIAL OR ARBITRATION PROCEEDING IS COMMENCED IN ACCORDANCE WITH THE AGREEMENT WITHIN ONE (1) YEAR FROM THE DATE ON WHICH THE PARTY ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIMS. The parties understand that such time limit might be shorter than otherwise allowed by law. You and your owners agree that your and their sole recourse for claims arising between the parties shall be against us or our successors and assigns.  You and your owners agree that our and our affiliates' members, managers, owners, directors, officers, employees, and agents shall not be personally liable nor named as a party in any action between us or our affiliates and you or your owners.

No previous course of dealing shall be admissible to explain, modify, or contradict the terms of the Agreement.  No implied covenant of good faith and fair dealing shall be used to alter the express terms of the Agreement.

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

19. **MISCELLANEOUS**.

    A.     **SECURITY INTEREST**.

You hereby collaterally assign to us the Lease and grant us a security interest in all of the Operating Assets and all other assets of your Studio, including but not limited to inventory, accounts, supplies, contracts, cash derived from the operation of your Studio and sale of other assets, and proceeds and products of all those assets. You agree to execute such other documents as we may reasonably request in order to further document, perfect and record our security interest. If you default in any of your obligations under the Agreement, we may exercise all rights of a secured creditor granted to us by law, in addition to our other rights under the Agreement and at law. If an approved third-party lender requires that we subordinate our security interest in the assets of your Studio as a condition to lending you working capital for the construction or operation of your Studio, we will agree to subordinate pursuant to terms and conditions determined by us. The Agreement shall be deemed to be a Security Agreement and Financing Statement and may be filed for record as such in the records of any county and state that we deem appropriate to protect our interests.

    B.     **BINDING EFFECT**.

The Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns, and successors in interest. Subject to our right to modify the Operations Manual, System and System Standards, the Agreement may not be modified except by a written agreement signed by our and your duly authorized officers.

    C.     **RIGHTS OF PARTIES ARE CUMULATIVE**.

Our and your rights under the Agreement are cumulative, and our or your exercise or enforcement of any right or remedy under the Agreement will not preclude our or your exercise or enforcement of any other right or remedy which we or you are entitled by law to enforce.

    D.     **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS**.

Except as expressly provided to the contrary in the Agreement, each section, paragraph, term, and provision of the Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of the Agreement, which will continue to have full force and effect and bind the parties.

If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.

If any applicable and binding law or rule of any jurisdiction requires more notice than the Agreement requires or if, under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any System Standard is invalid, unenforceable, or unlawful, the notice or other action required by the law or rule will be substituted for the comparable provisions of the Agreement, and we may modify the invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of the Agreement, as though it were separately articulated in and made a part of the Agreement.

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 139 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

E.    **WAIVER OF OBLIGATIONS**.

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under the Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. Any waiver granted will be without prejudice to any other rights we or you have, will be subject to continuing review, and may be revoked at any time and for any reason effective upon delivery of 10 days' prior written notice.

No right, power, or option you or we are provided under this Agreement will be impaired or waived because of any custom or practice at variance with the Agreement's terms or your or our failure, refusal, or neglect to exercise any right under the Agreement or to insist upon the other's compliance with the Agreement, including any System Standard; our waiver of or failure to exercise any right, power, or option, whether of the same, similar, or different nature, with other Studios; the existence of franchise agreements for other Studios which contain provisions different from those contained in the Agreement; or our acceptance of any payments due from you after any breach of the Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement, or accord and satisfaction. We are authorized to remove any legend or endorsement, which then will have no effect.

The following provision applies if you or the Franchise granted hereby are subject to the franchise registration or disclosure laws in California, Illinois, Indiana, Maryland, Michigan, Minnesota, Rhode Island, Virginia, or Wisconsin: No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the Franchise.

F.    **THE EXERCISE OF OUR JUDGMENT**.

We have the right to operate, develop, and change the System in any manner that is not specifically prohibited by the Agreement.  Whenever we have reserved in the Agreement a right to take or to withhold an action, to grant or decline to grant you a right to take or withhold an action, or to provide or withhold approval or consent, we may, except as otherwise specifically provided in the Agreement, make our decision or exercise our rights in our sole and unfettered discretion.

G.    **CONSTRUCTION**.

The preambles and attachments are a part of these Terms, which together with these Terms and the attached Data Sheet, constitute our and your entire agreement, and there are no other oral or written understandings or agreements between us and you, or oral or written representations by us, relating to the subject matter of or relationships created by the Agreement or your Studio (any such understandings or agreements reached, or any representations made, before the execution of this Agreement are superseded by the Agreement). Nothing in this or any related agreement is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you. Any policies that we periodically adopt and implement to guide us in our decision-making are subject to change, are not a part of the Agreement, and are not binding on us. Except as provided in Section 17.C (Indemnification), nothing in the Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to the Agreement.

Except where the Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed, initiated, or completed actions that require

39

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

our approval. The headings of the sections and paragraphs are for convenience only and do not define, limit, or construe the contents of these sections or paragraphs.

References in these Terms to the "Agreement" mean these Terms and the attached Data Sheet, together. References in the Agreement to "we," "us," and "our" include any of our affiliates with whom you deal. The term "affiliate" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling you or us. "Control" means the power to direct or cause the direction of management and policies. "Including" means "including, without limitation." References to "owner" mean any person holding a direct or indirect ownership interest (whether of record, beneficially, or otherwise) or voting rights in you (or a transferee of the Agreement and your Studio or an ownership interest in you), including, without limitation, any person who has a direct or indirect interest in you (or a transferee), the Agreement, the Franchise, or your Studio and any person who has any other legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets. References to an "ownership interest" in you or one of your owners (if you are not a natural person) mean the percent of the voting shares or other voting rights that results from dividing 100% of the ownership interests by the number of owners. "Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative, or other legal or functional entity. Unless otherwise specified, all references to a number of days shall mean calendar days and not business days. "Your Studio" includes all of the assets of your Studio you operate under the Agreement, including its revenue and the Lease.

If two or more Persons are at any time the owners of the Franchise and your Studio, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several.

## H.   **NOTICES AND PAYMENTS**.

All written notices, reports, and payments permitted or required to be delivered by the Agreement or the Operations Manual will be deemed to be delivered on the earlier of the date of actual delivery or one of the following: (i) at the time delivered by hand; (ii) at the time delivered via computer transmission and, in the case of the Royalty, Marketing Fund contributions, and other amounts due, at the time we actually receive electronic payment; or (iii) one business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery. Notices must be sent to the party to be notified at its address shown on the attached Data Sheet or these Terms, as applicable, or the most current principal business address of which the notifying party has notice; except that, it will always be deemed acceptable to send notice to you at the address of the Premises. Notices to us must be sent to the Attention of our Chief Executive Officer, with a copy (which shall not constitute notice) to the Legal Department.

## I.   **COUNTERPARTS; COPIES**.

The Agreement and its Attachments (including Attachment B, which must be executed currently with the Agreement) may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Faxed, scanned or electronic signatures shall have the same effect and validity, and may be relied upon in the same manner, as original signatures.

## J.   **SAFETY**.

We will not be required to send any of our representatives to your Studio to provide any assistance or services if, in our sole determination, it is unsafe to do so. Such determination by us will not relieve you from your obligations under the Agreement (including, without limitation, to pay monies owed) and will not serve as a basis for your termination of the Agreement.

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

K. **PROHIBITED PARTIES**.

You hereby represent and warrant to us, as an express consideration for the Franchise granted hereby, that neither you nor any of your employees, agents, or representatives, nor any other person or entity associated with you, is now, or has been:

1. Listed on: (a) the U.S. Treasury Department's List of Specially Designated Nationals, (b) the U.S. Commerce Department's Denied Persons List, Unverified List, Entity List, or General Orders, (c) the U.S. State Department's Debarred List or Nonproliferation Sanctions, or (d) the Annex to U.S. Executive Order 13224.

2. A person or entity who assists, sponsors, or supports terrorists or acts of terrorism, or is owned or controlled by terrorists or sponsors of terrorism.

You further represent and warrant to us that you are now, and have been, in compliance with U.S. anti-money laundering and counter-terrorism financing laws and regulations, and that any funds provided by you to us or our affiliates are and will be legally obtained in compliance with these laws. You agree not to, and to cause all employees, agents, representatives, and any other person or entity associated with you not to, during the term of this Agreement, take any action or refrain from taking any action that would cause such person or entity to become a target of any such laws and regulations.

*[Signature Page to Follow]*

41

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 142 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**IN WITNESS WHEREOF**, the parties have executed and delivered the Agreement on the dates noted below, to be effective as of the Effective Date.

| | |
|---|---|
| **THE DAILY PILATES LLC**, a Georgia limited liability company | **FRANCHISE OWNER:** |
| | _____ |
| | **[Name]** |
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date: _____ | Date: _____ |

42

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 143 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<u>**ATTACHMENT A**</u>
**TO FRANCHISE AGREEMENT**

<u>**GUARANTY AND ASSUMPTION OF OBLIGATIONS**</u>

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given by each of the undersigned persons indicated below who have executed this Guaranty (each a "**Guarantor**") to be effective as of the Effective Date of the Agreement (defined below).

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement (as amended, modified, restated or supplemented from time to time, the "**Agreement**") on this date by **THE DAILY PILATES LLC**, a Georgia limited liability company ("**us**," "**we**," or "**our**"), each Guarantor personally and unconditionally (a) guarantees to us and our successors and assigns that _____ ("**Franchise Owner**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including the non-competition, confidentiality, and transfer requirements.

Each Guarantor consents and agrees that: (1) Guarantor's direct and immediate liability under this Guaranty will be joint and several, both with Franchise Owner and among other guarantors; (2) Guarantor will render any payment or performance required under the Agreement upon demand if Franchise Owner fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon our pursuit of any remedies against Franchise Owner or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which we may from time to time grant to Franchise Owner or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement; and (5) at our request, each Guarantor shall present updated financial information to us as reasonably necessary to demonstrate such Guarantor's ability to satisfy the financial obligations of Franchise Owner under the Agreement.

Each Guarantor waives: (i) all rights to payments and claims for reimbursement or subrogation which any Guarantor may have against Franchise Owner arising as a result of the Guarantor's execution of and performance under this Guaranty; and (ii) acceptance and notice of acceptance by us of Guarantor's undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled.

Each Guarantor represents and warrants that, if no signature appears below for such Guarantor's spouse, such Guarantor is either not married or, if married, is a resident of a state which does not require the consent of both spouses to encumber the assets of a marital estate.

The provisions contained in Article 18 (Enforcement) of the Agreement, including Section 18.A (Arbitration), Section 18.C (Consent to Jurisdiction) and Section 18.F (Costs and Attorneys' Fees) of the Agreement are incorporated into this Guaranty by reference and shall govern this Guaranty and any disputes between the Guarantors and us. The Guarantors shall reimburse us for all costs and expenses we incur in connection with enforcing the terms of this Guaranty.

Attachment A - 1

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

By signing below, the undersigned spouse of each Guarantor indicated below, acknowledges and consents to the guaranty given herein by his/her spouse and personally agrees to be bound to the obligations in the Agreement regarding Confidential Information (Section 7) and Competitive Businesses (Sections 8 and 16.A(10)). Such consent also serves to bind the assets of the marital estate to Guarantor's performance of this Guaranty. We confirm that a spouse who signs this Guaranty solely in his or her capacity as a spouse (and not as an owner) is signing merely for the purposes described above and, as necessary, to bind the assets of the marital estate as described herein and for no other purpose (including, without limitation, to bind the spouse's own separate property).

Each Guarantor that is a business entity, retirement or investment account, or trust acknowledges and agrees that if Franchisee (or any of its affiliates) is delinquent in payment of any amounts guaranteed hereunder, that no dividends or distributions may be made by such Guarantor (or on such Guarantor's account) to its owners, accountholders or beneficiaries or otherwise, for so long as such delinquency exists, subject to applicable law.

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as this Guaranty and Assumption of Obligations was executed.

| GUARANTOR(S) | SPOUSE(S) |
|---|---|
| Name:_____ Sign: _____ Address: _____ _____ _____ | Name:_____ Sign: _____ Address: _____ _____ _____ |
| Name:_____ Sign: _____ Address: _____ _____ _____ | Name:_____ Sign: _____ Address: _____ _____ _____ |

Attachment A - 2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**ATTACHMENT B**
**TO FRANCHISE AGREEMENT**

**REPRESENTATIONS AND ACKNOWLEDGEMENT STATEMENT**

**DO NOT SIGN THIS QUESTIONNAIRE IF YOU ARE A RESIDENT OF OR LOCATED IN, OR YOUR FRANCHISED BUSINESS IS TO BE OPERATED IN: CALIFORNIA, ILLINOIS, INDIANA, MARYLAND, MICHIGAN, RHODE ISLAND, VIRGINIA, OR WISCONSIN.**

The purpose of this Statement is to demonstrate to **THE DAILY PILATES LLC**, a Georgia limited liability company ("Franchisor") that the person(s) signing below ("I," "me" or "my"), whether acting individually or on behalf of any legal entity established to acquire the development and/or franchise rights ("Franchisee"), (a) fully understands that the purchase of a *The Daily Pilates* franchise is a significant long-term commitment, complete with its associated risks, and (b) is not relying on any statements, representations, promises or assurances that are not specifically set forth in Franchisor's franchise disclosure document and exhibits (collectively, the "FDD") with which you were provided prior to signing the Agreement in deciding to purchase the Franchise.

In that regard, I represent to Franchisor and acknowledge that:

| | |
|---|---|
| I understand that buying a franchise is not a guarantee of success. Purchasing or establishing any business is risky, and the success or failure of the Franchise is subject to many variables such as my skills and abilities (and those of my partners, officers, employees), the time my associates and I devote to the business, competition, interest rates, the economy, inflation, operation costs, location, lease terms, the market place generally and other economic and business factors.  I am aware of and am willing to undertake these business risks. I understand that the success or failure of my business will depend primarily upon my efforts and not those of Franchisor. | INITIAL: |
| I acknowledge that I have had the opportunity to personally and carefully review the FDD and have, in fact, done so. I have been advised to have professionals (such as lawyers and accountants) review the documents for me and to have them help me understand these documents. I have also been advised to consult with other franchisees regarding the risks associated with the purchase of the Franchise. | INITIAL: |
| Neither the Franchisor nor any of its officers, employees or agents (including any franchise broker) has made a statement, promise or assurance to me concerning any matter related to the Franchise (including those regarding advertising, marketing, training, support service or assistance provided by Franchisor) that is contrary to, or different from, the information contained in the FDD. | INITIAL: |
| My decision to purchase the Franchise has not been influenced by any oral representations, assurances, warranties, guarantees or promises whatsoever made by the Franchisor or any of its officers, employees or agents (including any franchise broker), including as to the likelihood of success of the Franchise. | INITIAL: |

Appendix B - 1

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| | |
|---|---|
| I have made my own independent determination as to whether I have the capital necessary to fund the business and my living expenses, particularly during the start-up phase. | INITIAL: |
| PLEASE READ THE FOLLOWING QUESTION CAREFULLY. THEN SELECT YES OR NO AND PLACE YOUR INITIALS WHERE INDICATED.<br><br>Have you received any information from the Franchisor or any of its officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted sales, revenues, income, profits or earnings of the Franchise (including any statement, promise or assurance concerning the likelihood of success) other than information contained in the FDD?<br><br>    ☐ Yes ☐ No  (Initial Here: _____)<br><br>If you selected "Yes," please describe the information you received on the lines below:<br>_____<br>_____. | INITIAL: |

Sign: _____
Name: _____
Capacity:  Individually, and for and on behalf of
        [Franchisee Name]


Sign: _____
Name: _____
Capacity:  Individually, and for and on behalf of
        [Franchisee Name]


Sign: _____
Name: _____
Capacity:  Individually, and for and on behalf of
        [Franchisee Name]

<div align="center">Appendix B - 2</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**EXHIBIT C**

**MULTI-UNIT DEVELOPMENT AGREEMENT**

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# THE DAILY PILATES®

## MULTI-UNIT DEVELOPMENT AGREEMENT

**Developer:** _____

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 149 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<div align="center">

**THE DAILY PILATES®**
**MULTI-UNIT DEVELOPMENT AGREEMENT**

**DATA SHEET**

</div>

1. **Effective Date of Agreement**: _____

2. **Developer:**

| | |
|---|---|
| Name: | |
| Address: | |
| Attention: | |
| Email Address: | |
| Phone: | |
| Type of Entity: | |
| Date of Formation: | |
| State of Formation: | |
| Managing Owner: | |

3. **Owners**.

| Name | Address | Type of Interest | Percentage Held |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

4. **Development Fee**. □ $90,000 for two (2) Studios    □ $120,000 for three (3) Studios
   □ Other: $_____ _____

5. **Development Area**.

   The geographic area within _____, as depicted on the following map:

<div align="center">

[insert map]

</div>

   If the Development Area is identified by counties or other political subdivisions, boundaries will be considered fixed as of the date of this Agreement and will not change, notwithstanding a political reorganization or change to the boundaries or regions.

<div align="center">

Data Sheet - 1

</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

6. **Development Schedule**.

| Development Period | Leases Executed During Development Period* | Leases Executed by End of Development Period* | Studios Opened During Development Period | Studios Operating by End of Development Period |
|---|---|---|---|---|
| _____ to _____ | _____ | _____ | _____ | _____ |
| _____ to _____ | _____ | _____ | _____ | _____ |
| _____ to _____ | _____ | _____ | _____ | _____ |
| _____ to _____ | _____ | _____ | _____ | _____ |
| _____ to _____ | _____ | _____ | _____ | _____ |

\* To satisfy this requirement, we must have received, by the end of the Development Period, a fully executed copy of the lease (together with all exhibits) that we have approved in accordance with the applicable Franchise Agreement.

7. **Additional Terms or Modifications to this Agreement**. The following terms, if any, supplement or amend the provisions of the Multi-Unit Development Agreement Terms attached hereto and will control in the event of any conflicts:

[insert as applicable]

8. **Acknowledgement and Acceptance of Agreement**. By signing below, you represent and warrant to us that the information contained in this Data Sheet is true and correct. The parties, intending to be legally bound, accept and agree that this Data Sheet and the accompanying Multi-Unit Development Agreement Terms (together, the "**Agreement**") describe their respective rights and obligations, and each agrees to be bound thereto and to perform as set forth therein.

**THE DAILY PILATES LLC**,
a Georgia limited liability company

By: _____
Name: _____
Title: _____
Date: _____

**DEVELOPER:**
_____
**[Name]**

By: _____
Name: _____
Title: _____
Date: _____

Data Sheet - 2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# THE DAILY PILATES®
## MULTI-UNIT DEVELOPMENT AGREEMENT TERMS

## TABLE OF CONTENTS

**Section**             **Page**

1. Preambles. .................................................................................................................................1
   - A. Background. .......................................................................................................................1
   - B. Business Entity. .................................................................................................................1
   - C. Your Liquidity. ..................................................................................................................2

2. The Development Rights. ...........................................................................................................2
   - A. Grant. ................................................................................................................................2
   - B. Development Area and Reservation of Rights. .................................................................2
   - C. Development Schedule. .....................................................................................................3
   - D. Locating Sites for Your Studios. ......................................................................................3
   - E. Execution of Franchise Agreements. ................................................................................3

3. Development Fee. .......................................................................................................................4

4. Records and Reporting Requirements. .......................................................................................4

5. Transfer. .....................................................................................................................................4
   - A. By Us. ...............................................................................................................................4
   - B. By You or Your Owners. ..................................................................................................4
   - C. Conditions for Approval of Transfer. ...............................................................................5
   - D. Effect of Consent to Transfer. ..........................................................................................6
   - E. Public or Private Offerings. ..............................................................................................6
   - F. Our Right of First Refusal. ...............................................................................................6

6. Termination of Agreement. ........................................................................................................7
   - A. By You. .............................................................................................................................7
   - B. By Us. ...............................................................................................................................7

7. Rights and Obligations on Termination or Expiration of this Agreement. ................................8

8. Relationship of the Parties/Indemnification. .............................................................................8
   - A. Independent Contractors. ..................................................................................................8
   - B. Indemnification. ...............................................................................................................8

9. Enforcement. ..............................................................................................................................9
   - A. Arbitration. .......................................................................................................................9
   - B. Governing Law. ..............................................................................................................10
   - C. Consent to Jurisdiction. ..................................................................................................10
   - D. Waiver of Punitive Damages and Jury Trial. .................................................................11
   - E. Injunctive Relief. ............................................................................................................11
   - F. Costs and Attorneys' Fees. .............................................................................................11

Table of Contents - 1

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

G.     Limitations of Claims.................................................................................................11

10.     Miscellaneous.........................................................................................................................12
    A.     Binding Effect...................................................................................................12
    B.     Rights of Parties Are Cumulative....................................................................12
    C.     Severability and Substitution of Valid Provisions. .......................................12
    D.     Waiver of Obligations. ....................................................................................12
    E.     The Exercise of Our Judgment. .......................................................................13
    F.     Construction. ....................................................................................................13
    G.     Notices..............................................................................................................14
    H.     Counterparts. ....................................................................................................14

## ATTACHMENTS

ATTACHMENT A     Guaranty and Assumption of Obligations

The Daily Pilates LLC
2024_04 FDD | Ex. C – Multi-Unit Development Agreement
1533.002.002/402899.3

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

The following Multi-Unit Development Agreement Terms (these "**Terms**") form an integral part of the Agreement between **THE DAILY PILATES LLC**, a Georgia limited liability company having its address at 900 Dekalb Avenue, Suite 600, Atlanta, Georgia 30307 ("**us**") and the party signing the attached Data Sheet as the "Developer" ("**you**").

1.      **PREAMBLES**.

A.      **BACKGROUND**.

We grant franchises for the development, ownership and operation of fitness studios that (a) are currently identified by the trademark *The Daily Pilates*® (the "**Brand**") and together with such other trademarks and commercial symbols we periodically designate, the "**Marks**"); (b) offer and sell Pilates and wellness classes, instruction and private sessions, and related services; (c) reflect distinctive interior design and display procedures, color schemes, and décor; and (d) operate using a designated "**System**" which includes the Marks, interior design schemes, and our intellectual property including trade secrets, copyrights, confidential and proprietary information, and designated training and exercise methods and know-how, fitness equipment, furniture and fixtures, marketing, advertising, sales promotions, cost controls, accounting and reporting procedures, and personnel management systems, each of which we may replace, further develop, or otherwise modify or discontinue from time to time (each a "**Studio**" and collectively, the "**Studios**").

Based on your own investigation and diligence, you have requested that we grant you the right to acquire multiple franchises (each a "**Franchise**") for the development and operation of Studios (the "**Development Rights**") and, to support your request, you and, as applicable, your owners have provided us with certain information about your and their background, experience, skills, financial condition and resources (collectively, the "**Application Materials**").  In reliance on, among other things, the Application Materials, we are willing to grant you the Development Rights on the Terms contained in this Agreement.

B.      **BUSINESS ENTITY**.

If you are a business organization such as a corporation, limited liability company or partnership (a "**Business Entity**"), you represent and warrant to us that: (1) you were validly formed and are and will maintain, throughout the Term (defined below) and in each jurisdiction included in the Development Area, your existence, good standing, and qualification to conduct business; (2) the information on the attached Data Sheet is complete and accurate as of the Effective Date; (3) each of your owners that has direct or indirect ownerships of at least 10% of the ownership interests in you (each a "**Principal Owner**") will sign and deliver to us our then-standard form of Guaranty and Assumption of Obligations (the "**Guaranty**"); (4) you will designate, subject to our approval, one of your owners who is a natural person having at least 10% of the ownership interests and voting power in you and who will have the authority of a chief executive officer who is and will be authorized, on your behalf, to deal with us in all matters that arise in respect of your Studio(s); (5) the only business that you will own or operate during the Term will be the activities described in these Terms and the ownership and operation of any Studios pursuant to franchise agreements with us; and (6) at our request, you will furnish us with true and correct copies of all documents regarding your formation, existence, standing, and governance. Our current form of Guaranty is attached hereto as Attachment A. The non-owner spouse of each guarantor must also sign the Guaranty in the capacity and for the purposes reflected in the Guaranty.

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 154 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

C. **YOUR LIQUIDITY**.

Our decision to grant you the Development Rights is based, in part, on your representations to us regarding, and our assessment of, your liquidity as of the Effective Date. You will ensure that, throughout the Term, you will maintain sufficient liquidity to meet your obligations under this Agreement. We reserve the right to establish and modify specific liquidity thresholds from time to time, and you agree to comply with such minimum liquidity requirements that we reasonably impose.

2. **THE DEVELOPMENT RIGHTS**.

A. **GRANT**.

We hereby grant you the Development Rights, which must be exercised in strict compliance with this Agreement. The Development Rights may be exercised from the Effective Date and, unless sooner terminated as provided herein, continuing through the earlier of (1) the date on which the last Studio required to be opened in order to satisfy the Development Schedule shown on the attached Data Sheet (the "**Development Schedule**") opens for regular business or (2) the last day of the last Development Period (defined below) of the Development Schedule (the "**Term**"). You accept the grant of the Development Rights and agree to, at all times, faithfully, honestly and diligently perform your obligations under this Agreement and fully exploit the Development Rights during the Term and throughout the entire Development Area identified on the attached Data Sheet (the "**Development Area**"). You must perform all of your obligations under these Terms, and you may not subcontract or delegate any of those obligations to any third parties.

B. **DEVELOPMENT AREA AND RESERVATION OF RIGHTS**.

The Development Rights may only be exercised for Studios to be located in the Development Area. As long as you are in compliance with this Agreement and all Franchise Agreements signed pursuant to this Agreement, and except with respect to Special Venue Businesses (defined below), we will not, during the Term, operate or grant the right to anyone else to operate a Studio within the Development Area, or grant Development Rights to anyone else to be exercised with your Development Area. A "**Special Venue Business**" is any Studio (1) that is located within or as part of a larger venue or facility (a "**Host Facility**"), (2) that is operated by the owner or operator of the Host Facility or its licensee (which may be us, our affiliates, or our franchisees) as an amenity of the Host Facility, and (3) whose customers are primarily the customers, members or residents of the Host Facility and their permitted guests.

For the avoidance of doubt, we reserve for ourselves and our affiliates all rights not expressly granted to you in these Terms and the right to do all things that we do not expressly agree in these Terms not to do, in each case, without compensation to you, without regard to proximity to your Studios or Development Area, and on such terms and conditions as we deem appropriate. For example, and without limitation, we and our affiliates may, ourselves or through authorized third parties:

(1) own and operate, and license others to own and operate, Studios offering similar or identical products and services and using the System or elements of the System (i) under the Marks anywhere outside of the Development Area, and (ii) under names, symbols, or marks other than the Marks anywhere, including inside and outside of the Development Area;

(2) develop or become associated with other businesses, including those within the health and wellness industry, and/or award franchises under such other concepts for locations anywhere, including inside and outside of the Development Area, whether or not using the System and/or the Marks, provided that such businesses located in the Development Area are not, during the Term, primarily identified by the Marks;

2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

(3)     acquire, be acquired by, merge with, affiliate with, or engage in any transaction with other businesses (whether competitive or not) located anywhere and, even if such businesses are located in the Development Area, (i) convert the other businesses to the Brand, (ii) allow such other businesses to operate as part of the System, whether or not converted to the Brand, and/or (iii) permit the other businesses to continue to operate under another name;

(4)     solicit customers, advertise, and authorize others to advertise, and promote sales of and from Studios anywhere, including within the Development Area; and

(5)     using the Marks or other trademarks and commercial symbols, market and sell, and grant to others the right to market and sell, anywhere (including within the Development Area), through other channels of distribution (for example, through the Internet, mail order, e-commerce, catalog sales, and product lines in other retail businesses), any products and services that are or have been authorized for sale at Studios.

## C.     **DEVELOPMENT SCHEDULE**.

Each period described in the Development Schedule is a "**Development Period**." You agree to deliver to us a fully executed lease (or otherwise secure possession of a site), and open and operate Studios in the Development Area, each pursuant to a written franchise agreement and related agreements signed by us and you or your affiliate that we approve (each a "**Franchise Agreement**"), each as necessary to satisfy the requirements of each Development Period, but you shall not be required to open, in total, more than the cumulative number of Studios shown for the last Development Period. The Development Schedule is not our representation, express or implied, that the Development Area can support, or that there are or will be sufficient sites for, the number of Studios specified in the Development Schedule or during any particular Development Period. We are relying on your knowledge and expertise of the Development Area and your representation that you have conducted your own independent investigation and have determined that you can satisfy the development obligations under each Development Period of the Development Schedule.

## D.     **LOCATING SITES FOR YOUR STUDIOS**.

Despite any assistance we may provide, you are entirely responsible for locating and presenting to us proposed sites for Studios in the Development Area as necessary to comply with the Development Schedule (each a "**Site**"). You agree to give us all information and materials we request to assess each proposed Site as well as your or your proposed affiliate's financial and operational ability to develop and operate a Studio at the proposed Site. We have the absolute right to reject any proposed Site or affiliate (a) that does not meet our criteria or (b) if you or your affiliates are not then in compliance with any existing Franchise Agreements executed pursuant to these Terms or operating your or their Studios in compliance with the mandatory specifications, standards, operating procedures and rules that we periodically prescribe for operating Studios (the "**System Standards**"). We agree to use our reasonable efforts to review and evaluate your proposed Sites within 30 days after we receive all requested information and materials. If we accept a proposed Site, you or your approved affiliate must sign a separate Franchise Agreement for the Site within 15 days after we provide you with an execution copy of the Franchise Agreement, failing which, we may withdraw our acceptance. Our approval of any proposed Site is entirely for our own purposes and, by approving your Site, we are not representing or guaranteeing that it will perform as you or we expect it to do.

## E.     **EXECUTION OF FRANCHISE AGREEMENTS**.

Simultaneously with signing this Agreement, you or an affiliate we approve must sign and deliver to us a Franchise Agreement and related documents representing the first Franchise you are obligated to acquire under this Agreement. You or your approved affiliate must then open and operate a Studio

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

according to the terms of that Franchise Agreement. Thereafter, once we have accepted a Site, and prior to signing a lease or otherwise securing possession of the Site, you or an affiliate we approve must sign our then-current form of Franchise Agreement and related documents, the terms of which may differ substantially from the terms contained in the form of Franchise Agreement we are using to grant Franchises on the Effective Date, except that the Royalty rate will not exceed 6% of Gross Sales, and the Initial Franchise Fee will be $40,000 for the second Franchise Agreement and $30,000 for the third and each subsequent Franchise Agreement. Each Franchise Agreement will govern the development and operation of the Studio at the accepted Site identified therein.

3.    **DEVELOPMENT FEE**.

In addition to paying the Initial Franchise Fee due under the first Franchise Agreement referenced in Section 2.C, you must pay us, on your execution of this Agreement and in consideration of the grant of the Development Rights, a nonrecurring and non-refundable Development Fee in the amount shown on the attached Data Sheet (the "**Development Fee**"). The Development Fee is fully earned by us when you and we sign this Agreement and is non-refundable. We will apply the Development Fee as a credit against the initial franchise fee due under each Franchise Agreement (after the first Franchise Agreement) which you or your affiliates execute pursuant to this Agreement, subject to a maximum credit under any Franchise Agreement equal to the amount shown on the attached Data Sheet and a maximum credit for all such Franchise Agreements, in the aggregate, equal to the total Development Fee.

4.    **RECORDS AND REPORTING REQUIREMENTS**.

You agree, during the Term, to maintain records regarding your activities in connection with the exercise of the Development Rights and to provide us with the following records and reports:

(1)    within 10 days after the end of each month during the Term, you must send us a report of your business activities during that month, including information about your efforts to find Sites for your Studios in the Development Area and the status of development and projected opening for each Studio under development in the Development Area;

(2)    within 30 days after the end of each calendar quarter, you must provide us with a balance sheet and profit and loss statement for you and your affiliates covering that quarter and the year-to-date, and an updated balance sheet for each person or entity signing the Guaranty; and

(3)    such other data, reports, information, financial statements, and supporting records as we reasonably request from time to time.

5.    **TRANSFER**.

A.    **BY US**.

We have the right to delegate the performance of any portion or all of our rights and obligations under these Terms to third-party designees. You represent that you have not signed this Agreement in reliance on any particular person or entity remaining with us in any capacity. We may change our ownership or form or assign this Agreement and any other agreement to a third party without restriction.

B.    **BY YOU OR YOUR OWNERS**.

Your rights and duties under this Agreement are personal to you (or your owners if you are a Business Entity), and we have granted you the Development Rights in reliance upon our assessment of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, neither you nor any of your owners, nor any of your or their permitted successors


Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 157 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

or assigns, may sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise dispose of or encumber this Agreement (or any direct or indirect interest in this Agreement), the Development Rights, or any direct or indirect ownership interest in you (regardless of its size) (each, a "**Transfer**"), or engage in any solicitation or marketing efforts in relation to any of the foregoing without our prior written consent. Any Transfer without our prior written approval is a material breach of this Agreement and has no effect.

C.      **CONDITIONS FOR APPROVAL OF TRANSFER**.

We may consider, and you will provide or assist us in compiling, any information we deem necessary or appropriate in connection with our assessment of a proposed Transfer. If we elect to approve a proposed Transfer, we may, at our discretion, condition our approval in any manner we deem necessary and appropriate to protect the Brand and our interests in the System and this Agreement, including any of the following (each of which you agree is reasonable):

(1)      you and any person or entity obligated under this Agreement or Guaranty must be in compliance with your or its obligations;

(2)      you and the proposed transferee and its owners (if the transferee is a Business Entity) must provide all information and documents we request regarding the Transfer and the proposed transferee and its owners or affiliates;

(3)      you must provide us with executed versions of any documents regarding the proposed Transfer, and all other information we request about the proposed Transfer;

(4)      if you or the transferor offers the transferee financing for any part of the purchase price, all of your or the transferee's obligations under promissory notes, agreements, or security interests reserved in the Development Rights must be subordinate to your or the transferee's obligation to pay all amounts due to us, our affiliates, and third-party vendors and otherwise agree to comply with these Terms and any Franchise Agreements with us);

(5)      you (and your owner(s)) must sign a general release, in a form satisfactory to us, of any and all claims against us and our owners, officers, directors, employees and agents;

(6)      you (and your transferring owner(s)) (and your or their immediate family members) must sign a non-competition covenant in favor of us, commencing on the effective date of the Transfer and consistent with the post-term non-competition obligations contained in the most recent Franchise Agreement that you or your affiliates have signed with us;

(7)      you must pay all amounts owed to us, our affiliates, and third-party vendors and must have submitted all required reports and statements under these Terms and any Franchise Agreement with us;

(8)      you and your owners must not have violated any provision of these Terms or any other agreement with us or our affiliates during both the 60-day period before you requested our consent to the Transfer and the period between your request and the effective date of the Transfer;

(9)      the transferee, at our request, must sign our then-current form of multi-unit development agreement and related documents, any and all of the provisions of which may differ materially from any and all of those contained in this Agreement;

<div align="center">5</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

(10)     you must pay or cause to be paid to us our then-current Transfer fee (currently, $5,000); and

(11)     the Transfer of this Agreement must not be made separate and apart from the Transfer to the same transferee of all Franchise Agreements that were signed pursuant to this Agreement.

D.     **EFFECT OF CONSENT TO TRANSFER**.

Our consent to a Transfer is not a representation of the fairness of the terms of any contract between you and the transferee, transferee's prospects of success, or a waiver of any claims we have against you (or your owners) or of our right to demand full compliance by you and the transferee with these Terms.

E.     **PUBLIC OR PRIVATE OFFERINGS**.

Written information used to raise or secure funds can reflect upon us and the System. You agree to submit any written information intended to be used for that purpose to us before inclusion in any registration statement, prospectus or similar offering memorandum. Should we object to any reference to us or our affiliates or any of our business in the offering literature or prospectus, the literature or prospectus shall not be used until our objections are addressed to our satisfaction or withdrawn. You may not engage in a public offering of securities without our prior written consent.

F.     **OUR RIGHT OF FIRST REFUSAL**.

If you (or any of your owners) desire to engage in a Transfer, you (or your owners) agree to obtain from a responsible and fully disclosed buyer, and send us, a true and complete copy of a bona fide, executed written offer (which may include a letter of intent) relating exclusively to an interest in you or in this Agreement and your Development Rights. The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be couched entirely as a dollar amount, and we may require the proposed buyer submit with its offer a reasonable earnest money deposit acceptable to us. We may require you (or your owners) to send us copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction.

Within 30 days after we receive an exact copy of the bona fide offer and all relevant information we request, we may, by written notice delivered to you or your selling owner(s), elect to purchase the interest offered for the price and on the terms and conditions contained in the offer, except that we may substitute cash and cash equivalents for any non-cash form of payment proposed in the offer. If we exercise our right of first refusal, we will have 30 days from the date we notified you of our intended purchase to prepare for closing. You and your owners must make all customary representations and warranties given by the seller of the assets of a business or the ownership interests in a legal entity, as applicable (including that the items sold are free and clear of all liens), and you and your selling owner(s) (and your and their immediate family members) must comply with the obligations regarding Competitive Businesses, as described in the Franchise Agreements executed pursuant to this Agreement, as though such Franchise Agreements had expired on the date of the purchase. We have the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this Section 5.F.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we otherwise approve the Transfer in accordance with, and you (and your owners) and the transferee comply with the conditions in, Sections 5.B and 5.C above. If you do not complete the sale to the proposed buyer within 60 days after either we notify you that we do not intend to exercise our right of first refusal or the time our exercise expires, or if there is a material

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

change in the terms of the sale (which you agree to tell us promptly), we or our designee will have an additional right of first refusal during the 30-day period following either the expiration of the 60-day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our or our designee's option.

6. **TERMINATION OF AGREEMENT**.

A. **BY YOU**.

If you and your owners are fully complying with this Agreement and we materially fail to comply with these Terms and do not correct the failure within 30 days after you deliver written notice of the material failure to us or if we cannot correct the failure within 30 days and we fail to give you within 30 days after your notice reasonable evidence of our effort to correct the failure within a reasonable time, you may terminate this Agreement effective 30 days after you deliver to us written notice of termination. Your termination of this Agreement other than according to this Section 6.A will be deemed a termination without cause and a breach of these Terms.

B. **BY US**.

We may terminate this Agreement, effective upon delivery of written notice to you, if:

(1) you (or any of your owners) have made or make any material misrepresentation or omission in the Application Materials or otherwise;

(2) you fail to comply with the Development Schedule or fail to make progress in the development of Studios to indicate, in our determination, that you will not be able to satisfy your development obligations under this Agreement for the then-current Development Period;

(3) you (or any of your owners) make or attempt to make a Transfer without complying with the requirements of Section 5;

(4) you (or any of your owners) (a) fail on three (3) or more separate occasions within any 12 consecutive month period to comply with any provision of these Terms or (b) fail on two (2) or more separate occasions within any six (6) consecutive month period to comply with the same obligation under these Terms, in either case, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you;

(5) you (or any of your owners) file a petition in bankruptcy or a petition in bankruptcy is filed against you; you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or the substantial part of your property; any of your or your affiliates' Studios are attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant, or levy is vacated within 30 days; or any order appointing a receiver, trustee, or liquidator of your or your affiliates' Studios are not vacated within 30 days following the order's entry;

(6) you (or any of your owners) fail to comply with anti-terrorism laws, ordinances, regulations and Executive Orders;

(7) you (or any of your owners) fail to comply with any other provision of these Terms and do not correct the failure within 30 days after we deliver written notice of the failure to you;

7

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

(8) you (or any of your owners) are convicted of a felony or any criminal act that is likely to adversely affect the goodwill of Studios or the System;

(9) you or a Guarantor or an affiliate fails to comply with any other agreement with us or our affiliate, including any Franchise Agreement, unless the failure is timely and completely cured within any cure period provided under the applicable agreement; or

(10) you (or any of your owners) engage in any conduct which, in our opinion, adversely affects the reputation of any Studios (including your own) or the goodwill associated with the Marks.

7. **RIGHTS AND OBLIGATIONS ON TERMINATION OR EXPIRATION OF THIS AGREEMENT**.

You and, as applicable, your owners and all such other persons or Business Entities who are bound under the terms of this Agreement must immediately upon the expiration or termination of this Agreement, cease to directly or indirectly exercise or attempt to exercise any of the rights granted to you under this Agreement, comply with all obligations that either expressly survive or by their nature are intended to survive the expiration or termination of this Agreement, and refrain from interfering or attempting to interfere with our or our affiliates' relationships with any vendors, franchisees or consultants or engage in any other activity which might injure the goodwill of the Marks or the System.

All of our and your (and your owners') obligations which expressly or by their nature survive this Agreement's expiration or termination will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire, including, without limitation, all obligations relating to indemnification.

8. **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION**.

A. **INDEPENDENT CONTRACTORS**.

This Agreement does not create a fiduciary relationship between you and us. You and we are and will be independent contractors, and nothing in these Terms is intended to make either you or us a general or special agent, joint venturer, partner, or employee of the other for any purpose. You agree to identify yourself conspicuously in all dealings with customers, vendors, public officials, your personnel, and others as the owner of your business under a franchise we have granted and to place notices of independent ownership on the business cards, advertising, and other materials we periodically require.

You also acknowledge that you will have a contractual relationship only with us and may look only to us to perform under these Terms. None of our affiliates is a party to this Agreement and no affiliate has any obligations under it.

B. **INDEMNIFICATION**.

You agree to indemnify, defend, and hold harmless us, our affiliates, and our and their respective owners, managers, directors, officers, employees, agents, successors, and assignees (the "**Indemnified Parties**") against, and to reimburse any one or more of the Indemnified Parties for, all claims, obligations, and damages directly or indirectly arising out of the operation of the business you conduct under this Agreement, or your breach of these Terms, including, without limitation, those alleged to be caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused solely by the Indemnified Party's intentional misconduct in a final, unappealable ruling issued by a court with competent jurisdiction. For purposes of this indemnification, "**claims**" include all obligations, damages (actual, consequential, or otherwise), and costs that any

8

Case 3:26-cv-00550-KDB-DCK   Document 1-1   Filed 07/08/26   Page 161 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation or alternative dispute resolution, regardless of whether litigation or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at your expense (including choosing and retaining its own legal counsel) and agree to settlements or take any other remedial, corrective, or other actions. This indemnity will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you under this subparagraph. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you under this Section 8.B.

9.    **ENFORCEMENT**.

   A.    **ARBITRATION**.

   We and you agree that all controversies, disputes, or claims between us or any of our affiliates, and our and their respective owners, officers, directors, agents, and employees, on the one hand, and you (and your owners, guarantors, affiliates, and employees), on the other hand, arising out of or related to: (1) this Agreement or any other agreement between you (or any of your owners) and us (or any of our affiliates); (2) our relationship with you; (3) the scope or validity of this Agreement or any other agreement between you (or any of your owners) and us (or any of our affiliates) or any provision of any of such agreements (including the validity and scope of the arbitration provision under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court); or (4) any System Standards, must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association (the "**AAA**"). The arbitration proceedings will be conducted by one arbitrator and, except as this Section otherwise provides, according to the AAA's then-current Commercial Arbitration Rules. All proceedings will be conducted at a suitable location chosen by the arbitrator that is within 50 miles of our or, as applicable, our successor's or assign's then current principal place of business (currently, Atlanta, Georgia). All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). The interim and final awards of the arbitrator shall be final and binding upon each party, and judgment upon the arbitrator's awards may be entered in any court of competent jurisdiction.

   The arbitrator has the right to award or include in his or her awards any relief which he or she deems proper, including, without limitation, money damages, pre- and post-award interest, interim costs and attorneys' fees, specific performance, and injunctive relief, provided that the arbitrator may not declare any of the trademarks owned by us or our affiliates generic or otherwise invalid, or award any punitive or exemplary damages against any party to the arbitration proceeding (we and you hereby waiving to the fullest extent permitted by law any such right to or claim for any punitive or exemplary damages against any party to the arbitration proceeding). Further, at the conclusion of the arbitration, the arbitrator shall award to the prevailing party its attorneys' fees and costs.

   We and you agree to be bound by the provisions of any applicable contractual or statutory limitations provision, whichever expires earlier. We and you further agree that, in any arbitration proceeding, each party must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding. Any claim which is not submitted or filed as required will be forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us.

   WE AND YOU AGREE THAT ARBITRATION WILL BE CONDUCTED ON AN INDIVIDUAL BASIS AND THAT A PROCEEDING REQUIRED UNDER THIS SECTION TO BE SUBMITTED TO ARBITRATION MAY NOT BE: (I) CONDUCTED ON A CLASS-WIDE BASIS, (II)

<div align="center">9</div>

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 162 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

COMMENCED, CONDUCTED OR CONSOLIDATED WITH ANY OTHER ARBITRATION PROCEEDING, (III) JOINED WITH ANY SEPARATE CLAIM OF AN UNAFFILIATED THIRD-PARTY, OR (IV) BROUGHT ON YOUR BEHALF BY ANY ASSOCIATION OR AGENT. Notwithstanding the foregoing, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute, controversy or claim that otherwise would be subject to arbitration under this Section, then all parties agree that this arbitration clause shall not apply to that dispute, controversy or claim and that such dispute, controversy or claim shall be resolved in a judicial proceeding in accordance with the dispute resolution provisions of these Terms.

We and you agree that, in any arbitration arising as described herein, the arbitrator shall have full authority to manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute. The parties may only serve reasonable requests for documents, which must be limited to documents upon which a party intends to rely or documents that are directly relevant and material to a significant disputed issue in the case or to the case's outcome. The document requests shall be restricted in terms of time frame, subject matter and persons or entities to which the requests pertain, and shall not include broad phraseology such as "all documents directly or indirectly related to." You and we further agree that no interrogatories or requests to admit shall be propounded, unless the parties later mutually agree to their use.

The provisions of this Section are intended to benefit and bind certain third party non-signatories. The provisions of this Section will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

Any provisions of these Terms below that pertain to judicial proceedings shall be subject to the agreement to arbitrate contained in this Section.

B.      **GOVERNING LAW**.

Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.), or other United States federal law, this Agreement or any related agreement, the Development Rights and all claims arising from the relationship between us (or any of our affiliates, and our and their respective owners, officers, directors, agents, representatives, and employees) and you (and your owners, guarantors, affiliates, and employees) will be governed by the laws of the State of Georgia, without regard to its conflict of laws rules, except that (1) any state law regulating the offer or sale of franchises or governing the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this section, and (2) the enforceability of those provisions of these Terms which relate to restrictions on you and your owners' competitive activities will be governed by the laws of the state in which your Development Area is located.

C.      **CONSENT TO JURISDICTION**.

Subject to the obligation to arbitrate under Section 9.A above and the provisions below, you and your owners agree that all actions arising under the Agreement or any related agreements, or otherwise as a result of the relationship between you (or your owners, guarantors, affiliates, and employees) and us (or any of our affiliates, and our and their respective owners, officers, directors, agents, representatives, and employees) must be commenced in the court nearest to our or, as applicable, our successor's or assign's then-current principal place of business (currently, Atlanta, Georgia), and you (and each owner) irrevocably submit to the jurisdiction of that court and waive any objection you (or the owner) might have to either the jurisdiction of or venue in that court.

<div align="center">10</div>

D.  **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL**.

Except for your obligation to indemnify us for third party claims under Section 8.B, we and you (and your owners) waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between us and you, the party making a claim will be limited to equitable relief and to recovery of any actual damages it sustains. We and you irrevocably waive trial by jury in any action or proceeding brought by either of us.

E.  **INJUNCTIVE RELIEF**.

Nothing in these Terms, including the provisions of Section 9.A, bars our right to obtain specific performance of the provisions of these Terms and injunctive relief against any threatened or actual conduct that will cause us, the Marks, or the System loss or damage, under customary equity rules, including applicable rules for obtaining restraining orders and temporary or preliminary injunctions. You agree that we may seek such relief from any court of competent jurisdiction in addition to such further or other relief as may be available to us at law or in equity. You agree that we will not be required to post a bond to obtain injunctive relief and that your only remedy if an injunction is entered against you will be the dissolution of that injunction, if warranted, upon due hearing (all claims for damages by injunction being expressly waived hereby).

F.  **COSTS AND ATTORNEYS' FEES**.

The prevailing party in any judicial or arbitration proceeding shall be entitled to recover from the other party all damages, costs and expenses, including arbitration and court costs and reasonable attorneys' fees, incurred by the prevailing party in connection with such proceeding.

G.  **LIMITATIONS OF CLAIMS**.

UNLESS PROHIBITED BY APPLICABLE LAW, EXCEPT FOR CLAIMS ARISING FROM YOUR NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS YOU OWE US, ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THE AGREEMENT OR OUR RELATIONSHIP WITH YOU WILL BE BARRED UNLESS A JUDICIAL OR ARBITRATION PROCEEDING IS COMMENCED IN ACCORDANCE WITH THESE TERMS WITHIN ONE (1) YEAR FROM THE DATE ON WHICH THE PARTY ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIMS. The parties understand that such time limit might be shorter than otherwise allowed by law. You and your owners agree that your and their sole recourse for claims arising between the parties shall be against us or our successors and assigns. You and your owners agree that our and our affiliates' members, managers, owners, directors, officers, employees, and agents shall not be personally liable nor named as a party in any action between us or our affiliates and you or your owners.

WE AND YOU AGREE THAT ANY PROCEEDING DESCRIBED IN THIS SECTION 9 WILL BE CONDUCTED ON AN INDIVIDUAL BASIS AND MAY NOT BE: (I) CONDUCTED ON A CLASS-WIDE BASIS, (II) COMMENCED, CONDUCTED OR CONSOLIDATED WITH ANY OTHER PROCEEDING, (III) JOINED WITH ANY CLAIM OF AN UNAFFILIATED THIRD-PARTY, OR (IV) BROUGHT ON YOUR BEHALF BY ANY ASSOCIATION OR AGENT.

No previous course of dealing shall be admissible to explain, modify, or contradict the terms of these Terms. No implied covenant of good faith and fair dealing shall be used to alter the express terms of these Terms.

The Daily Pilates LLC
2024_04 FDD | Ex. C - Multi-Unit Development Agreement
1533.002.002/402899.3

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

10. **MISCELLANEOUS**.

    A.     **BINDING EFFECT**.

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns, and successors in interest. Subject to our right to modify the System Standards, these Terms may not be modified except by a written agreement signed by our and your duly-authorized officers.

    B.     **RIGHTS OF PARTIES ARE CUMULATIVE**.

Our and your rights under this Agreement are cumulative, and our or your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy which we or you are entitled by law to enforce.

    C.     **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS**.

Except as expressly provided to the contrary in these Terms, each section, paragraph, term, and provision of these Terms is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of these Terms, which will continue to have full force and effect and bind the parties.

If any applicable and binding law or rule of any jurisdiction requires more notice than these Terms require, or if, under any applicable and binding law or rule of any jurisdiction, any provision of these Terms or any System Standard is invalid, unenforceable, or unlawful, the notice or other action required by the law or rule will be substituted for the comparable provisions of these Terms, and we may modify the invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of these Terms, as though it were separately articulated in and made a part of these Terms.

    D.     **WAIVER OF OBLIGATIONS**.

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under these Terms, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. Any waiver granted will be without prejudice to any other rights we or you have, will be subject to continuing review, and may be revoked at any time and for any reason effective upon delivery of 10 days' prior written notice.

No right, power, or option you or we are provided under this Agreement will be impaired or waived because of any custom or practice at variance with this Agreement's terms or your or our failure, refusal, or neglect to exercise any right under this Agreement or to insist upon the other's compliance with this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement, or accord and satisfaction. We are authorized to remove any legend or endorsement, which then will have no effect.

The following provision applies if you or the rights granted hereby are subject to the franchise registration or disclosure laws in California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, or Wisconsin: No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any

The Daily Pilates LLC
2024\_04 FDD Ex. C - Multi-Unit Development Agreement
1533.002.002/402899.3

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

E.    **THE EXERCISE OF OUR JUDGMENT**.

We have the right to operate, develop, and change the System in any manner that is not specifically prohibited by these Terms.  Whenever we have reserved in these Terms a right to take or to withhold an action, to grant or decline to grant you a right to take or withhold an action, or to provide or withhold approval or consent, we may, except as otherwise specifically provided in these Terms, make our decision or exercise our rights in our sole and unfettered discretion.

F.    **CONSTRUCTION**.

The preambles and exhibits are a part of these Terms, which together with these Terms and the attached Data Sheet constitute our and your entire agreement, and there are no other oral or written understandings or agreements between us and you, or oral or written representations by us, relating to the subject matter of or relationships created by this Agreement, or your Development Rights (any such understandings or agreements reached, or any representations made, before the execution of this Agreement are superseded by this Agreement). Nothing in this or any related agreement is intended to disclaim the representations we made in the latest franchise disclosure document that we furnished to you.  Any policies that we periodically adopt and implement to guide us in our decision-making are subject to change, are not a part of these Terms, and are not binding on us. Except as provided in Section 8.B (Indemnification), nothing in these Terms is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.

Except where these Terms expressly obligate us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed, initiated, or completed actions that require our approval. The headings of the sections and paragraphs are for convenience only and do not define, limit, or construe the contents of these sections or paragraphs.

References in these Terms to "we," "us," and "our," with respect to all of our rights and all of your obligations to us under these Terms, include any of our affiliates with whom you deal.  The term "affiliate" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling you or us. "Control" means the power to direct or cause the direction of management and policies. "Including" means "including, without limitation." References to "owner" mean any person holding a direct or indirect ownership interest (whether of record, beneficially, or otherwise) or voting rights in you (or a transferee of this Agreement and your Development Rights or an ownership interest in you), including, without limitation, any person who has a direct or indirect interest in you (or a transferee), these Terms, the franchise, or your Development Rights and any person who has any other legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets. References to an "ownership interest" in you or one of your owners (if a Business Entity) mean the percent of the voting shares or other voting rights that results from dividing 100% of the ownership interests by the number of owners. "Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative, or other legal or functional entity. Unless otherwise specified, all references to a number of days shall mean calendar days and not business days.

If two or more persons are at any time the owners of the Development Rights, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several.

The Daily Pilates LLC
2024_04 FDD Ex. C – Multi-Unit Development Agreement
1533.002.002/402899.3

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

G.  **NOTICES**.

All notices, consents, approvals, statements, documents or other communications required or permitted to be given hereunder must be in writing, and will be deemed to be delivered on the earlier of the date of actual delivery or one of the following: (i) at the time delivered by hand, (ii) at the time delivered via computer transmission and, in the case of amounts due, at the time we actually receive electronic payment, or (iii) one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery. Your and our current notice addresses are shown on the attached Data Sheet or these Terms, as applicable. Any notice must be sent to the party to be notified at its most current principal business address of which the notifying party has notice; except that, it will always be deemed acceptable to send notice to you at the address of any of your Studios. Any required payment or report which we do not actually receive during regular business hours on the date due will be deemed delinquent. Notices to us must be sent to the Attention: Chief Executive Officer, with a copy (which shall not constitute notice) to Legal Department.

H.  **COUNTERPARTS**.

This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Faxed, scanned or electronic signatures shall have the same effect and validity, and may be relied upon in the same manner, as original signatures.

[*Signature Page to Follow*]

14

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 167 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**IN WITNESS WHEREOF**, the parties have executed and delivered these Terms on the dates noted below, to be effective as of the Effective Date.

| | |
|---|---|
| **THE DAILY PILATES LLC,** | **DEVELOPER:** |
| a Georgia limited liability company | **[Name]** |

By:_____     By:_____

Name:_____     Name:_____

Title:_____     Title:_____

Date: _____     Date: _____

<div align="center">1</div>

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 168 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**GUARANTY AND ASSUMPTION OF OBLIGATIONS**

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given by each of the undersigned persons indicated below who have executed this Guaranty (each a "**Guarantor**") to be effective as of the Effective Date of the Agreement (defined below).

In consideration of, and as an inducement to, the execution of that certain Multi-Unit Development Agreement (as amended, modified, restated or supplemented from time to time, the "**Agreement**") on this date by **THE DAILY PILATES LLC** ("**we**" or "**our**"), each Guarantor personally and unconditionally (a) guarantees to us and our successors and assigns that _____ ("**Developer**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement and (b) agrees to be personally bound by, and personally liable for each and every provision in the Agreement that sets out an obligation of the Developer, including both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities.

Each Guarantor consents and agrees that: (1) Guarantor's direct and immediate liability under this Guaranty will be joint and several, both with Developer and among other guarantors; (2) Guarantor will render any payment or performance required under the Agreement upon demand if Developer fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon our pursuit of any remedies against Developer or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which we may from time to time grant to Developer or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement; and (5) at our request, each Guarantor shall present updated financial information to us as reasonably necessary to demonstrate such Guarantor's ability to satisfy the financial obligations of Developer under the Agreement.

Each Guarantor waives: (i) all rights to payments and claims for reimbursement or subrogation which any Guarantor may have against Developer arising as a result of the Guarantor's execution of and performance under this Guaranty; and (ii) acceptance and notice of acceptance by us of Guarantor's undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled.

Each Guarantor represents and warrants that, if no signature appears below for such Guarantor's spouse, such Guarantor is either not married or, if married, is a resident of a state which does not require the consent of both spouses to encumber the assets of a marital estate.

The provisions contained in Section 9 (Enforcement) of the Agreement, including Section 9.A (Arbitration), Section 9.C (Consent to Jurisdiction) and Section 9.F (Costs and Attorneys' Fees) of the Agreement are incorporated into this Guaranty by reference and shall govern this Guaranty and any disputes between the Guarantors and us. The Guarantors shall reimburse us for all costs and expenses we incur in connection with enforcing the terms of this Guaranty.

A-1

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 169 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

By signing below, the undersigned spouse of each Guarantor indicated below, acknowledges and consents to the guaranty given herein by his/her spouse. Such consent also serves to bind the assets of the marital estate to Guarantor's performance of this Guaranty. We confirm that a spouse who signs this Guaranty solely in his or her capacity as a spouse (and not as an owner) is signing merely to acknowledge and consent to the execution of the Guaranty by his or her spouse and to bind the assets of the marital estate as described therein and for no other purpose (including, without limitation, to bind the spouse's own separate property).

Each Guarantor that is a business entity, retirement or investment account, or trust acknowledges and agrees that if Franchisee (or any of its affiliates) is delinquent in payment of any amounts guaranteed hereunder, that no dividends or distributions may be made by such Guarantor (or on such Guarantor's account) to its owners, accountholders or beneficiaries or otherwise, for so long as such delinquency exists, subject to applicable law

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as this Guaranty and Assumption of Obligations was executed.

| GUARANTOR(S) | SPOUSE(S) |
|---|---|
| Name:_____ Sign: _____ Address: _____ _____ _____ | Name:_____ Sign: _____ Address: _____ _____ _____ |
| Name:_____ Sign: _____ Address: _____ _____ _____ | Name:_____ Sign: _____ Address: _____ _____ _____ |

A-2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**EXHIBIT D**

**STATE SPECIFIC ADDENDA**

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 171 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<div align="center">

**ADDITIONAL DISCLOSURES FOR THE**
**FRANCHISE DISCLOSURE DOCUMENT OF**
**THE DAILY PILATES LLC**

</div>

The following are additional disclosures for the Franchise Disclosure Document of The Daily Pilates LLC required by various state franchise laws. Each provision of these additional disclosures will only apply to you if the applicable state franchise registration and disclosure law applies to you.

**FOR THE FOLLOWING STATES: CALIFORNIA, ILLINOIS, MARYLAND, MICHIGAN, NEW YORK, OR VIRGINIA.**

No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

**CALIFORNIA**

1.      THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

2.      SECTION 31125 OF THE FRANCHISE INVESTMENT LAW REQUIRES US TO GIVE YOU A DISCLOSURE DOCUMENT APPROVED BY THE COMMISSIONER OF FINANCIAL PROTECTION AND INNOVATION BEFORE WE ASK YOU TO CONSIDER A MATERIAL MODIFICATION OF YOUR MULTI-UNIT DEVELOPMENT AGREEMENT OR FRANCHISE AGREEMENT.

3.      OUR WEBSITE, WWW.THEDAILYPILATES.COM, HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION. ANY COMPLAINTS CONCERNING THE CONTENT OF THE WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION AT www.dfpi.ca.gov.

4.      The following is added at the end of Item 3:

Neither we, our parent, predecessor or affiliates nor any person in Item 2 of the Disclosure Document is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. Sections 78a et seq., suspending or expelling such persons from membership in that association or exchange.

5.      The following sentence is added to the end of Item 6:

The highest rate of interest allowed by California law is 10% annually.

6.      The following paragraphs are added at the end of Item 17:

California Business and Professions Code Sections 20000 through 20043 provide rights to the franchisee and multi-unit developers concerning termination, transfer or

The Daily Pilates LLC
2024_04 FDD | Ex. D – State Addenda and Riders
1533.002.002/398437

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

nonrenewal of a franchise. If the Multi-Unit Development Agreement or Franchise Agreement contains a provision that is inconsistent with the law, and the law applies, the law will control.

The Multi-Unit Development Agreement and Franchise Agreement contain a covenant not to compete that extends beyond termination of the franchise. These provisions might not be enforceable under California law.

The Multi-Unit Development Agreement and Franchise Agreement provide for termination upon bankruptcy. This provision might not be enforceable under federal bankruptcy law (11 U.S.C.A. Sections 101 et seq.).

The Franchise Agreement contains a liquidated damages clause. Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

The Multi-Unit Development Agreement and Franchise Agreement require binding arbitration. The arbitration will be conducted at a suitable location chosen by the arbitrator which is in or within a 50 mile radius of our, or, as applicable, our successor's or assign's then-current principal place of business (currently, Atlanta, Georgia). The arbitrator shall award to the prevailing party its attorneys' fees and costs. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California.

The Franchise Agreement requires you to sign a general release of claims upon renewal or transfer of the Franchise Agreement or the Multi-Unit Development Agreement. California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order thereunder is void. Section 31512 might void a waiver of your rights under the Franchise Investment Law (California Corporations Code Section 31000 – 31516). Business and Professions Code Section 20010 might void a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 – 20043).

Under the Franchise Agreement, we reserve the right to require that franchisees comply with maximum and minimum prices we set for goods and services. The Antitrust Law Section of the Office of the California Attorney General views maximum price agreements as per se violations of the California's Cartwright Act (Cal. Bus. and Prof. Code §§ 16700 to 16770).

Section 31512.1 of the California Corporations Code requires that any provision of the Franchise Agreement, Disclosure Document, acknowledgement, questionnaire, or other writing, including any exhibit thereto, disclaiming or denying any of the following shall be deemed contrary to public policy and shall be void and unenforceable: (a) representations made by the franchisor or its personnel or agents to a prospective franchisee; (b) reliance by a franchisee on any representations made by the franchisor or its personnel or agents; (c) reliance by a franchisee on the franchise disclosure document, including any exhibit thereto; or (d) violations of any provision of this division.

<div align="center">2</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**ILLINOIS**

1. The following paragraphs are added to the end of Item 17:

Except for the U.S. Federal Arbitration Act and other federal laws in the U.S., the laws of the State of Illinois will govern the Franchise Agreement.

Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a franchise agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration outside of Illinois.

Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

Your rights upon termination and non-renewal of a franchise agreement are subject to sections 19 and 20 of the Illinois Franchise Disclosure Act.

**MARYLAND**

1. The following is added to the end of the "Summary" sections of Item 17(c) entitled "Requirements for Franchisee to Renew or Extend," and Item 17(m) entitled "Conditions for Franchisor Approval of Transfer:"

However, any release required as a condition of renewal, sale and/or assignment/transfer will not apply to claims or liability arising under the Maryland Franchise Registration and Disclosure Law.

2. The following is added to the end of the "Summary" section of Item 17(h), entitled "'Cause' Defined – Non-Curable Defaults:"

The Multi-Unit Development Agreement and Franchise Agreement provide for termination upon bankruptcy. This provision might not be enforceable under federal bankruptcy law (11 U.S.C. Sections 101 et seq.), but we will enforce it to the extent enforceable.

3. The following sentence is added to the end of the "Summary" section of Item 17(v) entitled "Choice of Forum" and Item 17(w) entitled "Choice of Law:"

You may bring suit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

4. The following sentence is added to the end of Item 17:

Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

3

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**NEW YORK**

1.      The following information is added to the cover page of the Franchise Disclosure Document:

**INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THE FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION AND SECURITIES, 28 LIBERTY STREET, 21ST FLOOR, NEW YORK, NEW YORK 10005.**

**WE MAY, IF WE CHOOSE, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, WE CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE MULTI-UNIT DEVELOPER OR FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS DISCLOSURE DOCUMENT.**

2.      The following is added at the end of Item 3:

With regard to us, our parent, predecessor or affiliate, the persons identified in Item 2, or an affiliate offering franchises under our principal trademark:

A.      No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust, or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable civil or misdemeanor allegations.

B.      No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

C.      No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10 year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.

D.      No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise,

<center>4</center>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3. The following is added to the end of Item 4:

None of the franchisor, its affiliate, its predecessor, officers, or general partner during the 10-year period immediately before the date of the offering circular: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after that officer or general partner of the franchisor held this position in the company or partnership.

4. The following is added to the end of Item 5:

The Initial Franchise Fee and Development Fee constitute part of our general operating funds and will be used as such in our discretion.

5. The following is added to the end of the "Summary" sections of Item 17(c) entitled "Requirements for Franchisee to Renew or Extend," and Item 17(m) entitled "Conditions for Franchisor Approval of Transfer:"

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6. The following language replaces the "Summary" section of Item 17(d) entitled "Termination by Franchisee:"

You may terminate the Development Agreement or Franchise Agreement on any grounds available by law.

7. The following is added to the end of the "Summary" section of Item 17(j), entitled "Assignment of Contract by Franchisor:"

However, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Development Agreement or Franchise Agreement.

<div align="center">5</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

8.      The following is added to the end of the "Summary" sections of Item 17(v) entitled "Choice of Forum" and Item 17(w) entitled "Choice of Law:"

The foregoing choice of law and choice of forum should not be considered a waiver of any right conferred upon you by Article 33 of the General Business Law of the State of New York.

**<u>VIRGINIA</u>**

1.      The following language is added to the end of the "Summary" section of Item 17(e), entitled "Termination by Franchisor Without Cause:"

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the Multi-Unit Development Agreement or Franchise Agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

<div align="center">6</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**THE FOLLOWING PAGES IN THIS EXHIBIT ARE
STATE-SPECIFIC RIDERS TO THE
FRANCHISE AGREEMENT**

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 178 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# RIDER TO THE
# FRANCHISE AGREEMENT
# FOR USE IN ILLINOIS

**THIS RIDER** is made and entered into by and between **THE DAILY PILATES LLC,** a Georgia limited liability company whose address is 900 Dekalb Avenue, Suite 600, Atlanta, GA 30307 ("**we**"), and _____ a(n) _____ whose principal business address is _____ ("**you**").

1.     **BACKGROUND**.  We and you are parties to that certain Franchise Agreement dated _____, 20___ (the "Franchise Agreement"). This Rider is annexed to and forms part of the Franchise Agreement. This Rider supersedes any inconsistent or conflicting provisions of the Franchise Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Franchise Agreement. This Rider is being signed because (a) the offer for the franchise was made or accepted in the State of Illinois <u>and</u> the Studio that you will operate under the Franchise Agreement will be located in Illinois, or (b) you are domiciled in the State of Illinois.

2.     **LIMITATIONS OF CLAIMS**.  Section 18.G ("Limitations of Claims") of the Franchise Agreement is amended by adding the following:

> However, nothing contained in this Section shall constitute a condition, stipulation, or provision purporting to bind any person to waive compliance with any provision of the Illinois Franchise Disclosure Act at Section 705/27 or any other law of the State of Illinois, to the extent applicable.

3.     **ILLINOIS FRANCHISE DISCLOSURE ACT**.  The following language is added to the end of the Franchise Agreement and supersede any conflicting provisions in the Franchise Agreement:

> Except for the U.S. Federal Arbitration Act and other federal laws in the U.S., the laws of the State of Illinois will govern the Franchise Agreement.

> Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a franchise agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration outside of Illinois.

> Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

> Your rights upon termination and non-renewal of a franchise agreement are subject to sections 19 and 20 of the Illinois Franchise Disclosure Act.

[*Signature Page to Follow*]

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider on the dates noted below, to be effective as of the Effective Date of the Franchise Agreement.

**THE DAILY PILATES LLC**                    **FRANCHISE OWNER:**

 

 

                                                 _____

By:_____       **[Name]**
Name:_____
Title:_____       By:_____
Date\*:_____       Name:_____
         (\*This is the Effective Date)       Title:_____
                                                 Date: _____

<div align="center">2</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# RIDER TO THE
# FRANCHISE AGREEMENT
# FOR USE IN MARYLAND

**THIS RIDER** is made and entered into by and between **THE DAILY PILATES LLC,** a Georgia limited liability company whose address is 900 Dekalb Avenue, Suite 600, Atlanta, GA 30307 (“**we**”), and _____ a(n) _____ whose principal business address is _____ (“**you**”).

1.      **BACKGROUND**.  We and you are parties to that certain Franchise Agreement dated _____, 20___ (the “Franchise Agreement”). This Rider is annexed to and forms part of the Franchise Agreement. This Rider supersedes any inconsistent or conflicting provisions of the Franchise Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Franchise Agreement. This Rider is being signed because (a) you are domiciled in the State of Maryland, (b) the Studio that you will operate under the Franchise Agreement will be located in the State of Maryland, or (c) the offer for the franchise was made or accepted in the State of Maryland.

2.      **RELEASES.**  The following is added to the end of Section 13.B (“Transfer – By You or Your Owners”), Section 14.A (“Your Right to Acquire a Successor Franchise”), and Section 16.B (“Our Right to Purchase Your Studio”) of the Franchise Agreement:

> Pursuant to COMAR 02.02.08.16L(1), any release required as a condition of renewal, sale and/or assignment/transfer will not apply to any claims or liability arising under the Maryland Franchise Registration and Disclosure Law.

3.      **INSOLVENCY**.  The following sentence is added to the end of Section 15.B(16) (“Termination of Agreement – By Us”) of the Franchise Agreement:

> This provision may not be enforceable under federal bankruptcy law (11 U.S.C. Sections 101 et seq.).

4.      **DISPUTE RESOLUTION; ARBITRATION**.  The following paragraph is added at the end of Section 18.A (“Enforcement – Arbitration”) of the Franchise Agreement:

> A Maryland franchise regulation states that it is an unfair or deceptive practice to require a franchisee to waive its right to file a lawsuit in Maryland claiming a violation of Maryland Franchise Law.  In light of the Federal Arbitration Act, there is some dispute as to whether this forum selection requirement is legally enforceable.

5.      **GOVERNING LAW**.  The following paragraph is added at the end of Section 18.B (“Governing Law”) of the Franchise Agreement:

> Notwithstanding the foregoing, you may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure law.  Maryland law will apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

6.  **CONSENT TO JURISDICTION; LIMITATIONS OF CLAIMS**.  The following language is added to the end of Section 18.C ("Consent to Jurisdiction") and Section 18.G ("Limitations of Claims") of the Franchise Agreement:

You must bring an action in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

7.  **MARYLAND LAW**.  All representations requiring you to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

[*Signature Page to Follow*]

2

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 182 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider on the dates noted below, to be effective as of the Effective Date of the Franchise Agreement.

**THE DAILY PILATES LLC**                    **FRANCHISE OWNER:**

 

 

_____

**[Name]**

By:_____

Name:_____                    By:_____

Title:_____                    Name:_____

Date\***:**_____                    Title:_____

(\*This is the Effective Date)                    Date: _____

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<div align="center">

**RIDER TO THE**
**FRANCHISE AGREEMENT FOR USE IN THE**
**STATE OF NEW YORK**

</div>

**THIS RIDER** is made and entered into by and between **THE DAILY PILATES LLC,** a Georgia limited liability company whose address is 900 Dekalb Avenue, Suite 600, Atlanta, GA 30307 ("**we**"), and _____ a(n) _____ whose principal business address is _____ ("**you**").

1.      **BACKGROUND**.  We and you are parties to that certain Franchise Agreement dated _____, (the "Franchise Agreement"). This Rider supersedes any inconsistent or conflicting provisions of the Franchise Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Franchise Agreement. This Rider is being signed because (a) you are domiciled in the State of New York <u>and</u> the Studio that you will operate under the Franchise Agreement will be located in State of New York, and/or (b) the offer to sell the franchise for your Studio was made or accepted in the State of New York.

2.      **TRANSFER BY US**.  The following language is added to the end of Section 13.A ("Transfer – By Us") of the Franchise Agreement:

> However, to the extent required by applicable law, no transfer will be made except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under this Agreement.

3.      **RELEASES**.  The following is added to the end of Section 13.B ("Transfer – By You or Your Owners"), Section 14.A ("Your Right to Acquire a Successor Franchise"), and Section 16.B ("Our Right to Purchase Your Studio") of the Franchise Agreement:

> Notwithstanding the foregoing all rights enjoyed by you and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force to the extent required by the non-waiver provisions of GBL Sections 687.4 and 687.5, as amended.

4.      **TERMINATION BY YOU**.  The following language is added to the end of Section 15.B ("Termination of Agreement – By You") of the Franchise Agreement:

> You also may terminate this Agreement on any grounds available by law under the provisions of Article 33 of the General Business Law of the State of New York.

5.      **VENUE; GOVERNING LAW**.  The following statement is added at the end of Section 18.C ("Consent to Jurisdiction") of the Franchise Agreement:

> This Section shall not be considered a waiver of any right conferred upon you by the provisions of Article 33 of the New York State General Business Law, as amended, and the regulations issued thereunder.

<div align="center">

[*Signature Page to Follow*]

</div>

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider on the dates noted below, to be effective as of the Effective Date of the Franchise Agreement.

**THE DAILY PILATES LLC**                    **FRANCHISE OWNER:**

_____
**[Name]**

By:_____                By:_____
Name:_____                Name:_____
Title:_____                Title:_____
Date*:_____                Date: _____
     (*This is the Effective Date)

2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**THE FOLLOWING PAGES IN THIS EXHIBIT ARE
STATE-SPECIFIC RIDERS TO THE
MULTI-UNIT DEVELOPMENT AGREEMENT**

The Daily Pilates LLC
2024_04 FDD | Ex. D – State Addenda and Riders
1533.002.002/398437

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<div align="center">

**RIDER TO THE DAILY PILATES LLC**
**MULTI-UNIT DEVELOPMENT AGREEMENT**
**FOR USE IN ILLINOIS**

</div>

**THIS RIDER** is made and entered into by and between **THE DAILY PILATES LLC,** a Georgia limited liability company whose address is 900 Dekalb Avenue, Suite 600, Atlanta, GA 30307 ("**we**"), and _____ a(n) _____ whose principal business address is _____ ("**you**").

1.     **BACKGROUND**. We and you are parties to that certain Multi-Unit Development Agreement dated _____, 20\_\_\_ (the "Development Agreement") that has been signed concurrently with the signing of this Rider. This Rider is annexed to and forms part of the Development Agreement. This Rider supersedes any inconsistent or conflicting provisions of the Development Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Development Agreement. This Rider is being signed because (a) the offer for sale of the Development Rights was made or accepted in the State of Illinois <u>and</u> the Development Area located in the State of Illinois, and/or (b) you are domiciled in the State of Illinois.

2.     **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL; LIMITATIONS OF CLAIMS**. The following language is added to the end of Section 9.D ("Waiver of Punitive Damages and Jury Trial") and Section 9.G ("Limitations of Claims") of the Development Agreement:

> However, nothing contained in this Section shall constitute a condition, stipulation, or provision purporting to bind any person to waive compliance with any provision of the Illinois Franchise Disclosure Act at Section 705/27 or any other law of the State of Illinois, to the extent applicable.

3.     **ILLINOIS FRANCHISE DISCLOSURE ACT**. The following language is added to the end of the Development Agreement:

> Except for the U.S. Federal Arbitration Act and other federal laws in the U.S., the laws of the State of Illinois will govern the Development Agreement.

> Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a development agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a development agreement may provide for arbitration outside of Illinois.

> Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

> Your rights upon termination and non-renewal of a Development Agreement are subject to sections 19 and 20 of the Illinois Franchise Disclosure Act.

<div align="center">

[*Signature Page to Follow*]

</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider on the dates noted below, to be effective as of the Effective Date of the Development Agreement.

**THE DAILY PILATES LLC**                    **FRANCHISE OWNER:**

_____
**[Name]**

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____
Date*:_____          Date: _____
      (*This is the Effective Date)

2

The Daily Pilates LLC
2024_04 FDD | Ex. D – State Addenda and Riders
1533.002.002/398437

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 188 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# RIDER TO THE DAILY PILATES LLC
## MULTI-UNIT DEVELOPMENT AGREEMENT
## FOR USE IN MARYLAND

**THIS RIDER** is made and entered into by and between **THE DAILY PILATES LLC,** a Georgia limited liability company whose address is 900 Dekalb Avenue, Suite 600, Atlanta, GA 30307 ("**we**"), and _____ a(n) _____ whose principal business address is _____ ("**you**").

1. **BACKGROUND**. We and you are parties to that certain Multi-Unit Development Agreement dated _____, 20___ (the "Development Agreement") that has been signed concurrently with the signing of this Rider.This Rider is annexed to and forms part of the Development Agreement. This Rider supersedes any inconsistent or conflicting provisions of the Development Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Development Agreement. This Rider is being signed because (a) you are domiciled in the State of Maryland, or (b) the Development Area is located in the State of Maryland, or (c) the offer for sale of the Development Rights was made or accepted in the State of Maryland.

2. **INSOLVENCY**. The following sentence is added to the end of Section 6.B(5) ("Termination of Agreement – By Us") of the Development Agreement:

> This Section 6.B(5) may not be enforceable under federal bankruptcy law (11U.S.C. Sections 101 et seq.).

3. **RELEASES**. The following sentence is added to the end of Sections 5.C(5) ("Conditions for Approval of Transfer") of the Development Agreement:

> Pursuant to COMAR 02.02.08.16L(1), any release required as a condition of renewal, sale and/or assignment/transfer will not apply to any claims or liability arising under the Maryland Franchise Registration and Disclosure Law.

4. **ARBITRATION**. The following paragraph is added at the end of Section 9.A ("Enforcement – Arbitration") of the Development Agreement:

> A Maryland franchise regulation states that it is an unfair or deceptive practice to require a franchisee to waive its right to file a lawsuit in Maryland claiming a violation of Maryland Franchise Law. In light of the Federal Arbitration Act, there is some dispute as to whether this forum selection requirement is legally enforceable.

> You must bring an action in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

5. **GOVERNING LAW**. The following is added to the end of Section 9.B ("Governing Law") of the Development Agreement:

> Notwithstanding the foregoing, you may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure law. Maryland law will apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

6.      **LIMITATIONS OF CLAIMS**.  The following sentence is added to the end of Section 9.G ("Limitations of Claims") of the Development Agreement:

You must bring any claims arising under the Maryland Franchise Registration and Disclosure Law within 3 years after we grant you the franchise.

7.      **MARYLAND LAW**. All representations requiring prospective franchisees to assent to a release, estoppel or waiver of liability are not intended to or shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

[*Signature Page to Follow*]

2

The Daily Pilates LLC
2024_04 FDD | Ex. D – State Addenda and Riders
1533.002.002/398437

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 190 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider on the dates noted below, to be effective as of the Effective Date of the Development Agreement.

**THE DAILY PILATES LLC**                           **FRANCHISE OWNER:**

 

 

 

**[Name]**

By:_____                  By:_____

Name:_____                  Name:_____

Title:_____                  Title:_____

Date*:_____                  Date: _____

        (*This is the Effective Date)

3

The Daily Pilates LLC
2024_04 FDD | Ex. D – State Addenda and Riders
1533.002.002/398437

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<div align="center">

**RIDER TO THE DAILY PILATES LLC**
**MULTI-UNIT DEVELOPMENT AGREEMENT FOR USE IN THE**
**STATE OF NEW YORK**

</div>

      **THIS RIDER** is made and entered into by and between **THE DAILY PILATES LLC,** a Georgia limited liability company whose address is 900 Dekalb Avenue, Suite 600, Atlanta, GA 30307 ("**we**"), and _____ a(n) _____ whose principal business address is _____ ("**you**").

      1.    **BACKGROUND**.  We and you are parties to that certain Multi-Unit Development Agreement dated _____, (the "Development Agreement") that has been signed concurrently with this Rider. This Rider is annexed to and forms part of the Development Agreement.  This Rider supersedes any inconsistent or conflicting provisions of the Development Agreement. Terms not otherwise defined in this Rider have the meanings as defined in the Development Agreement. This Rider is being signed because (a) you are domiciled in the State of New York <u>and</u> the Development Area is located in the State of New York, and/or (b) the offer for sale of the Development Rights was made or accepted in the State of New York.

      2.    **RELEASES.** The following is added to the end of Section 5.C(5) ("Conditions for Approval of Transfer") of the Development Agreement:

      Notwithstanding the foregoing all rights enjoyed by you and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force to the extent required by the non-waiver provisions of General Business Law Sections 687.4 and 687.5, as amended.

      3.    **TERMINATION BY YOU**.  The following language is added to the end of Section 6.A ("Termination of Agreement – By You") of the Development Agreement:

      You also may terminate this Agreement on any grounds available by law under the provisions of Article 33 of the General Business Law of the State of New York.

      4.    **GOVERNING LAW; CONSENT TO JURISDICTION**.  The following is added to the end of Section 9.B ("Governing Law") and Section 9.C ("Consent to Jurisdiction") of the Development Agreement:

      This Section shall not be considered a waiver of any right conferred upon you by the provisions of Article 33 of the New York State General Business Law, as amended, and the regulations issued thereunder.

<div align="center">

[*Signature Page to Follow*]

</div>

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider on the dates noted below, to be effective as of the Effective Date of the Development Agreement.

**THE DAILY PILATES LLC**                              **FRANCHISE OWNER:**

_____
**[Name]**

By:_____                          By:_____
Name:_____                          Name:_____
Title:_____                         Title:_____
Date*:_____                          Date: _____
(*This is the Effective Date)

2

The Daily Pilates LLC
2024_04 FDD | Ex. D – State Addenda and Riders
1533.002.002/398437

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 194 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**EXHIBIT E**

**TABLE OF CONTENTS OF THE OPERATIONS MANUAL**

# TABLE OF CONTENTS

# The Daily Pilates Operations Manual

Chapter 1: General Information ....................................................1-4
    1. The Purpose of the Manual
    2. How to Use This Manual
    3. The Daily Pilates Mission Statement
    4. The Daily Pilates Story

Chapter 2: The Franchise ....................................................5-38
    5. Independent Contractor
    6. Independently Owned and Operated
    7. You are the CEO of This Studio
    8. Pre-opening Obligations
    9. Continuing Obligations
    10. Compliance with The Daily Pilates Standards
    11. Products & Services
    12. Payment of Fees & Taxes
    13. Confidentiality
    14. Site Selection and Development
    15. Insurance
    16. Approved Products & Vendors
    23. Merchandise Guide
    32. Approved Classes
    33. Requesting New Products
    34. Accounting & Reports
    35. Financial Audits
    36. Naming your Entity & Tax ID Numbers
    38. Transferring Your Franchise Agreement

Chapter 3: Operational Standards ....................................................39-54
    39. Measurement Guidelines
    40. Hours of Operations
    41. Studio Cleanliness & Opening Procedures
    42. Studio Cleanliness & After Class Procedures
    43. Studio Cleanliness & Closing Procedures
    44. Equipment Maintenance Schedule
    45. Signs, Marketing

The Daily Pilates LLC
2024_04 FDD | Ex. E – Ops Manual TOC
1533.002.002/398452

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

46. Newsletters
47. Memberships, Packages, Gift Cards
48. Music Template for Classes
49. Workplace Attire, Personal Hygiene & Appearance
50. Behavior & Online Standards
51. Quality Standards
52. Customer Service Standards
53. Class Standards and Outlines
54. The Daily Pilates Teacher Training Program


Chapter 4: Personnel ....................................................55-64
55. Laws, Requirements, Policy
56. Position Descriptions
57. Guidelines for Hiring and Creating your Team
58. Instructor Audition Sheet
59. New Hire Checklist
60. Mindbody Instructor Training Checklist
61. Instructor Responsibilities
62. Instructor Format + Conduct
64. Front Desk Standards


Chapter 5: Classes ...................................................65-77
65. The Daily Pilates Class Descriptions
66. The Daily Pilates Method - 9 Pilates Principles & Breathwork
67. The Daily Pilates Method - Alignment
68. The Daily Pilates Class Format - Foundations
69. The Daily Pilates Class Format - Sculpt
70. The Daily Pilates Class Format - Sculpt Jump
71. The Daily Pilates Class Format - Sculpt HIIT 45
72. The Daily Pilates Class Format - Prenatal
73. The Daily Pilates Class Format - Stretch
74. The Daily Pilates Class Format - Sound bath + Reformer Stretch
75. The Daily Pilates Spring Settings for Allegro 2 Reformer
76. Creating a Class Schedule
77. Private and Duet Training


Chapter 6: The Client ....................................................78-82
78. Client Policies
79. Running Late/Waitlist Policy

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

80. Client Cancellation Fees and Instructions
81. Client Cancellation Fee Instructional Flow Chart
82. Link to Sample Email Responses in Google Drive


Chapter 7: Mindbody ....................................................83-92
83. Sample Auto-Email Descriptions
84. Class Descriptions for use in Mindbody
85. Adding Instructors
86. Adding Different Pay Scales for Instructors
87. Appointment Availability
88. Events
89. Products
90. Private Appointments
91. Duet Appointments
92. Pricing and Names


Chapter 8: The Daily Pilates Online .......................................................93-94
93. Online Videos
94. Online Pricing


Chapter 9: Sales .......................................................95-99
95. Pre-Sale Specials
96. When to do a Sale on Classes
97. When to do a Sale on Products
98. ClassPass, Peerfit, GymPass
99. Specific Packages for Different Client Needs and How to Sell Them


Chapter 10: Crisis Management .......................................................100-109
100. Instructor Handbook Emergency Information Including Fire Safety
101. What to do in case of emergency
102. How to handle bad reviews
103. How to handle distraught client or instructors
104. Crime
105. Security Cameras
106. Locked Doors
107. Spills & Water
108. Lifting
109. Incident Reports

Chapter 11: Studio Administration .......................................................110-117

       110. Weekly Reports to Review

       111. Monthly Reports to Review

       112. Calculating Gross Sales

       113. Labor Costs/Payroll

       114. Cost of goods sold

       115. Marketing

       116. Social Media Guidelines

       117. Inventory

The Daily Pilates LLC
2024_04 FDD | Ex. E – Ops Manual TOC
1533.002.002/398452

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**EXHIBIT F**

**LIST OF CURRENT FRANCHISEES;
LIST OF FRANCHISEES WHO HAVE LEFT THE SYSTEM**

**List of Franchisees with Open Studios as of December 31, 2023:**

| Franchisee | Address | City | State | Zip | Telephone |
|---|---|---|---|---|---|
| Nikki Hightower, Jessica Davis | 230 Pharr Road, Suite G004 | Atlanta | GA | 30305 | (678) 799-0451 |

**List of Studios Not Yet Opened as of December 31, 2023:**

| Franchisee | City | State | Telephone |
|---|---|---|---|
| Kelly Hamm | Milton | GA | (770) 265-2335 |
| Stephanie Ahenkora | Summit | NJ | (973) 280-7760 |

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**List of Franchisees Who Have Left the System as of December 31, 2023, or Who Have Not Communicated with Us in the 10 Weeks Prior to the Issuance Date of the Disclosure Document:**

None.

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 202 of 299

**EXHIBIT G**

**FINANCIAL STATEMENTS**

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**UNAUDITED FINANCIAL STATEMENTS**

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

| | Jan 31, 24 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Wells Fargo Operating | 104,501.38 |
| **Total Checking/Savings** | 104,501.38 |
| **Accounts Receivable** | |
| Accounts Receivable | 8,031.62 |
| **Total Accounts Receivable** | 8,031.62 |
| **Other Current Assets** | |
| Inventory | 3,339.19 |
| **Total Other Current Assets** | 3,339.19 |
| **Total Current Assets** | 115,872.19 |
| **TOTAL ASSETS** | **115,872.19** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 1,722.90 |
| **Total Accounts Payable** | 1,722.90 |
| **Other Current Liabilities** | |
| Deferred Revenue | 38,950.00 |
| Due to LC Fitness LLC | 50.00 |
| Due to Lily Collins | 360.25 |
| **Total Other Current Liabilities** | 39,360.25 |
| **Total Current Liabilities** | 41,083.15 |
| **Total Liabilities** | 41,083.15 |
| **Equity** | |
| Retained Earnings | 68,280.32 |
| Net Income | 6,508.72 |
| **Total Equity** | 74,789.04 |
| **TOTAL LIABILITIES & EQUITY** | **115,872.19** |

THESE FINANCIAL STATEMENTS WERE PREPARED WITHOUT AN AUDIT. INVESTORS IN OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT AS AUDITED THESE FIGURES OR EXPRESSED HIS OPINION WITH REGARD TO THEIR CONTENTS OR FORM.

## The Daily Pilates LLC
## Statement of Income and Expense

Accrual Basis

January 2024

|  | Jan 24 |
|---|---|
| **Ordinary Income/Expense** | |
| Income | |
| Franchise Fee Income | 8,181.62 |
| Total Income | 8,181.62 |
| **Gross Profit** | 8,181.62 |
| Expense | |
| Advertising and Promotion | 300.00 |
| Bank Service Charges | 15.00 |
| Dues and Subscriptions | 782.90 |
| Outside Services | 525.00 |
| Taxes - Other | 50.00 |
| Total Expense | 1,672.90 |
| Net Ordinary Income | 6,508.72 |
| **Net Income** | **6,508.72** |

THESE FINANCIAL STATEMENTS WERE PREPARED WITHOUT AN AUDIT. INVESTORS IN OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT AS AUDITED THESE FIGURES OR EXPRESSED HIS OPINION WITH REGARD TO THEIR CONTENTS OR FORM.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**AUDITED FINANCIAL STATEMENTS**

The Daily Pilates LLC
2024_04 FDD | Ex. G – Financial Statements
1533.002.002/398454

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

THE DAILY PILATES LLC

ATLANTA, GEORGIA

FINANCIAL STATEMENTS

AS OF AND FOR THE YEARS ENDED

DECEMBER 31, 2023 AND 2022

AND FOR THE YEAR ENDED DECEMBER 31, 2021

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## TABLE OF CONTENTS

AUDITORS' REPORT ON FINANCIAL STATEMENTS ...................................................... 1

FINANCIAL STATEMENTS

    Balance Sheets .............................................................................................3
    Statements of Income .....................................................................................4
    Statements of Changes in Member's Equity....................................................5
    Statements of Cash Flows ..............................................................................6
    Notes to Financial Statements ........................................................................7

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

ROBERT A. BRADSHAW, CPA
JANICE C. POPE, CPA

**BRADSHAW, POPE & COMPANY, LLP**
CERTIFIED PUBLIC ACCOUNTANTS
1805 HERRINGTON ROAD
BLDG 1 SUITE A
LAWRENCEVILLE, GEORGIA 30043

(770) 939-9445
FAX (770) 939-9137

AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

GEORGIA SOCIETY OF
CERTIFIED PUBLIC ACCOUNTANTS

## INDEPENDENT AUDITORS' REPORT

To Management
The Daily Pilates LLC.
Atlanta, Georgia

### Opinion

We have audited the accompanying financial statements of THE DAILY PILATES LLC (the "Company"), which comprise the balance sheets as of December 31, 2023 and 2022, and the related statements of income, member's equity, and cash flows for the years then ended, and the related notes to the financial statements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of THE DAILY PILATES LLC as of December 31, 2023 and 2022, and the changes in its net assets and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of THE DAILY PILATES LLC and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Responsibilities of Management for the Financial Statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about THE DAILY PILATES LLC's ability to continue as a going concern within one year after the date that the financial statements are available to be issued.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

To Management
The Daily Pilates LLC
Page 2

**Auditors' Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of THE DAILY PILATES LLC's internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about THE DAILY PILATES LLC ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

*Bradshaw, Pjse & Company, LLP*

February 12, 2024

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

THE DAILY PILATES LLC
ATLANTA, GEORGIA
BALANCE SHEETS
DECEMBER 31, 2023 AND 2022

## A S S E T S

|  | 2023 | 2022 |
|---|---|---|
| CURRENT ASSETS |  |  |
| Cash and cash equivalents | $ 102,163.34 | $ 30,592.20 |
| Accounts receivable | 5,627.33 | - |
| TOTAL CURRENT ASSETS | 107,790.67 | 30,592.20 |
| TOTAL ASSETS | $ 107,790.67 | $ 30,592.20 |

## L I A B I L I T I E S  A N D  M E M B E R ' S EQUITY

|  | 2023 | 2022 |
|---|---|---|
| CURRENT LIABILITIES |  |  |
| Accounts payable - due to affiliate | $ 50.00 | $ 1,958.00 |
| Due to member | 360.25 | 102.20 |
| Deferred revenue - current portion | 30,800.00 | 30,200.00 |
| TOTAL CURRENT LIABILITIES | 31,210.25 | 32,260.20 |
| NONCURRENT LIABILITIES |  |  |
| Deferred revenue - less current portion | 8,300.00 | 4,200.00 |
| TOTAL NONCURRENT LIABILITIES | 8,300.00 | 4,200.00 |
| MEMBER'S EQUITY | 68,280.42 | (5,868.00) |
| TOTAL LIABILITIES AND MEMBER'S EQUITY | $ 107,790.67 | $ 30,592.20 |

The accompanying notes are an integral part of these financial statements.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

THE DAILY PILATES LLC
ATLANTA, GEORGIA
STATEMENTS OF INCOME
FOR THE YEARS ENDED DECEMBER 31, 2023, 2022 and 2021

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| REVENUE | | | |
| Franchise fees and royalties | $ 76,463.67 | $ 600.00 | $ - |
| EXPENSES | | | |
| Automobile expenses | 360.25 | 106.80 | - |
| Bank and credit card fees | 105.00 | - | - |
| Business licenses and permits | 50.00 | 50.00 | - |
| Outside services | 600.00 | 150.00 | - |
| Printing | - | 41.20 | - |
| Professional fees | 1,200.00 | 6,120.00 | - |
| TOTAL EXPENSES | 2,315.25 | 6,468.00 | - |
| NET INCOME (LOSS) | $ 74,148.42 | $ (5,868.00) | $ - |

The accompanying notes are an integral part of these financial statements.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

|  | 2023 | 2022 |
|---|---|---|
| MEMBER'S EQUITY- January 1 | $ (5,868.00) | $ - |
| Net income (loss) for the year | 74,148.42 | (5,868.00) |
| MEMBER'S EQUITY - December 31 | $ 68,280.42 | $ (5,868.00) |

The accompanying notes are an integral part of these financial statements.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |  |  |
| Net Income | $ 74,148.42 | $ (5,868.00) | $ - |
| Add (deduct) to reconcile increase in net income to net cash flows: |  |  |  |
| (Increase) decrease in |  |  |  |
| Accounts receivable | (5,627.33) | - | - |
| Increase (decrease) in |  |  |  |
| Accounts payable - due to affiliate | (1,908.00) | 1,958.00 | - |
| Due to member | 258.05 | 102.20 | - |
| Deferred Revenue | 4,700.00 | 34,400.00 | - |
| NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES | 71,571.14 | 30,592.20 | - |
| NET CASH PROVIDED (USED) BY INVESTING ACTIVITIES | - | - | - |
| NET CASH PROVIDED (USED) BY FINANCING ACTIVITIES | - | - | - |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 71,571.14 | 30,592.20 | - |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 30,592.20 | - | - |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 102,163.34 | $ 30,592.20 | $ - |

The accompanying notes are an integral part of these financial statements.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Operations

The Daily Pilates LLC (the Company) offers franchises for the right to establish and operate a fitness studio that provides Pilates reformer classes and other wellness services under "The Daily Pilates®" name and business system. The Company was organized as a limited liability company under the laws of Georgia on August 24, 2020, and has one member. The Company began operations in May, 2022.

At December 31, 2023, the Company had one franchise studio in operation and is under contract for another studio set to open in Spring 2024. At December 31, 2022 the Company had no franchise studios under operation and was under contract for one studio set to open in March 2023. An affiliate of the Company (see Note 6 Related Party Transactions) also had one studio in operation during 2023 and 2022.

### Revenue Recognition

The Company follows Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers ("ASC 606") for revenue recognition. ASC 606 provides a five-step analysis of contracts to determine when and how revenue is recognized and replaces most existing revenue recognition guidance in the United States of America. Under the guidance in Topic 606, the franchisor is required to determine whether the pre-opening activities contain any separate performance obligations and to analyze the standalone selling prices for those performance obligations to determine the timing and amount of revenue recognition.

To simplify compliance with Topic 606, in January 2021 FASB issued Accounting Standards Update No. 2021-02, *Franchisors-Revenue from Contracts with Customers,* which provided a practical expedient to recognize the pre-opening services as a single performance obligation.

The Company identifies certain pre-opening services for which it elects to use the practical expedient and recognizes them as a single performance obligation distinct from the initial franchise license. These services include assistance with site selection, design, initial marketing, and training. In consideration for these pre-opening services and for its initial franchise license, the Company collects an initial franchise fee. This is a non-refundable fee, determined by the signed franchise agreement, and is due when the agreement is executed. Revenues related to pre-opening services are recognized on the date the franchise opens. Revenues related to the initial franchise license are recognized over the initial franchise license term, which varies by contract.

The Company uses the accrual method of accounting. Revenue from monthly royalty fees is recognized as a percentage of each franchisee's monthly gross sales, as defined within the individual franchise agreements. Revenue from royalty fees is recognized at the end of each month, with payment collected from each franchisee during the next month.

### Cash and Cash Equivalents

For purposes of the statement of cash flows, the Company considers all investments purchased with a maturity of three months or less to be cash equivalents.

7

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

Income Taxes

The Company is considered a pass-through entity for income tax purposes. It elected to be taxed as an S corporation under Section 1327(a) of the Internal Revenue Code. Under this election, the Company does not pay Federal or State corporate income taxes. Instead, its member is personally liable for Federal and State income taxes on the Company's income.

FASB Topic 740, *Income Taxes,* requires disclosure and recognition in financial statements of positions taken in a tax return about the treatment of transactions and events that more likely than not would not be sustained upon examination by tax authorities. The Company believes it complies with all relevant tax laws and regulations and has no significant uncertain tax positions. Therefore, no liability for uncertain taxes has been recorded in the financial statements.

The Company's income tax filings are subject to audit by various taxing authorities. The Company's open audit periods are December 31, 2022 and 2023.

NOTE 2 - CASH AND CASH EQUIVALENTS

Cash and cash equivalents are comprised of the following at December 31, 2023 and December 31, 2022:

|  | 2023 | 2022 |
|---|---|---|
| Non-interest-bearing checking accounts | $ 102,163.34 | $ 30,592.20 |

NOTE 3 – ACCOUNTS RECEIVABLE

Accounting principles generally accepted in the United States of America require that the allowance method be used to recognize bad debts. The Company considers accounts receivable to be fully collectible; accordingly, no allowance for doubtful amounts is required. If amounts become uncollectible, they will be charged to operations when that determination is made.

Accounts receivable balances at December 31, 2023 and 2022 are as follows

|  | 2023 | 2022 |
|---|---|---|
| Sales-based royalties receivable (included in trade receivables) | $ 5,627.33 | $ - |

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## NOTE 4 – REVENUE FROM CONTRACTS WITH CUSTOMERS

### Revenue Recognition Timing

Initial and continuing license fees and other revenue for the years ended December 31, 2023 and 2022 consist of the following

|  | 2023 | 2022 | 2023 |
|---|---|---|---|
| Recognized at a point in time | $ 29,000.00 | $ - | $ - |
| Recognized over time | 47,463.67 | 600.00 | - |
| Total revenue | $ 76,463.67 | $ 600.00 | $ - |

### Contract Balances

The following table provides information about the change in the franchise contract liability balances during the years ended December 31, 2023 and December 31, 2022:

|  | 2023 | 2022 | 2023 |
|---|---|---|---|
| Deferred revenue -beginning balance | $ 34,400.00 | $ - | $ - |
| Revenue recognized | (30,200.00) | - | - |
| Additional deferred revenue | 35,000.00 | 35,000.00 | - |
| Revenue recognized - additional deferred revenue | (100.00) | (600.00) | - |
| Deferred revenue -ending balance | 39,100.00 | 34,400.00 | - |
| Less current maturities | (30,800.00) | (30,200.00) | - |
| Deferred revenue - less current portion | $ 8,300.00 | $ 4,200.00 | $ - |

## NOTE 5 - OFF-BALANCE SHEET RISK AND CONCENTRATION OF CREDIT RISK

In March 1990, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 105, Disclosure of Information about Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentrations of Credit Risk. The pronouncement requires disclosure of information about financial instruments for which risk could exceed amounts reflected in the financial statements and information about significant geographic, industry, or other concentrations of credit risk for all financial instruments.

The Company has no potential concentration of credit risk and is not exposed to any significant credit risk on cash.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## NOTE 6 – RELATED PARTY TRANSACTIONS

During the years ended December 31, 2023 and 2022 the Company received management services from its sole member at no charge to the Company.

The Company's sole member owns and manages an affiliated studio, LC Fitness LLC. It operates under the business name The Daily Pilates. While both are under common control, LC Fitness LLC is not part of the Company.

During the years ended December 31, 2023 and 2022 the Company reimbursed or accrued the following expenses to LC Fitness LLC:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Trademark / logo reimbursement | $ 1,200.00 | $ - | $ - |
| Printing expenses | - | 41.20 | - |
| Background checks | - | 150.00 | - |
| Registrations | 50.00 | 50.00 | - |

At December 31, 2023 and 2022, the Company had outstanding payables to LC Fitness LLC of $50.00 and $1,958.00, respectively.

The Company facilitates the purchase and shipping of merchandise from its affiliate, LC Fitness LLC, to its franchisees. During 2023 and 2022, the Company's franchisees purchased $858.75 and $1,258.00 of inventory from LC Fitness, LLC through the Company.

Payments made by its franchisees are recognized as liabilities by the Company and credited to its "Accounts payable - due to affiliate" liability account. Merchandise is then shipped directly to the franchisee location by LC Fitness, LLC. The Company then pays LC Fitness LLC for merchandise and debits the "Accounts payable - due to affiliate" liability account.

At December 31, 2023 and 2022 the Company owes reimbursements to the sole member $360.25 and $102.20, respectively.

## NOTE 7 – SUBSEQUENT EVENTS

The Company has evaluated subsequent events through February 12, 2024, the date which the financial statements were available to be issued. As of this date, there were no significant events requiring disclosure.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# EXHIBIT H

## SAMPLE GENERAL RELEASE

The Daily Pilates LLC
2024_04 FDD | Ex. H – Sample General Release
1533.002.002/398438

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# THE DAILY PILATES LLC

## GRANT OF FRANCHISOR CONSENT AND RELEASE

**The Daily Pilates LLC** ("**we**," "**us**," or "**our**") and the undersigned [*franchisee/developer*] ("**you**" or "**your**"), currently are parties to a certain that certain [*franchise agreement/multi-unit development agreement*] dated _____, 20___ (the "**Agreement**"). You have asked us to take the following action or to agree to the following request: _____

_____

_____

_____

_____. We have the right under the Agreement to obtain a general release from you and your owners as a condition of taking this action or agreeing to this request. Therefore, we are willing to take the action or agree to the request specified above if you and your owners give us the release and covenant not to sue provided below in this document. You and your owners are willing to give us the release and covenant not to sue provided below as partial consideration for our willingness to take the action or agree to the request described above.

Consistent with the previous introduction, you, on your own behalf and on behalf of your successors, heirs, executors, administrators, personal representatives, agents, assigns, partners, owners, managers, directors, officers, principals, employees, and affiliated entities (collectively, the "Releasing Parties"), hereby forever release and discharge us and our current and former officers, directors, owners, managers, principals, employees, agents, representatives, affiliated entities, successors, and assigns (collectively, the "Franchisor Parties") from any and all claims, damages (known and unknown), demands, causes of action, suits, duties, liabilities, and agreements of any nature and kind (collectively, "Claims") that you and any of the other Releasing Parties now has, ever had, or, but for this document, hereafter would or could have against any of the Franchisor Parties, including without limitation, (1) arising out of or related to the Franchisor Parties' obligations under the Agreement, or (2) otherwise arising from or related to your and the other Releasing Parties' relationship, from the beginning of time to the date of your signature below, with any of the Franchisor Parties. You, on your own behalf and on behalf of the other Releasing Parties, further covenant not to sue any of the Franchisor Parties on any of the Claims released by this paragraph and represent that you have not assigned any of the Claims released by this paragraph to any individual or entity who is not bound by this paragraph.

We also are entitled to release and covenant not to sue from your owners. By his, her, or their separate signatures below, your owners likewise grant to us the release and covenant not to sue provided above.

IF YOUR STUDIO YOU OPERATE UNDER THE FRANCHISE AGREEMENT IS LOCATED IN CALIFORNIA OR IF YOU ARE A RESIDENT OF CALIFORNIA, THE FOLLOWING SHALL APPLY:

**SECTION 1542 ACKNOWLEDGMENT.** IT IS YOUR INTENTION, ON YOUR OWN BEHALF AND ON BEHALF OF THE RELEASING PARTIES, IN EXECUTING THIS RELEASE THAT THIS INSTRUMENT BE AND IS A GENERAL RELEASE WHICH SHALL BE EFFECTIVE AS A BAR TO EACH AND EVERY CLAIM, DEMAND, OR CAUSE OF ACTION RELEASED BY YOU OR THE RELEASING PARTIES. YOU RECOGNIZE THAT YOU OR THE

1

The Daily Pilates LLC
2024_04 FDD | Ex. H – Sample General Release
1533.002.002/398438

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

RELEASING PARTIES MAY HAVE SOME CLAIM, DEMAND, OR CAUSE OF ACTION AGAINST THE FRANCHISOR PARTIES OF WHICH YOU, HE, SHE, OR IT IS TOTALLY UNAWARE AND UNSUSPECTING, WHICH YOU, HE, SHE, OR IT IS GIVING UP BY EXECUTING THIS RELEASE.  IT IS YOUR INTENTION, ON YOUR OWN BEHALF AND ON BEHALF OF THE RELEASING PARTIES, IN EXECUTING THIS INSTRUMENT THAT IT WILL DEPRIVE YOU, HIM, HER, OR IT OF EACH SUCH CLAIM, DEMAND, OR CAUSE OF ACTION AND PREVENT YOU, HIM, HER, OR IT FROM ASSERTING IT AGAINST THE FRANCHISOR PARTIES.  IN FURTHERANCE OF THIS INTENTION, YOU, ON YOUR OWN BEHALF AND ON BEHALF OF THE RELEASING PARTIES, EXPRESSLY WAIVE ANY RIGHTS OR BENEFITS CONFERRED BY THE PROVISIONS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES AS FOLLOWS:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

YOU ACKNOWLEDGE AND REPRESENT THAT YOU HAVE CONSULTED WITH LEGAL COUNSEL BEFORE EXECUTING THIS RELEASE AND THAT YOU UNDERSTAND ITS MEANING, INCLUDING THE EFFECT OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, AND EXPRESSLY CONSENT THAT THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH AND ALL OF ITS EXPRESS TERMS AND PROVISIONS, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO THE RELEASE OF UNKNOWN AND UNSUSPECTED CLAIMS, DEMANDS, AND CAUSES OF ACTION.

If your Studio is located in Maryland or if you are a resident of Maryland, the following shall apply:

Any general release provided for hereunder shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

[*Signature Page to Follow*]

2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement on the date stated below.

**THE DAILY PILATES LLC**,
a Georgia limited liability company


By:_____

Name:_____

Title:_____


Dated:_____

**FRANCHISEE:**

**(IF YOU ARE A CORPORATION, LIMITED LIABILITY COMPANY, OR PARTNERSHIP):**

By:_____

Name:_____

Title:_____


**(IF YOU ARE AN INDIVIDUAL AND NOT A LEGAL ENTITY; AND/OR ALL FRANCHISEE OWNERS):**


_____
Signature

_____
Print Name



_____
Signature

_____
Print Name

3

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 222 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**EXHIBIT I**

**FORM OF LEASE RIDER**

The Daily Pilates LLC
2024_04 FDD| Ex. I - Form of Lease Rider
1533.002.002/400836.2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

## FORM OF THE DAILY PILATES LLC
## LEASE RIDER

**THIS THE DAILY PILATES LLC LEASE RIDER** (this "**Rider**") is effective as of _____, 20___ (the "**Effective Date**"), and is being signed simultaneously with the Lease dated _____, 20____ (the "**Lease**") between _____ (the "**Franchisee**" or "**Tenant**") and _____ (the "**Landlord**") for the real property commonly known as _____ (the "**Premises**").

1.　　**Incorporation and Precedence**.　This Rider is incorporated into the Lease and supersedes any conflicting provisions in it.　Capitalized terms not otherwise defined in this Rider have the meanings as defined in the Lease.

2.　　**Background**.　Tenant will operate a The Daily Pilates® Studio at the Premises under a Franchise Agreement dated _____, 20___ (the "**Franchise Agreement**") with The Daily Pilates LLC (the "**Franchisor**"). Under the Franchise Agreement, Tenant is required to secure Franchisor's consent to the Lease prior to executing the Lease. As a condition to the grant of its consent, Franchisor requires that the Lease contain certain provisions that Tenant is requesting Landlord to include.

3.　　**Collateral Assignment**.　Tenant hereby collaterally assigns the Lease to Franchisor, and Landlord consents to the collateral assignment of the Lease by Tenant to Franchisor. Landlord agrees that, pursuant to the collateral assignment or as a result of Franchisor's exercise of its rights and remedies under the Franchise Agreement, Franchisor or its affiliate may, upon a default by Tenant under the Lease or the Franchise Agreement and/or a termination of the Franchise Agreement, (a) succeed to Tenant's interest in the Lease, or (b) assign its rights to succeed to its affiliate or another *The Daily Pilates* franchisee and have the affiliate or *The Daily Pilates* franchisee succeed to Tenant's interest in the Lease. If Tenant's interest in the Lease is assigned to Franchisor or Franchisor's affiliate, Landlord's consent to the assignment will not be required, but Franchisor will provide Landlord with prior written notice of the assignment and assumption. If, however, Tenant's interest in the Lease is proposed to be assigned to another *The Daily Pilates* franchisee, Landlord's prior written consent to the assignment will be required but will not be unreasonably withheld, conditioned or delayed, and Landlord agrees that it will not withhold its consent to the proposed assignment if all of the following criteria are met: (a) Franchisor has an established franchising program for *The Daily Pilates* Studios; (b) the proposed franchisee has met all of Franchisor's then-applicable program criteria and requirements and has executed Franchisor's standard franchise agreement; (c) such assignee assumes all of the terms and conditions of the Lease; and (d) such franchisee has submitted to Landlord its financial statements and has an equal or greater net worth than Tenant. Unless otherwise agreed by Landlord, Tenant shall remain liable and shall not be afforded any release in the event the Lease is assigned to Franchisor, its affiliate or another *The Daily Pilates* franchisee pursuant to the collateral assignment.

4.　　**Signage.** Subject to applicable zoning laws, Landlord consents to Tenant's installation and use of such trademarks, service marks, signs, decor items, color schemes and related components which from time to time comprise the *The Daily Pilates* franchise system. Landlord grants to Tenant during the term of the Lease a non-exclusive right and easement over that portion of the property as may be required by Tenant to improve, renovate, repair, replace and maintain the Premises or to install, replace, or remove its signage or its panel on the pylon and/or monument sign for the property.

5.　　**Access to Premises**.　During the term of the Lease, Landlord and Tenant acknowledge and agree that Franchisor will have unrestricted access to the Premises to inspect the Premises and Tenant's business operations in accordance with the Franchise Agreement.

1

The Daily Pilates LLC
2024_04 FDD| Ex. I - Form of Lease Rider
1533.002.002/400836.2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

6. **Copies of Reports**. Landlord agrees to provide copies of all Tenant's revenue and other information and data in Landlord's possession, if any, related to the operation of Tenant's *The Daily Pilates* Studio on a timely basis as Franchisor may reasonably request, during the term of the Lease.

7. **Notice of Default**. Landlord will give written notice to Franchisor (concurrently with the giving of such notice to Tenant) of any defaults (a "**Default**") by Tenant under the Lease by certified mail, return receipt requested, or by nationally recognized overnight courier service, at the following address or to such other address as Franchisor may provide to Landlord from time to time:

The Daily Pilates LLC
900 Dekalb Avenue, Suite 600
Atlanta, Georgia 30307

Such notice will grant Franchisor the right, but not the obligation, to cure any Default, if Tenant fails to do so, within 15 days (or such longer period as may be reasonably required to cure such Default provided Franchisor commences such cure within such 15-day period and diligently pursues such cure to completion) after the expiration of the period in which Tenant may cure the Default under the Lease.

8. **Assignment and Assumption of Lease**. Tenant shall have the right, at any time during the term of the Lease and any extensions or renewals thereof, to assign all of its right, title and interest in the Lease to Franchisor, to an affiliate of Franchisor, or to another *The Daily Pilates* franchisee, subject to the terms and condition described in Paragraph 3 above regarding Landlord's notice or consent. The assignment will be effective upon the assignee's providing Landlord written notice of its acceptance of the assignment (the "**Assignment Notice**"). Landlord will recognize the assignee as the lessee of the Premises effective as of the date of the Assignment Notice. No assignment shall be, and nothing contained herein or in any other document shall make Franchisor a party to the Lease, or a guarantor thereof, and shall not create any liability or obligation of Franchisor unless and until the Lease is assigned to, and accepted in writing by, Franchisor. Upon any assignment to Franchisor, the term "assignment" under the Lease shall specifically exclude any change of control, sale of substantially all assets or equity, or merger of Franchisor.

9. **Amendment**. Landlord and Tenant will not cancel, terminate (including Tenant's voluntary surrender), modify or amend the Lease including, without limitation, Franchisor's rights under this Rider, without Franchisor's prior written consent, which will not be unreasonably withheld, conditioned, or delayed, and any such attempted cancellation, termination, modification, acceptance of surrender or amendment without Franchisor's consent shall be null and void and have no effect as to Franchisor's interest thereunder. Franchisor will have 15 days from receipt to respond to such requests.

10. **Removal of Fixtures**. Landlord agrees that, upon the earlier of the expiration or termination of the Franchise Agreement or the Lease or upon any Default under the Lease or any default under the Franchise Agreement, Franchisor will have the right, but not the obligation, at Franchisor's sole cost, to enter upon the Premises and to remove any or all furniture, fixtures, equipment and all trade names, trade dress and other trade indicia associated with Franchisor, including, without limitation, Tenant's property, external and internal signage and all trade dress and architectural characteristics identifying the Premises as a *The Daily Pilates* franchise, provided that Franchisor shall promptly repair any damage to the Premises caused by such removal or modifications.

11. **Relationship of Tenant and Franchisor**. Landlord acknowledges that Tenant is not an agent or employee of Franchisor and Tenant has no authority or power to act for, or to create any liability on behalf of, or to in any way bind Franchisor or any affiliate of Franchisor, and that Landlord has entered

2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

into this Rider with the full understanding that it creates no duties, obligations or liabilities of or against Franchisor or any of its affiliates.

12.     **Estoppel Certificate**.  Landlord shall from time to time, within 20 days after written request by Franchisor, execute, acknowledge and deliver to Franchisor a written certification, in a form reasonably satisfactory to Franchisor: (i) that the Lease is unmodified and in full force and effect (or, if there has been any modification, stating the nature of such modification); (ii) as to the dates to which the rent and other charges arising under the Lease have been paid; (iii) as to the amount of any prepaid rent or any credit due to Tenant under the Lease; (iv) the date on which the term of the Lease commenced; (v) as to whether, to the best of its knowledge, information and belief of Landlord, Landlord or Tenant is then in default in performing any of its obligations under the Lease (and, if so, specifying the nature of each such default); and (vi) as to any other fact or condition reasonably requested by Franchisor.

13.     **Benefits and Successors.**  The benefits of this Rider inure to Franchisor and to its successor and assigns.

14.     **Remaining Provisions Unaffected**.  Those parts of the Lease that are not expressly modified by this Rider remain in full force and effect.


Intending to be bound, Landlord and Tenant sign and deliver this Rider effective on the Effective Date, regardless of the actual date of signature.

**LANDLORD**:                                                      **TENANT**:

_____                    _____
Address:_____                    Address:_____
_____                    _____
Phone:_____                    Phone:_____


By:_____                    By:_____
Name:_____                    Name:_____
Title:_____                    Title:_____

<div align="center">3</div>

The Daily Pilates LLC
2024_04 FDD| Ex. I - Form of Lease Rider
1533.002.002/400836.2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

<u>**NEW YORK REPRESENTATIONS PAGE**</u>

**FRANCHISOR REPRESENTS THAT THIS FRANCHISE DISCLOSURE DOCUMENT DOES NOT KNOWINGLY OMIT ANY MATERIAL FACT OR CONTAIN ANY UNTRUE STATEMENT OF A MATERIAL FACT.**

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 227 of 299

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# STATE EFFECTIVE DATES

The following states require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This Franchise Disclosure Document is registered, on file or exempt from registration in the following states having franchise registration and disclosure laws, with the following effective dates:

|  | **Effective Date** |
|---|---|
| California | Pending |
| Hawaii | Not Registered |
| Illinois | Pending |
| Indiana | Not Registered |
| Maryland | Pending |
| Michigan | Pending |
| Minnesota | Not Registered |
| New York | Pending |
| North Dakota | Not Registered |
| Rhode Island | Not Registered |
| South Dakota | Not Registered |
| Virginia | Pending |
| Washington | Not Registered |
| Wisconsin | Not Registered |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

**EXHIBIT J**

**RECEIPTS**

The Daily Pilates LLC
2024_04 FDD | Ex. J – Receipts
1533.002.002/398455.2

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# RECEIPT
## (OUR COPY)

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If The Daily Pilates LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale, or sooner if required by applicable state law. Under Iowa law, we must give you this disclosure document at the earlier of our 1st personal meeting or 14 calendar days before you sign an agreement with, or make a payment to, us or an affiliate in connection with the proposed franchise sale. Under New York law, we must provide this Disclosure Document at the earlier of the 1st personal meeting or 10 business days before you sign a binding agreement with, or make a payment to, us or an affiliate in connection with the proposed franchise sale. Michigan requires that we give you this Disclosure Document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If The Daily Pilates LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency identified on Exhibit A.

The franchisor is The Daily Pilates LLC, located at 900 Dekalb Avenue #600, Atlanta, Georgia 30307. Its telephone number is (404) 254-0167.

Issuance Date: April 2, 2024

The franchise seller for this offering is:

☐ Lily Collins
The Daily Pilates, LLC
900 Dekalb Avenue #600
Atlanta, Georgia 30307
(404) 254-0167

☐ Erica Poynter
The Daily Pilates, LLC
900 Dekalb Avenue #600
Atlanta, Georgia 30307
(404) 254-0167

☐ _____
_____
_____
_____
_____

The Daily Pilates LLC authorizes the respective state agencies identified on Exhibit A to receive service of process for it in the particular state.

I received a Disclosure Document dated April 2, 2024, that included the following Exhibits:

| | | | | |
|---|---|---|---|---|
| Exhibit A | List of State Agencies / Agents for Service of Process | | Exhibit F | List of Current Franchisees; List of Franchisees Who Have Left the System |
| Exhibit B | Franchise Agreement | | Exhibit G | Financial Statements |
| Exhibit C | Multi-Unit Development Agreement | | Exhibit H | Sample General Release |
| Exhibit D | State Addenda and Agreement Riders | | Exhibit I | Form of Lease Addendum |
| Exhibit E | Table of Contents – Operations Manual | | Exhibit J | Receipts |

PROSPECTIVE FRANCHISEE:

If a business entity:

_____
Name of Business Entity

By: _____

Its: _____

Print Name: _____

Dated: _____
      (Do not leave blank)

If an individual:

*Michael Libretto*
_____
Print Name:   Mike Libretto

Dated:  04/30/202_
      (Do not leave blank)

Please sign this copy of the receipt, print the date on which you received this Disclosure Document, and return it to The Daily Pilates LLC, 900 Dekalb Avenue, Suite 600, Atlanta, Georgia 30307.

# RECEIPT
# (YOUR COPY)

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If The Daily Pilates LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale, or sooner if required by applicable state law. Under Iowa law, we must give you this disclosure document at the earlier of our 1st personal meeting or 14 calendar days before you sign an agreement with, or make a payment to, us or an affiliate in connection with the proposed franchise sale. Under New York law, we must provide this Disclosure Document at the earlier of the 1st personal meeting or 10 business days before you sign a binding agreement with, or make a payment to, us or an affiliate in connection with the proposed franchise sale. Michigan requires that we give you this Disclosure Document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If The Daily Pilates LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency identified on Exhibit A.

The franchisor is The Daily Pilates LLC, located at 900 Dekalb Avenue #600, Atlanta, Georgia 30307. Its telephone number is (404) 254-0167.

Issuance Date: April 2, 2024

The franchise seller for this offering is:

| ❑ Lily Collins | ❑ Erica Poynter | ❑ _____ |
|---|---|---|
| The Daily Pilates LLC | The Daily Pilates, LLC | _____ |
| 900 Dekalb Avenue #600 | 900 Dekalb Avenue #600 | _____ |
| Atlanta, Georgia 30307 | Atlanta, Georgia 30307 | _____ |
| (404) 254-0167 | (404) 254-0167 | _____ |
| | | _____ |

The Daily Pilates LLC authorizes the respective state agencies identified on Exhibit A to receive service of process for it in the particular state.

I received a Disclosure Document dated April 2, 2024, that included the following Exhibits:

| | | | | |
|---|---|---|---|---|
| Exhibit A | List of State Agencies / Agents for Service of Process | | Exhibit F | List of Current Franchisees; List of Franchisees Who Have Left the System |
| Exhibit B | Franchise Agreement | | Exhibit G | Financial Statements |
| Exhibit C | Multi-Unit Development Agreement | | Exhibit H | Sample General Release |
| Exhibit D | State Addenda and Agreement Riders | | Exhibit I | Form of Lease Addendum |
| Exhibit E | Table of Contents – Operations Manual | | Exhibit J | Receipts |

PROSPECTIVE FRANCHISEE:

If a business entity:                                          If an individual:

_____              _____
Name of Business Entity                                   Print Name: _____

By: _____

Its: _____              Dated: _____

Print Name: _____              (Do not leave blank)

Dated: _____
        (Do not leave blank)

KEEP THIS COPY FOR YOUR RECORDS

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8



Completed Document Audit Report
Completed with SignWell.com

## Title: TDP - Comprehensive Clean FDD _2_

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

Time Zone: (GMT+00:00) Coordinated Universal Time

### Files

TDP - Comprehensive Clean FDD _2_.pdf                           Apr 23, 2024 18:47:11 UTC

### Activity

| | | | |
|---|---|---|---|
| 📄 **THE DAILY PILATES**<br>IP: 136.55.191.49 | created the document | Apr 23, 2024<br>18:47:55 UTC |
| ✈ **THE DAILY PILATES** | sent the document to mlibretto@gmail.com | Apr 23, 2024<br>18:48:16 UTC |
| 👁 **Michael Libretto**<br>IP: 97.129.155.21 | first viewed document | Apr 29, 2024<br>18:04:56 UTC |
| ✓ **Michael Libretto**<br>IP: 2607:f280:3015:3490::fd23 | signed the document | Apr 30, 2024<br>14:20:00 UTC |

Document ID: 3854428a-3dda-4017-afd1-088d6f75e5a8

# EXHIBIT 1-C

**THE DAILY PILATES LLC**

**FRANCHISE AGREEMENT**

Franchisee: <u>TDPCHARLOTTE1, LLC</u>

Studio Number: <u>009</u>

Studio Address: <u>14835 Ballantyne Village Way B-100, Charlotte, NC 28277</u>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

<div align="center">

**THE DAILY PILATES®**

**FRANCHISE AGREEMENT**

**DATA SHEET**

</div>

1. **Effective Date of Agreement**: _11/19/2024_

2. **Franchisee**:

| | |
|---|---|
| Name: | TDPCHARLOTTE1, LLC |
| Address: | 2329 Harvester Ave, Fort Mill, SC 29708 |
| Attention: | Mike Libretto |
| Email Address: | mlibretto@gmail.com |
| Phone: | 917.881.3052 |
| Type of Entity: | LLC |
| Date of Formation: | August 2023 |
| State of Formation: | North Carolina |
| Managing Owner: | Mike Libretto |

3. **Franchisee Owners**.

| Name | Address | Type of Interest | Percentage Held |
|---|---|---|---|
| Mike Libretto | 2329 Harvester Ave, Fort Mill, SC 29708 | Managing Member | 100 |
| | | | |
| | | | |
| | | | |
| | | | |

4. **Operations Manager** [Section 9.D]: Mike Libretto and Kimberly Libretto

5. **Territory** [Section 2.B]: (check one):

☑ the area within a circle having the main entrance to your Studio as its center and a radius of __6__ miles; or

☐ the area described as follows: _____
_____; or

☐ the area shown on the following map:

[*insert map*]

6. **Studio Premises** [Section 2.A]: 14835 Ballantyne Village Way B-100, Charlotte, NC 28277

<div align="center">

Data Sheet - 1

</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

7.  **Search Area** [Section 3.A] (check one):

   (a)   ☑ N/A

   (b)   ☐ The area shown on the following map:

   [*insert map*]

8.  **Certain Fees** [Article 4]:

   (a)   **Initial Franchise Fee** (check one): ☑ $40,000   ☐ Other $_____

   (b)   **Royalty** (check one): ☑ 6% of Gross Revenue   ☐ Other $_____

   (c)   **Marketing Fund contributions** (check one):   ☑ 2% of Gross Revenue
   ☐ Other $_____

9.  **Additional Terms or Modifications to the Agreement**. The following terms, if any, supplement or amend the provisions of the Franchise Agreement Terms attached hereto and will control in the event of any conflicts:

   [*insert as applicable*]

10. **Acknowledgement and Acceptance of Agreement**.  By signing below, you represent and warrant to us that the information contained in this Data Sheet is true and correct. The parties, intending to be legally bound, accept and agree that this Data Sheet and the accompanying Franchise Agreement Terms (together, the "**Agreement**") describe their respective rights and obligations, and each agrees to be bound thereto and to perform as set forth therein.

| | |
|---|---|
| **THE DAILY PILATES LLC**, a Georgia limited liability company | **FRANCHISE OWNER:** Mike Libretto |
| | **[Name]** |
| By: _Lily Collins_ | By: _Michael Libretto_ |
| Name: Lily Collins | Name: Michael Libretto |
| Title: Managing Member | Title: Managing Member |
| Date: 11/19/2024 | Date: 11/19/2024 |

Data Sheet - 2

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 236 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

<div align="center">

**THE DAILY PILATES®**
**FRANCHISE AGREEMENT TERMS**

**<u>TABLE OF CONTENTS</u>**

</div>

**<u>Section</u>**                                                                                **<u>Page</u>**

1. Preambles. ...........................................................................................................................1
   - A. Background. ........................................................................................................1
   - B. Business Entity....................................................................................................1
   - C. Managing Owner. ...............................................................................................1
2. The Franchise. .....................................................................................................................2
   - A. Grant. ..................................................................................................................2
   - B. Your Territory.....................................................................................................2
   - C. Territorial Rights We Reserve. ..........................................................................2
3. Development and Opening of Your Studio. .........................................................................3
   - A. Locating and Securing Possession of the Premises............................................3
   - B. Development and Opening of Your Studio..........................................................3
   - C. Liquidity, Ownership and Financing. .................................................................4
4. Certain Fees. ........................................................................................................................4
   - A. Initial Franchise Fee............................................................................................4
   - B. Royalty Fee. ........................................................................................................4
   - C. Definition of "Gross Revenue"...........................................................................4
   - D. Non-Compliance Fee. .........................................................................................5
   - E. Late Payments and Reporting. ............................................................................5
   - F. Application of Payments; Set-Offs. ....................................................................5
   - G. Method of Payment.............................................................................................5
5. Training and Assistance. .....................................................................................................6
   - A. Initial Training Program. ....................................................................................6
   - B. Authorized Instructor Training Program.............................................................6
   - C. Training of Employees........................................................................................7
   - D. Additional Training and Guidance......................................................................7
   - E. Operations Manual..............................................................................................8
6. Marks....................................................................................................................................8
   - A. Ownership and Goodwill of Marks.....................................................................8
   - B. Limitations on Your Use of Marks. ....................................................................9
   - C. Notification of Infringements and Claims. .........................................................9
   - D. Discontinuance of Use of Marks.........................................................................9
   - E. Non-Disparagement. ...........................................................................................9
7. Confidential Information. ...................................................................................................10
   - A. Types of Confidential Information. ...................................................................10
   - B. Disclosure and Limitations of Use....................................................................10
   - C. Exceptions to Limitations. ................................................................................10
   - D. Innovations........................................................................................................11
8. Competition and Interference During Term. .....................................................................11
   - A. Covenants...........................................................................................................11
   - B. Competitive Business Defined...........................................................................12
9. Business Operations and System Standards. .....................................................................12
   - A. Condition and Appearance of Your Studio........................................................12
   - B. Use of Designated Computer System. ...............................................................12
   - C. Products and Services Your Studio Offers. .......................................................13
   - D. Management of Your Studio...............................................................................13
   - E. Approved Vendors. ............................................................................................14

<div align="center">

i

</div>

F.  Compliance with Laws and Good Business Practices. ..............................................14
G.  Insurance. ...................................................................................................................15
H.  Pricing. .......................................................................................................................15
I.  Contact Information and Listings. ..............................................................................16
J.  Compliance with System Standards. ..........................................................................16
K.  Information Security. ..................................................................................................17
L.  Employees, Agents and Independent Contractors. ....................................................18
10.  Marketing. ...............................................................................................................................18
A.  Grand Opening Marketing. ........................................................................................18
B.  Marketing Fund. .........................................................................................................18
C.  Local Advertising Expenditures. ...............................................................................19
D.  Local Advertising Cooperative. .................................................................................20
E.  Branded Emails. ..........................................................................................................20
F.  System Websites & Online Presences. .......................................................................21
11.  Records, Reports, and Financial Statements. .........................................................................22
12.  Inspections and Audits. ...........................................................................................................23
A.  Our Right to Inspect Your Studio. .............................................................................23
B.  Our Right to Audit. .....................................................................................................23
13.  Transfer. ...................................................................................................................................23
A.  By Us. ..........................................................................................................................23
B.  By You or Your Owners. .............................................................................................23
C.  Conditions for Approval of Transfer. .........................................................................24
D.  Your Death or Disability. ............................................................................................25
E.  Effect of Consent to Transfer. ....................................................................................26
F.  Public or Private Offering. ..........................................................................................26
G.  Our Right of First Refusal. .........................................................................................26
14.  Expiration of the Agreement. ..................................................................................................27
A.  Your Right to Acquire a Successor Franchise. ..........................................................27
B.  Grant of a Successor Franchise. .................................................................................27
15.  Termination of Agreement. .....................................................................................................28
A.  By You. ........................................................................................................................28
B.  By Us. ..........................................................................................................................28
C.  Franchisor's Rights AND Remedies in Addition to Termination. .............................30
16.  Our and Your Rights and Obligations Upon Termination or Expiration of the Agreement. ..........31
A.  Your Obligations. ........................................................................................................31
B.  Our Right to Purchase Your Studio. ...........................................................................32
C.  Lost Revenue Damages. ..............................................................................................33
D.  Continuing Obligations. ..............................................................................................34
17.  Relationship of the Parties/Indemnification. ..........................................................................34
A.  Independent Contractors. ............................................................................................34
B.  No Liability To Or for Acts of Other Party. ...............................................................34
C.  Indemnification. ..........................................................................................................34
18.  Enforcement. ............................................................................................................................35
A.  Arbitration. ..................................................................................................................35
B.  Governing Law. ...........................................................................................................36
C.  Consent to Jurisdiction. ..............................................................................................36
D.  Waiver of Punitive Damages, Jury Trial and Class Action. .......................................37
E.  Injunctive Relief. .........................................................................................................37
F.  Costs and Attorneys' Fees. ..........................................................................................37
G.  Limitations of Claims. .................................................................................................37
19.  Miscellaneous. .........................................................................................................................38
A.  Security Interest. ..........................................................................................................38

The Daily Pilates LLC
2024 Daily Pilates Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

B.   Binding Effect.................................................................................................................38
C.   Rights of Parties are Cumulative. ..................................................................................38
D.   Severability and Substitution of Valid Provisions. ......................................................38
E.   Waiver of Obligations....................................................................................................39
F.   The Exercise of our Judgment. .....................................................................................39
G.   Construction...................................................................................................................39
H.   Notices and Payments....................................................................................................40
I.   Counterparts; Copies.....................................................................................................40
J.   Safety. ............................................................................................................................40
K.   Prohibited Parties..........................................................................................................41

## ATTACHMENTS

ATTACHMENT A      Guaranty and Assumption of Obligations
ATTACHMENT B      Representations and Acknowledgement Statement

The Daily Pilates LLC
2024 USFD 3 Ex. G – Franchise Agreement
1533.002.002/398469.9
Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

THE DAILY PILATES®
FRANCHISE AGREEMENT TERMS

The following Franchise Agreement Terms (these "**Terms**") form an integral part of the Agreement between **The Daily Pilates LLC**, a Georgia limited liability company having its address at 900 Dekalb Avenue, Suite 600, Atlanta, Georgia 30307 ("**we**," "**us**" or "**our**"), and the party signing the attached Data Sheet as the "Franchisee" ("**you**").

1. **PREAMBLES**.

   A. **BACKGROUND**.

   We grant franchises for the development, ownership and operation of fitness studios that (a) are currently identified by the trademark *The Daily Pilates*® (the "**Brand**") and together with such other trademarks and commercial symbols we periodically designate, the "**Marks**"); (b) offer and sell Pilates and wellness classes, instruction and private sessions, and related services; (c) reflect distinctive interior design and display procedures, color schemes, and décor; ("**Trade Dress**"); and (d) operate using a designated "**System**" which includes the Marks, Trade Dress, and our intellectual property including trade secrets, copyrights, confidential and proprietary information, and designated training and exercise methods and know-how, fitness equipment, furniture and fixtures, marketing, advertising, sales promotions, cost controls, accounting and reporting procedures, and personnel management systems, each of which we may replace, further develop, or otherwise modify or discontinue from time to time (each a "**Studio**" and collectively, the "**Studios**").

   Based on your own investigation and diligence, you have requested that we grant you the right to develop, own and operate a Studio, using the Marks and System (the "**Franchise**") and, to support your request, you and, as applicable, your owners have provided us with certain information about your and their background, experience, skills, financial condition and resources (collectively, the "**Application Materials**"). In reliance on, among other things, the Application Materials, we are willing to grant you the Franchise on these Terms.

   B. **BUSINESS ENTITY**.

   If you are not a natural person, you agree, represent and warrant to us that: (1) you were validly formed and are and will maintain, throughout the Term (defined below), your existence and good standing under the laws of the state of your formation and remain qualified to do business in the state in which you operate your Studio; (2) the information on the attached Data Sheet is complete and accurate as of the Effective Date; (3) the only business that you will own or operate during the Term will be your Franchise and, if applicable, other Studios that you operate pursuant to other franchise agreements with us; (4) at our request, you will furnish us with copies of all documents regarding your formation, existence, standing, and governance; and (5) each of your owners that has direct or indirect ownership of at least 10% of the ownership interests in you (each a "**Principal Owner**") and, if the Agreement is signed pursuant to a Multi-Unit Development Agreement, the developer under that agreement, will sign and deliver to us our then-standard form of Guaranty and Assumption of Obligations (the "**Guaranty**"). Our current form of Guaranty appears as <u>Attachment A</u> hereto. The non-owner spouse of each guarantor must also sign the Guaranty in the capacity and for the purposes reflected in the Guaranty.

   C. **MANAGING OWNER**.

   You or, if you are not a natural person, one of your Principal Owners you designate, subject to our approval, will be your "**Managing Owner**." You agree that your Managing Owner will be authorized, on your behalf, to deal with us in all matters that arise in respect of the Agreement. We will be entitled to rely on the decision of your Managing Owner without being obligated to seek the approval of your other owners.

1

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 240 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

2. **THE FRANCHISE**.

   A. **GRANT**.

   We hereby grant you the Franchise to develop, own and operate a Studio ("**your Studio**") solely at the "**Premises**" identified on the attached Data Sheet or that we subsequently approve as described in Section 3 below, for a term beginning on the Effective Date and, unless sooner terminated as provided herein, expiring at the close of regular business on the day preceding the 10th anniversary of that date (the "**Term**"). You agree to faithfully, honestly, and diligently perform your obligations under these Terms and use your best efforts to promote your Studio and the Brand. You agree not to conduct the business of your Studio at any location other than the Premises and to use the Premises only for your Studio. Once your Studio opens for business, you agree to continuously operate it in accordance with these Terms for the duration of the Term.

   B. **YOUR TERRITORY**.

   Subject to your compliance with the terms of the Agreement, we will not, and we will not authorize any other person to, operate a Studio within the area described on the attached Data Sheet as your Territory (the "**Territory**"). If you have not selected a site for your Studio as of the Effective Date, we reserve the right to define your Territory at the time the Premises are identified and approved by us in accordance with Section 3.A below. If you disagree with our definition of the Territory, you may elect to locate and submit an alternative location to us for approval pursuant to Section 3.A below.

   C. **TERRITORIAL RIGHTS WE RESERVE**.

   We retain all rights to conduct and authorize anyone else to conduct any business activities of any kind whatsoever and do anything other than what we have specifically and expressly agreed in Section 2.B to refrain from doing, at all times before, during and after the Term, without limitation and without compensation to you, regardless of the nature or location of such activities or their customers, and including any business offering or selling products or services that are similar to, the same as, or competitive with, those that your Studio customarily offers or sells, including, the right to:

   (1)    own and operate, and license others to own and operate, Studios using the System and the Marks on such terms and conditions we deem appropriate;

   (2)    develop or become associated with other businesses, including other fitness, health and wellness concepts and systems, and/or award franchises under such other concepts for locations whether or not using the System and/or the Marks;

   (3)    acquire, be acquired by, merge or affiliate with, or engage in any transaction with other businesses (whether or not competitive) located anywhere and (i) convert the other businesses to the Brand and to allow them to operate as part of the System, and/or (ii) permit the other businesses to continue to operate under another name;

   (4)    solicit customers, advertise, and authorize others to advertise, and promote sales of Studios, and fill customer orders; and

   (5)    market and sell, and grant to others the right to market and sell, products and services that are authorized for sale at Studios through other or alternative channels of distribution (for example, through the Internet, telemarketing, mail order, e-commerce and catalog sales, and product lines in other businesses) using the Marks or other trademarks and commercial symbols.

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

3.      **DEVELOPMENT AND OPENING OF YOUR STUDIO.**

   A.      **LOCATING AND SECURING POSSESSION OF THE PREMISES**.

Despite any assistance we provide, you are entirely responsible, at your expense, for doing everything necessary to develop and open your Studio in accordance with these Terms, including, subject to our prior written approval, locating, selecting, and securing possession of the Premises from which your Studio will operate. If the Premises are not identified in the attached Data Sheet when you sign the Agreement, you must, within 90 days after the Effective Date, locate and obtain our approval of the Premises that must be located within the Search Area identified on the attached Data Sheet. You must provide any information we request to aid in our evaluation of your proposed Premises. Our approval of your proposed site is entirely for our own purposes and, by approving your site, we are not representing or guaranteeing that it will perform as you or we expect. We are not responsible if the site we approve fails to meet your expectations.

If you submit multiple proposed sites to us for our review, for each such site after the first one, we may require you to pay us a site review fee of $2,000 plus reimbursement of any out-of-pocket expenses we incur in connection with the review.

You must secure possession of the Premises within 30 days following our approval, by signing a lease, sublease or other agreement that allows you to develop and operate your Studio at the Premises for the entire Term (the "**Lease**"). You may not, however, sign the Lease until you have received our written approval of its terms. As a condition of our acceptance of the Lease, we may require the Lease to include certain provisions that we periodically require to protect and maintain the Brand and System. If we accept the Lease, we do so for our own purposes, and we make no representation or warranty as to the quality or suitability of the Lease or its terms. You should obtain the advice of your own professional advisors before signing it.

   B.      **DEVELOPMENT AND OPENING OF YOUR STUDIO**.

We will provide you our current prototypical plans showing the standard layout and placement specifications for all required equipment, the Computer System (defined below), furniture, fixtures and signs (all of the foregoing being referred to, collectively, as the "**Operating Assets**"). You must, by 10 months after you sign the Lease, do all things necessary to complete the development of your Studio and prepare it for opening in accordance with these Terms, the System, and applicable laws, including adapting the prototypical plans; acquiring and installing the Operating Assets; constructing your Studio to our approval, using vendors we approve as described below, in accordance with the approved detailed construction plans and specifications and space plans for your Studio; retaining and paying all architects and contractors; securing all required operating permits, licenses, and insurance; and retaining and training all employees. You will provide us with any progress reports we request during the course of any design, construction, and remodeling work. We are permitted to visit and inspect the Premises at any time during the design, construction, and remodeling process. At our option, you will employ any design, construction, and remodeling professionals that we designate or approve.

You may not open your Studio for business until we have confirmed in writing that you have completed all pre-opening tasks we require to our satisfaction. Subject to your compliance with applicable laws, you must open your Studio for regular business not later than five days following our written confirmation that you are approved to open. In any event, if you do not open your Studio for business within 12 months following the effective date of this Agreement, we may terminate this Agreement.

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

**LIQUIDITY, OWNERSHIP AND FINANCING**.

We have granted the Franchise to you based, in part, on your representations to us regarding, and our assessment of, your liquidity as of the Effective Date. You will ensure that, throughout the Term, you will maintain sufficient liquidity to meet your obligations under the Agreement.

If at any time you or your affiliates propose to obtain any financing with respect to the Premises, your Studio, or any Operating Assets in which any of such items are pledged as collateral to secure your performance in connection with such financing, the financing is a Transfer subject to our prior written consent in accordance with Sections 13.B and 13.C of these Terms. You may not pledge, assign or encumber this Agreement or the Franchise granted herein.

Subject to this Section 3.C, you must apply for and diligently pursue any government-issued, government-sponsored, or governmental-guaranteed grants, non-recourse loans and/or bailouts for which you qualify and that are made available to small businesses for economic stimulus.

4.      **CERTAIN FEES**.

A.      **INITIAL FRANCHISE FEE**.

You agree to pay us, on your execution of the Agreement, a non-recurring and non-refundable initial franchise fee in the amount shown on the attached Data Sheet.

B.      **ROYALTY FEE**.

Throughout the Term, you agree to pay us a royalty fee (the "**Royalty**") calculated at the rate identified on the attached Data Sheet.  Unless we specify otherwise, Royalty will be payable monthly, on or before the day of the month we specify from time to time, based on the Gross Revenue generated during the preceding month. Notwithstanding the foregoing, if you temporarily close your Studio without our consent, you must pay us $750 ("**Temporary Royalty**") each full or partial week your Studio is temporarily closed, due and payable as, when and in the same manner as the Royalty. Temporary Royalty payments will continue on the same day of each subsequent week following the closure of your Studio, until reopening or termination of the Agreement. The amount of Temporary Royalty will not be prorated if your Studio is closed for only part of a week. Payment of Temporary Royalty will not act as a cure of the default caused by the unauthorized closure and will not alter or impair any other rights we have under the Agreement or any other agreements between us and you or your affiliates, all of which are reserved. If we do not exercise our right to terminate based on your unauthorized closure, you may only re-open your Studio with our prior written consent, and upon the re-opening, your last Temporary Royalty payment will be prorated (if applicable), and your Royalty will resume as described above in this Section 4.C.

C.      **DEFINITION OF "GROSS REVENUE"**.

As used in the Agreement, "**Gross Revenue**" means the total revenue generated by or from the operation of your Studio, regardless of collection, in whatever form and whether or not in compliance with this Agreement. "Gross Revenue" does not include (a) any sales tax and equivalent taxes that are collected by you for or on behalf of any governmental taxing authority and paid thereto, (b) the value of any allowance issued or granted to any client of your Studio that is credited in good faith by you in full or partial satisfaction of the price of the approved products or services offered in connection with your Studio, or (c) the provision of the Authorized Instructor Training Program at your Studio if we provide the training at your Studio and receive all fees associated therewith. Revenue from the purchase or redemption of gift certificates, gift cards or similar programs is calculated as part of Gross Revenue in accordance with our then-current guidelines for such programs.  Gross Revenue also include all insurance proceeds you receive to replace revenue that you lose from the interruption of your Studio due to a casualty or other event covered by business interruption or similar insurance coverage.

4

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

D. **NON-COMPLIANCE FEE**.

The Royalty rate we charge under the Agreement was determined based on the assumption that you will comply with your obligations hereunder. If you do not comply with your obligations (including your obligation to at all times engage an Authorized Instructor (as defined in Section 5.B) for the provision of services at your Studio), we will incur additional costs and expenses and, depending on the nature of the noncompliance, may lose the revenue we bargained for in entering the Agreement. Therefore, if we determine that you are not in compliance with your obligations under the Agreement, your Royalty rate will be increased to one percentage point (1%) above the Royalty rate shown on the attached Data Sheet (the "**Non-Compliance Fee**") until we determine that you have cured all deficiencies and are compliant with all terms of the Agreement, at which time it will revert to the rate shown in the attached Data Sheet. Payment of the Non-Compliance Fee is not a cure of the non-compliance that triggered its payment. The Non-Compliance Fee is intended to compensate us for certain expenses or losses we will incur as a result of the non-compliance and is not a penalty or an expression of the total amount of such damages. Nothing in this Section limits any of our other rights and remedies available under the terms of these Terms.

E. **LATE PAYMENTS AND REPORTING**.

All unpaid amounts you owe us for any reason will bear interest after their due date at the lesser of two percent (2%) per month or the highest commercial contract interest rate allowed by law. Payment of interest is in addition to a $100 late fee for each late or returned payment. We may debit your bank account automatically for the service charge and interest. You acknowledge that this Section 4.I is not our agreement to accept any payments after they are due or our commitment to extend credit to, or otherwise finance your operation of, your Studio.

If, through no fault of our own, we are unable to determine your Gross Revenue, we may debit your account for 110% of the average of the last three Royalty and Marketing Fund (as defined in Section 10.C) contributions that we debited. If the amounts that we debit from your account under this paragraph are less than the amounts you actually owe us (once we have determined the true and correct Gross Revenue), we will debit your account for the balance on the day we specify. If the amounts that we debit from your account are greater than the amounts you actually owe us, we will credit the excess against the amounts we otherwise would debit from your account during the following week. You must pay us any costs we incur (including reasonable attorneys' fees) in attempting to collect payments you owe or in otherwise enforcing the terms of the Agreement.

F. **APPLICATION OF PAYMENTS; SET-OFFS**.

Despite any designation you make, we may apply any of your payments to any of your past due indebtedness to us. We and our affiliates may set off any amounts you or your affiliates owe to us or our affiliates against any amounts we or our affiliates owe you or your affiliates. You may not withhold payment of any amounts owed to us on the grounds of our alleged non-performance of any of our obligations under the Agreement or for any other reason, and you specifically waive any right you may have at law or in equity to offset any funds you may owe us or to fail or refuse to perform any of your obligations under the Agreement.

G. **METHOD OF PAYMENT**.

We may require you, and you agree, to pay any amounts you owe us or our affiliates by any means we periodically specify whenever we deem appropriate. Currently, you authorize us to debit your designated bank account for all such amounts (the "**EFT Authorization**"). You agree to sign and deliver to us any documents we or your bank require for such EFT Authorization. Such EFT Authorization shall remain in full force and effect at all times the Agreement is in effect and for 30 days following its expiration or termination.

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 244 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

5.    **TRAINING AND ASSISTANCE**.

    A.    **INITIAL TRAINING PROGRAM**.

The Initial Training Program is comprised of both (i) the Owner Module and Operations Manager Module (the "**Operations Manager Training**"); and (ii) opening business assistance training, which provides assistance and recommendations regarding the opening and initial operations of your Studio ("**Opening Assistance Training**," and together with Operations Manager Training, the "**Initial Training Program**").

Scheduling, location, content, length and format of our Initial Training Program is at our discretion, and we reserve the right to require that all of your attendees attend and participate at the same time. Successful completion, to our satisfaction, of the Initial Training Program by your Managing Owner and your Operations Manager (which may be the same person at your discretion) (the "**Required Trainees**") is required before you open your Studio to the public. You are expected to successfully complete the Owner Module of the Initial Training Program at least 90 days before you open your Studio, and your Operations Manager (if applicable) is expected to successfully complete the Operations Manager Module at least 45 days prior to opening your Studio. In addition to completion of Operations Manager Training, your Required Trainees must complete Opening Assistance Training within the 30 days prior to your Studio's scheduled opening. In any event, all components of the Initial Training Program must be completed before soliciting or pre-selling any memberships in or for your Studio, and before opening your Studio for business. You will be responsible for all travel and living expenses, wages, and benefits owed to, and other costs of, persons attending the training programs on your behalf or at your request.

If you or your affiliates are opening your (or their) first or second Studio, we will conduct the Initial Training Program and will not charge a fee for participation by the Required Trainees. After your and your affiliates' second Studio, you will be required to conduct the Initial Training Program for the Required Trainees who have not previously completed the training program as provided by us. Before acting as trainers, your trainers must themselves have successfully completed the Initial Training Program, and you must conduct the Initial Training Program in a manner we designate, at a Studio owned by you or your affiliates. Notwithstanding the foregoing, we reserve the right to conduct the Initial Training Program ourselves for your or your affiliates' third or subsequent Studio if we determine that you are unable to properly conduct the required training and, in the event we conduct such required training, we may charge you a reasonable fee for doing so. We may also charge a reasonable fee if any replacement Required Trainee or any persons other than the Required Trainees attend the Initial Training Programs that we conduct.

There is no fee for your Required Trainees' attendance at the Initial Training Program; however, you are responsible for all travel and living expenses we incur if we are traveling to your Studio, and you are responsible for all of your own travel and living expenses if your Required Trainees are attending the training in Atlanta, Georgia. If you are acquiring an existing franchise from another System franchisee, then you must pay our then-current Additional Assistance or Training Fee for all Required Trainees. We may also charge you the Additional Assistance or Training Fee, plus our expenses, if any replacement Required Trainee or any persons other than the Required Trainees must attend the Initial Training Program that we conduct. If your Required Trainees fail to complete all portions of the Initial Training Program within the prescribed timeline, we may terminate the Agreement.

    B.    **AUTHORIZED INSTRUCTOR TRAINING PROGRAM**.

Your Studio must at all times engage at least one individual that is Pilates-certified and capable of and authorized to provide Pilates instruction and other approved services at all times (an "**Authorized Instructor**"), which may be you (or your Managing Owner) or your Operations Manager. Any individual that wishes to become an Authorized Instructor must first (i) demonstrate that he/she has met all instructor

<div align="center">6</div>

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 245 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

eligibility requirements we require from time to time, (ii) complete the training program we require for all Authorized Instructors, and (ii) test out with a sample class with us, you or your Operations Manager (the "**Authorized Instructor Training Program**"). We are not responsible for any costs or expenses incurred by any person attending our training programs. You are responsible for all travel and living expenses incurred by you (and your employees) or, if applicable, us and our representative(s). The Authorized Instructor Training Program for your prospective Authorized Instructor(s) will be held at a time that you and we agree.

If at any time your Studio does not engage at least one Authorized Instructor for the provision of services, we may charge you our then-current Non-Compliance Fee for each day that you permit or have permitted a non-certified/trained Pilates instructor to provide any Pilates instruction or any other approved services at your Studio.

The fee for our Authorized Instructor Training Program is currently $2,499 per person, plus a flat fee of $1,000 if you request, and we agree, to provide such training at your Studio. If our representative(s) travel to your Studio for training, you will be responsible for reimbursement of all related travel costs of such representatives. We are not responsible for any costs or expenses incurred by any person attending our training programs. These costs are assessed on all participants in the Authorized Instructor Training Program, including if your Required Trainees attend. The costs and fees for us to conduct the Authorized Instructor Training Program at your Studio will be charged per occurrence of training at your Studio and are subject to change in our sole discretion.

You must pay us a "no-show" fee equal to the greater of $500 per occurrence or the actual costs of rescheduling travel, if your trainee registers for any portion of the Initial Training Program or the Authorized Instructor Training Program and fails, with less than 2 weeks' notice, to show up at the scheduled time or complete the majority of the program.

C.     **TRAINING OF EMPLOYEES**.

You are responsible for providing a training program that we approve for all your employees other than the attendees of the Initial Training Program. All employees must pass a training program to our satisfaction that meets our minimum criteria prior to providing services at your Studio. You will be responsible for the proper training of your employees. You must ensure that everyone you employ is properly trained and is qualified to perform his or her duties at your Studio in accordance with the System and System Standards.

D.     **ADDITIONAL TRAINING AND GUIDANCE**.

If this is your or your affiliates' first or second Studio, we will, at our expense, send one or more of our representative(s) to your Studio to assist with its grand opening (the identity, composition, and length of which will be in our discretion). If this is your or your affiliates' third or subsequent Studio, and we determine that it is in your and the Brand's best interests to send a training and grand opening representative to assist with your Studio's opening, you will be responsible for reimbursing us for the costs and expenses incurred by the training and grand opening representative(s) we send to provide that support, including the costs of travel, lodging, meals, and our then-current Additional Assistance or Training Fee to cover the teams' salary. Our trainer(s) will determine the amount of required time and support necessary to prepare your staff for the grand opening of your Studio.

We may implement annual franchise conferences for our franchisees and provide additional mandatory training programs from time to time on new topics, for your replacement personnel, or as refreshers for previously trained people. We reserve the right to charge a fee for any such programs and for any training materials that we provide in connection with such trainings. You agree to give us reasonable

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 246 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

assistance in training other Studio franchisees, and we will reimburse you for your reasonable out-of-pocket expenses in doing so.

We may periodically advise and guide you regarding various aspects of the operation of your Studio and System Standards (defined below). We will determine the location, frequency, content, and method of delivering all such advice and guidance. If you request, and we agree to provide, additional or special guidance, assistance, or training, we may charge you our then-applicable fees, including per diem charges and travel and living expenses for our personnel.

If, at any time prior to opening your Studio or after your Studio is operational, we agree to provide, at your request, additional assistance that we are not required under the Franchise Agreement to provide, you will be required to pay us a fee, currently in the amount of $1,000 per day but subject to change (the "**Additional Assistance or Training Fee**"), plus the cost of all travel and living expenses incurred by our representative(s) (if applicable). This Additional Assistance or Training Fee applies if you request our assistance in providing the Authorized Instructor Training Program or any additional or ongoing business training at your Studio, and is subject to change in our sole discretion.

E.        **OPERATIONS MANUAL**.

During the Term, we will provide you with electronic access to our manual for the operation of Studios (the "**Operations Manual**"). We will determine the content of the Operations Manual, the frequency in which it may be updated, and the manner and format in which it is delivered or made available to you. The Operations Manual may contain mandatory specifications, standards, operating procedures and rules that we periodically prescribe for operating Studios ("**System Standards**"), and you agree to comply with those standards and requirements. The Operations Manual may also contain other specifications, standards and policies that we may periodically suggest for the operation of your Studio, and adoption of those items in the operation of your Studio will be at your discretion. We may periodically modify the Operations Manual, including in the form of memoranda and newsletters, to reflect changes in System Standards.

Our master copy of the Operations Manual is the controlling copy, and it remains our sole property. The Operations Manual and any passwords and access credentials are part of our Confidential Information (defined below) and must be protected against improper use and disclosure. As such, you may use it only in the operation of your Studio in accordance with these Terms and protect it from improper use and disclosure as described in Article 7 below. If you or your owners or affiliates, intentionally or otherwise, compromise the secure access to the Operations Manual, including, but not limited to, allowing unauthorized users access to it and its contents, you will be required to pay us liquidated damages in the amount of $10,000 to compensate us for the breach and related damage to the System. You are responsible for any loss, destruction, damage, or unauthorized access or use of your copy of the Operations Manual.

6.        **MARKS**.

A.        **OWNERSHIP AND GOODWILL OF MARKS**.

Your right to use the Marks and the System is derived solely from this Agreement and limited to your operating your Studio at the Premises according to these Terms and all System Standards. Your unauthorized use of the Marks or the System is a breach of the Agreement and infringes our and our affiliates' intellectual property rights. Your use of the Marks and any goodwill created by that use are exclusively for our and our affiliates' benefit, and the Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to use them strictly as described in these Terms). You agree not to, at any time during or after the Term, contest or assist any other person in contesting the validity of our and our affiliates' rights to the Marks.

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

B. **LIMITATIONS ON YOUR USE OF MARKS**.

You agree to use the Marks we periodically designate as the sole identification of your Studio and to identify yourself as the licensee of the Marks and the independent owner of your Studio in the manner we prescribe. You may not use any Mark (1) as part of any legal entity name or trade name (unless required by law and you promptly notify us in writing of all trade names you intend to register or use); (2) with any modifying words, terms, designs, or symbols (other than logos we have licensed to you); (3) in selling any unauthorized services or products, (4) as part of any website, domain name, email address, social media account, user name, other online presence or presence on any electronic, virtual, or digital medium of any kind ("**Online Presence**"), except as set forth in the Operations Manual or otherwise in writing from time to time; (5) in connection with any advertisement of any prospective transfer that would require our approval under Article 13; (6) to secure any obligation or indebtedness; or (7) in any other manner that we have not expressly authorized in writing. You agree to give the notices of trademark and service mark ownership and registrations that we specify and to maintain, solely during the Term, any fictitious or assumed name registrations required under applicable law.

C. **NOTIFICATION OF INFRINGEMENTS AND CLAIMS**.

You must notify us immediately of any apparent infringement or challenge to your use of any Mark, or of any person's claim of any rights to or in any Mark (each an "**Infringement Matter**"), and not to communicate with any person other than us or our affiliates, our attorneys, and your attorneys, regarding any such Infringement Matter. We and our affiliates may take the action we or they deem appropriate (including no action) and control exclusively any litigation, administrative actions, or other legal proceedings arising from any Infringement Matter, and you agree to sign any documents and take any other reasonable action that we believe to be necessary or advisable to protect and maintain our and our affiliates' interests in any such proceeding or otherwise to protect and maintain our and their interests in the Marks. We will reimburse you for your reasonable costs of taking any action that we or our affiliates ask you to take in this regard. We also agree to reimburse you for all damages and expenses that you incur in any trademark infringement proceeding disputing your authorized use of any Mark under the Agreement if you have timely notified us of, and comply with our directions in responding to, the proceeding.

D. **DISCONTINUANCE OF USE OF MARKS.**

If it becomes advisable, in our opinion, to modify or discontinue any Mark used by Studios or to use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your expenses of complying with our directions in that regard or for any loss of revenue due to any modified or discontinued Mark. We may exercise these rights at any time and for any reason, business or otherwise, that we think best, and you waive any claims, demands or damages arising therefrom.

E. **NON-DISPARAGEMENT**.

You agree not to (and to use your best efforts to cause your current and former owners, officers, directors, agents, employees, representatives, attorneys, spouses, affiliates, successors and assigns not to) disparage or otherwise speak or write negatively, directly or indirectly, of us, our affiliates, any of our or our affiliates' directors, officers, employees, representatives, current and former franchisees or developers, the Brand, the System, any Studio (including your Studio), any business using the Marks, any other brand or concept of us or our affiliates, or which is reasonably likely to subject the Brand or such other brands to ridicule, scandal, reproach, scorn, or indignity, or negatively impact the goodwill of the Marks or the System. This provision survives termination or expiration of the Agreement.

9

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 248 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

7. **CONFIDENTIAL INFORMATION.**

    A.     **TYPES OF CONFIDENTIAL INFORMATION**.

In connection with your Franchise under the Agreement, you and your owners and personnel may from time to time be provided and/or have access to non-public information about the System and the operation of Studios (including your Studio) some of which constitutes our trade secrets under applicable law, whether or not marked confidential (the "**Confidential Information**"), including:

    (1)     Marketing strategies, methods, materials and information;

    (2)     Pricing strategies;

    (3)     the Operations Manual and its contents;

    (4)     growth and development plans, strategies, and forecasts related to the System;

    (5)     site selection criteria;

    (6)     training and operations materials;

    (7)     the System Standards and other methods, formats, specifications, standards, systems, procedures, techniques, market research, customer data, knowledge, and experience used in developing, promoting and operating Studios and the products and services they offer and sell;

    (8)     knowledge of specifications for, and vendors of, Operating Assets and other products and supplies;

    (9)     any software or other technology which is proprietary to us, our affiliates, or the System, including, without limitation, digital passwords and identifications and any source code of, and data, reports, and other materials generated by, the software or other technology, and any materials created by or for our benefit; and

    (10)     knowledge of the operating results and financial performance of Studios (including your Studio).

    B.     **DISCLOSURE AND LIMITATIONS OF USE**.

You agree that your relationship with us does not vest in you any interest in the Confidential Information other than the right to use it in the development and operation of your Studio in accordance with these Terms, and that the use, duplication or improper distribution or publication of the Confidential Information in any case would constitute an unfair method of competition. You acknowledge and agree that the Confidential Information is proprietary, includes trade secrets belonging to us and is disclosed to you or authorized for your use solely on the condition that you agree, and you therefore do agree, that you will: (1) not use the Confidential Information in any other capacity; (2) maintain the absolute confidentiality of the Confidential Information during and after the Term; (3) not make unauthorized copies of, or improperly disclose or publish any portion of, the Confidential Information however and in whatever form or format disclosed to you; and (4) adopt and implement all reasonable procedures and safeguards we periodically prescribe to prevent unauthorized use or disclosure of the Confidential Information, including, establishing reasonable security and access measures, restricting disclosure to your employees, and the use of nondisclosure and noncompetition agreements we may prescribe for employees or others who have access to the Confidential Information.

    C.     **EXCEPTIONS TO LIMITATIONS**.

The restrictions on your disclosure of the Confidential Information will not apply to the: (i) disclosure of information, processes, or techniques which are lawfully known and used in wellness industry or by the public generally (as long as the availability is not because of a violation of applicable law or an obligation

<div align="center">10</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

to us or our affiliates by you), provided that you have first given us written notice of your intended disclosure; (ii) disclosure of the Confidential Information in judicial or administrative proceedings when and only to the extent you are legally compelled to disclose it, provided that you have first given us the opportunity to obtain an appropriate protective order or other assurance satisfactory to us that the information required to be disclosed will be treated confidentially; and (iii) disclosure of your Studio's operating results and financial performance to your existing and prospective lenders, and, provided they are bound by confidentiality obligations, to potential investors in you or purchasers of your Studio.

D.  **INNOVATIONS**.

You must promptly disclose to us all ideas, concepts, methods, techniques and products conceived or developed by you and/or any of your affiliates, owners, agents, representatives, contractors or employees during the Term relating to the development or operation of your Studio or other Studios ("**Innovations**"), whether or not protectable intellectual property and whether created by or for you or your owners or employees. All Innovations are our sole and exclusive property and works made-for-hire for us and shall constitute our Confidential Information. To the extent any Innovation does not qualify as a work made-for-hire for us, by this Section you assign ownership of that Innovation, and all related rights to that Innovation, to us and agree to sign (and to cause your owners, employees, and contractors to sign) whatever assignment or other documents we request to evidence our ownership or to help us obtain intellectual property rights in the Innovation. We and our affiliates have no obligation to make any payments to you or any other person with respect to any Innovations. You may not use any Innovation in operating your Studio or otherwise without our prior approval.

8.  **COMPETITION AND INTERFERENCE DURING TERM**.

A.  **COVENANTS**.

We have granted you the Franchise in consideration of and reliance upon your agreement to deal exclusively with us and the agreement of certain of your related parties not to engage in activities that are competitive with us and Studios. You therefore agree that, during the Term, neither you, your affiliates, your Operations Manager, nor any of your or your affiliates' owners or their immediate family members (collectively, the "**Restricted Parties**") will:

(1)  have any direct or indirect interest as an owner (whether of record, beneficially, or otherwise) in a Competitive Business (as defined below), wherever located or operating (except that equity ownership of less than five percent (5%) of a Competitive Business whose stock or other forms of ownership interest are publicly traded on a recognized United States stock exchange will not be deemed to violate this subparagraph);

(2)  perform services for or provide benefits to, in any capacity, a Competitive Business, wherever located or operating;

(3)  divert or attempt to divert any actual or potential business or customer of your Studio to a Competitive Business;

(4)  interfere or attempt to interfere with our or our affiliates' relationships with any vendors, franchisees or consultants; or

(5)  directly or indirectly, appropriate, use or duplicate the System or System Standards, or any portion thereof, for use in any other business or endeavor.

You agree to obtain similar covenants from your owners and Operations Managers. We have the right to regulate the form of agreement that you use and to be a third-party beneficiary of that agreement

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

with independent enforcement rights. Nothing contained herein shall be deemed a waiver of our right to terminate pursuant to Section 15.B of these Terms.

B. **<u>COMPETITIVE BUSINESS DEFINED</u>**.

The term "**Competitive Business**" means any business (other than an authorized Studio): (i) that offers products and services that are the same as or substantially similar to those offered at Studios; (ii) whose core offerings include Pilates and wellness instruction, classes, and private sessions and related services; (iii) whose offerings, concept, business model or method of operation is similar to that of a Studio or any other wellness businesses operated, franchised or licensed by us or our affiliates; or (iv) that grants franchises or licenses for the operation of any of the foregoing or provides services to the franchisor or licensor of any of the foregoing.

9. **<u>BUSINESS OPERATIONS AND SYSTEM STANDARDS</u>**.

A. **<u>CONDITION AND APPEARANCE OF YOUR STUDIO</u>**.

You agree to place or display at the Premises (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos, display and advertising materials, and other Trade Dress elements that we periodically approve. You further agree to maintain the condition and appearance of your Studio, its Operating Assets and the Premises in accordance with the System Standards and, consistent with the image of Studios, as an efficiently operated business offering high-quality products and services and observing the highest cleanliness and efficient, courteous service. Toward that end, you agree, without limitation and at your expense, to: (a) clean, repaint, redecorate, repair, and maintain the interior and exterior of the Premises at intervals that we prescribe; (b) maintain, repair or, at our discretion, replace damaged, worn-out or obsolete Operating Assets or elements of the Trade Dress at intervals that we may prescribe (or, if we do not prescribe an interval for replacing any Operating Asset or Trade Dress element, as that Operating Asset or Trade Dress element needs to be repaired or replaced); and (c) renovate, refurbish, remodel, or replace the real and personal property and equipment used in operating your Studio when reasonably required to comply with our System Standards. If we change our System Standards, we will give you a reasonable period of time within which to comply with such changes.

You are responsible for maintaining required branded retail items in sufficient quantities, and for maintaining and/or replacing Pilates and other equipment as needed and follow maintenance guidelines as described in any manufacturer's or seller's instructions and in the Operations Manual from time to time.

B. **<u>USE OF DESIGNATED COMPUTER SYSTEM</u>**.

You must, at your expense, obtain, maintain, and use in your Studio the integrated computer hardware and software that we periodically specify from time to time in the Operations Manual, including the management software, point-of-sale system, and inventory control system we designate (the "**Computer System**"). You also agree to maintain a functioning e-mail address and all specified points of high-speed internet connection. We may modify specifications for, and components of, the Computer System, which might require you to acquire new or modified computer hardware or software and obtain service and support for the Computer System. You must at all times during the Term ensure that your Computer System, as modified, meets our System Standards and functions properly. You must record all documents and information in the Computer System as we specify, including all receipts, expenses, invoices, member lists, class and employee schedules and other business information.

You may be required to license, and sign a software license agreement regarding, certain proprietary software as part of our requirements for the Computer System. We and our affiliates may charge you an initial and recurring fee to fund the development, licensure, and acquisition of various technologies and technology-related systems used in Studios (a "**Technology Fee**"). We reserve the right to increase the

<div align="center">12</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

Technology Fee to reflect changes in the costs and availability of technology. We may also require that you pay us for software and other technology that you receive through us from third-party providers. You will have sole and complete responsibility for the manner in which your Computer System interfaces at our specified levels of connection speed with our and any third party's computer system and any and all consequences if the Computer System is not properly operated, maintained, and upgraded. We may change the Technology Fee from time to time.

You must incur the costs of obtaining the Computer System (or additions and modifications) and required service or support, payable to us and/or our affiliates through the Technology Fee. It is your responsibility to implement and pay for all changes, modifications, maintenance, and upgrades associated with the Computer System, and we have no obligation to reimburse you for any costs detailed in this Section 9.B unless otherwise noted. We have no obligation to provide maintenance, repairs, upgrades, or updates to the Computer System. If proprietary software is developed and provided to you, we may revise your obligations in that regard. We may elect to require updates or upgrades to any component of these systems, and there will be no limitations on such requests.

You will provide us with any passwords necessary to access the business information for your Studio that is stored on the Computer System. We may use such information to communicate directly to the members of your Studio, and to provide updates, information, newsletters, and special offers to the members. Upon expiration or termination of the Agreement, you shall have no further access or rights to the member information.

C. **PRODUCTS AND SERVICES YOUR STUDIO OFFERS**.

You agree that you (1) will offer and sell from your Studio all of the products and services, and in the manner, that we periodically specify; (2) will not offer or sell at or from your Studio, the Premises or any other location any products or services we have not authorized; and (3) will discontinue selling and offering for sale any products or services that we at any time disapprove. You will obtain and use all equipment we require for the operation of your Studio and will refrain from using any equipment prohibited or not approved by us. You must immediately bring your Studio into compliance with our System Standards for such products or services, including by purchasing or leasing any necessary Operating Assets, making any required changes to signage and advertising materials, and updating your Computer System to include any software, hardware or other equipment necessary to offer such products services through an online and/or automated system. If, at any time, we require or permit you to offer off-site products or services, we reserve the right to limit the geographic area in which you may offer such products or services, and we may periodically modify that geographic area, in our sole discretion. We may implement membership reciprocity programs or campaigns by and among Studios within the franchise system, and you must comply with such programming.

D. **MANAGEMENT OF YOUR STUDIO**.

You must designate a person, who may, but need not, be your Managing Owner or one of your other owners, to serve as the "**Operations Manager**" of your Studio. Your Studio must at all times be managed by your Operations Manager that: (i) is designated by you to assume primary responsibility, and has authority, for the day-to-day management and operation of your Studio; (ii) will devote full-time and best efforts to the supervision and management of your Studio; (iii) satisfies our educational and business experience criteria for Operations Managers of Studios, as set forth in the Operations Manual or otherwise; and (iv) has satisfactorily completed our Initial Training Program and any other training programs we may periodically require. Such individual must be on-site at your Studio during normal business hours to manage the day-to-day operations of your Studio, but you are solely responsible for hiring and determining the terms of employment for your Operations Manager.

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 252 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

You must inform us in writing of the identity of your Operations Manager and any replacements. You must also keep us advised in writing of all instructors involved in the operation of your Studio and their contact information. If your Operations Manager ceases active employment at your Studio or no longer satisfies the qualifications of an Operations Manager in accordance with this Section, you must promptly notify us and take corrective measures (which may include additional training or replacement) within 30 days. You are responsible for ensuring proper interim management and continued operations of your Studio until those corrective measures are completed or a replacement Operations Manager is designated, approved by us, and trained as required by these Terms.

E. **APPROVED VENDORS**.

You agree to use the manufacturers, vendors, distributors, suppliers, and producers (collectively referred to herein as "**vendors**") that we specify or approve for all aspects of the development (including site selection, selection and appointment of an architect and general contractor, review of construction bids, supervision of construction, and general oversight of the construction process) and operation of your Studio for which such vendors provide goods or services. We also reserve the right to periodically approve or designate the terms and distribution methods for any goods or services. We may, at our option, arrange with designated vendors to collect or have our affiliates collect fees and expenses associated with products and services they provide to you and, in turn, pay the vendor on your behalf for such products or services. If we elect to do so, you agree that we or our affiliates may auto-debit your bank account for such amounts in the same manner and using the same authorization that you grant us with respect to payment of Royalty and other fees. We or any of our affiliates may be a vendor, or otherwise party to these transactions, and may derive revenue or profit from such transactions. We and any of our affiliates may use such revenue or profit without restriction. We also reserve the right to collect a music licensing fee on behalf of any designated third-party supplier or otherwise.

If you would like us to consider approving a vendor that is not then approved by us, you must submit a written request before purchasing any items or services from that vendor. We will make all determinations about whether to approve an alternative vendor or product based on our then-current criteria, which may change periodically. We are not required to respond to your request, and any actions we take in response to your request will be at our sole and unfettered discretion, including the assessment of a fee to compensate us for the time and resources we spend in evaluating the proposed vendor. We may, with or without cause, revoke our approval of any vendor at any time.

F. **COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES**.

You must secure and maintain in force throughout the Term all required licenses, permits and certificates relating to the operation of your Studio and operate your Studio in full compliance with all applicable laws, ordinances and regulations, including PCI compliance standards. You agree to comply and assist us in our compliance efforts, as applicable, with any and all laws, regulations, executive orders (whether at the federal, state or local level) or otherwise relating to anti-terrorist activities, including without limitation the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury or other regulations. In connection with such compliance efforts, you agree not to enter into any prohibited transactions and to properly perform any currency reporting and other activities relating to your Studio as may be required by us or by law. You confirm that you are not listed in the Annex to Executive Order 13224 and agree not to hire any person so listed or have any dealing with a person so listed (the Annex is currently available at http://www.treasury.gov). You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders or regulations, and specifically acknowledge and agree that your indemnification responsibilities as provided in Section 17.C pertain to your obligations hereunder. Notwithstanding the foregoing, in the event an executive order is issued that directly affects the operation of your Studio, you will not close your Studio unless: (1) you obtain our prior written consent; and (2) it is

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

specifically in response to an applicable executive order and not based on recommendations or guidelines issued by a governmental authority or agency or the Centers for Disease Control and Prevention.

You agree to comply with our website privacy policy, as it may be amended periodically, pertaining to any Online Presence or use or access to any System Website (as defined in Section 10.G below); you further agree to comply with any requests to return or delete consumer personal information, whether requested by us or directly by the consumer, as required by applicable data sharing and privacy laws.

You and your Studio must in all dealings with its customers, vendors, us and the public adhere to the highest honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice that might injure our business, any Studios, or the goodwill associated with the Marks. You must notify us in writing within three (3) business days of: (1) the commencement of any action, suit or proceeding relating to your Studio; (2) the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality relating to your Studio; (3) any notice of violation of any law, ordinance or regulation relating to your Studio, and/or that any audit, investigation, or similar proceeding is pending or threatened against you or your Studio; (4) receipt of any notice of complaint from the Better Business Bureau, any local, state or federal consumer affairs department or division, or any other government or independent third party involving a complaint from a client or potential client relating to your Studio; (5) written complaints from any customer or potential customer, and (6) any and all other notices you receive claiming that you (or your affiliates or representatives) have violated or breached any intellectual property rights, or the terms and conditions of any agreements related to the operation of your Studio. You must immediately provide to us copies of any documentation you receive of any of the foregoing events and resolve the matter in a prompt and reasonable manner in accordance with good business practices.

G.  **INSURANCE**.

You must, at your expense, comply with the requirements regarding insurance coverages that we describe in our Operations Manual from time to time. If you fail or refuse to procure and maintain the required insurance, we may (but need not) obtain such insurance on your behalf, in which event you must cooperate with us and reimburse us for all premiums, costs and expenses we incur in obtaining and maintaining the insurance, plus a reasonable fee for our time incurred in obtaining such insurance. No insurance coverage that you or any other party maintains will be deemed a substitute for your indemnification obligations to us or affiliates under Section 17.C or otherwise.

Our insurance requirements represent only the minimum coverage that we deem acceptable to protect our interests and are not representations or warranties of any kind that such coverage is sufficient to comply with applicable law or protect your interests or those of your Studio.  It is your sole responsibility to make that determination and to acquire any additional coverages you believe are necessary to protect those interests, based on your own independent investigation.

H.  **PRICING**.

Unless prohibited by applicable law, we may periodically set a maximum or minimum price that you may charge for products and services offered by your Studio. If we impose such a maximum or minimum price, you may charge any price for the product or service up to and including our designated maximum price or down to and including our designated minimum price. The designated maximum and minimum prices for the same product or service may, at our option, be the same.  For any product or service for which we do not impose a maximum or minimum price, we may require you to comply with an advertising policy adopted by us which will prohibit you from advertising any price for a product or service that is different than our suggested retail price. Although you must comply with any advertising policy we

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

adopt, you will not be prohibited from selling any product or service at a price above or below the suggested retail price unless we impose a maximum price or minimum price for such product or service.

I.    **CONTACT INFORMATION AND LISTINGS**.

You agree that each telephone or facsimile number, directory listing, and any other type of contact information used by or that identifies or is associated with your Studio (any "**Contact Identifiers**") will be used solely to identify your Studio in accordance with these Terms. You acknowledge and agree that, as between us and you, we have the sole rights to, and interest in, all Contact Identifiers and all Online Presences. You hereby authorize us and irrevocably appoint us or our designee as your attorney-in-fact to direct the telephone company, postal service, registrar, Internet Service Provider and all listing agencies to transfer such Contact Identifiers to us.

J.    **COMPLIANCE WITH SYSTEM STANDARDS**.

You agree at all times to operate and maintain your Studio according to each and every System Standard, as we periodically modify and supplement them. Though we retain the right to establish and periodically modify System Standards, you retain the right and sole responsibility for the day-to-day management and operation of your Studio and the implementation and maintenance of System Standards at your Studio. System Standards may regulate any aspect of the operation and maintenance of your Studio, including, but not limited to, any one or more of the following:

(1)    sales, marketing, advertising and promotional programs and materials and media used in these programs;

(2)    staffing levels for your Studio and employee qualifications, training, dress and appearance (although employee selection and promotion, hours worked, rates of pay and other benefits, work assigned and working conditions are your sole responsibility);

(3)    use and display of the Marks;

(4)    days and hours of operation;

(5)    methods of payment that your Studio may accept from customers;

(6)    participation in market research and product and service testing programs;

(7)    participation in gift card programs and other loyalty programs;

(8)    cleanliness, consistency, safety and training specifications;

(9)    class and private session instruction, including service offerings, equipment use, class cadence, and inclusion (or exclusion) of certain instruction;

(10)    bookkeeping, accounting, data processing and record keeping systems and forms; formats, content and frequency of reports to us of sales, revenue, and financial performance and condition;

(11)    participation in quality assurance and customer satisfaction programs;

(12)    types, amounts, terms and conditions of insurance coverage required for your Studio, including criteria for your insurance carriers; and

(13)    any other aspects of operating and maintaining your Studio that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Studios.

16

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

Our modification of System Standards, which may accommodate regional or local variations, may obligate you to invest additional capital in your Studio and incur higher operating costs. At our discretion, we may require you to make certain modifications to the manner of operation of your Studio, including without limitation, modifying the hours of operation, changing the manner in which products or services shall be delivered to customers, limiting or changing the products or services that you shall provide to customers, and creating and displaying temporary signage, all of which may be required on a regional or local basis as necessary to address certain public health concerns. These modifications do not need to be implemented throughout the System, and in certain situations, could only affect your Studio, and could include requiring temporary closure. We will determine the scope and duration of such modifications.

K.      **INFORMATION SECURITY**.

You may from time to time have access to information that can be used to identify an individual, including names, addresses, telephone numbers, e-mail addresses, employee identification numbers, signatures, passwords, financial information, credit card information, biometric or health data, government-issued identification numbers and credit report information ("**Personal Information**").  You may gain access to such Personal Information from us, our affiliates, our vendors, or from your own operations. You acknowledge and agree that, as between us and you, all Personal Information (other than Restricted Data, as defined below) is our Confidential Information and is subject to the protections in Section 7.

During and after the Term, you (and if you are a legal entity, each of your owners) agree to, and to cause your respective current and former employees, representatives, affiliates, successors, and assigns to: (a) collect, disclose, process, retain, and use all Personal Information only in strict accordance with all applicable laws, regulations, orders, the guidance and codes issued by industry or regulatory agencies, and the privacy policies and terms and conditions of any applicable Internet presence; (b) assist us with meeting our compliance obligations under applicable laws and regulations relating to Personal Information; and (c) promptly notify us of any communication or request from any customer or other data subject to access, correct, delete, opt-out of, or limit activities relating to any Personal Information.

If you become aware of a suspected or actual breach of security or unauthorized access involving Personal Information, you will notify us immediately and specify the extent to which Personal Information was compromised or disclosed. You also agree to follow our instructions regarding curative actions and public statements relating to the breach.  We reserve the right to conduct a data security and privacy audit of any part of the Studio and Computer System at any time, from time to time, to ensure that you are complying with our requirements.  You must promptly notify us if you receive any complaint, notice, or communication, whether from a governmental agency, customer or other person, relating to any Personal Information, or your compliance with our obligations relating to Personal Information under this Agreement, and/or if you have any reason to believe that you will not be able to satisfy any of your obligations relating to Personal Information under this Agreement.

Notwithstanding anything to the contrary in the Agreement, you agree that we do not control or own any of the following Personal Information (collectively, the "**Restricted Data**"): (a) any Personal Information of employees, officers, contractors, owners or other personnel of you, your affiliates, or the Studio; (b) such other Personal Information as we may from time to time expressly designate as Restricted Data; and/or (c) any other Personal Information to which we do not have access. Regardless of any guidance we may provide generally and/or any specifications that we may establish for Personal Information, You have sole and exclusive responsibility for all Restricted Data, including establishing protections and safeguards for such Restricted Data.

The Daily Pilates LLC
2024-04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.9

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 256 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

L.     **EMPLOYEES, AGENTS AND INDEPENDENT CONTRACTORS**.

You must maintain at all times a sufficient number of properly trained and competent employees and independent contractors in order to operate your Studio in accordance with the System Standards. You acknowledge and agree that you are solely responsible for all decisions relating to employees, agents, and independent contractors that you hire to assist in the operation of your Studio. You agree that any employee, agent or independent contractor that you hire will be your – not our – employee, agent or independent contractor. You also agree that you are exclusively responsible for the terms and conditions of employment of your employees, including recruiting, hiring, firing, training, compensation, work hours and schedules, work assignments, safety and security, discipline, and supervision. You must ensure that all personnel who work at your Studio are properly licensed, certified, registered with appropriate authorities, trained, educated and experienced to perform the tasks assigned to them or to which they are likely to engage in connection with their relationship with your Studio. You agree to manage the employment functions of your Studio in compliance with federal, state, and local employment laws.

10.     **MARKETING**.

A.     **GRAND OPENING MARKETING**.

You must, at your expense and on the dates we designate, conduct a grand opening marketing program for your Studio that complies with the requirements set forth in the Operations Manual ("**Grand Opening Marketing**"). The amount you will be required to spend on Grand Opening Marketing will depend on various factors, but we require that you spend no less than $6,000. We or our approved vendors may choose to perform certain advertising and promotional activities reasonably targeted at the area surrounding the Premises, in which case you may be required to pay to us directly the Grand Opening Marketing expenses or other expenses we designate. The amount you spend on Grand Opening Marketing will not count towards your other required marketing expenditures under this Article 10 or the Marketing Expenditure Cap (defined below).

B.     **MARKETING FUND**.

We reserve the right to form and require you to contribute to a Marketing Fund, which will be used to promote the awareness of the Brand and Studios generally (the "**Marketing Fund**"). Your contribution will be in amounts we periodically specify and will be payable in the same manner as the Royalty. We have the right, at any time and on notice to you, to change the amount you must contribute to the Marketing Fund, but we cannot require that the percentage of Gross Revenue you are required to contribute to the Marketing Fund, spend on local marketing pursuant to Section 10.D below, and contribute to a Local Advertising Cooperative exceed, in the aggregate, five percent (5%) ("**Marketing Expenditure Cap**").

We or our affiliates or other designees will direct all programs that are funded by contributions to the Marketing Fund, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation. We may use contributions to the Marketing Fund to pay for preparing and producing materials and electronic or digital media in any form or format that we periodically designate, including but not limited to: administrating online advertising strategies, including maintaining a System Website or mobile apps; administering regional and multi-regional marketing and advertising programs; implementing a loyalty program; and supporting public relations, market research, product development, and other advertising, promotion, social media and marketing activities. In our discretion, we may sell you, at a reasonable price, copies of certain materials funded by contributions to the Marketing Fund.

We will account for contributions to the Marketing Fund separately from our other funds and not use the Marketing Fund contributions for any of our general operating expenses. However, we may use contributions to the Marketing Fund to reimburse us or our affiliates or designees for the reasonable salaries

18

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

and benefits of personnel who manage and administer activities funded by the Marketing Fund, the Marketing Fund's other administrative costs, travel expenses of personnel while they are on Marketing Fund business, meeting costs, overhead relating to Marketing Fund business, and other expenses that we incur in activities reasonably related to administering or directing the Marketing Fund and its programs.

Contributions to the Marketing Fund will not be our asset, but we do not assume or owe any fiduciary obligation to you in respect of those contributions or for administering the Marketing Fund or any other reason. We will hold all Marketing Fund contributions for the benefit of the contributors and use contributions for the purposes described in this Section 10.C. We may spend in any fiscal year on Marketing Fund activities more or less than the total Marketing Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We may use all interest earned on the Marketing Fund contributions to pay costs before using the Marketing Fund's other assets. We will prepare an annual, unaudited statement of Marketing Fund collections and expenses and, once prepared, give you the statement for the most recently completed fiscal year upon your written request. The Marketing Fund is not audited. We may incorporate the Marketing Fund or operate it through a separate entity whenever we deem appropriate. The successor entity will have all of the rights and duties specified in this Section 10.C.

We need not ensure that Marketing Fund expenditures in or affecting any geographic area are proportionate or equivalent to Marketing Fund contributions by Studios operating in that geographic area or that any Studio benefits from Marketing Fund activities either directly or in proportion to its Marketing Fund contributions. We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Marketing Fund contributions at the Marketing Fund's expense. We also may forgive, waive, settle, and compromise all claims by or against the Marketing Fund.  Except as expressly provided in this Section 10.C, we assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing, or administering the Marketing Fund. Studios owned by us or our affiliates are not required to contribute to any Marketing Fund.

We may at any time defer or reduce your contributions to the Marketing Fund, and upon 30 days' prior notice to you, suspend Marketing Fund operations for one or more periods of any length and/or terminate (and if terminate, reinstate) the Marketing Fund. If we terminate the Marketing Fund, we will, at our option, either spend all unspent monies at our discretion, until such amounts are exhausted, or distribute the funds in the Marketing Fund to the contributing Studio owners in a manner we deem fair and equitable.

C.      **<u>LOCAL ADVERTISING EXPENDITURES</u>**.

In addition to your obligations under Section 10.A through Section 10.C above, and beginning after you complete your Grand Opening Marketing pursuant to Section 10.B, you must spend a certain amount of your monthly Gross Revenue to locally advertise and promote your Studio (the "**Local Advertising Requirement**"). However, subject to the Marketing Expenditure Cap we have the right, at any time and on notice to you, to change the amount of your Local Advertising Requirement. You must list and advertise your Studio with the online directories we periodically prescribe and establish any other Online Presence we require or authorize, each in accordance with our System Standards. If other Studios are located within the directory's distribution area, we may require you to participate in a collective advertisement with them and to pay your share of that collective advertisement. Within 30 days after the end of each calendar quarter, and upon our request at any other time, you agree to send us, on our request and in the manner that we prescribe, an accounting of your expenditures required under this Section during the preceding calendar quarter or another period we designate.

You must not engage in any advertising or promotions within any known Territory of any other franchisee's Studio without our written consent. All materials you use to promote your Studio must be materials that we have provided or made available to you or that we otherwise approve, in writing, prior to

<div align="center">19</div>

Case 3:26-cv-00550-KDB-DCK      Document 1-1      Filed 07/08/26      Page 258 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

your use. All such materials that you create must be completely clear, factual, ethical and not misleading and must conform to our marketing and advertising policies that we periodically prescribe. You must submit to us, for our approval, samples of marketing materials you intend to use at least 14 days prior to your proposed use. If you do not receive our written approval of the materials within 14 days of your submission, they are deemed to be disapproved. We may, in our discretion, withdraw our approval if a regulatory or other issue arises that, in our opinion, makes such withdrawal in our or the System's best interests.

You must also obtain our prior approval before participating in any marketing events or advertising opportunities. If you submit to us for approval any materials or proposals, then we are permitted to adopt those materials or proposals for general use in advertising or promotions, in which case you will take any action we reasonably request to document and confirm an irrevocable and perpetual assignment to us or our designee of any copyright and a waiver of any moral rights relating to that advertising or promotion in consideration of the continued use of the Marks and System. You must fully participate, at your expense, in all advertising, marketing, and promotional activities we require, including the introduction or test marketing of new products or services, grand opening events, industry events, reciprocity programs and other initiatives and programs we direct or approve.

We reserve the right, at any time, to issue you a notice that the amounts required to be spent by you under this Section 10.D shall, instead, be paid to us or our designee. If we exercise this option, we will then spend such amounts, in accordance with local marketing guidelines and programs that we periodically develop, to advertise and promote your Studio on your behalf. We may instead, in our discretion, contribute any such amounts to the Marketing Fund or to a Local Advertising Cooperative in accordance with and as required under Section 10.E below. We may also elect, on one or more occasions and without prejudice to our rights to issue further notices, to temporarily or permanently cease conducting such marketing activities on your behalf and, instead, to require you to conduct such marketing activities yourself in accordance with this Section 10.D.

D.       **LOCAL ADVERTISING COOPERATIVE**.

When there are multiple Studios operating in the same geographical area (as we define), we may establish or direct the establishment of a local advertising cooperative ("**Local Advertising Cooperative**"), the purpose of which is, with our approval, to administer coordinated advertising programs and develop advertising, marketing and promotional materials for the area that the Local Advertising Cooperative covers. The Local Advertising Cooperative will be organized and governed in a form and manner, and begin operating on a date, that we determine. We may change, dissolve and merge Local Advertising Cooperatives. You agree to sign any documents we require to become a member of a Local Advertising Cooperative and, subject to the Marketing Expenditure Cap, to contribute to and participate in the designated Local Advertising Cooperative.

E.       **BRANDED EMAILS**.

We may require you to use an email address associated with our registered domain name in connection with the operation of your Studio. If we require you to obtain and use such an email address, you must do so in accordance with our System Standards. You acknowledge and agree that we will have access to all such email accounts and all documents, data, materials, and messages shared from or by such accounts. We may deactivate any such account or limit your or your users' access to it at any time. You acknowledge and agree that you will use such email address only in connection with the operation of your Studio and in compliance with all applicable laws. You agree to indemnify us and our affiliates for claims arising from your unlawful use of such email address.

<div align="center">20</div>

Case 3:26-cv-00550-KDB-DCK       Document 1-1       Filed 07/08/26       Page 259 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

We may establish, develop and update Online Presences to advertise, market, and promote Studios, the products and services that they offer and sell, or your Studio franchise opportunity (each a "**System Website**"). We may, but are not obligated to, provide you with a webpage or other Online Presence that references your Studio on any System Website, upon which, you must: (i) provide us the information and materials we request to develop, update, and modify the information about your Studio; (ii) notify us whenever any information about your Studio is not accurate; and (iii) pay our then-current initial technology Fee for the Online Presences that are dedicated to your Studio. You acknowledge that we have final approval rights over all information on any System Website.

If you default under the Agreement, we may, in addition to our other remedies, temporarily remove references to your Studio from any System Website until you fully cure the default. All advertising, marketing, and promotional materials that you develop for your Studio must contain notices of the System Website's domain name in the manner we designate. We may deactivate the System Website or limit your users' access to it at any time.

You may not, without our prior written consent, develop, maintain or authorize any Online Presence that mentions your Studio, links to any System Website, or displays any of the Marks. You may not, directly or indirectly, through any Online Presence, promote, advertise or sell any products or services without our prior written approval. If we approve the use of any such Online Presence in your Studio's operations, you will develop and maintain such Online Presence only in accordance with our guidelines, including our guidelines for posting any messages or commentary on other third-party websites. Unless we specify otherwise, we will own the rights to each such Online Presence. At our request, you agree to grant us access to each such Online Presence, and to take whatever action (including signing assignment or other documents) we request to evidence our ownership of such Online Presence, or to help us obtain exclusive rights in such Online Presence. If we allow you to maintain an Online Presence for your Studio, you must prepare and link a privacy policy to such Online Presence. Your Online Presence's privacy policy must comply with all applicable laws, the System Standards, and other terms and conditions that we may prescribe in writing.

We and our affiliates have the right to sell merchandise through any System Website directly to retail and/or wholesale customers, and in doing so, we have the right to create a separate System Website or other web page containing the *The Daily Pilates*® name and Marks.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, WE HEREBY EXPRESSLY DISCLAIM ALL WARRANTIES (WHETHER EXPRESS, IMPLIED OR STATUTORY) RELATED TO THE AVAILABILITY AND PERFORMANCE OF A SYSTEM WEBSITE AND YOUR STUDIO'S PAGE, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. TO THE MAXIMUM EXTENT PERMITTED BY LAW, WE WILL NOT BE LIABLE FOR ANY DIRECT OR INDIRECT DAMAGES (INCLUDING ANY CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS) RELATED TO THE USE, OPERATION, AVAILABILITY OR FAILURE OF THE SYSTEM WEBSITE OR YOUR STUDIO'S PAGE.

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

11. **RECORDS, REPORTS, AND FINANCIAL STATEMENTS**.

You must establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats we periodically prescribe. You agree to give us in the manner and format that we periodically prescribe:

(1) on or before the 5th day following each accounting period specified by us from time to time (each an "**Accounting Period**"), a report on the Gross Revenue of your Studio during the preceding Accounting Period;

(2) within 30 days after the end of each accounting month specified by us from time to time (each an "**Accounting Month**"), the operating statements, financial statements, statistical reports, purchase records, and other information we request regarding you and your Studio covering the previous Accounting Month and the fiscal year to date;

(3) within 90 days after the end of each fiscal year, annual profit and loss and source and use of funds statements and a balance sheet for your Studio as of the end of that calendar year, prepared in accordance with generally accepted accounting principles or, at our option, international accounting standards and principles;

(4) within 10 days after our request, exact copies of federal and state income tax returns, sales tax returns, and any other forms, records, books, and other information we periodically require relating to your Studio and the Franchise; and

(5) by January 15, April 15, July 15 and October 15 of each calendar year, reports on the status (including the outstanding balance, then-current payment amounts, and whether such loan is in good standing) of any loans outstanding as of the previous calendar quarter for which your Studio or any of the Operating Assets are used as collateral. You must also deliver to us, within five (5) days after your receipt, copies of any default notices you receive from any of such lenders. You agree that we or our affiliates may contact your banks, other lenders, and vendors to obtain information regarding the status of loans of the type described herein and your accounts (including payment histories and any defaults), and you hereby authorize your bank, other lenders, and vendors to provide such information to us and our affiliates.

We may disclose data derived from these reports. Moreover, we may, as often as we deem appropriate (including on a daily basis), access the Computer System and retrieve all information relating to the operation of your Studio. You agree to preserve and maintain, in a secure location at your Studio for at least seven (7) years after the end of each fiscal year, all records related to that year (including, but not limited to, sales checks, purchase orders, invoices, payroll records, customer lists, check stubs, sales tax records and returns, cash receipts and disbursement journals, and general ledgers). Your submission of any records or reports to us will constitute your representation that the contents of such records or reports are accurate to the best of your knowledge.

At our request, you will provide current financial information for your owners and guarantors sufficient to demonstrate their ability to satisfy their obligations under their individual Guarantees. If you are an entity, then you will provide to us on our request copies of any corporate records, including formation and governance documents.

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 261 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

12. **INSPECTIONS AND AUDITS**.

    A.    **OUR RIGHT TO INSPECT YOUR STUDIO**.

We (or our designee) may at all times and without prior notice to you inspect, photograph, record activity in, and observe your Studio and its operations for consecutive or intermittent periods we deem necessary; remove samples of any products and supplies; interview your personnel and customers; inspect your Computer System and its components; and inspect and copy any books, records, and documents relating to the operation of your Studio. You agree to fully cooperate with us. If we exercise any of these rights, we will not interfere unreasonably with the operation of your Studio. You agree to present to your customers the evaluation forms that we may prescribe and to participate (and request your customers to participate) in any surveys performed by or for us. You must reimburse all of our costs (including supplier fees, travel expenses, room and board, and compensation of our employees) associated with re-inspections or follow-up visits that we conduct after any audit or inspection of your Studio identifies one or more failures of the System Standards, and/or if any follow-up visit is necessary because we or our designated representatives were for any reason prevented from properly inspecting any or all of your Studio (including because you or your personnel refuse entry to your Studio).

    B.    **OUR RIGHT TO AUDIT**.

We and our designated agents or representatives may at any time during your business hours, and without prior notice to you, examine, take, or copy the bookkeeping and accounting records for your Studio, the sales and income tax records and returns, and such other records we deem necessary to determine your compliance with the Agreement. You agree to cooperate fully with us and our representatives and independent accountants in any examination, and you hereby appoint us as your attorney-in-fact to receive and inspect your confidential sales and other tax records and hereby authorize all tax authorities to provide such information to us for all tax periods during the Term. If any examination discloses an understatement of the Gross Revenue, you agree to pay us, within 15 days after receiving the examination report, the Royalty and Marketing Fund contributions due on the amount of the understatement, plus our service charges and interest on the understated amounts from the date originally due until the date of payment. Furthermore, if an examination is necessary due to your failure to timely furnish reports, supporting records, or other information as required, or if our examination reveals a Royalty or Marketing Fund contribution understatement exceeding two percent (2%) of the amount that you actually reported to us for the period examined, you agree to reimburse us for the costs of the examination, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board, and compensation of our employees. These remedies are in addition to our other remedies and rights under the Agreement and applicable law.

13. **TRANSFER**.

    A.    **BY US**.

We have the right to delegate the performance of any portion or all of our rights and obligations under the Agreement to third-party designees, whether these designees are our agents or independent contractors with whom we have contracted to perform these obligations. We maintain a staff to manage and operate the System and that staff members can change as employees come and go. You represent that you have not signed the Agreement in reliance on any particular manager, owner, director, officer, or employee remaining with us in any capacity. We may change our ownership or form or assign the Agreement and any other agreement to a third party without restriction.

    B.    **BY YOU OR YOUR OWNERS**.

Your rights and duties under the Agreement are personal to you (or your owners if you are a Business Entity), and we have granted you the Franchise in reliance upon our perceptions of your (or your

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Case 3:26-cv-00550-KDB-DCK   Document 1-1   Filed 07/08/26   Page 262 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

owners') individual or collective character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, neither you nor any owners, nor any of your or their permitted successors or assigns, shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise dispose of or encumber any direct or indirect interest in the Agreement (including, without limitation, any or all of your rights or obligations under it), your Studio or its assets (other than in the ordinary course of business), your right to possession of the Premises, or any direct or indirect ownership interest in you (regardless of its size) (each, a "**Transfer**"), without our prior written approval. Any Transfer without our prior written approval is a material breach of the Agreement and has no effect.

If you intend to list your Studio for sale with any broker or agent, you shall do so only after obtaining our written approval of the broker or agent and of the listing agreement and any advertising materials. You may not use any Mark in advertising the sale of your Studio or of any ownership in you without our prior written consent.

C.      **CONDITIONS FOR APPROVAL OF TRANSFER**.

You may not transfer or assign the Agreement before your Studio has opened for business. You also agree that you may not engage in a Transfer that results in the grant of a security interest in the Agreement or the Franchise. Thereafter, if you (and your owners) are in full compliance with these Terms and the proposed transferee and its owners (if the transferee is a Business Entity) meet our then-current qualifications for new franchisees then, subject to the other provisions of this Article 13, we may approve a Transfer subject to the conditions that we determine are necessary to protect the Brand and System, which conditions may include the following:

(1)      you and the proposed transferee and its owners (if the transferee is a Business Entity) must provide all information and documents we request, and request our consent, regarding the Transfer and the proposed transferee and its owners or affiliates, such that we may determine, in our sole discretion, whether the terms of the proposed Transfer are reasonable and will not unduly hinder the transferee's ability to operate your Studio in accordance with the then-applicable franchise agreement;

(2)      you must provide us executed versions of any relevant documents to affect the Transfer, and all other information we request about the proposed Transfer, and such Transfer meets all of our requirements. If you or your owners offer the transferee financing for any part of the purchase price, you and your owners hereby agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in your Studio are subordinate to the transferee's obligation to pay Royalty, Marketing Fund contributions, and other amounts due to us, our affiliates, and third party vendors and otherwise to comply with the Agreement (or any applicable franchise agreement replacing the Agreement);

(3)      the transferee agrees to upgrade, remodel and/or refurbish your Studio in accordance with our then-current System Standards;

(4)      you (and your owner(s)) sign a general release, in a form satisfactory to us, of any and all claims against us and our owners, officers, directors, employees and agents;

(5)      you (and your transferring owner(s)) (and your or their immediate family members) have signed a non-competition covenant in favor of us, commencing on the effective date of the Transfer, by the post-termination obligations under the Agreement;

(6)      you are in full compliance with the Agreement and any other agreement between us and our affiliates and you and your affiliates, and your Studio is being operated in all respects in compliance with our System Standards, including that all Operating Assets are in place and in good working order; all fees and other amounts owed to us, our affiliates, and vendors are paid in full;

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

all required reports and statements have been submitted; and all operating deficiencies identified in pre-sale inspections have been corrected;

(7) all persons required to complete training under the transferee's franchise agreement satisfactorily complete our training program, and transferee has paid all costs and expenses we incur to provide the training program to such persons;

(8) all notices or approvals relating to the proposed Transfer (including any landlord notices or consents) have been given or obtained, as required, with copies provided to us;

(9) the transferee, at our request, signs our then-current form of franchise agreement and related documents for the balance of the Term, any and all of the provisions of which may differ materially from any and all of those contained in these Terms;

(10) you pay or cause to be paid to us a Transfer fee in the amount of 50% of our then-current standard initial franchise fee; and

(11) you provide us the evidence we reasonably request to show that appropriate measures have been taken to affect the Transfer as it relates to your Studio's operations, including, by transferring all necessary and appropriate business licenses, insurance policies, and material agreements, or obtaining new business licenses, insurance policies and material agreements.

We may review all information regarding your Studio that you give the transferee, correct any information that we believe is inaccurate, and give the transferee copies of any reports that you have given us or we have made regarding your Studio.

D. **<u>YOUR DEATH OR DISABILITY</u>**.

Upon your death or disability (if you are a natural person), the executor, administrator or other personal representative of such person must promptly notify us in writing and must transfer your interest in the Agreement and in your Studio to a third party approved by us, within a reasonable period of time, not to exceed 12 months from the date of death or six months from the date of disability. Such transfers, including by will or by inheritance, will be subject to the same terms and conditions as *inter vivos* Transfers and will be subject to our right of first refusal under Section 13.G. For purposes of these Terms, the term "**disability**" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent such person from performing the obligations set forth in these Terms.

If any of the foregoing in this Section 13.D occurs, and your Studio is not being managed by a trained Operations Manager, the executor, administer or other personal representative must, within a reasonable period of time, not to exceed 15 days from the date of death or disability, appoint a qualified manager to operate your Studio. If it has not already done so, the Operations Manager will be required to complete our Initial Training Program at your expense. Pending the appointment of a new Operations Manager as provided herein, or if, in our judgment, your Studio is not being managed properly any time after your death or disability, we have the right, but not the obligation, to appoint an interim manager for your Studio. All funds from the operation of your Studio during the management by our appointed manager will be kept in a separate account, and all expenses of your Studio, including compensation, other costs and travel and living expenses of our manager, will be charged to this account. We also have the right to charge a reasonable management fee (in addition to amounts payable under the Agreement) during the period that our appointed manager manages your Studio. Operation of your Studio during any such period will be on your behalf, provided that we only have a duty to utilize our best efforts and will not be liable to you or your owners for any debts, losses or obligations incurred by your Studio or to any of your creditors for any products, materials, supplies or services your Studio purchases during any period it is managed by our appointed manager.

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

E.       **EFFECT OF CONSENT TO TRANSFER**.

Our consent to a Transfer is not, and may not be relied upon by any party as, a representation of the fairness of the terms of any contract between you and the transferee, a guarantee of your transferee's prospects of success, or a waiver of any claims we have against you (or your owners) or of our right to demand full compliance by you and the transferee with the Agreement.

F.       **PUBLIC OR PRIVATE OFFERING**.

Written information used to raise or secure funds can reflect upon us and the System. You agree to submit any written information intended to be used for that purpose to us before inclusion in any registration statement, prospectus or similar offering memorandum. Should we object to any reference to us or our affiliates or any of our business in the offering literature or prospectus, the literature or prospectus shall not be used until our objections are withdrawn. You may not engage in a public offering of securities without our prior written consent.

G.       **OUR RIGHT OF FIRST REFUSAL**.

If you (or any of your owners) desire to engage in a Transfer, you (or your owners) agree to obtain from a responsible and fully disclosed buyer, and send us, a true and complete copy of a bona fide, executed written offer (which may include a letter of intent) relating exclusively to an interest in you or in the Agreement and your Studio no later than five days after your receipt of the executed offer. The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be couched entirely as a dollar amount, and we may require the proposed buyer submit with its offer a reasonable earnest money deposit acceptable to us. We may require you (or your owners) to send us copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction.

Within 30 days after we receive an exact copy of the bona fide offer and all relevant information we request, we may, by written notice delivered to you or your selling owner(s), elect to purchase the interest offered for the price and on the terms and conditions contained in the offer. We may substitute cash and cash equivalents for any non-cash form of payment proposed in the offer. If we exercise our right of first refusal, we will have 30 days from the date we notified you of our intended purchase to prepare for closing. You and your owners must make all customary representations and warranties given by the seller of the assets of a business or the ownership interests in a legal entity, as applicable (including that the items sold are free and clear of all liens), and you and your selling owner(s) (and your and their immediate family members) must comply with the obligations regarding Competitive Businesses, as described in Section 16.A below, as though the Agreement had expired on the date of the purchase. We have the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this Section 13.G.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we otherwise approve the Transfer in accordance with, and you (and your owners) and the transferee comply with the conditions in, Sections 13.B and 13.C above. If you do not complete the sale to the proposed buyer within 60 days after either we notify you that we do not intend to exercise our right of first refusal or the time our exercise expires, or if there is a material change in the terms of the sale (which you agree to tell us promptly), we or our designee will have an additional right of first refusal during the 30-day period following either the expiration of the 60-day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our or our designee's option.

<div align="center">26</div>

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 265 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

14. **EXPIRATION OF THE AGREEMENT.**

A. **YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE**.

Subject to this Article 14, you may acquire, separately, up to two (2) consecutive successor Franchises of five (5) years each (or, if shorter, until the expiration or termination of your right to possess the Premises). The acquisition of the first successor Franchise will be subject to this Section 14.A, and the acquisition of the second (and each subsequent) successor Franchise will be subject to the franchise agreement whose term is expiring. If you desire to acquire a successor Franchise under the Agreement, then each of the following conditions must be met before and/or at the time of acquisition (as appropriate):

(1) you must have given us written notice of your election to acquire a successor Franchise not less than 90 days and not more than 180 days before the end of the Term;

(2) you must have taken, at your expense, all steps identified by us to bring your Studio into full compliance with the then-current System Standards;

(3) you must be, and must have been throughout the Term in compliance with your obligations under these Terms (including any monetary obligations to us or third parties), and during that same period, you and your affiliates must have been in compliance with your or their obligations under any other agreements with us;

(4) you must pay us our then-current successor franchise fee, which will be in lieu of any initial franchise fee otherwise required by that agreement;

(5) you must meet our requirements then-applicable for approval of new franchisees;

(6) you must present satisfactory evidence that you have the right to remain in possession of the Premises for the operation of your Studio for the full duration of the successor term, and you must have obtained, maintained, and be in good standing with all necessary and applicable licenses and permits required for the operation of your Studio;

(7) you and you owners must execute our then-current form of franchise agreement and related documents, which will supersede the Agreement in all respects, and the terms of which may differ from the terms of the Agreement and may include a higher Royalty and Marketing Fund contribution or expenditure requirement, and the then-current franchise agreement will be modified to reflect, among other things, that your Studio is developed and operating and that the right to further successor terms is as provided in this Section 14.A;

(8) you and your owners must have executed and delivered to us a general release (in a form prescribed by us, as permitted by applicable law) of all claims against us and our affiliates, and each of our respective officers, directors, owners, partners, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, including claims arising under the Agreement or under federal, state or local laws, rules, regulations or orders;

(9) you must remain in compliance with all provisions of the Agreement until the execution of the successor franchise agreement; and

(10) we are then granting Franchises for Studios in the state in which your Studio is located.

B. **GRANT OF A SUCCESSOR FRANCHISE**.

We will respond, in writing, within 90 days after we receive your notice under Section 14.A(1) with our decision to grant you a successor franchise and listing any deficiencies that must be corrected or to not grant a successor franchise with reasons for our decision. If our decision is to grant you a successor franchise, our willingness to do so will also be subject to your continued compliance with all of the terms

The Daily Pilates LLC
2024_04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

and conditions of the Agreement through the date of its expiration. Failure by you or your owners to sign such agreements and releases necessary for the successor franchise and to deliver them to us, along with payment of the applicable fee, for acceptance and signature within the earlier of 60 days after their delivery to you or the expiration of the Term will be deemed an election not to acquire a successor franchise.

15. **TERMINATION OF AGREEMENT**.

A. **BY YOU**.

If you and your owners are fully complying with the Agreement and we materially fail to comply with the Agreement and do not correct the failure within 30 days after you deliver written notice of the material failure to us or if we cannot correct the failure within 30 days and we fail to give you within 30 days after your notice reasonable evidence of our effort to correct the failure within a reasonable time, you may terminate the Agreement effective an additional 30 days after you deliver to us written notice of termination. Your termination of the Agreement other than according to this Section 15.A. will be deemed a termination without cause and a breach of the Agreement.

B. **BY US**.

We may terminate the Agreement, effective upon delivery of written notice to you, if:

(1) you (or any of your owners) have made or make any material misrepresentation or omission in the Application Materials or otherwise in acquiring the Franchise or operating your Studio;

(2) you do not sign a Lease for an acceptable site for the Premises or open your Studio within the time periods specified under Article 3;

(3) you do not construct your Studio in strict accordance with the plans we approve;

(4) we determine any Required Trainees are not capable or qualified to satisfactorily complete the Initial Training Program, and you do not replace them with persons who are able to, and do, successfully complete the Initial Training Program within 21 days following our written notice to you;

(5) you (i) close your Studio for business or inform us of your intention to cease operation of your Studio, (ii) fail to actively operate your Studio for three or more consecutive days, or (iii) otherwise abandon or appear to have abandoned your rights under the Agreement;

(6) you (or any of your owners) are or have been convicted by a trial court of, or plead or have pled no contest or guilty to, a felony, or engage in any other conduct that, in any of the foregoing events, is reasonably likely in our opinion to adversely affect the reputation of your Studio, other Studios, the System, or the goodwill associated with the Marks;

(7) you fail to maintain the insurance we require and do not correct the failure within 10 days after we deliver written notice of that failure to you;

(8) you (or any of your owners) make or attempt to make a Transfer without complying with the requirements of Article 14;

(9) you lose the right to occupy the Premises;

The Daily Pilates LLC
2024–04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

(10) you (or any of your owners) knowingly make any unauthorized use or disclosure of any Confidential Information;

(11) you violate any law, ordinance, rule or regulation of a governmental agency in connection with the operation of your Studio and fail to correct such violation within 72 hours after you receive notice from us or any other party;

(12) you fail to pay us or our affiliates any amounts due and do not correct the failure within five days after written notice of that failure has been delivered or fail to pay any third-party obligations owed in connection with your ownership or operation of your Studio and do not correct such failure within any cure periods permitted by the person or Business Entity to whom such obligations are owed;

(13) you fail to pay when due any federal or state taxes due on or in connection with the operation of your Studio, unless you are in good faith contesting your liability for those taxes;

(14) you understate the Gross Revenue three times or more during the Term;

(15) you (or any of your owners) (a) fail on three or more separate occasions within any 12 consecutive month period to comply with any provision of these Terms, or (b) fail on two or more separate occasions within any six consecutive month period to comply with the same obligation under these Terms, in either case, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you;

(16) you (or any of your owners) file a petition in bankruptcy or a petition in bankruptcy is filed against you; you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or the substantial part of your property; your Studio is attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant, or levy is vacated within 30 days; or any order appointing a receiver, trustee, or liquidator of you or your Studio is not vacated within 30 days following the order's entry;

(17) you (or any of your owners) fail to comply with anti-terrorism laws, ordinances, regulations and Executive Orders;

(18) you create or allow to exist any condition in connection with your operation of your Studio, at any location, which we reasonably determine to present a health or safety concern for your Studio's customers or employees;

(19) you fail to pass a quality assurance audit, and do not cure such failure within 15 days after we deliver written notice of the failure to you;

(20) you (or any of your owners) fail to comply with any other provision of these Terms or any System Standard (including your offer or sale of non-approved products or services or offer or sale of products or services through a medium we have not approved), and do not correct the failure within 30 days after we deliver written notice of the failure to you; or

(21) you or an affiliate fails to comply with any other agreement with us or our affiliate and do not correct such failure within the applicable cure period, if any.

<div align="center">29</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

In addition to our right to terminate the Agreement in accordance with this Section, we may also exercise any lesser remedies prior to such termination and during any period in which you must cure a default of the Terms. These lesser remedies are in addition to our right to terminate the Agreement or to bring a claim for damages. You acknowledge that our taking of any or all such actions under this Section will not deprive you of the most essential benefits of the Agreement and will not constitute a constructive termination of the Agreement.

C.      **FRANCHISOR'S RIGHTS AND REMEDIES IN ADDITION TO TERMINATION**.

If you are in default in the performance of any of your obligations, or if you breach any term or condition of the Agreement, in addition to our right to terminate the Agreement, and without limiting any other rights or remedies to which we may be entitled at law or in equity, or if we have issued a notice to you in exercise of our rights to purchase your Studio under Section 16.B below, then we may, at our election, immediately or at any time thereafter, and without notice to you, cure such default on your behalf and, in our discretion, either directly or through our designee, enter upon and take possession of your Studio for a period not to exceed 180 days, and thereafter take, in your name, all other actions necessary to effect the provisions of the Agreement. We have the right to extend the period in which we take possession of your Studio if you are in continuing default under the Agreement or if returning operations to you will, in our sole determination, be detrimental to the Brand. You agree that any such entry or other action shall not be deemed a trespass or other illegal act, and we will not be liable in any manner to you for so doing. You must pay the entire cost of such entry or other action(s) to us on demand, including reasonable compensation to us for the management of your Studio. If we exercise our rights under this Section, then we are not required to use your employees and reserve the right to designate our own personnel to manage and operate your Studio.

During the period in which we or our designee operates your Studio under this Section, you will cooperate with us and our designees to support the operation of your Studio in compliance with the System Standards, including making available any and all books, records, systems and accounts. You agree that all funds derived from the operation of your Studio during this period will be held and used solely by us or our designee, will be used to pay expenses associated with the operation of your Studio (including payment of any fees and other amounts owed by you to us under the Agreement and our then-current fee for such interim operation of your Studio), and will be accounted for separately from our other revenue and expenses.

You agree that we or our designee must exercise only a reasonable degree of care in operating your Studio and we are under no duty to take extraordinary measures or, in any way, fund the operations to ensure your Studio's success or continued operations during or after such period. You agree that you continue to bear the sole liability for any and all accounts payable, obligations, and/or contracts, including all obligations under your Studio lease and all obligations to your vendors and employees and contractors, unless and until we expressly assume them in connection with the purchase of your Studio under Section 16.B below. We may elect to cease such interim operations of your Studio at any time with notice to you. We (or our designee) will not be liable to you or your owners for any debts, losses, or obligations your Studio incurs, or to any of your creditors.

Our decision to operate your Studio on an interim basis will not affect our right to terminate the Agreement under Section 15.B above. Your indemnification obligations set forth under Section 17.C will continue to apply during any period that we or our designee operate your Studio.

<div align="center">30</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

16. **OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THE AGREEMENT**.

A. **YOUR OBLIGATIONS**.

You and, as applicable, your owners and all such other persons or entities who are bound under the terms of the Agreement must immediately do the following:

(1) pay us all Royalty, Marketing Fund contributions, interest, and all other amounts owed to us (and our affiliates) which then are unpaid;

(2) close your Studio for business to customers and cease to directly or indirectly sell any products and services of any kind and in any manner from the Premises unless we direct you otherwise in connection with our exercise of our option to purchase pursuant to Section 16.B below;

(3) cease all direct or indirect use any Mark, any colorable imitation of a Mark, other indicia of a Studio, any trade name, trademark, service mark, trade dress, or other commercial symbol that indicates or suggests a connection or association with us or the System, in any manner or for any purpose (except in connection with other Studios you operate in compliance with other franchise agreements with us);

(4) cease to directly or indirectly identify yourself or your business as a current or former Studio or as one of our current or former franchise owners (except in connection with other Studios you operate in compliance with other franchise agreements with us) and take the action required to cancel or assign all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

(5) return to us or destroy (as we require) all items, forms and materials containing any Mark or otherwise identifying or relating to your Studio as a *The Daily Pilates*-branded Studio;

(6) if we do not exercise our option to purchase your Studio under Section 16.B below, promptly and at your own expense, make the alterations we specify in the Operations Manual (or otherwise) to distinguish the Premises and building clearly from its former appearance and from other Studios, including by removing all materials bearing the Marks and removing from both the interior and exterior of the Premises all materials and components of our trade dress as we determine to be necessary in order to prevent public confusion and in order to comply with the non-competition provisions set forth in paragraph (10) below;

(7) cease using or operating with any Contact Identifiers or Online Presence related to your Studio or the Marks, and take any action as may be required to disable such Contact Identifier or Online Presence, or transfer exclusive control and access of such Contact Identifier or Online Presence to us or our designee, as we determine in our sole discretion;

(8) comply with all other System Standards we periodically establish (and all applicable laws) in connection with the closure and de-identification of your Studio, including as it relates to disposing of Personal Information, in any form, in your possession or the possession of any of your employees; and

(9) cease using any Confidential Information (including computer software or similar technology and digital passwords and identifications that we have licensed to you or that otherwise are proprietary to us or the System) in any business or otherwise and return to us or destroy (as we require) all copies of the Operations Manual and any other confidential materials that we have loaned you;

(10) for two (2) years beginning on the effective date of termination or expiration, neither you nor any other Restricted Party will have any direct or indirect interest as an owner (whether of record, beneficially, or otherwise), investor, partner, director, officer, employee,

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

consultant, lessor, representative, or agent in any Competitive Business located or operating (i) at the Premises, (ii) within a 30-mile radius of the Premises; or (iii) within a 30-mile radius of any other Studio in operation or under construction on the later of the effective date of the termination or expiration of the Agreement or the date on which all Restricted Parties begin to comply with such obligations; and

(11)   you and your owners, your or your owners' affiliates, or the officers, directors, managers or immediate family members of any of the foregoing, will refrain from interfering or attempting to interfere with our or our affiliates' relationships with any vendors, franchisees or consultants or engage in any other activity which might injure the goodwill of the Marks or the System.

Within 30 days after the expiration or termination of the Agreement, you must give us evidence satisfactory to us of your compliance with these obligations. If you fail to take any of the actions or refrain from taking any of the actions described above, we may take whatever action and sign whatever documents we deem appropriate on your behalf to cure the deficiencies, including, without liability to you or third parties for trespass or any other claim, to enter the Premises and remove any signs or other materials containing any Marks from your Studio. You must reimburse us for all costs and expenses we incur in correcting any such deficiencies. If any Restricted Party refuses voluntarily to comply with the obligations set forth in Section 16.A(10), the two-year period for that person will commence with the entry of a court order enforcing that provision. You and your owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcement of the covenants made in Section 16.A(10) will not deprive you of your personal goodwill or ability to earn a living.

B.        **<u>OUR RIGHT TO PURCHASE YOUR STUDIO</u>**.

In addition to any other rights to purchase we have, we have the right to purchase your Studio and/or any and all equipment, furniture, fixtures, signs, supplies you own and used in your Studio, as described in this Section 16.B (the "**Purchase Option**"), upon the expiration of the Agreement without the grant of a successor Franchise (except where a successor Franchise was not granted because we are not then offering Franchises), our termination of the Agreement under Section 15.B, or your termination of the Agreement without cause (each of the foregoing, a "**Termination Event**"). We will have 30 days after a Termination Event to exercise the Purchase Option upon written notice to you. We have the unrestricted right to assign the Purchase Option in our discretion. The purchase price for your Studio will be the net realizable value of the tangible assets in accordance with the liquidation basis of accounting (not the value of your Studio as a going concern) ("**Liquidation Value**"). In any case, the Liquidation Value will be less any outstanding liabilities of your Studio. In addition, we shall have the option to assume your Lease for the Premises, or if an assignment is prohibited, a sublease for the full remaining term on the same terms and conditions as your Lease. No value will be attributed to the value of the Marks or the System or to the assignment of the Lease (or sublease) for the Premises or the assignment of any other assets used in conjunction with your Studio, and we will not be required to pay any separate consideration for any such assignment or sublease.

If you dispute our calculation of the Liquidation Value, we will appoint one independent accredited appraiser, within 30 days after we receive all relevant financial and other information necessary to calculate the Liquidation Value, who will calculate the Liquidation Value based on the criteria above. You and we will share equally the appraiser's fees and expenses. The appraiser must complete its calculation within 30 days after its appointment. The appraiser's calculation of the Liquidation Value will be the purchase price. Closing of the purchase will take place, as described below, on a date we select which is within 90 days after determination of the Liquidation Value.

<div align="center">32</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

Unless we assume the management of your Studio under Section 15.D above, you will continue to operate your Studio in accordance with the Agreement through the closing. Prior to closing, you agree to cooperate with us in conducting due diligence, including providing us with access to your business and financial records, contracts and all other information relevant to your Studio. At the closing, we (or our assignee) will pay the purchase price in cash. You agree to execute and deliver to us (or our assignee):

(a) all customary agreements, in form and substance acceptable to us and in which you (i) provide all customary warranties and representations, including, without limitation, as to ownership and condition of and title to assets, no liens and encumbrances on assets, validity of contracts and agreements, and liabilities affecting the assets, contingent or otherwise; (ii) transfer good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and other transfer taxes paid by you; (iii) and assign the Lease and all of the licenses and permits for your Studio which are permitted to be assigned or transferred; and

(b) an agreement, in form and substance satisfactory to us, voluntarily terminating the Agreement under which you and your owners release, in form and substance satisfactory to us, any and all claims you and your owners have against us and our owners, officers, directors, employees, agents, successors, and assigns and agree to comply with all post-term obligations set forth in Sections 16.A above and with all other obligations which, either expressly or by their nature, are intended to survive termination or expiration of the Agreement.

C. **<u>LOST REVENUE DAMAGES</u>**.

You agree that we will suffer compensable damages including, among others, the amount of the Royalty and Marketing Fund contributions we would have received, and for which we bargained in entering into this Agreement, if you terminate this Agreement without cause or we terminate this Agreement because of your breach (the "**Lost Revenue Damages**"). You and we acknowledge that, because Royalty and Marketing Fund contributions are calculated primarily as a percentage of your Studio's Gross Revenue, it will be impossible to calculate Lost Revenue Damages once your Studio ceases operation. To bring certainty to the actual amount of Lost Revenue Damages, you and we agree that Lost Revenue Damages will equal the net present value of: (1) the lesser of 36 or the number of calendar months remaining on the Term absent the termination, multiplied by (2) the sum of the Royalty and Marketing Fund contribution percentages in effect as of the termination date, multiplied by (3) the average monthly Gross Revenue of your Studio during the 24 full calendar months immediately preceding the termination date, minus (4) any cost savings we experienced as a result of the termination (or, if the termination is based on your unapproved closure of your Studio, the 36 full calendar months immediately preceding the closure); provided, however, that (i) if, as of the termination date, your Studio had not opened for business or had operated for fewer than 12 full calendar months, the average monthly Gross Revenue will equal the 24-month average Gross Revenue of all Studios that had operated for the full 24 calendar months immediately preceding termination of this Agreement; (ii) if, as of the termination date, your Studio operated for at least 12 but fewer than 24 full calendar months, monthly average Gross Revenue will equal the highest monthly Gross Revenue achieved by your Studio during the period in which it operated; and (iii) if the termination was based on your unapproved closure of your Studio, average monthly Gross Revenue, as described above, would be measured from closure date rather than the termination date.

You and we acknowledge and agree that (a) our agreement on the calculation of Lost Revenue Damages is a reasonable determination of actual damages we will suffer in the event of a termination as described above and is not a penalty, and (b) Lost Revenue Damages represent only lost Royalty and Marketing Fund contributions, and the right to recover such damages is not exclusive of and does not replace any other rights we have under this Agreement or applicable law if this Agreement is terminated as

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

described above, including the right to seek other damages we suffer as a result of a termination as described above or the events on which such termination was based.

You agree to pay us Lost Revenue Damages, as calculated in accordance with this Section, within 15 days after the Agreement expires or is terminated, or on any later date that we determine.

### D.     **CONTINUING OBLIGATIONS**.

All of our and your (and your owners') obligations which expressly or by their nature survive the Agreement's expiration or termination will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire, including all obligations relating to non-disparagement, non-competition, non-interference, confidentiality, and indemnification.

### 17.     **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION**.

### A.     **INDEPENDENT CONTRACTORS**.

The Agreement does not create a fiduciary relationship between you and us. You and we are and will be independent contractors, and nothing in the Agreement is intended to make either you or us a general or special agent, joint venturer, partner, or employee of the other for any purpose. Nothing in the Agreement authorizes you to make any contract, agreement, warranty, or representation on our behalf or to incur any debt or other obligation in our name. You agree to identify yourself conspicuously in all dealings with customers, vendors, public officials, your personnel, and others as the owner of your Studio under a franchise we have granted and to place notices of independent ownership on the business cards, advertising, invoices, and other materials we periodically require. You also acknowledge that you will have a contractual relationship only with us and may look only to us to perform under the Agreement. None of our affiliates is a party to the Agreement and has no obligations under it.

### B.     **NO LIABILITY TO OR FOR ACTS OF OTHER PARTY**.

We and you may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other or represent that our respective relationship is other than franchisor and franchise owner. We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of your Studio or the business you conduct under the Agreement. We will have no liability for your obligations to pay any third parties, including any product vendors. We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes, whether levied upon you or your Studio, due to the business you conduct (except for our income taxes). You are responsible for paying these taxes and must reimburse us for any such taxes that we must pay to any state taxing authority on account of your operation or payments that you make to us, and, at our election, a reasonable administrative fee (not to exceed 10%) in making such payment.

### C.     **INDEMNIFICATION**.

You agree to indemnify, defend, and hold us, our affiliates, and our and their respective owners, directors, managers, officers, employees, agents, successors, and assignees (the "**Indemnified Parties**") harmless against, and to reimburse any one or more of the Indemnified Parties for, all claims, obligations, and damages directly or indirectly arising out of the development or operation of your Studio, the business you conduct under the Agreement, or your breach of the Agreement, including, without limitation, those alleged to be caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused solely by the Indemnified Party's gross negligence or willful misconduct in a final, unappealable ruling issued by a court with competent jurisdiction. For purposes of this indemnification, "**claims**" include all obligations, damages (actual,

<div align="center">34</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

consequential, or otherwise), and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation or alternative dispute resolution, regardless of whether litigation or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at your expense (including choosing and retaining its own legal counsel) and agree to settlements or take any other remedial, corrective, or other actions. This indemnity will continue in full force and effect subsequent to and notwithstanding the Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you under this subparagraph. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you under this subparagraph.

18. **ENFORCEMENT**.

A. **ARBITRATION**.

We and you agree that all controversies, disputes, or claims between us or any of our affiliates, and our and their respective owners, officers, directors, agents, and employees, on the one hand, and you (and your owners, guarantors, affiliates, and employees), on the other hand, arising out of or related to: (1) the Agreement or any other agreement between you (or any of your owners) and us (or any of our affiliates); (2) our relationship with you;  (3) the scope or validity of the Agreement or any other agreement between you (or any of your owners) and us (or any of our affiliates) or any provision of any of such agreements (including the validity and scope of the arbitration provision under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court); or (4) any System Standard, must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association (the "**AAA**"). The arbitration proceedings will be conducted by one arbitrator and, except as this Section otherwise provides, according to the AAA's then-current Commercial Arbitration Rules.  All proceedings will be conducted at a suitable location chosen by the arbitrator that is within 50 miles of our or, as applicable, our successor's or assign's then-current principal place of business (currently, Atlanta, Georgia). All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 *et seq.*). The interim and final awards of the arbitrator shall be final and binding upon each party, and judgment upon the arbitrator's awards may be entered in any court of competent jurisdiction.

The arbitrator has the right to award or include in his or her awards any relief which he or she deems proper, including, without limitation, money damages, pre- and post-award interest, interim costs and attorneys' fees, specific performance, and injunctive relief, provided that the arbitrator may not declare any of the trademarks owned by us or our affiliates generic or otherwise invalid, or award any punitive or exemplary damages against any party to the arbitration proceeding (we and you hereby waiving to the fullest extent permitted by law any such right to or claim for any punitive or exemplary damages against any party to the arbitration proceeding). In any arbitration brought pursuant to this Section, and in any action in which a party seeks to enforce compliance with this provision, the prevailing party shall be awarded its costs and expenses, including attorneys' fees, incurred in connection therewith.

We and you agree to be bound by the provisions of any applicable contractual or statutory limitations provision, whichever expires earlier.  We and you further agree that, in any arbitration proceeding, each party must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding.  Any claim which is not submitted or filed as required will be forever barred.  The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us.

The Daily Pilates LLC
2024_04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

WE AND YOU AGREE THAT ARBITRATION WILL BE CONDUCTED ON AN INDIVIDUAL BASIS AND THAT A PROCEEDING REQUIRED UNDER THIS SECTION TO BE SUBMITTED TO ARBITRATION MAY NOT BE: (I) CONDUCTED ON A CLASS-WIDE BASIS, (II) COMMENCED, CONDUCTED OR CONSOLIDATED WITH ANY OTHER ARBITRATION PROCEEDING, (III) JOINED WITH ANY SEPARATE CONTROVERSY, DISPUTE OR CLAIM OF AN UNAFFILIATED THIRD-PARTY, OR (IV) BROUGHT ON YOUR BEHALF BY ANY ASSOCIATION OR AGENT. Notwithstanding the foregoing, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute, controversy or claim that otherwise would be subject to arbitration under this Section, then all parties agree that this arbitration clause shall not apply to that dispute, controversy or claim and that such dispute, controversy or claim shall be resolved in a judicial proceeding in accordance with the dispute resolution provisions of these Terms.

We and you agree that, in any arbitration arising as described herein, the arbitrator shall have full authority to manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute. The parties may only serve reasonable requests for documents, which must be limited to documents upon which a party intends to rely or documents that are directly relevant and material to a significant disputed issue in the case or to the case's outcome. The document requests shall be restricted in terms of time frame, subject matter and persons or entities to which the requests pertain, and shall not include broad phraseology such as "all documents directly or indirectly related to." You and we further agree that no interrogatories or requests to admit shall be propounded, unless the parties later mutually agree to their use.

The provisions of this Section are intended to benefit and bind certain third-party non-signatories. The provisions of this Section will continue in full force and effect subsequent to and notwithstanding the expiration or termination of the Agreement.

Any provisions of these Terms below that pertain to judicial proceedings shall be subject to the agreement to arbitrate contained in this Section.

B. **<u>GOVERNING LAW</u>**.

Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 *et seq*.), or other United States federal law, the Agreement and any related agreements, the Franchise and all claims arising from the relationship between us (or any of our affiliates, and our and their respective owners, officers, directors, agents, representatives, and employees) and you (and your owners, guarantors, affiliates, and employees) will be governed by the laws of the State of Georgia, without regard to its conflict of laws rules, except that (1) any state law regulating the offer or sale of franchises or governing the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section, and (2) the enforceability of those provisions of the Agreement which relate to restrictions on you and your owners' competitive activities will be governed by the laws of the state in which your Studio is located.

C. **<u>CONSENT TO JURISDICTION</u>**.

Subject to the obligation to arbitrate under Section 18.A above and the provisions below, you and your owners agree that all actions arising under the Agreement or any related agreements, or otherwise as a result of the relationship between you (and your owners, guarantors, affiliates, and employees) and us (or any of our affiliates, and our and their respective owners, officers, directors, agents, representatives, and employees) must be commenced in the court nearest to our or, as applicable, our successor's or assign's then-current principal place of business (currently, Atlanta, Georgia), and you (and each owner) irrevocably submit to the jurisdiction of that court and waive any objection you (or the owner) might have to either the jurisdiction of or venue in that court.

<div align="center">36</div>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

D. **WAIVER OF PUNITIVE DAMAGES, JURY TRIAL AND CLASS ACTION**.

Except for your obligation to indemnify us for third party claims under Section 17.C, we and you (and your owners) waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between us and you, the party making a claim will be limited to equitable relief and to recovery of any actual damages it sustains. We and you irrevocably waive trial by jury in any action or proceeding brought by either of us.

We and you agree that any proceeding between us or relating to the Agreement will be conducted on an individual basis and that any proceeding between us and any of our affiliates, or our and their respective owners, officers, directors, agents, and employees, on the one hand, and you or your owners, guarantors, affiliates, and employees, on the other hand, may not be: (i) conducted on a class wide basis, (ii) commenced, conducted or consolidated with any other proceeding, (iii) joined with any claim of an unaffiliated third-party, or (iv) brough on your behalf by any association or agent.

E. **INJUNCTIVE RELIEF**.

Nothing in the Agreement, including the provisions of Section 18.A, bars our right to obtain specific performance of the provisions of the Agreement and injunctive relief against any threatened or actual conduct that will cause us, the Marks, or the System loss or damage, under customary equity rules, including applicable rules for obtaining restraining orders and temporary or preliminary injunctions. You agree that we may seek such relief from any court of competent jurisdiction in addition to such further or other relief as may be available to us at law or in equity. You agree that we will not be required to post a bond to obtain injunctive relief and that your only remedy if an injunction is entered against you will be the dissolution of that injunction, if warranted, upon due hearing (all claims for damages by injunction being expressly waived hereby).

F. **COSTS AND ATTORNEYS' FEES**.

The prevailing party in any judicial or arbitration proceeding shall be entitled to recover from the other party all damages, costs and expenses, including arbitration and court costs and reasonable attorneys' fees, incurred by the prevailing party in connection with such proceeding.

G. **LIMITATIONS OF CLAIMS**.

You and your owners agree not to bring any claim asserting that any of the Marks are generic or otherwise invalid. UNLESS PROHIBITED BY APPLICABLE LAW, EXCEPT FOR CLAIMS ARISING FROM YOUR NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS YOU OWE US, ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THE AGREEMENT OR OUR RELATIONSHIP WITH YOU WILL BE BARRED UNLESS A JUDICIAL OR ARBITRATION PROCEEDING IS COMMENCED IN ACCORDANCE WITH THE AGREEMENT WITHIN ONE (1) YEAR FROM THE DATE ON WHICH THE PARTY ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIMS. The parties understand that such time limit might be shorter than otherwise allowed by law. You and your owners agree that your and their sole recourse for claims arising between the parties shall be against us or our successors and assigns. You and your owners agree that our and our affiliates' members, managers, owners, directors, officers, employees, and agents shall not be personally liable nor named as a party in any action between us or our affiliates and you or your owners.

No previous course of dealing shall be admissible to explain, modify, or contradict the terms of the Agreement. No implied covenant of good faith and fair dealing shall be used to alter the express terms of the Agreement.

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

19. **MISCELLANEOUS**.

    A.    **SECURITY INTEREST**.

You hereby collaterally assign to us the Lease and grant us a security interest in all of the Operating Assets and all other assets of your Studio, including but not limited to inventory, accounts, supplies, contracts, cash derived from the operation of your Studio and sale of other assets, and proceeds and products of all those assets. You agree to execute such other documents as we may reasonably request in order to further document, perfect and record our security interest. If you default in any of your obligations under the Agreement, we may exercise all rights of a secured creditor granted to us by law, in addition to our other rights under the Agreement and at law. If an approved third-party lender requires that we subordinate our security interest in the assets of your Studio as a condition to lending you working capital for the construction or operation of your Studio, we will agree to subordinate pursuant to terms and conditions determined by us. The Agreement shall be deemed to be a Security Agreement and Financing Statement and may be filed for record as such in the records of any county and state that we deem appropriate to protect our interests.

    B.    **BINDING EFFECT**.

The Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns, and successors in interest. Subject to our right to modify the Operations Manual, System and System Standards, the Agreement may not be modified except by a written agreement signed by our and your duly authorized officers.

    C.    **RIGHTS OF PARTIES ARE CUMULATIVE**.

Our and your rights under the Agreement are cumulative, and our or your exercise or enforcement of any right or remedy under the Agreement will not preclude our or your exercise or enforcement of any other right or remedy which we or you are entitled by law to enforce.

    D.    **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS**.

Except as expressly provided to the contrary in the Agreement, each section, paragraph, term, and provision of the Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of the Agreement, which will continue to have full force and effect and bind the parties.

If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.

If any applicable and binding law or rule of any jurisdiction requires more notice than the Agreement requires or if, under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any System Standard is invalid, unenforceable, or unlawful, the notice or other action required by the law or rule will be substituted for the comparable provisions of the Agreement, and we may modify the invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of the Agreement, as though it were separately articulated in and made a part of the Agreement.

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

E. **WAIVER OF OBLIGATIONS**.

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under the Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. Any waiver granted will be without prejudice to any other rights we or you have, will be subject to continuing review, and may be revoked at any time and for any reason effective upon delivery of 10 days' prior written notice.

No right, power, or option you or we are provided under this Agreement will be impaired or waived because of any custom or practice at variance with the Agreement's terms or your or our failure, refusal, or neglect to exercise any right under the Agreement or to insist upon the other's compliance with the Agreement, including any System Standard; our waiver of or failure to exercise any right, power, or option, whether of the same, similar, or different nature, with other Studios; the existence of franchise agreements for other Studios which contain provisions different from those contained in the Agreement; or our acceptance of any payments due from you after any breach of the Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement, or accord and satisfaction. We are authorized to remove any legend or endorsement, which then will have no effect.

The following provision applies if you or the Franchise granted hereby are subject to the franchise registration or disclosure laws in California, Illinois, Indiana, Maryland, Michigan, Minnesota, Rhode Island, Virginia, or Wisconsin: No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the Franchise.

F. **THE EXERCISE OF OUR JUDGMENT**.

We have the right to operate, develop, and change the System in any manner that is not specifically prohibited by the Agreement. Whenever we have reserved in the Agreement a right to take or to withhold an action, to grant or decline to grant you a right to take or withhold an action, or to provide or withhold approval or consent, we may, except as otherwise specifically provided in the Agreement, make our decision or exercise our rights in our sole and unfettered discretion.

G. **CONSTRUCTION**.

The preambles and attachments are a part of these Terms, which together with these Terms and the attached Data Sheet, constitute our and your entire agreement, and there are no other oral or written understandings or agreements between us and you, or oral or written representations by us, relating to the subject matter of or relationships created by the Agreement or your Studio (any such understandings or agreements reached, or any representations made, before the execution of this Agreement are superseded by the Agreement). Nothing in this or any related agreement is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you. Any policies that we periodically adopt and implement to guide us in our decision-making are subject to change, are not a part of the Agreement, and are not binding on us. Except as provided in Section 17.C (Indemnification), nothing in the Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to the Agreement.

Except where the Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed, initiated, or completed actions that require

The Daily Pilates LLC
2024_04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Case 3:26-cv-00550-KDB-DCK     Document 1-1     Filed 07/08/26     Page 278 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

our approval. The headings of the sections and paragraphs are for convenience only and do not define, limit, or construe the contents of these sections or paragraphs.

References in these Terms to the "Agreement" mean these Terms and the attached Data Sheet, together. References in the Agreement to "we," "us," and "our" include any of our affiliates with whom you deal. The term "affiliate" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling you or us. "Control" means the power to direct or cause the direction of management and policies. "Including" means "including, without limitation." References to "owner" mean any person holding a direct or indirect ownership interest (whether of record, beneficially, or otherwise) or voting rights in you (or a transferee of the Agreement and your Studio or an ownership interest in you), including, without limitation, any person who has a direct or indirect interest in you (or a transferee), the Agreement, the Franchise, or your Studio and any person who has any other legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets. References to an "ownership interest" in you or one of your owners (if you are not a natural person) mean the percent of the voting shares or other voting rights that results from dividing 100% of the ownership interests by the number of owners. "Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative, or other legal or functional entity. Unless otherwise specified, all references to a number of days shall mean calendar days and not business days.  "Your Studio" includes all of the assets of your Studio you operate under the Agreement, including its revenue and the Lease.

If two or more Persons are at any time the owners of the Franchise and your Studio, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several.

H.    **NOTICES AND PAYMENTS**.

All written notices, reports, and payments permitted or required to be delivered by the Agreement or the Operations Manual will be deemed to be delivered on the earlier of the date of actual delivery or one of the following: (i) at the time delivered by hand; (ii) at the time delivered via computer transmission and, in the case of the Royalty, Marketing Fund contributions, and other amounts due, at the time we actually receive electronic payment; or (iii) one business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery. Notices must be sent to the party to be notified at its address shown on the attached Data Sheet or these Terms, as applicable, or the most current principal business address of which the notifying party has notice; except that, it will always be deemed acceptable to send notice to you at the address of the Premises. Notices to us must be sent to the Attention of our Chief Executive Officer, with a copy (which shall not constitute notice) to the Legal Department.

I.    **COUNTERPARTS; COPIES**.

The Agreement and its Attachments (including Attachment B, which must be executed currently with the Agreement) may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Faxed, scanned or electronic signatures shall have the same effect and validity, and may be relied upon in the same manner, as original signatures.

J.    **SAFETY**.

We will not be required to send any of our representatives to your Studio to provide any assistance or services if, in our sole determination, it is unsafe to do so. Such determination by us will not relieve you from your obligations under the Agreement (including, without limitation, to pay monies owed) and will not serve as a basis for your termination of the Agreement.

The Daily Pilates LLC
2024_04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

K.  **PROHIBITED PARTIES**.

You hereby represent and warrant to us, as an express consideration for the Franchise granted hereby, that neither you nor any of your employees, agents, or representatives, nor any other person or entity associated with you, is now, or has been:

1.  Listed on: (a) the U.S. Treasury Department's List of Specially Designated Nationals, (b) the U.S. Commerce Department's Denied Persons List, Unverified List, Entity List, or General Orders, (c) the U.S. State Department's Debarred List or Nonproliferation Sanctions, or (d) the Annex to U.S. Executive Order 13224.

2.  A person or entity who assists, sponsors, or supports terrorists or acts of terrorism, or is owned or controlled by terrorists or sponsors of terrorism.

You further represent and warrant to us that you are now, and have been, in compliance with U.S. anti-money laundering and counter-terrorism financing laws and regulations, and that any funds provided by you to us or our affiliates are and will be legally obtained in compliance with these laws. You agree not to, and to cause all employees, agents, representatives, and any other person or entity associated with you not to, during the term of this Agreement, take any action or refrain from taking any action that would cause such person or entity to become a target of any such laws and regulations.

[*Signature Page to Follow*]

41

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 280 of 299

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

**IN WITNESS WHEREOF**, the parties have executed and delivered the Agreement on the dates noted below, to be effective as of the Effective Date.

**THE DAILY PILATES LLC**, a Georgia limited liability company

**FRANCHISE OWNER:**

Mike Libretto
_____
**[Name]**

By: _Lily Coll_
Name: Lily Collins
Title: Managing Member
Date: 11/19/2024

By: _Michael Libretto_
Name: MIchael Libretto
Title: Managing Member
Date: 11/19/2024

The Daily Pilates LLC
2024-04 FDD | Ex. B – Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

<p align="center">**ATTACHMENT A**
**TO FRANCHISE AGREEMENT**</p>

<p align="center">**GUARANTY AND ASSUMPTION OF OBLIGATIONS**</p>

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given by each of the undersigned persons indicated below who have executed this Guaranty (each a "**Guarantor**") to be effective as of the Effective Date of the Agreement (defined below).

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement (as amended, modified, restated or supplemented from time to time, the "**Agreement**") on this date by **THE DAILY PILATES LLC**, a Georgia limited liability company ("**us**," "**we**," or "**our**"), each Guarantor personally and unconditionally (a) guarantees to us and our successors and assigns that _____TDPCharlotte1, LLC_____ ("**Franchise Owner**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including the non-competition, confidentiality, and transfer requirements.

Each Guarantor consents and agrees that: (1) Guarantor's direct and immediate liability under this Guaranty will be joint and several, both with Franchise Owner and among other guarantors; (2) Guarantor will render any payment or performance required under the Agreement upon demand if Franchise Owner fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon our pursuit of any remedies against Franchise Owner or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which we may from time to time grant to Franchise Owner or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement; and (5) at our request, each Guarantor shall present updated financial information to us as reasonably necessary to demonstrate such Guarantor's ability to satisfy the financial obligations of Franchise Owner under the Agreement.

Each Guarantor waives: (i) all rights to payments and claims for reimbursement or subrogation which any Guarantor may have against Franchise Owner arising as a result of the Guarantor's execution of and performance under this Guaranty; and (ii) acceptance and notice of acceptance by us of Guarantor's undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled.

Each Guarantor represents and warrants that, if no signature appears below for such Guarantor's spouse, such Guarantor is either not married or, if married, is a resident of a state which does not require the consent of both spouses to encumber the assets of a marital estate.

The provisions contained in Article 18 (Enforcement) of the Agreement, including Section 18.A (Arbitration), Section 18.C (Consent to Jurisdiction) and Section 18.F (Costs and Attorneys' Fees) of the Agreement are incorporated into this Guaranty by reference and shall govern this Guaranty and any disputes between the Guarantors and us. The Guarantors shall reimburse us for all costs and expenses we incur in connection with enforcing the terms of this Guaranty.

<p align="center">Attachment A - 1</p>

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

By signing below, the undersigned spouse of each Guarantor indicated below, acknowledges and consents to the guaranty given herein by his/her spouse and personally agrees to be bound to the obligations in the Agreement regarding Confidential Information (Section 7) and Competitive Businesses (Sections 8 and 16.A(10)). Such consent also serves to bind the assets of the marital estate to Guarantor's performance of this Guaranty. We confirm that a spouse who signs this Guaranty solely in his or her capacity as a spouse (and not as an owner) is signing merely for the purposes described above and, as necessary, to bind the assets of the marital estate as described herein and for no other purpose (including, without limitation, to bind the spouse's own separate property).

Each Guarantor that is a business entity, retirement or investment account, or trust acknowledges and agrees that if Franchisee (or any of its affiliates) is delinquent in payment of any amounts guaranteed hereunder, that no dividends or distributions may be made by such Guarantor (or on such Guarantor's account) to its owners, accountholders or beneficiaries or otherwise, for so long as such delinquency exists, subject to applicable law.

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as this Guaranty and Assumption of Obligations was executed.

| GUARANTOR(S) | SPOUSE(S) |
|---|---|
| Name: Mike Libretto<br><br>Sign: *Michael Libretto*<br><br>Address: 2329 Harvester Ave Fort Mill, SC 29708 | Name:<br><br>Sign:<br><br>Address: |
| Name:<br><br>Sign:<br><br>Address: | Name:<br><br>Sign:<br><br>Address: |

Attachment A - 2

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

**ATTACHMENT B**
**TO FRANCHISE AGREEMENT**

**REPRESENTATIONS AND ACKNOWLEDGEMENT STATEMENT**

**DO NOT SIGN THIS QUESTIONNAIRE IF YOU ARE A RESIDENT OF OR LOCATED IN, OR YOUR FRANCHISED BUSINESS IS TO BE OPERATED IN: CALIFORNIA, ILLINOIS, INDIANA, MARYLAND, MICHIGAN, RHODE ISLAND, VIRGINIA, OR WISCONSIN.**

The purpose of this Statement is to demonstrate to **THE DAILY PILATES LLC**, a Georgia limited liability company ("Franchisor") that the person(s) signing below ("I," "me" or "my"), whether acting individually or on behalf of any legal entity established to acquire the development and/or franchise rights ("Franchisee"), (a) fully understands that the purchase of a *The Daily Pilates* franchise is a significant long-term commitment, complete with its associated risks, and (b) is not relying on any statements, representations, promises or assurances that are not specifically set forth in Franchisor's franchise disclosure document and exhibits (collectively, the "FDD") with which you were provided prior to signing the Agreement in deciding to purchase the Franchise.

In that regard, I represent to Franchisor and acknowledge that:

| | |
|---|---|
| I understand that buying a franchise is not a guarantee of success. Purchasing or establishing any business is risky, and the success or failure of the Franchise is subject to many variables such as my skills and abilities (and those of my partners, officers, employees), the time my associates and I devote to the business, competition, interest rates, the economy, inflation, operation costs, location, lease terms, the market place generally and other economic and business factors.  I am aware of and am willing to undertake these business risks. I understand that the success or failure of my business will depend primarily upon my efforts and not those of Franchisor. | INITIAL:<br><br>*ML* |
| I acknowledge that I have had the opportunity to personally and carefully review the FDD and have, in fact, done so. I have been advised to have professionals (such as lawyers and accountants) review the documents for me and to have them help me understand these documents. I have also been advised to consult with other franchisees regarding the risks associated with the purchase of the Franchise. | INITIAL:<br><br>*ML* |
| Neither the Franchisor nor any of its officers, employees or agents (including any franchise broker) has made a statement, promise or assurance to me concerning any matter related to the Franchise (including those regarding advertising, marketing, training, support service or assistance provided by Franchisor) that is contrary to, or different from, the information contained in the FDD. | INITIAL:<br><br>*ML* |
| My decision to purchase the Franchise has not been influenced by any oral representations, assurances, warranties, guarantees or promises whatsoever made by the Franchisor or any of its officers, employees or agents (including any franchise broker), including as to the likelihood of success of the Franchise. | INITIAL:<br><br>*ML* |

Appendix B - 1

The Daily Pilates LLC
2024_04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

| I have made my own independent determination as to whether I have the capital necessary to fund the business and my living expenses, particularly during the start-up phase. | INITIAL:<br><br>*ML* |
|---|---|
| PLEASE READ THE FOLLOWING QUESTION CAREFULLY. THEN SELECT YES OR NO AND PLACE YOUR INITIALS WHERE INDICATED.<br><br>Have you received any information from the Franchisor or any of its officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted sales, revenues, income, profits or earnings of the Franchise (including any statement, promise or assurance concerning the likelihood of success) other than information contained in the FDD?<br><br>☐ Yes ☐ No (Initial Here: *ML*)<br><br>If you selected "Yes," please describe the information you received on the lines below:<br>_____<br>_____. | INITIAL:<br><br>*ML* |

Sign: _Michael Libretto_

Name: _Mike Libretto_

Capacity: Individually, and for and on behalf of
_TDPCharlotte1, LLC_

Appendix B - 2

The Daily Pilates LLC
2024_04 FDD | Ex. B - Franchise Agreement
1533.002.002/398469.9

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf



## Completed Document Audit Report
Completed with SignWell.com

### Title: TDP - Franchise Agreement (MikeLibretto)

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

Time Zone: (GMT+00:00) Coordinated Universal Time

### Files

TDP - Franchise Agreement (MikeLibretto).docx - 52 pages     Nov 19, 2024 18:14:18 UTC

### Activity

| | | | |
|---|---|---|---|
| 📄 | **THE DAILY PILATES** | created the document (thedailyatl@gmail.com) | Nov 19, 2024 18:15:06 UTC |
| | IP: 2600:1702:1360:e70:b542:6a59:6e40:1b20 | | |
| ✈ | **THE DAILY PILATES** | sent the document to franchise@thedailypilates.com | Nov 19, 2024 18:15:29 UTC |
| 👁 | **[Email ID]** | **franchise@thedailypilates.com** - first viewed document (franchise@thedailypilates.com) | Nov 19, 2024 18:16:02 UTC |
| | IP: 2600:1702:1360:e70:b542:6a59:6e40:1b20 | | |
| ✔ | **[Email ID]** | **franchise@thedailypilates.com** - completed the document (franchise@thedailypilates.com) | Nov 19, 2024 18:16:22 UTC |
| | IP: 2600:1702:1360:e70:b542:6a59:6e40:1b20 | | |
| ✈ | **THE DAILY PILATES** | sent the document to mlibretto@gmail.com | Nov 19, 2024 18:16:22 UTC |
| 👁 | **Michael Libretto** | first viewed document (mlibretto@gmail.com) | Nov 20, 2024 02:23:18 UTC |
| | IP: 2600:1004:a031:8f84:a5e4:d1d8:f189:3cd9 | | |
| ✔ | **Michael Libretto** | signed the document (mlibretto@gmail.com) | Nov 20, 2024 02:35:45 UTC |
| | IP: 2600:1004:a031:8f84:a5e4:d1d8:f189:3cd9 | | |
| ✈ | **THE DAILY PILATES** | sent the document to lily@thedailypilates.com | Nov 20, 2024 02:35:46 UTC |
| 👁 | **Lily Collins** | first viewed document (lily@thedailypilates.com) | Nov 20, 2024 13:41:07 UTC |

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

IP: 2600:1702:1360:e70:3dad:7a2c:5c2:c418

✔ **Lily Collins**     signed the document (lily@thedailypilates.com)     Nov 20, 2024
13:43:07 UTC

IP: 2600:1702:1360:e70:3dad:7a2c:5c2:c418

Document ID: 840ed6fe-e7a7-4f51-974d-3b009a608acf

# EXHIBIT 1-D

 **Clark Hill**

Binford Minter
T (678) 370-4384
F (678) 370-4358
Email:bminter@clarkhill.com

Clark Hill PLC
3630 Peachtree Rd NE
Ste. 550
Atlanta, GA 30326

November 19, 2025

***Via email and in-person delivery***

THE DAILY PILATES, LLC
LILY COLLINS
650 Killian Street
Atlanta, GA, 30312

900 Dekalb Ave. #600
Atlanta, GA, 30307

franchise@thedailypilates.com
lily@thedailypilates.com

copy: Michael R. Daigle
      Aaron-Michael Sapp
      Cheng Cohen, LLC
      363 West Erie Street
      Suite 500
      Chicago, Illinois 60654
      michael.daigle@chengcohen.com
      asapp@chengcohen.com

      Re:    Demand on behalf of TDPCharlotte1, LLC and Mike Libretto

Ms. Collins,

Our firm represents TDPCharlotte1, LLC and Mike Libretto (collectively, "Libretto" or "Our Clients"), who were induced into signing a franchise agreement with The Daily Pilates, LLC ("TDP") for a The Daily Pilates franchise in North Carolina on or about November 19, 2023. The purpose of this letter is to outline your violations of state laws, to rescind the franchise agreement, and to demand restitution for the harm you have caused Our Clients. Specifically, you have collectively violated 16 CFR Part 436 (the "FTC Franchise Rule"), North Carolina General Statute § 66-94, et seq. (the "North Carolina Business Opportunity Sales Act"), and North Carolina General Statute § 75-1, et seq. (the "North Carolina Unfair and Deceptive Trade Practices Act" or "NCUDTPA"). You, Ms. Collins, had direct knowledge of and involvement in the

unlawful acts which are discussed below, and therefore you will be personally named as a defendant in the likely event of litigation/arbitration.

As TDP has done with other franchisees, it, through Ms. Collins, sold Our Clients a The Daily Pilates franchise by intentionally making false and misleading financial performance representations based off a business Ms. Collins had operated since 2015 and a single franchisee that is materially different from the business opportunity sold to Our Clients. In 2023, when TDP first began selling a business opportunity to our clients, Ms. Collins represented in several conversations that Our Clients would realize $54,000 per month in revenue (which certainly exceeds the franchise fee of $40,000). She did not provide Our Clients with a Franchise Disclosure Document ("FDD") until the following year. In between the time that Ms. Collins provided Our Clients with the FDD and the date they signed the franchise agreement with TDP, TDP updated its FDD, but it did not provide the most recent version to Our Clients before they contracted with TDP for a business opportunity in North Carolina.

The FDD provided to Our Clients did not contain the cover sheet disclosure statement required by NC Gen. Stat. § 66-95. TDP also had not obtain a surety bond or establish a trust account in North Carolina when it sold a franchise to Our Clients as required by NC Gen. Stat. § 66-96. TDP also had not made the required filings with the North Carolina Secretary of State pursuant to NC Gen. Stat. § 66-97 when it induced Our Clients to sign the franchise agreement. TDP also has never had a registered agent in North Carolina and therefore did not identify an agent to receive service of process in the state on the Franchise Agreement, in violation of NC Gen. Stat. § 66-99. All of the foregoing actions and omissions are violations of the North Carolina Business Opportunity Sales Act, and therefore also violations of the North Carolina Unfair and Deceptive Trade Practices Act.

As stated above, TDP made unsubstantiated and/or false representations of income or earning potential outside of Item 19 of the FDD, which is prohibited under NC Gen. Stat. § 66-98. Our Clients have never come close to realizing the revenue projections made by Ms. Collins or in the FDD, and we have reason to believe the figures represented in Item 19 of the FDD were false or unsubstantiated. Instead, Our Clients' The Daily Pilates business has lost money every month it has been in operation. TDP also materially misrepresented the level of training and support that it would provide Our Clients. For instance, TDP never provided training to Our Clients before they opened for business, despite a promise to do so, and the marketing "support" (Our Clients pay 2% of their gross revenue to TDP's Marketing Fund) has been *harmful* to Our Clients' business. TDP insists on complete control of all marketing done online or in social media, yet it systematically denies or even refuses to even acknowledge requests for approval.

TDP and its founder have breached the franchise agreement and actively inhibited Our Clients' business in other ways. To wit:

- TDP constantly changes its operations manual without notice, then threatens default notices and fines for noncompliance;

- TDP promised to hold an in-person training for new teachers at Our Client's location, but cancelled the event without notice to Our Clients over pedantic and unreasonable objections to advertising for the event that had been proffered months in advance;
- Ms. Collins has told Our Clients they would have to, without compensation, fulfill her personal agreements to train potential employees, and has even held Our Clients responsible for drafting the agreements (having actually instructed them to create a binding contract using ChatGPT);
- TDP has consistently refused to approve social media posts by Our Clients in a timely matter, which directly led to a 20% drop of sales for the month of October;
- TDP refuses to post Our Clients' business phone number on their The Daily Pilates website hosted by TDP, feigning refusal due because the proposed voicemail did not meet TDP's approval; yet the affiliate location owned by Ms. Collins did not even have working voicemail when Our Clients last called the location;
- TDP has increased the costs it charges Our Clients for goods TDP requires Our Clients to purchase from TDP *after* those goods have been ordered;
- TDP's only known expenses from the Marketing Fund have been a) hosting an event in Florida, where TDP has no franchised or affiliate units, with an equipment provider, Bala, that gifted equipment to "influencers" who have no influence in Charlotte, NC; and b) hosting a "Marketing Event" in Charleston, SC, another state with no TDP presence, that was in truth a thinly disguised baby shower for Ms. Collins; and
- TDP insisted, approximately six months after Our Clients opened their business, that they switch from cash to accrual basis accounting as a way to hide their losses from other prospective franchisees, and when Our Clients refused, TDP informed them it would not offer them performance initiatives available to other franchisees.

In short, TDP and Ms. Collins fraudulently induced Our Clients to enter into Franchise Agreements, breached those Agreements, breached obligations of good faith and fair dealing, and violated state and federal laws in a variety of ways. As a direct and proximate result of your actions, Our Clients have suffered damages that will only increase with time, and they will seek treble damages, as allowed under the NCUDTPA, should we not resolve their claims out of court.

In the meanwhile, TDP having made untrue or misleading statements in the sale of a business opportunity and having otherwise violated the North Carolina Business Opportunity Sales Act, **Our Clients hereby give this written notice of their election to void the contract and receive all sums paid to TDP to date**, including chiefly the franchise fee of $40,000 paid to TDP. Our Clients will meanwhile gladly return all items purchased from TDP and completely remove TDP's trademark from its business in Charlotte, NC.

Our Clients are obviously prepared to litigate their claims aggressively, but they are open to resolving their claims out of Court. Our Clients therefore request mediation within thirty (30) days of your receipt of this letter. We look forward to your response.

Respectfully Yours,

CLARK HILL, PLC

*/s/ A. Binford Minter*
A. Binford Minter

*Counsel for TDPCharlotte1, LLC and Mike Libretto*

cc: Michael S. Rosenthal
   Mike Libretto

# EXHIBIT 1-E



Binford Minter
T (678) 370-4384
F (678) 370-4358
Email:bminter@clarkhill.com

Clark Hill PLC
3630 Peachtree Rd NE
Ste. 550
Atlanta, GA 30326

April 20, 2026

***Via Email***

Aaron-Michael Sapp
Cheng Cohen, LLC
363 West Erie Street
Suite 500
Chicago, Illinois 60654

      Re:    Previous Correspondence

Dear Aaron-Michael,

As you know from our letters sent on November 19, 2025, our firm represents TDP Charlotte1, LLC and Mike Libretto (collectively, "Libretto" or "Our Client"), a franchisee of your client The Daily Pilates, LLC, which is owned by your client, Ms. Lily Collins (collectively, "TDP"). In that letter, we demanded rescission of the franchise agreement between our respective clients and outlined TDP's numerous breaches of the franchise agreement.

To date, TDP has not responded to the demand for rescission nor taken any actions to cure the numerous material breaches of the franchise agreement. On the contrary, TDP has taken action to punish Our Client by approving another TDP franchisee in Charlotte, NC just outside Our Client's territory (after originally misleading Our Client about the location of the pending new franchisee); and TDP has been promoting it in a manner to actively undermine Our Client's business. His employees and clients who live closer to the newer franchisee have, in confusion, asked whether they can transfer to the new location. Furthermore, TDP has confirmed that it will offer discounted rates for new members at the new location at a price 25% cheaper than the current monthly rate allowed to be offered to new members at Our Client's business.

Additionally, since November:

- TDP continues to issue unannounced updates via the MindBody business management software platform, often with errors, thus hurting Our Client's ability to sell membership packages and charge customers and confusing his employees, thus making it more difficult to run the studio.

- TDP engages in deceptive trade practices by intentionally misleading expiration timelines on package sales, which harms the relationship between Our Client and his customers.

- TDP continues in its failure to provide meaningful support, failing even to attend two monthly support calls with Our Client.

- TDP continues in its refusal to provide any information on how the Marketing Fund/Brand Fee money is being used (no doubt because it continues to be misused to attract future franchisees with no benefit to existing franchisees).

- Our Client received a shipping invoice from Bala Bangles, Inc. ("Bala") this month for $500.00 in connection with an order for exercise equipment placed on July 10, 2025. However, Our Client never made any purchase directly from Bala. Instead, he purchased over $3,000 in equipment directly from TDP, and an invoice from TDP sent in August 2025 for the purchase indicated it was "Paid in Full." TDP should resolve this matter with Bala immediately so that it does not affect Our Client's credit rating.

- TDP, through Olivia Collins (Lily Collins' presumed elative and TDP's new "Marketing and Content Manager"), recently contacted Our Client's employees directly and without prior notice to Our Client to ask the employees to contribute content for use on TDP's Instagram page.

- TDP generally directs Our Client's employees, particularly his trainers, as TDP's own, while failing to provide training or instruction, which has led to resignations.

In summary, the material breaches of the franchise agreement continue to mount. I remind you that Our Client had grounds to rescind the franchise agreement and made demand to do so. I also remind you of the Litigation Hold notice we sent in November of last year. It should be obvious to TDP that Our Client is prepared to file suit, but he nonetheless remains hopeful that TDP will recognize the benefit of a mutually agreeable resolution out of court in contrast with the risks it faces in litigation (particularly given its weak legal position). We therefore seek a response from TDP by May 4, 2026, two weeks from the date of this letter.

Respectfully Yours,

CLARK HILL, PLC

*/s/ A. Binford Minter*
A. Binford Minter

*Counsel for TDP Charlotte1, LLC and Mike Libretto*

cc:     Michael S. Rosenthal
        Mike Libretto
        Tanya Nebo

# EXHIBIT 1-F



AARON-MICHAEL SAPP
asapp@chengcohen.com
P|312.243.1725
M|312.972.4424

May 13, 2026

<u>VIA EMAIL</u>

A. Binford Minter
Clark Hill PLC
3630 Peachtree Rd. NE, Ste. 550
Atlanta, GA 30326
bminter@clarkhill.com

      Re:     **Response to November 19, 2025 and April 20, 2026 Demand Letters (the "Demand Letters")**

Bin:

I write on behalf of The Daily Pilates, LLC ("TDP")[1] in response to the two Demand Letters regarding the franchise agreement between TDP, as franchisor, and TDP Charlotte1, LLC, as franchisee, and Mike Libretto, as personal guarantor (collectively, "Franchisee").

TDP did not respond to the first Demand Letter for the simple reason that Franchisee's demand for rescission is without legal or factual merit. The statutes that the Demand Letter cites either do not apply to the franchise sold to your clients or do not provide a private right of action. In any event, Mrs. Collins denies making the oral representations attributed to her in the letter. Indeed, since that time, Franchisee has continued to operate the franchised studio despite demanding rescission.

The contentions in the second Demand Letter fare no better. TDP, for example, retained the right to locate additional franchisees outside your client's territory and rejects the notion that its approval of a location outside your client's territory is now somehow unlawful. The rest of the allegations do not warrant much response, especially through counsel. These are mostly the types of day-to-day gripes that the parties should be able to resolve between themselves. For example, Franchisee argues, on the one hand, that TDP fails to provide meaningful support. On the other hand, Franchisee demands that Franchisor cease contact with Franchisee's employees.

Rather than following the Demand Letter's invitation to engage on each of the issues raised in the Demand Letters, my client requests a more practical solution. If your client is unhappy with the relationship, then Mrs. Collins would like to work out any disputes with the Franchisee directly. Yet every effort she has made to do so has been met with a response that all communications must go through the lawyers. This is not an efficient or effective way for resolving the types of disputes raised in the Demand Letters. Mrs. Collins respectfully requests that Franchisee contact her directly to schedule some time to talk through these issues. If the parties cannot resolve these disputes through such direct conversations, but are able to make some progress, then TDP may reconsider the request for mediation. If, however, Franchisee maintains its position that it is entitled to rescission and that all negotiations

---

[1] The letter is also addressed to TDP's founder Mrs. Lily Collins who joins in this response.

Case 3:26-cv-00550-KDB-DCK    Document 1-1    Filed 07/08/26    Page 298 of 299



must be done through lawyers, then TDP does not see any benefit to spending resources on mediation and rejects that proposal.

Sincerely,

**CHENG COHEN LLC**

Aaron-Michael Sapp

cc: The Daily Pilates, LLC